5,431,997

| | 5 | | | | | 6 | | |

1 percent by weight; at least 3–4 percent binder is preferably employed to impart adequate stiffness to the web to facilitate handling on commercial seam forming machinery. For conventional tea bags, a binder pick up of about 8–10 percent is preferred. With larger "family size" tea bags, as much as 15–20 percent binder pick up may be used.

The web material treated with a hydrophobic binder of the type described, while retaining its porosity, exhibits substantially no absorption characteristics. As mentioned, these are measured by a "water climb" test procedure that determines the rate of saturation of a web material by capillary action. In accordance with this procedure, a strip of treated material is cut to a specimen size of one inch by five inches. The strip is mounted on a support bar above a container, such as a 500 ml. beaker, so that the strip will be suspended within the beaker. The specimen is marked at $\frac{1}{2}$ inch and at $1\frac{1}{2}$ inches from the bottom of the specimen. The beaker is partially filled with distilled water to a level such that the bottom $\frac{1}{2}$ inch of the specimen will be immersed in the water. The time then is recorded for the water front to advance up the specimen to the $1\frac{1}{2}$" mark, a distance of one inch. The test is stopped at 400 seconds if the water front has not advanced sufficiently to complete the one inch climb on the specimen. The time is reported for the one inch travel of the water front. If the water front does not move above the level of the water in the beaker, a report of "no absorption" is recorded.

The water climb absorbency rate test has been correlated to the number of seam failures in a standard teabag of the flow through type. The purpose of the seam failure test is to assess the ability of a tea bag seam to maintain its integrity during forces exerted on it in a harsh brewing condition. In accordance with this test procedure, a teabag of the flow through type is inverted so that the "W" fold is extending in an upward direction and the head fold in a downward direction, with the tea located adjacent the head fold. The teabag so oriented is placed in the bottom of a beaker with the head fold facing down. Tap water is heated to a constant boiling condition and approximately 400 ml. of boiling water is poured directly onto the teabag with the stream of water being maintained on the bag throughout the pour to provide a maximum degree of water flow turbulence upon the bag. The time for pouring the boiling water onto the teabag should take about 3 seconds. The container then is examined for tea leaves discharged by the teabag. Thereafter, the bag is removed and examined at both the center fold and the head fold for any openings therein. If any of the following conditions are present, the seam is considered to be a failure:
 1. Tea leaves in the beaker;
 2. Opening of the center fold area;
 3. Opening of the head fold area.
Based on the foregoing, the determination is made as to either failure or non-failure of the seam.

Table 1 provides an indication of the direct relationship between the water climb value of papers treated with various binders and the percent of seam failures. The seam failures are based on a minimum of 20 teabags tested.

TABLE I

| | | Water Climb | | | | Seam Failure (%) |
|---|---|---|---|---|---|---|
| | | Cold Water | | Hot Water (100° C.) | | |
| | Binder | MD | CD | MD | CD | |
| A. | Viscose | 191 | 400+ | 72 | 262 | 30 |
| B. | Kymene/CMC | 35 | 69 | 46 | 70 | 50 |
| C. | Polyvinyl chloride | $\frac{1}{4}$"* | $\frac{1}{4}$"* | 292 | 370 | 75 |
| D. | Ethyl vinyl acetate | $\frac{1}{4}$"* | $\frac{1}{4}$"* | 303 | 400+ | 50 |
| E. | Ethyl acrylate copolymer | NA | NA | $\frac{1}{4}$"* | $\frac{1}{4}$"* | 0 |
| F. | Butyl acrylate copolymer | NA | NA | NA | NA | 0 |
| G. | Copolymer of ethyl and butyl acrylate | NA | NA | NA | NA | 0 |

*Extent of water climb in 400 seconds
NA = no absorption

When the web material made with binder G was further treated with a surfactant, water climb values of 10 to 20 seconds were obtained coupled with 10 percent seam failures, thus indicating that the hydrophobic character of the binder as measured by the water climb was the significant factor in the seam failure results.

Measurements were also made to compare the time for the first color to appear in a tea brew using web materials with different binders. When samples B and F were compared, the first color infusion time varied by only 0.2 seconds with sample B having an infusion first color time of 6.7 seconds.

As mentioned, the hydrophobic agent used to treat the web material may also be applied to a prebonded sheet to achieve the beneficial result of the present invention. In accordance with this embodiment of the invention, the hydrophobic treating agent may be any of a number of fluid-repellent materials, such as silicones, fluorohydrocarbons, parafins, alkyl ketene dimers, stearylated materials and the like. The silicones may be any of those materials mentioned in U.S. Pat. No. 3,386,834, the disclosure of which is incorporated herein by reference. The silicone pick up varies from 10–30 percent by weight. Where a fluorochemical treating agent is employed, it should, of course, meet the standards for use with foods and beverages and preferably should be in the form of an aqueous emulsion for ease of application. A typical aqueous emulsion formulation contains about 0.7 to 1.5 parts by volume of a fluorohydrocarbon for each hundred parts of water and may employ materials such as the Scotchban treating agent sold by Minnesota Mining and Manufacturing under the designation "FC-809" or "FX-845". Other fluorohydrocarbon materials that can be employed include the DuPont material designated Zonyl RP or NF. The parafin and stearylated materials include those sold by Sequa Chemicals Company under the tradename Sequapel, such as Sequapel 414 and 417, while the alkyl ketene dimers are exemplified by Hercon 70 sold by Hercules Chemical Company.

Where a material using viscose binder, as shown in sample A of Table I, was saturated with a solution containing 0.3 percent of a fluorohydrocarbon, the water climb values for both hot and cold water were comparable to samples F and G, namely no absorption. A similar situation was evidenced when a web containing binder B of Table I was saturated with an emulsion containing 25 percent silicone (a mixture of methyloxypolydimethyl siloxane and polydimethyl siloxane sup-

5,431,997

| 7 | 8 |

plied by General Electric under the name Silicone II). The same result is achieved when the web material using binder B is treated with a fluorohydrocarbon at a fluorocarbon treatment level of 0.3 percent. This material also exhibits no seam failures although the appearance of first color is slightly slower.

As will be appreciated, the repellent may be added as a separate treatment to a bonded web material or may be added to the conventional binder to be applied simultaneously therewith to the web material.

As can be seen from the foregoing, the present invention provides infuser web material possessing improved mechanical seam integrity as a result of impregnating the web with a hydrophobic treating material in a latex dispersion. The latex may be used as a replacement for binder systems used heretofore or as a supplement thereto.

As will be apparent to persons skilled in the art, various modifications and adaptations of the web material above described will become readily apparent without departure from the spirit of the invention.

We claim:

1. A fibrous web suited for making infusion packages for brewing beverages and exhibiting improved resistance to the failure of a mechanical seam therein, said web comprising a porous fibrous sheet material impregnated throughout its extent with about one percent or more by weight of a hydrophobic treating system comprising a cured hydrophobic agent selected from the group consisting of high molecular weight cross-linked acrylic polymers, silicones, fluorohydrocarbons, paraffins, alkyl ketene dimers and stearylated materials, the impregnated sheet material exhibiting no appreciable water climb when measured using water at a temperature of about 100° C. and no substantial loss of infusion characteristics while providing less than 10 percent failure in the mechanical seam upon exposure to boiling water.

2. The infusion web of claim 1 wherein the hydrophobic agent that completely impregnates the entire web material comprises at least 3-4 percent by weight of the web material.

3. The infusion web of claim 1 wherein the hydrophobic agent is a high molecular weight alkyl acrylate strength imparting hydrophobic binder.

4. The infusion web of claim 3 wherein the hydrophobic binder is selected from the group consisting of ethyl acrylate and butyl acrylate polymers and copolymers.

5. The infusion web of claim 1 wherein the hydrophobic agent comprises up to about 8-12 percent by weight of the web material and the mechanical seam failure of the web is less than one percent.

6. The infusion web of claim 1 wherein the hydrophobic agent is a strength imparting hydrophobic binder comprising a high molecular weight cross-linked butyl acrylate copolymer.

7. The infusion web of claim 1 wherein the hydrophobic agent is a hydrophobic strength imparting binder completely impregnating the entire web material and imparting sufficient resistance to wetting to eliminate the water climb of the fibrous sheet material, the hydrophobic binder exhibiting an affinity for being readily absorbed into the fibers of the web, the binder being a high molecular weight cross-linked alkyl acrylate polymeric material.

8. The infusion web of claim 1 wherein the fibrous sheet material contains a strength imparting binder other than the hydrophobic agent.

9. The infusion web of claim 8 wherein the hydrophobic agent comprises from 0.3 to 30 percent by weight.

10. A process for producing porous web materials for making infusion packages having enhanced mechanical seam integrity comprising the steps of providing a porous absorbent web material suited for use as an infusion package, treating the entire web material with an aqueous emulsion of a hydrophobic agent selected from the group consisting of high molecular weight cross-linked acrylic polymers, silicones, fluorohydrocarbons, paraffins, alkyl ketene dimers and stearylated materials to provide a treated web that exhibits no appreciable water climb when measured using water at a temperature of about 100° C. and less than 10 percent failure in a mechanical seam therein when exposed to boiling water.

11. The process of claim 10 wherein the aqueous emulsion of the hydrophobic agent exhibits an affinity for being readily absorbed into the fibers of the web and the process includes the step of subsequently insolublizing the agent on the web.

12. The process of claim 10 wherein the hydrophobic agent is a cross-linked high molecular weight acrylic polymer which also acts as a strength imparting hydrophobic binder, the hydrophobic agent imparting resistance to aqueous absorption as measured by water climb and exhibiting an affinity for being readily absorbed into the fibers of the web, the treating step comprising a saturating treatment and the process includes the step of subsequently drying the treated web material.

13. The process of claim 12 wherein the binder is a latex dispersion of an alkyl acrylate, the latex binder being present in an amount sufficient to provide a binder pick up by the web of at least 3-4 percent by weight.

14. The process of claim 10 wherein the fibrous sheet material is soft, tissue weight material, the process including the step of treating the web with a binder in addition to the hydrophobic treating agent, said agent exhibiting an affinity for being readily absorbed into the fibers of the web, said hydrophobic agent being applied as a latex dispersion in an amount sufficient to impart a hydrophobic agent pick up of about 0.3 to 30 percent by weight.

15. The process of claim 10 wherein the fibrous sheet material is a prebonded, light weight, highly wettable material and the hydrophobic agent imparts complete resistance to wetting as measured by water climb, the hydrophobic agent exhibiting an affinity for being readily absorbed into the fibers of the web and being applied by a size press.

16. The process of claim 10 wherein the hydrophobic treating agent completely impregnates the web material as the web material is being treated with a strength imparting binder.

* * * * *

Exhibit B

## AGREEMENT

THIS AGREEMENT ("Agreement") is made as of this 24th day of September, 1999, (the "Effective Date") by and between Dexter Corporation, a Connecticut corporation with its principal place of business in Windsor Locks, Connecticut ("Dexter"); and Schoeller & Hoesch, NA, Inc., a Delaware corporation with its principal place of business in Summerville, South Carolina, and P.H. Glatfelter Company, a Pennsylvania corporation with its principal place of business in Spring Grove, Pennsylvania, (collectively "S&H").

WHEREAS, disputes have arisen between Dexter and S&H, regarding among other things, S&H's infringement of U.S. Patent No. 5,431,997, ("the Dexter Patent"); and

WHEREAS, Dexter and S&H seek to resolve the dispute between them on the terms and conditions set forth herein;

NOW, THEREFORE, Dexter and S&H agree as follows:

1. (a) "Dexter" shall mean Dexter Corporation and its subsidiary corporations, business and operating units, trusts, partnerships, licensees, and affiliates, and the shareholders, directors, trustees, officers, agents, employees, partners, principals, representatives, counsel, heirs, beneficiaries, executors, administrators, predecessors, successors and assigns of any of them, and each of them; and

    (b) "S&H" shall mean both Schoeller & Hoesch, NA, Inc., and P.H. Glatfelter Company, and their parent and subsidiary corporations, business and operating units, trusts, partnerships, licensees, affiliates, and the shareholders, directors, trustees, officers, agents, employees, partners, principals, representatives, counsel, heirs, beneficiaries, executors, administrators, predecessors, successors, and assigns of any of them, and each of them.

2. In return for the release granted below, S&H agrees that until the Dexter Patent expires or is held invalid or unenforceable by a court of competent jurisdiction, it will not make, have made, use or sell in the United States of America

    (a) "S&H Grade 012/RL-T" and/or "S&H Grade 212/LEUT" products, either under the present designation or any other designation; or

    (b) fibrous web materials for making infusion packages for brewing beverages as covered by one or more claims of the Dexter Patent.

-2-

3. Dexter and S&H hereby mutually release and forever discharge each other from any and all claims, demands, and rights of action, whether known or unknown, which either Dexter or S&H may have relating to the Dexter Patent or arising from or in connection with actions relating to the Dexter Patent, which claims arose or are based on acts which occurred prior to the Effective Date. Nothing in this Agreement shall release S&H from any claim of any nature arising from any activity whatsoever undertaken or performed after the date of the execution of this Agreement.

4. This Agreement may be executed in multiple counterparts, which together shall have the force and effect of a single, fully-executed document. This Agreement shall not be supplemented, modified, amended or changed in any manner except in a writing signed by a duly-authorized representative of each party to this Agreement.

5. This Agreement is to be interpreted and enforced under the laws of the State of Connecticut as a contract under seal made in, and to be performed within, said state, without regard to the choice of law or conflict of laws principles of Connecticut or any other jurisdiction. The parties agree to submit exclusively to the jurisdiction of the state or federal courts in Connecticut, and to bring only to such courts any issues arising out of a breach of or to enforce any provision of this Agreement, or relating to the Dexter Patent.

-3-

IN WITNESS WHEREOF, the parties have signed this Agreement through their duly-authorized representatives as of the date first set forth above.

DEXTER CORPORATION

By: _____

Title: Vice President

Date: 25. 11. 1999

P.H. GLATFELTER COMPANY

By: _____

Title: Associate Counsel - Assistant Secretary

Date: September 24, 1999

SCHOELLER & HOESCH, NA, INC.

By: _____

Title: General Manager

Date: October 6, 1999

g:\word\jd\glatfelteragreement.doc