IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

AHLSTROM WINDSOR LOCKS LLC,         :
                                    :
            Plaintiff               :   CASE NO. 3:03-CV-0169-AVC
                                    :
v.                                  :
                                    :
SCHOELLER & HOESCH, NA, INC.,       :
                                    :
    and                             :
                                    :
P. H. GLATFELTER COMPANY            :
                                    :
            Defendants              :   MAY 17, 2004

### DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINITFF'S FIRST MOTION TO COMPEL

Pursuant to Local Rule 7(a), the defendants, Schoeller & Hoesch, NA, Inc. and P. H. Glatfelter Company (collectively, "Defendants"), hereby object to the First Motion to Compel filed by the Plaintiff, Ahlstrom Windsor Locks LLC ("Plaintiff") on April 26, 2004.

Plaintiff's motion should be denied for several reasons. First and foremost, counsel for the parties long ago reached an agreement that excluded from the permissible bounds of discoverable subject matter a portion of the very documents and information which Plaintiff now seeks. Second, even absent the agreement among counsel, Plaintiff's motion seeks information that is wholly irrelevant to this litigation, including but not limited to grades of paper that Plaintiff has already conceded are not at issue in this litigation. Third, as to subject matter that the parties have agreed <u>was</u> properly discoverable for the grades of Defendants' paper that remain at issue, Plaintiff already possesses the information it now claims to be without.

Plaintiff's motion seeks "the test records or test data sheets concerning Defendants' accused products" dating from at least as early as 1997 to the present, including "any experimentation, testing or analysis." Memorandum in Support of Plaintiff's First Motion to

Compel Production of Documents, pgs. 1, 4 (hereinafter referred to as "Plaintiff's Memo"). The data which Plaintiff seeks includes results for the "'water climb test,' the 'seam failure test' ('bag bursting test') and the 'infusion test'." Plaintiff's Memo, p. 4. Plaintiff has already agreed that such data developed prior to the September 24, 1999 Agreement between the parties (hereinafter referred to as the " '99 Agreement") is "off limits" for purposes of discovery in this case. As to data developed after the '99 Agreement, Plaintiff has already been provided with an abundance of such data. Accordingly, the Plaintiff's motion should be denied.

I. **COUNSEL FOR THE PARTIES PREVIOUSLY REACHED AN AGREEMENT PROHIBITING DISCOVERY RELATIVE TO THE VERY SUBJECT MATTER WHICH PLAINTIFF NOW SEEKS VIA ITS MOTION TO COMPEL.**

    A. **BACKGROUND LEADING TO COUNSELS' AGREEMENT.**

This is not the first time the parties have disagreed on the scope of permissible discovery relating to information that predates the '99 Agreement (which encompasses a portion of the material Plaintiff is seeking in its Motion to Compel). At least as early as July 22, 2003, Defendants objected to producing any documents or information for the time period prior to September 24, 1999 (hereinafter that date will be abbreviated as "9/24/99"), including any testing data or other similar technical information regarding any of Defendants' products developed prior to that date. See letter dated July 22, 2003, from Marc Farrell (counsel for Defendants) to Myron Cohen[1] (counsel for Plaintiff), attached hereto as Exhibit 1.

In response to the July 22, 2003 letter, counsel for Plaintiff indicated that it was prepared to file a Rule 37 motion to compel but wanted to first discuss the matter in order to see if the

---

[1] It should be noted that Attorney Cohen is no longer involved in this case, having withdrawn due to an illness. Attorney Cohen's replacement, Sidney Bresnick, was therefore not involved in the discovery agreement that was reached among counsel, and did not participate in the conference call during which defense counsel's bases for requesting restrictions on pre-9/24/99 discovery were discussed.

dispute could be resolved. See letter dated July 23, 2003, from Attorney Cohen to Attorney Farrell, attached hereto as Exhibit 2. It was out of the ensuing telephone conference that the agreement among counsel referred to in Plaintiff's Memo arose.

Plaintiff correctly reproduces the terms of the agreement among counsel. However, the interpretation which Plaintiff now attempts to associate with those terms goes far beyond the understanding that was reached, and far beyond the plain meaning of the terms of the agreement itself.

**B.    PLAINTIFF'S MOTION TO COMPEL IS IN DIRECT CONTRAVENTION OF THE PLAIN MEANING OF THE TERMS OF THE AGREEMENT AMONG COUNSEL, AND THEREFORE MUST BE DENIED.**

It was agreed among counsel that discovery was permissible as to documents and information between July 11, 1995 and September 24, 1999 only with regard to three discrete areas. See e-mail from Yunling Ren (counsel for Plaintiff) to Attorney Farrell, attached as Exhibit J to Plaintiff's Memo. As explained below, the testing records or test data sheets which Plaintiff now seeks clearly do not in any way relate to or otherwise fall within any of those three areas (hereinafter referred to as the "Pre-9/24/99 Permissible Areas").

The first Pre-9/24/99 Permissible Area deals with documents and things relating to the validity and enforceability of Plaintiff's '997 Patent. Plaintiff does not even attempt to explain in its Memo how testing data done on Defendants' products prior to 9/24/99 is somehow relevant to the validity and/or enforceability of the '997 Patent, because no such explanation exists. The same holds true for the second Pre-9/24/99 Permissible Area, i.e., there is absolutely no connection between Defendants' pre-9/24/99 testing data and "the scope and/or content of any claim in the '997 Patent." Plaintiff admits as much by making no argument to the contrary.

As to the third and final Pre-9/24/99 Permissible Area ("the infringement or non-infringement of one or more claims of the '997 Patent by any products"), the '99 Agreement itself makes Defendants' activities - including test records related to products prior to 9/24/99 - completely irrelevant to the issue of infringement. By its very nature, the '99 Agreement puts the parties in a situation whereby Defendants can only be liable for infringement, if at all, for acts occurring **after** 9/24/99. As such, there is absolutely no justification for Plaintiff's request for testing data as it relates to the third Pre-9/24/99 Permissible Area, infringement or non-infringement of the '997 Patent.

Therefore, since any testing data which Plaintiff seeks from the time period prior to 9/24/99 does not fall within any of the three permissible areas agreed upon by counsel for documents and information preceding the '99 Agreement, Plaintiff's First Motion to Compel should be denied as to that subject matter.

**C.    IT IS CLEAR THE INTERPRETATION PLAINTIFF NOW SEEKS TO ASSOCIATE WITH THE TERMS OF THE AGREEMENT AMONG COUNSEL COULD NOT POSSIBLY REFLECT THE UNDERSTANDING THAT WAS REACHED AT THE TIME OF THE AGREEMENT.**

That the testing data sought by Plaintiff's motion (at least as far as it relates to information preceding the '99 Agreement) was outside the scope of the limited Pre-9/24/99 Permissible Areas agreed upon by the parties' counsel is further evidenced by Attorney Farrell's response to Attorney Ren's e-mail setting forth the proposed terms of the agreement. See Exhibit K attached to Plaintiff's Memo. In his August 8, 2003 e-mail responding to Attorney Ren, Attorney Farrell noted that to the extent there were any documents falling within the three Pre-9/24/99 Permissible Areas, most if not all of them would be privileged. Clearly it would be unreasonable to treat as privileged testing data developed by a client, without any attorney involvement, many

years prior to any litigation. Moreover, if Plaintiff's counsel truly believed at the time of the August 8 exchange of e-mails that pre-9/24/99 test data was open to discovery, i.e., fell within the scope of one or more of the Pre-9/24/99 Permissible Areas, then certainly one would have expected Attorney Farrell's prediction of privileged status to have elicited some sort of objection from opposing counsel. Yet as evidenced by Attorney Ren's subsequent response of August 8, 2003 (see Exhibit K, Plaintiff's Memo), no such objection was lodged.

It is only now, after Plaintiff's counsel has for whatever reason determined that the agreement it entered into no longer suits Plaintiff's needs, that Plaintiff suggests a wholly different interpretation of its terms. If Plaintiff's interpretation is accepted, one must then ask: Exactly what types of documents was the agreement among counsel designed to exclude from the permissible bounds of discovery? Clearly there must have been *some* type(s) of information that counsels' agreement was designed to preclude. Under Plaintiff's interpretation, what documents would Defendants legitimately be entitled to exclude from production? The answer is none. To adopt Plaintiff's interpretation would be to completely ignore counsels' agreement, making it as if there never was such an agreement. The fact that Plaintiff now regrets having made the agreement is no basis for this Court to undo the bargain which Plaintiff's counsel struck.

## II. EVEN ABSENT THE AGREEMENT AMONG COUNSEL, PLAINTIFF'S MOTION TO COMPEL SEEKS INFORMATION THAT IS WHOLLY IRRELEVANT TO THIS LITIGATION.

For at least two reasons, denial of Plaintiff's Motion would be proper even if the parties' counsel had not reached the agreement alluded to above in Section I limiting certain discovery.

First, as to information which Plaintiff's Motion seeks from the time period preceding the

'99 Agreement, such information is irrelevant to the issue of whether or not Defendants sold or offered for sale in the U.S. one or more products covered by the claims of the '997 Patent after 9/24/99.

In addition, it is undisputed that Defendants do not "make" or "use" any tea bag papers in the U.S., and therefore the only potential acts of infringement as defined in 35 U.S.C. § 271[2] at issue in this case are "offers to sell" or "sales" in the U.S. Likewise, pursuant to the '99 Agreement, Defendants agreed not to "make, have made, use or sell in the United States of America" two specifically-identified grades as well as any grade that fell within the scope of any claim of the '997 Patent. Thus, for purposes of Plaintiff's breach of contract claim, only the act of actually selling in the U.S. is at issue. Plaintiff's motion, however, acknowledges no such limitations, instead boldly demanding information regarding "products Defendants *developed* prior to the ['99] Agreement." Plaintiff's Memo, p. 4 (emphasis added). Such a request would encompass, for example, products made in Europe but never offered for sale or sold in the U.S.

Second, as to information developed after the '99 Agreement, Plaintiff's motion seeks testing data for grades that it conceded months ago were not properly the subject of its Complaint in this action.

### A. THE '99 AGREEMENT PREVENTS PLAINTIFF FROM CHALLENGING AS IMPERMISSIBLE ACTS COMMITTED BY DEFENDANTS PRIOR TO 9/24/99, AND THUS TESTING DATA AND THE LIKE REGARDING PRE-9/24/99 PRODUCTS IS NOT RELEVANT TO THIS CASE.

It was (and is) Defendants' position that the '99 Agreement explicitly put to rest "any and

---

[2] 35 U.S.C. § 271 ("Infringement of patent") states in pertinent part:

(a) Except as otherwise provided in this title, whoever without authority **makes, uses, offers to sell, or sells any patent invention, within the United States or imports into the United States any patented invention during the term of the patent therefore, infringes the patent.**" (emphasis added)

all claims, demands, and rights of action, whether known or unknown, which either [Plaintiff] or [Defendants] may have related to the Dexter Patent or arising from or in connection with actions relating to the ['997] Patent or arising from or in connection with actions relating to the ['997] Patent, which claims arose or are based on acts which occurred prior to the Effective Date [September 24, 1999]."  See Exhibit 1 attached hereto; see also the '99 Agreement, attached to Plaintiff's Memo as Exhibit B.  The '99 Agreement "wiped the slate clean" between the parties as to pre-9/24/99 acts of Defendants.

Therefore, by its very nature, the '99 Agreement makes it impossible for Defendants to be found guilty of making a product covered by one or more claims of the '997 Patent, thus making testing data as to <u>all</u> pre-9/24/99 products wholly irrelevant to this litigation.  Further, any such allegedly infringing acts prior to 9/24/99 could not possibly constitute a breach of an agreement that, until 9/24/99, did not even exist.

### B. PLAINTIFF'S MOTION SEEKS INFORMATION FOR GRADES OF PAPER THAT PLAINTIFF HAS ALREADY CONCEDED ARE NOT AT ISSUE IN THIS CASE.

Aside from the temporal issues raised by the '99 Agreement and the agreement among counsel, Plaintiff's Motion seeks information (both pre- and post-9/24/99) for grades of paper that Plaintiff has conceded are not at issue in this case.

Plaintiff seeks, *inter alia*, testing data relating to Defendants' grades 012/RL, 212/L, 212/LU (also known as 212/LGU), 213/L, 212/LTA, 212/RLTA, 012/RL-T and 212/LEUT.  Of those grades, Plaintiff has conceded - after repeated insistence from the outset of this case by Defendants that grades containing no binder were completely irrelevant to this case - that it was not challenging grades 012/RL, 212/L, 212/LU (212/LGU) and 213/L as falling within the scope

of any of the claims of the '997 Patent.[3] See Plaintiff's supplemental Response to Interrogatory No. 1, January 26, 2004 (attached hereto as Exhibit 3), wherein Plaintiff identified the allegedly infringing grades as 212/LTA, 212/LTA-NA, 212/RL-TA, 213/RL-TA and 214/LTA.

Defendants utilize the letter "T" in their grade designations to indicate the addition of a binder system to the paper during its manufacture. Therefore, Defendants respectfully request that at a minimum Plaintiff's motion be denied to the extent it seeks any testing data (whether before or after 9/24/99) for grades that do not contain binder, i.e., that do not have a "T" in the grade designation.

## III. PLAINTIFF IS ALREADY IN POSSESSION OF AN EXTENSIVE AMOUNT OF THE INFORMATION IT SEEKS.

It is hard to fathom how Plaintiff can possibly represent to this Court that it only has in its possession seven sheets of the relevant test results. See Plaintiff's Memo, p. 6 (fn. 2). In fact, the reality is that Plaintiff has been provided with hundreds and hundreds of pages of Defendant's technical data, included within which are the very test results which Plaintiff seeks in its Motion to Compel.

### A. THE GRADES AT ISSUE.

#### 1. Defendants Have Sold Only One Binder-Containing Grade of Tea Bag Paper Into the U.S. Since the '99 Agreement.

The only grade of binder-containing tea bag paper which Defendants have sold in the U.S. since the '99 Agreement is 212/LTA. See Deposition of Gerhard Slawik, January 14, 2004, at 40:5-9 (hereinafter referred to as "Slawik Dep., Vol. I", relevant portions of which are attached

---

[3] This concession was not made, however, until well after Defendants had gone to the time and expense of producing many hundreds of pages of highly sensitive, confidential technical information related to the now-uncontested grades. This was done not because Defendants believed such information was in any way relevant, but

hereto as Exhibit 4). The first sale of Grade 212/LTA into the U.S. occurred in January 2002. See Deposition of Gerhard Slawik, February 17, 2004, at 22:3 to 24:8 (hereinafter referred to as "Slawik Dep., Vol. IV", relevant portions of which are attached hereto as Exhibit 6). In April 2003, Defendants internally changed the designation for the grade 212/LTA it was supplying to North America to "212/LTA-NA," although externally Defendants' customers in the U.S. continued to receive the paper under the designation 212/LTA. See Deposition of Gerhard Slawik, January 15, 2004, at 104:3-13 (hereinafter referred to as "Slawik Dep., Vol. II", relevant portions of which are attached hereto as Exhibit 5); see also Deposition of Gerhard Slawik, February 18, 2004, at 40:8-14 (hereinafter referred to as "Slawik Dep., Vol. V", relevant portions of which are attached hereto as Exhibit 7).

### 2. **Defendants Have Sampled on a Trial Basis Several Other Binder-Containing Grades of Tea Bag Paper Into the U.S. Since the '99 Agreement.**

The remaining binder-containing grades of Defendants at issue in this litigation have only been offered for sale in the U.S. For example, Grade 213/RL-TA was sampled to customers in the U.S. in 2002, but never sold in the U.S. See Exhibit 5 (Slawik Dep., Vol. II at 115:21 to 116:8).

### B. A PORTION OF THE DATA PLAINTIFF SEEKS DOES NOT EXIST.

Plantiff's Memo suggests that all of the data which it seeks ought to have been accumulated by Defendants, and further suggests that there should be an abundance of such data. That is simply not the case.

---

rather out of an abundance of caution, and to avoid involving the Court in yet another one of the parties' discovery disputes.

Plaintiff fails to point out that the tests for which it seeks results were not necessarily performed in the same way by Defendants as they would have been by the Plaintiff. For example, Defendants employed a "wettability" test that is substantially different from the so-called "water climb" test described in the '997 Patent. See Exhibit 7 (Slawik Dep., Vol. V at 104:22 to 105:20). Specifically, Defendants' "wettability" test involves placing the tea bag "flat" or horizontal (so that it lays on its side) in a beaker filled with water, and then seeing how much time elapses until the water soaks completely through the bag. See Exhibit 7 (Slawik Dep., Vol. V at 100:1 to 102:24). There is nothing at all similar to Defendants' wettability test in the '997 Patent. Therefore, wettability test results would be wholly irrelevant to establishing whether or not Defendants infringed the '997 Patent or breached the '99 Agreement.

In addition, the tests which Plaintiff alleges were "standard" tests performed by Defendants were in some instances only sporadically performed. Further, as to those tests which were in fact more regular, it was only very recently - not dating nearly as far back as 1997 or even 1999 as Plaintiff suggests - that it became routine practice for Defendants to conduct such tests.

As of March 2003, Defendants did not, on a regular basis, perform bag burst tests or wetting time tests. See Exhibit 7 (Slawik Dep., Vol. V at 11:7-22). It was not until closer to the middle of 2003 that Defendants began to run bag burst tests and wetting time tests on a regular basis, and even then those tests were performed only on grade 212/LTA-NA. See Exhibit 7 (Slawik Dep., Vol. V at 12:8-24).

Similarly, prior to the middle of 2003 the "water climb" test described in the '997 Patent was not regularly performed by Defendants. See Exhibit 7 (Slawik Dep., Vol. V at 21:12 to

22:1). Even then, once the water climb test became a "standard" test in mid-2003, it was only a regular practice for Defendants to test for it with regard to the North American market, and primarily with regard to Defendants' customer Redco Foods. See Exhibit 7 (Slawik Dep., Vol. V at 22:15-24). Therefore, the Court should not be misled into thinking Defendants are in possession of a vast quantity of the data which Plaintiff seeks.

### C. PLAINTIFF POSSESSES HUNDREDS OF PAGES OF TECHNICAL INFORMATION REGARDING DEFENDANTS' GRADES, WITHIN WHICH IS CONTAINED THE VERY DATA WHICH PLAINTIFF SEEKS.

Defendants have produced all of the recipe variations for its Grade 212/LTA, up through and including February 2004 (document nos. SH 1734-1755). See Exhibit 7 (Slawik Dep., Vol. V at 53:3-21). Defendants have further produced all of the recipe variations for its Grade 212/LTA-NA from that grade's inception in April 2003 up through and including February 2004 (document nos. SH 1756-1761). See Exhibit 7 (Slawik Dep., Vol. V at 48:17-20). A sample recipe sheet for Grade 212/LTA-NA (effective as of November 18, 2003) is attached hereto as Exhibit 8 (document no. SH 1761). This example shows the very detailed information that is presented regarding the grade's chemical make-up. Similar recipe information has been provided to Plaintiff for the other binder-containing grades offered for sale (but not sold) in the U.S. since the '99 Agreement.

In addition, for each "batch" or "making" of the foregoing grades (also sometimes referred to as a "run" or "production run"), Defendants have produced a "Laufkarte", i.e., a S&H record essentially consisting of detailed instructions for how to go about producing each batch. An example of one of the "Laufkarte" for Defendants' batch number 23330 (made using the

recipe shown in Exhibit 8) is attached hereto as Exhibit 9 (document nos. D 1211-1213). This shows the very detailed information that is presented therein.

Along with each "Laufkarte," Defendants have produced very detailed production data from each "making," including, *inter alia*, production data for all 212/LTA-NA makings that were sold to the U.S. from that grade's inception (April 2003) through and including the January 2004. See Exhibit 7 (Slawik Dep., Vol. V at 45:18-25). These production run printouts contain the very data which Plaintiff seeks (which has been fully explained to the Plaintiff).

For example, attached hereto as Exhibit 10 is the production printout (document nos. D 1214-1225) corresponding to the "Laufkarte" shown in Exhibit 9. On page D 1220, in the far right-hand column is the heading "bpla-auf". The letters "bpla" stand for "beutelplatzer" (or "bag burst"), and "auf" means "open". What is recorded in this column is the number of tea bags (out of six) made of paper from batch 23330 which burst open when subjected to a bag burst test (in this case, two bags came open, as shown by the numeral "2" underneath that column). Similarly, on page D 1223 in the third column from the left under the heading "bpla-zu", data is recorded for the number of tea bags which remained closed ("zu") (which in this case was four bags, as shown by the numeral "4" underneath that column).

Likewise, each production run printout includes data for wettability (shown in the example on page D 1223 of Exhibit 10 under the column "benzeit s" which is an abbreviation for "benetzungszeit," meaning "wetting time," measured in seconds) as well as data for the water climb test (shown in the four columns immediately to the right of the wetting time column on

page 1223)[4]. In this particular instance, batch 23330 demonstrated water climb values in hot water (95°C) of 25 and 22 millimeters.

## IV. CONCLUSION

Plaintiff has been provided with recipe sheets, Laufkarte, and production run printouts (within which bag burst, wettability and water climb data are contained) for each "making" sold or offered for sale in the U.S. since the '99 Agreement for all of the grades at issue. While this data has been explained at great length throughout the course of nearly 100 hours of depositions of Defendants' employees (including approximately 24 hours of testimony from Gerhard Slawik alone), it would seem as though - given Plaintiff's assertion that it only has seven sheets of the data it seeks - Plaintiff does not understand or has not bothered to read closely the hundreds upon hundreds of pages of technical information which Defendants have produced. Plaintiff's Motion to Compel is wholly without merit, and as such, should be denied in its entirety and costs awarded to Defendants related to its opposition of the motion.

---

[4] "Sgh" is an abbreviation for "saughoehe," meaning "water climb." The letter "l" immediately following "Sgh" is an abbreviation for "laengs," meaning "machine direction" or "MD" for short, and the letter "q" immediately following "Sgh" is an abbreviation for "quer," meaning "cross direction" or "CD" for short. The notation "23Gr" means 23°C, i.e., the water climb test performed using "cold" water, and "95Gr" means 95°C, i.e., the water climb test using "hot" water.

-14-

Attorneys for Defendants,
Schoeller & Hoesch, NA, Inc. and
P. H. Glatfelter Company

By _____
Dina S. Fisher (ct 14896)
280 Trumbull Street
Hartford, CT 06103-3597
Tel. No.: (860) 275-8200
Fax No.: (860) 275-8299
dfisher@rc.com

Marc J. Farrell (ct 24539)
BUCHANAN INGERSOLL PC
213 Market Street, 3rd Floor
Harrisburg, PA 17101-2121
(717) 237-4820
farrellmj@bipc.com

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was served by means of facsimile (without attachments) and federal express, on this the 17th day of May, 2004, upon the following:

> Sidney R. Bresnick, Esquire
> Yunling Ren, Esquire
> Cohen, Pontani, Lieberman & Pavane
> 551 Fifth Avenue
> New York, NY  10176
>
> Basam E. Nabulsi, Esquire
> Alexandra Stevens, Esquire
> McCarter & English LLP
> Four Stamford Plaza
> 107 Elm Street, 9th Floor
> Stamford, CT  06902

_____
Dina S. Fisher