UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| AHLSTROM WINDSOR LOCKS LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 3:03-CV-0169 (AVC) |
| | ) |
| SCHOELLER & HOESCH, N.A., INC. and | ) |
| P.H. GLATFELTER COMPANY, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL
COMPLIANCE WITH THE SUBPOENA OF ALIX, YALE & RISTAS**

**I.        PRELIMINARY STATEMENT**

Schoeller & Hoesch, N.A., Inc. and P. H. Glatfelter Company ("Defendants")

have moved the Court for an order compelling Ahlstrom Windsor Locks, LLC ("Ahlstrom" or

"Plaintiff") to comply with a subpoena served on or about March 3, 2004, on the law firm of

Alix, Yale & Ristas, LLP ("AYR"), to the attention of James Alix, Esq. AYR is Plaintiff's and

Plaintiff's predecessor, the Dexter Corporation's ("Dexter"), patent firm and has been so for about

80 years. Attorney Alix, to whose attention the subpoena was addressed, is a former partner in

AYR (he is now retired) and the attorney who prepared and prosecuted Plaintiff's

U. S. Patent No. 5,431,997 (the "'997 patent") in suit in the U. S. Patent and Trademark Office

("PTO"). Both AYR, on behalf of itself, and Plaintiff, on behalf of itself and Attorney Alix,

served objections to the subpoena prior to the deposition to the extent that it invaded the

attorney-client or attorney work product privileges and produced a privilege log identifying the

documents that were being withheld on that basis. Non-privileged documents were produced

prior to the deposition.  Mr. Alix appeared for his deposition on April 1, 2004, and testified until the deposition was suspended by Defendants.

Defendants now ask that the Court "compel compliance" with the subpoena by ordering the following:

(1)     AYR to produce all documents withheld on the grounds of privilege or redacted for any reason for an *in camera* review by the Court; and

(2)     With respect to documents for which no privilege was asserted and which were produced, AYR to provide the documents as they are kept in the usual course of business or labeled corresponding to the categories in Schedule A of the subpoena.

(3)     In addition, Defendants request that the Court review the transcript of the deposition of Attorney Alix, declare which questions and subjects are not properly protected by the attorney-client privilege, and order him to provide answers to those questions not protected by privilege when his deposition resumes.

Defendants' rationale and the *sole* basis they provide for invading the attorney-client privilege in connection with this motion is their *contention* that the '997 patent in suit is unenforceable due to inequitable conduct during its prosecution in the PTO.[1] This *contention* of inequitable conduct is just that, a contention, because it has not yet been pleaded in this action.[2] Defendants' motion to amend their complaint to assert this defense has not yet and should not be granted. But whether or not Defendants are permitted to enter such a pleading, the facts upon which this motion is based do not support Defendants' belated contention that the '997 patent is

---

[1] Mem. In Support of Motion, page 1. ("The allegation of unenforceability due to inequitable conduct forms the basis for this Motion to Compel . . . ")

[2] Defendants' statement (Mem. In Support of Motion, page 1) that they "have always contended" that the '997 patent is unenforceable, but that "out of an abundance of caution" they have moved to amend their complaint to add this affirmative defense, is wholly without merit. The affirmative defense of inequitable conduct must be pleaded with particularity.

unenforceable by reason of inequitable conduct. A reading of the principal document upon which

Defendants' contention of inequitable conduct is based reveals the false and misleading manner

in which Defendants have presented the issue to the Court.

## II.    ARGUMENT

### A. There Is No Basis For Defendants' Contention Regarding Inequitable Conduct, Upon Which The Entire Motion Rests

Defendants base their contention of inequitable conduct on the failure of Dexter

and/or its attorneys to report the existence of published European Patent Application No. EP-A-0

170 461 (the "Yadlowski application" or "Yadlowski") to the PTO during the prosecution of the

'997 patent application. The Yadlowski reference was cited in an EPO search report and

designated "particularly relevant" prior art by the European Patent Office ("EPO") during the

prosecution of Dexter's European counterpart to the '997 patent application ("European

Counterpart"). Defendants reliance upon this circumstance as presumptive evidence of

inequitable conduct warranting an invasion of the attorney/client privilege is misplaced on

several grounds:

First, even *after* the EPO designated Yadlowski as "particularly relevant" in an

early office action on Dexter's European Counterpart application, it later *granted* a patent

("European Counterpart Patent") to Dexter over Yadlowski after the examination had been

completed.

Second, in characterizing the circumstances, both past and present, surrounding

the purported "particular relevance" of Yadlowski, Defendants have resorted to false and

misleading statements in their motion papers regarding the effect Yadlowski has had upon the

patentability of the European Counterpart Patent.  Defendants append as Exhibit B to their

motion papers copies of relevant papers and *decision* of the EPO's Opposition Division, where Dexter's -- now Ahlstrom's -- European Counterpart Patent had been opposed by J. R. Crompton Limited ("Crompton"), a British company. Crompton relied upon three references in the opposition: (D1) U.S. Patent 3,386,834 to Noiset (the " Noiset patent"); (D2) the Yadlowski application; and (D3) U.S. Patent 3,616,166 to Kelley (the "Kelley patent").[3] Crompton relied upon Yadlowski as a secondary reference only (relying mainly upon the Noiset patent) as demonstrating a lack of novelty and "inventive step."[4]

Following the submission of written arguments by the parties to the opposition, a hearing was held in the EPO before a panel of three highly experienced members of the Opposition Division (EPO "Panel") on May 6, 2004 with respect to the patentability of the '997 European Counterpart Patent. The EPO Panel rendered an oral decision following the hearing and, later, a full written decision on June 1, 2004 ("Summary of Facts and Submissions"; Exhibit A). Claims in the European Counterpart Patent directed specifically to the treated tea bag *paper* were declared invalid as lacking novelty over the Kelley patent. Claims to a *tea bag* made from paper treated as described in the European Counterpart Patent were held to be novel and patentable. The EPO Panel made no reference to Yadlowski -- as will be shown -- in invalidating any claims of the European Counterpart Patent. In fact, the only occasion on which Yadlowski was discussed by the EPO Panel was in connection with claims in the Third auxiliary request (tea bags made from treated paper) in which claims were held *allowable*. Defendants, inexplicably, have trumpeted the EPO Panel's decision as demonstrating Yadowski's materiality to patentability of the '997 patent, which is an essential element in its recent motion to amend its

---

[3] The EPO Panel used the designations D1, D2 and D3 to refer to these patent references.
[4] European patent practice is not the same as U. S. practice and the requirements for patentability differ. Thus, for example, in the EPO there is a requirement for patentability called "inventive step", which is roughly analogous to that of obviousness in the United States.

pleadings to assert a defense of inequitable conduct and in the present motion relating to the issue of Plaintiff's privileged documents.

Defendants rely upon the EPO Panel's "recent decision sustaining a pending opposition and invalidating claims in Plaintiff's European Counterpart of the same scope as those in the '997 patent" as "[f]urther bolstering Defendants' claim of Yadlowski's materiality" (Mem. in Support, fn 1, page 2). That statement is false and misleading in its reference to the EPO Panel's reliance upon Yadlowski in invalidating *any* claims of the European Counterpart Patent.

The following *facts* are shown in the recent decision by the EPO Panel ("Summary of Facts and Submissions"), attached as Exhibit A:

FACT:  The Main Request, in which claims directed to a treated tea bag paper, suited for making infusion packages, was held to be unpatentable for lack of novelty, was decided by the EPO *solely* on the basis of (D3) *the Kelley patent. There was no reference to Yadlowski nor was Yadlowski relied upon by the EPO in connection with this ruling.* (Exh. A, Pars. 4.1-4.3, pages 3-5).

FACT:  The First auxiliary request, in which claims were amended to cover a treated tea bag paper of the non-heat seal type, suited for making infusion packages, was rejected on technical grounds under Art. 123(2) of the European Patent Convention (Exhibit B), which provides that a European patent or patent application may not be amended in such a way that it contains subject matter which extends beyond the content of the application as filed. The *only* prior art reference cited by the EPO in connection with these claims was (D3) *the Kelley patent. There was no reference to Yadlowski nor was Yadlowski relied upon by the EPO in connection with this ruling.* (Exh. A, Pars. 5.1-5.4, pages 5-7).

5

FACT:  The Second auxiliary request, in which claims were also amended to cover a treated tea bag paper of the non-heat seal type, suited for making infusion packages, also was ruled unpatentable on technical grounds under Art. 123(2) of the European Patent Convention, as in the case with the First auxiliary claims. *There was no reference to Yadlowski nor was Yadlowski relied upon by the EPO in connection with this ruling.* (Exh. A, Par. 6, page 7).

FACT:  The Third auxiliary request, in which claims to a mechanically sealed infusion package (tea bag) impregnated throughout its extent with a hydrophobic treating system, as in the '997 patent, was *allowed* by the EPO as *novel* over all three references, (D1) the Noiset patent, (D2) Yadlowski and (D3) the Kelley patent (Exh. A, Pars. 7.1-7.2, pages 7-8).

FACT:  The EPO ruled that the subject matter of the claims of the Third auxiliary request *were novel over Yadlowski because*:

> Document D2 *[Yadlowski] mainly concerns the treatment of an infusion package material with a sizing agent (which does not constitute a hydrophobic treating system:* D2, page 8, lines 3 to 5) in order to prevent the sorption of flavour oil by this material. This document mentions the application of an hydrophobic compound to the infusion bag material only lines 5 to 9 and page 2, lines 22 to 26). Consequently, although the sizing agent is distributed uniformly throughout the infusion package material (D2, page 6, lines 6 to 8), it can be excluded that the hydrophobic compound is applied other than in accordance with the teaching of D1 [the Noiset patent], ie the surface area of the infusion packages is impregnated only in discrete sections.
>
> *The subject-matter of the independent claims according to the third auxiliary request [the amended claims] is novel over the disclosure of D2.*

(emphasis added) (Exh. A, Par. 7.2, page 8)

FACT:  The EPO also ruled that the subject matter of the claims of the Third auxiliary request *met* the requirements for "inventive step" (roughly analogous to obviousness in U. S. patent law). It ruled that the "closest prior art is represented by document D1", the Noiset

patent (Exh. A, Par. 7.3, page 8), but that the Noiset "teaches away from" the claimed invention. The EPO further ruled that neither the disclosure of (D3) the Kelley patent nor (D2) Yadlowski, "can conduct the skilled person to disregard the teaching of document D1" (the Noiset patent). (Exh. A, Par. 7.3, pages 8-9). Thus, the EPO Panel, having considered Yadlowski in connection with the third auxiliary request found it *not* to be applicable to the issues of novelty and "inventive step" and *allowed* the claims.

Both references that the EPO considered to be the *most relevant* to the European Counterpart Patent, the Kelley patent and the Noiset patent, had been considered in detail by the U.S. PTO during the prosecution of the '997 patent. The Noiset patent was incorporated by reference directly into the specification of the '997 patent (Exhibit C, Col. 1, lines 55-58) and cited with the Kelley patent by the applicants to the PTO in an information disclosure statement (Exhibit D). There is no reasonable basis in the EPO Panel's decision supporting Defendants' contention that Yadlowski is material to patentability of the '997 patent.

Materiality with respect to a patent applicant's duty of candor and good faith in dealing with the PTO, which includes the duty to disclose information material to the prosecution of an application, is defined, in pertinent part, in The Rules of Practice in Patent Cases, 37 C.F.R. § 1.56 (1992), as follows:

Duty to disclose information material to patentability.

(b) Under this section, information is material to patentability when . . . .
(1) It establishes by itself or in combination with other information, a prima facie case of unpatentability of a claim; or

(2) It refutes, or is inconsistent with, a position the applicant takes in:
(i) Opposing an argument of unpatentability relied on by the Office, or
(ii) Asserting an argument of patentability.

The '997 patent application was filed on July 1, 1993 and was subject to that portion of Rule 1.56 quoted above. *Dayco Products, Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1363-64 (Fed. Cir. 2003). According to the EPO Panel, Yadlowski does *not* establish either alone or in combination with any other reference; a *prima facie* case of unpatentability under European law, nor is it inconsistent with or refute an argument of patentability made by the '997 patent applicants. The decision of the EPO Panel is totally and directly contrary to Defendants' stated position regarding Yadlowski's materiality.

Defendants also are in error in appearing to rely upon the outdated "reasonable examiner" standard in connection with their contention of inequitable conduct, as shown in their deposition of Mr. Alix (page 82): "Q.  Would you think that a *reasonable examiner at the Patent Office* . . . . would consider this [the Yadlowski application] to be  potentially relevant to patentability as to the '997 subject matter?" The "reasonable examiner" standard does *not* apply to cases that were filed in the PTO since Rule 1.56 was amended in 1992. *Dayco Products, Inc.,* supra, at 1364.

Regardless of whether an equitable standard of candor and good faith or a standard in which the withheld information establishes either a *prima facie* case of unpatentability or relates to or is inconsistent with a position taken by applicants, the evidence relied upon by Defendants fails to support Defendants' inequitable conduct assertions.

### B. The AYR Documents Were Produced as Kept in the Usual and Ordinary Course of Business at AYR

The Declaration of James E. Piotrowski, Esq. submitted herewith, states in great detail the steps that were taken to retrieve, review and produce the documents requested in the subpoena served on AYR. Documents that were withheld on grounds of privilege were identified on privilege lists that were provided to Defendants' counsel. According to Mr. Piotrowski, documents from AYR's files relevant to the '997 patent and the European Counterpart Patent were collected and reviewed by him and, if not privileged, produced to defendants as kept in the ordinary and usual course of business at AYR (Piotrowski, Pars. 8; 12). Those documents that were withheld on grounds of privilege were listed in a first privilege log according to *file location* so that defendants would be able to determine where they were originally filed (Piotrowski, Par. 8). When Defendants' counsel requested additional information regarding the privileged documents, Mr. Piotrowski prepared and sent to them a second privilege log in which the documents were listed both in *numerical order and also according to file location* (Piotrowski, Par. 12). In addition, Mr. Piotrowski sent Defendants' counsel an explanatory letter, dated April 29, 2004, together with additional information regarding the privileged documents (Piotrowski, Par. 12).

Mr. Piotrowski's declaration makes very clear that the documents requested in the subpoena were produced to Defendants in the same manner as they are kept in the usual course of business at AYR, in accordance with the requirements of Rule 34(b) Fed.R.Civ.P.

### C. AYR's Withheld Documents Are Privileged and Should Not Be Produced to Defendants

#### 1. The Attorney-Client Privilege

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 682 (1981). The purpose of the privilege is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn*, 449 U.S. at 389, 101 S.Ct. at 682. The attorney client privilege protects a client's confidential communications to an attorney in order to obtain effective legal counseling. *Upjohn*, 449 U.S. at 389, 101 S.Ct. at 682 (stating that "[t]he privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client (citations omitted)). In determining whether the privilege should apply, "a court should not lose sight of the strong policy considerations which form the underpinning of the attorney-client privilege." *Cargill, Inc., v. Sears Petroleum & Transport Corp.*, 2003 WL 22225580 at *3 (N.D.N.Y. 2003) (not reported in F. Supp.).

The attorney-client privilege generally consists of eight different elements: (1) where legal advice of any kind is sought, (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are at his instance permanently protected, (7) from disclosure by himself or by the legal advisor, and (8) except the protection be waived. *Walsh v. Seaboard Surety Co.*, 184 F.R.D. 494, 495-96 (D.Conn. 1999) (indicating the test under Connecticut law); *Golden Trade S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 517 (S.D.N.Y. 1992) (quoting 8 J. Wigmore, Evidence § 2292 at 554 (McNaughton Rev. 1961)) (stating the Second Circuit formulation); *Cargill*, at *3

**10**

(observing that the privilege is generally thought to encompass the elements stated). The burden

of proving each of the eight elements rests on the party claiming the protection. *Gorman v.*

*Polar Electro, Inc.*, 137 F.Supp.2d 223, 227-28 (E.D.N.Y. 2001); *Astra Aktiebolag v. Andrx*

*Pharmaceuticals Inc.*, 208 F.R.D. 92, 103 (S.D.N.Y. 2002) [hereinafter *Astra*].

        In any situation involving the attorney-client privilege, care must be taken to

avoid an inadvertent waiver. This will sometimes require, in close cases, that the privilege be

claimed. Plaintiff has and AYR have properly withheld the documents claimed as privileged, all

of which relate to U.S. and foreign patent prosecution and otherwise meet the formal

requirements for an assertion of privilege. The claim of privilege with respect to these documents

should be upheld by the Court.

## 2.  Both Federal Circuit and Second Circuit Law  Govern Aspects of Attorney-Client Privilege

        "In deciding issues in a patent case, a district court applies the law of the circuit in

which it sits with respect to *nonpatent issues* and the law of the Federal Circuit to issues of

*substantive patent law*." *Astra*, 208 F.R.D. at 96.  "[Q]uestions of privilege, confidentiality, and

waiver are generally governed by regional circuit law." *Id.* at 97.  Yet, *a "procedural issue* that

is not itself a substantive patent law issue *is nonetheless governed by Federal Circuit law if the*

*issue pertains to patent law*, if it bears an essential relationship to matters committed to [Federal

Circuit law] jurisdiction by statute, or if it clearly implicates the jurisprudential responsibilities of

[the Federal Circuit]." (emphasis added)  *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800,

803 (Fed. Cir. 2000) (citing *Midwest Indus., Inc. v. Karavan*, 175 F.3d 1356, 1359 (Fed.Cir.

1999)).

The Federal Circuit has determined that its decisional law applies "to the issue whether the attorney-client privilege applies to an invention record[5] prepared and submitted to house counsel relating to a litigated patent." *Spalding*, 203 F.3d at 803; *McCook Metals L.L.C. v. Alcoa Inc.*, 192 F.R.D. 242, 251 (N.D.Ill. 2000) (accepting the viewpoint that Federal Circuit law is controlling as it applies to invention records); *In re Gabapentin Patent Litigation*, 214 F.R.D. 178, 182 (D.N.J. 2003) (acknowledging that Federal Circuit law clearly "governs with respect to issues unique to patent law, including whether particular materials are discoverable."); *cf. Astra*, 208 F.R.D. at 97 (acknowledging *Spalding*, but holding that the documents at issue did not implicate issues unique to patent law, consequently Second Circuit law was controlling).

In holding that an invention record implicates substantive patent law, the Federal Circuit explained that an invention record relates to an invention submitted for consideration for possible patent protection and involves the issue of inequitable conduct before the Patent Office. *Spalding*, 203 F.3d at 803-04. The *McCook Metals* Court also endorsed an expansive view of the attorney-client privilege as it pertains to a patent attorney and *the patent application process*. *McCook Metals*, 192 F.R.D. at 249-50. The district court's ruling undertook a comprehensive review of the prior case law involving the attorney-client privilege and its applicability to the patent field. *Id.* at 248-51. The court ultimately held that Federal Circuit law applies to the issues that are unique to patent law, but that Seventh Circuit law applies to non-patent issues. *Id.* at 251.

The *Gabapentin* Court also evaluated the case law involving the attorney-client privilege and patent practice. *Gabapentin*, 214 F.R.D. at 181-82. The court agreed that Federal Circuit law controlled on the issue of patent prosecution. *Id.* at 182. The court stated that "the

---

[5] "Invention records are standard forms generally used by corporations as a means for inventors to disclose to the corporation's patent attorneys that an invention has been made." Id. at 802 n.2.

overall tenor of the documents indicates that it is a request for legal advice or services." *Id.* (citing *Spalding*, 203 F.3d at 806).

In contrast, the *Astra* Court held that "litigation documents, … including draft briefs and legal arguments, transmitted between in-house counsel and their agents and outside foreign counsel for purposes of obtaining legal advice about the conduct of litigation overseas" did not implicate issues unique to patent law, therefore Second Circuit law applied. *Astra*, 208 F.R.D. at 97. Additionally, *Sanofi-Synthelabo v. Apotex Inc.*, 299 F.Supp.2d 303, 307-8 (S.D.N.Y. 2004) [hereinafter "*Apotex*"], also states that Second Circuit law applies to the applicability of the attorney-client privilege for patent prosecutions. The *Apotex* Court held that although the action was appealable to the Court of Appeals for the Federal Circuit, Second Circuit law applies to the applicability and waiver of the attorney-client privilege." The *Apotex* Court further held that "[a]ll aspects of patent prosecution; that is, from patentability determinations to drafting patent applications to amending patent applications, have been held to constitute the practice of law." Citing *Sperry v. State of Florida*, 373 U.S. 379, 383 (1963).

### 3. Regardless of Which Law Controls, Communications Related to Patent Prosecution Are Subject to the Attorney-Client Privilege

The Federal Circuit has stated that "[c]onsultation with counsel during patent prosecution … is within the scope of subject matter that is subject to the attorney-client privilege." *In re the Regents of the University of California*, 102 F.3d 1386, 1391 (Fed.Cir. 1996). The Federal Circuit has also held that an invention record is subject to the attorney-client privilege. *Spalding*, 203 F.3d at 805. Additionally, several district court decisions have held that patent prosecution is subject to the attorney-client privilege. Therefore, regardless of which law

controls, it is clear that the attorney-client privilege applies to patent prosecution in the United States.

In *Spalding*, the decision contains language that is applicable to patent prosecutions. "[A]n invention record constitutes a privileged communication, as long as it is provided to an attorney for the purpose of securing primarily legal opinion, or legal services, or assistance in a legal proceeding." *Spalding*, 203 F.3d at 805 (quotation and citation omitted). Also, "an attorney cannot evaluate patentability or prepare a competent patent application without knowing the prior art and obtaining relevant technical information from the inventors. Accordingly, since "[the] invention record was prepared and submitted primarily for the purpose of obtaining legal advice on patentability and legal service in preparing a patent application, we conclude that it is *privileged in its entirety*." *Id.* at 806. (emphasis added)

Applying Federal Circuit law, the *Gabapentin* court held that *documents related to the preparation and prosecution of a patent application fall within the purview of the attorney-client privilege*. *Gabapentin*, 214 F.R.D. at 182. The court's rationale was that the client was seeking legal advice or services. *Id.*

Applying Second Circuit law, the *Apotex* court held that "[c]ommunications relating to the prosecution of a patent application are considered to be seeking legal advice or services *despite the fact that such communications might contain other information that is tangential to the legal services involved* with patent prosecution." *Apotex*. Although the *Astra* court did not directly hold on the issue, it found a wide category of documents protected by the attorney-client privilege. *Astra*, 208 F.R.D. at 104-05

Primarily applying Federal Circuit law (and secondarily applying Seventh Circuit law), the *McCook Metals* court held that the activities of a patent attorney and the patent

**14**

application process were protected by the attorney-client privilege. *McCook Metals,* 192 F.R.D. at 248-52. The court stated that a patent attorney adds legal importance to the legal protection by the "proper legal draftsmanship of an airtight patent that is successfully and properly prosecuted." *Id.* at 253. The court also stated that the attorney-client privilege "may be overcome only on a very compelling showing, *e.g.*, that despite the presumption of confidentiality, the inventor in fact expected specific communications he or she made to patent counsel to be disclosed, without editing, to the PTO." *Id.* at 249-50 (citing, *e.g.*, *Advanced Cardiovascular Systems, Inc. v. C.R. Bard, Inc.*, 144 F.R.D. 372, 378 (N.D.Cal. 1992)). The court's *in camera* review of the challenged documents resulted in the privilege applying to most of the documents. *McCook Metals,* 192 F.R.D. at 252-56.

In *Softview Computer Products Corp. v. Haworth, Inc.*, 2000 WL 351411 (S.D.N.Y. 2000),(not reported in F.Supp.2d), the district court did not explicitly pronounce which law it was following. The court stated that the "line of cases that follow Knogo stand for the proposition that the attorney-client privilege may attach to communications regarding patent prosecution, so long as those communications meet the other criteria of the privilege." *Id.* at *2 (citing *Knogo Corp. v. United States*, 213 USPQ 936, 940 (Ct.Cl. 1980)). The court also disagreed with previous rulings that held that patent applications are not protected by the attorney-client privilege. *Id.* at *9. The court held that *documents relating to a United States patent application are protected by the attorney-client privilege. Id.*

### 4. Patent Agents are Entitled to the Protection of the Privilege

The Second Circuit has generally "held that the attorney-client privilege applies to confidential communications with *patent agents* acting under the authority and control of counsel." *Gorman v. Polar Electro, Inc.*, 137 F.Supp.2d 223, 227 (E.D.N.Y. 2001) (quotations

omitted); *see e.g. Saxholm v. Dynal, Inc.*, 164 F.R.D. 331, 337 (E.D.N.Y. 1996); *Golden Trade v. Lee Apparel Co.*, 143 F.R.D. 514, 518-19 (S.D.N.Y. 1992). The applicability of the privilege to a patent agent "is consistent with its underlying rationale and with its application to communications with other specialists who assist attorneys." *Gorman*, 137 F.Supp.2d at 227. A patent "attorney cannot evaluate patentability or prepare a competent patent application without knowing the prior art and obtaining relevant technical information from the inventors." *Spalding*, 203 F.3d at 806.

Confidential communications with an in-house patent attorney that are then relayed to an outside patent agent are also shielded by the attorney-client privilege. *Cargill*, at *3. If the outside patent agent is assisting the in-house attorney in providing legal services, the communications with the outside agent by the attorney or the client is within the privilege. *Cargill*, at *3 (citing *Golden Trade, S.r.L. v. Lee Apparel Co.*,143 F.R.D. 514, 518-19 (S.D.N.Y. 1992)).

The cases that reject the principle that patent prosecution are not within the realm of the attorney-client privilege pre-date the current trend of including this subject area within the privilege. *See, e.g., JackWinter, Inc. v. Koratron Co., 50 F.R.D. 225, 228 (N.D.Cal. 1970); Howes v. Medical Components, Inc., & USPQ2d 1511, 1512 (E.D.Pa. 1988); Detection Sys., Inc. v. Pittway Corp., 96 F.R.D. 152, 155 (W.D.N.Y. 1982); Sneider v. Kimberly-Clark Corp., 91 F.R.D. 1,5 (N.D.Ill. 1980); Choat v. Rome Indus., Inc., 462 F.Supp. 728, 732 (N.D.Ga. 1978).*

Consequently, under both Federal Circuit and Second Circuit precedent, communications between the attorney and client and the attorney and an outside patent agent are both protected by the attorney-client privilege.

### 5. Communications With Foreign Patent Offices and <u>Foreign Patent Attorneys are Privileged</u>

Whether communications and documents to foreign patent attorneys or foreign patent agents are subject to the laws of the United States or to the foreign country is within the "choice of law" doctrine. *Astra*, 208 F.R.D. at 97-98. The Federal Circuit generally defers to the law of the regional circuit on questions of comity. *Id.* at 98. However, "[e]ven when the Federal Circuit applies its own law, it 'observes principles of international comity.'" *Id.* Therefore, "the outcome of the choice-of-law analysis … is the same regardless of whether Second Circuit or Federal Circuit law is applied. *Id.*

The district courts in the Second Circuit have adopted the comity or "touching base" approach and applied a traditional choice-of-law contacts analysis to determine which law applies. *Id.* The "touching base" standard specifies that "any communications *touching base with the United States* will be governed by the federal discovery rules while any communications related to matters solely involving a foreign country will be governed by the applicable foreign statute." *Id.* (citing *Golden Trade*, 143 F.R.D. at 520) (emphasis added). Although this standard would seem to indicate that any communication that mentions the United States, even incidentally, would be governed by the federal common law, its actual usage indicates otherwise. *See VLT Corp. v. Unitrode Corp.*, 194 F.R.D. 8, 14-16 (D.Mass. 2000) (explaining the "touching base" standard). The district courts which apply the "touching base" standard also hold that "communications relating to assistance in prosecuting patent application in their own foreign country or rendering legal advice on the patent law of their own country are, as a matter of comity, governed by the privilege law of the foreign country in which the patent application is filed." *Astra*, 208 F.R.D. at 98 (citing *Golden Trade*, 143 F.R.D. at 520). This has also been

phrased as determining which forum has "the most direct and compelling interest" in the communication. *VLT Corp.*, 194 F.R.D. at 16.

Consequently, if the communications took place in a foreign country or involved foreign attorneys or proceedings, the law of the country that has the predominant interest in whether those communications should remain confidential will prevail, unless that foreign law is contrary to public policy. *Astra*, 208 F.R.D. at 98; *Golden Trade*, 143 F.R.D at 522; *McCook Metals*, 192 F.R.D. at 256. "The jurisdiction with the 'predominant interest' is either 'the place where the allegedly privileged relationship was entered into' or 'the place in which that relationship was centered at the time the communication was sent.'" *Astra*, 208 F.R.D. at 98 (citing *Golden Trade*, 143 F.R.D at 521-22).

### 6. The Attorney-Client Privilege in the United Kingdom Applies to Documents Prepared by and Forwarded to Carpmaels & Ransford

Capmaels & Ransford ("C&R") is Ahlstrom's patent law firm in London, England, for the preparation and prosecution of foreign patent applications. C&R prepared and prosecuted Plaintiff's European Counterpart application in the EPO and represents Ahlstrom in connection with the opposition lodged by Compton in connection with the European Counterpart Patent. Their documents include record communications of an official nature to and from the EPO in connection with the European Counterpart application and patent (not privileged). C&R's documents would also include communications to and from Plaintiff (its client) and to and from AYR, Plaintiff's United States patent firm (privileged).

In Great Britain a patent agent is entitled to the same privilege as a solicitor or attorney.[6] *VLT Corp.*, 194 F.R.D. at 18; Daiske Yoshida, Note, *The Applicability of the*

---

[6] Note that this privilege only applies to legal proceedings in England, Wales or Northern Ireland. See *Smithkline Beecham Corp. v. Apotex Corp.*, 2000 WL 1310668 at *4 (N.D.Ill. 2000)

*Attorney-Client Privilege to Communications With Foreign Legal Professionals*, 66 FORDHAM

L.REV. 209, 224 (1997).  The applicable English statute reads as follows:

> A solicitor cannot be compelled to disclose communications, whether oral
> or written, passing directly or indirectly between him and his client, or
> between him and a person who is communicating with him professionally
> with a view of becoming his client, for the purpose of giving or receiving
> legal professional advice if they are legitimate communications in the
> sense that they are not made in furtherance of fraud or crime. ... The
> effect of the privilege is that neither the client, nor the solicitor without his
> consent, can be compelled to disclose the communications in the course of
> legal proceedings.

*VLT Corp.*, 194 F.R.D. at 18, (quoting 44(1) HALSBURY'S LAWS OF ENGLAND § 90

(4th ed. 1995)).

Therefore, the attorney-client privilege is applicable under British law to both

patent agents and solicitors. *VLT Corp.*, 194 F.R.D. at 18; *Stryker Corp. v. Intermedics*

*Orthopedics, Inc.*, 145 F.R.D. 298, 306 (E.D.N.Y. 1992) (explaining British law); *Smithkline*

*Beecham Corp. v. Apotex Corp.*, 2000 WL 1310668 at *2 (N.D.Ill. 2000) (determining that

communications with patent agents are deemed privileged).  However, it should be noted that if

the British patent agent is acting as a mere conduit for the transfer of non-confidential

information to the British patent office, those communications may not be privileged.  *Smithkline*

*Beecham Corp., at *2.

## 7.  <u>The Work Product Privilege</u>

The attorney work product doctrine is derived from *Hickman v. Taylor*, 329 U.S.

495, 67 S.Ct. 385 (1947) and the Federal Rule of Civil Procedure 26(b)(3).  *Sporck v. Peil*, 759

F.2d 312, 315 (3d Cir. 1985); *Loftis v. Amica Mut. Ins. Co.*, 175 F.R.D. 5, 10-11 (D.Conn. 1997).

The work product doctrine shields from disclosure documents and tangible things prepared in

anticipation of litigation, absent a showing of substantial need and an inability without undue

hardship to obtain the substantial equivalent of the materials by other means. Fed. R.Civ.P. 26(b)(3); *Loftis v. Amica Mut. Ins. Co.*, 175 F.R.D. 5, 10 (D.Conn. 1997); *see also In re Grand Jury Subpoenas*, 959 F.2d 1158, 1166 (2d Cir. 1992). There is a strong public policy supporting the rationale and applicability of the work product doctrine. *United States v. Nobles*, 422 U.S. 225, 236-240, 95 S.Ct. 2160, 2169-2171 (1975); *Upjohn Co. v. United States*, 449 U.S. 383, 398, 101 S.Ct. 677, 687 (1981). Among the purposes of the doctrine is that it (1) "shelters the mental processes of the attorney, providing a privileged area in which he can analyze and prepare his client's case." *United States v. Nobles*, 422 U.S. 225, 238, 95 S.Ct. 2160, 2170 (1975) and (2) prevents "one party from piggybacking on the adversary's preparation." *United States v. Adlman*, 68 F.3d 1495, 1501 (2d Cir. 1995). The doctrine now "extends its protection *far beyond*" the original concern for the files and mental impressions of an attorney. *United States v. Stewart*, 287 F.Supp.2d 461, 465 (2003) (emphasis supplied). Contrary to the defendant's assertion, the doctrine can cover "factual" material. *Golden Trade, S.r.L. v. Jordache*, 143 F.R.D. 508, 511 (S.D.N.Y. 1992); *Henry v. Champlain Enterprises Inc.*, 212 F.R.D. 73, 91 (N.D.N.Y. 2003).

In general, three conditions must be met in order to earn work product protection. *Astra Aktiebolag v. Andrx Pharmaceuticals Inc.*, 208 F.R.D. 92, 104 (S.D.N.Y. 2002) [hereinafter *Astra*]. "The material must (1) be a document or tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by or for his representative." *Id.* (citation and quotation omitted).

The work product privilege extends to documents and tangible things prepared in anticipation of litigation or for trial by, *inter alia*, a party's representative and an agent of a party. Fed. R.Civ.P. 26(b)(3). "The definition of the term 'representative' in Fed.R.Civ.P. 26(b)(3) goes beyond attorney work product and includes the work product prepared on an attorney's behalf."

*Weinhold v. Witte Heavy Lift, Inc.*, 1994 WL 132392 at *2 (S.D.N.Y. 1994). The Rule "makes clear that the work product doctrine protects work done in anticipation of litigation or trial by an attorney, as well as ... agents of the party or its representative." *Id.*; *see also United States v. Nobles*, 422 U.S. 225, 238-39 (1976). "It is ... necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself." *Nobles*, 422 U.S. at 238-39.

The documents that AYR identified in its privilege log as protected under the work product privilege are related to pre-litigation investigations relating to its early dispute with P. H. Glatfelter Company in 1998-99 that resulted in the 1999 settlement agreement between the parties, communications relating to infringement of its foreign patents and patent applications, and to the EPO opposition that has been discussed above. Documents Nos. 1 and 152-178 are related to potential litigation in the United States against P. H. Glatfelter Company in respect of the '997 patent. Documents Nos. 26, 27, 35, 36, 48, 49, 50, 51, 74 and 84 are related to potential infringement litigation in Europe on the subject matter of the European Counterpart Patent. Documents Nos. 16, 17, 18, 79, 80, 83, 84, 85, 88-121, 122, 123-139, 140, 140-147 and 149-151 relate to the EPO opposition proceeding.

The work done by C&R in connection with the opposition in the EPO on Plaintiff's European Counterpart Patent is comparable in many respects to litigation. Both C&R and the opposer, Crompton, through its patent firm, Marks & Clerk, European patent attorneys, in Manchester, England, submit arguments concerning patentability, i.e., novelty, "inventive step", etc., to the EPO; and both firms participate in the briefing and oral agreement before the EPO Opposition Division's three member panel. The parties, Ahlstrom and Crompton, are defending and opposing the patent, respectively, because of the import it will have in future court

litigation for infringement. Therefore, the opposition has all of the characteristics of pre-litigation legal activity as to which the work product privilege should apply.

### D. Attorney Alix Properly Refused to Answer Questions at His Deposition on the Ground of Attorney-Client Privilege

Attorney James E. Alix, whose deposition was taken by Defendants on April 1, 2004, properly asserted the attorney-client privilege and refused to answer certain questions on the advice of his counsel, Mr. Bresnick. Mr. Alix is a former partner of AYR and was responsible for preparing and prosecuting the '997 patent application in the PTO (Alix, at 25). According to Mr. Alix, he was the only person to work on the '997 patent application at AYR (Alix, at 33).

Defendants complain about Mr. Alix's failure to recall certain facts regarding the '997 patent prosecution, as if they took place yesterday, even though the application was filed in July 1993 and the patent issued in 1995. Mr. Alix answered the question to the best of his recollection and ability. He is 70 years old and is undergoing hormone treatment for prostate cancer (Alix, at 11). Moreover, he retired from AYR in 1999 (Alix, at 10) and is no longer engaged in the practice of law (Alix, at 15).

Defendants' reliance upon Judge Newman's decision in *SCM Corp. v. Xerox Corp.*, 70 F.R.D. 508 (D. Conn. 1976) in connection with Mr. Alix's deposition is misplaced. In the first place, *SCM* was decided in 1976, long before the more recent Federal Circuit and Second Circuit lines of cases relating to privilege cited herein, which hold that patent prosecution matters, such as invention records, and patent preparation and prosecution documents of all sorts, are entitled to the protection of the attorney-client privilege. It is difficult, if not impossible, to determine what portions of an attorney's notes and memoranda regarding a patent prosecution are

based on confidential client information. But since invention disclosures, which contain the most basic elements of an invention, are privileged (see, *Spalding Sports Worldwide*, supra), all information flowing from that initial disclosure, and expanded upon in the course of the prosecution, is based upon that initial confidential client information. Furthermore, the Court's decision in *SCM*, at 523, makes clear that the privilege is unavailable *only* in those cases in which the communication is demonstrably based on facts that did not come from the client in confidence:

> Without the protection for attorney communications that arguably contain client confidences, clients might be inhibited from confiding in their attorneys for fear that they might not be able to demonstrate that the attorney's communication was in fact based on their communication to him. *The risk of such inhibition is virtually removed by holding the privilege unavailable when the attorney's communication is demonstrably based on facts that did not come from the client in confidence.*

(emphasis added)

The questions that Attorney Alix refused to answer clearly relate to privileged patent prosecution matters. For example, whether there was ever any consideration as to whether a request for reexamination of the '997 patent should be filed with the PTO; whether he knew why a particular patent reference was not brought to the attention of the PTO; whether he discussed a particular reference with the inventors; the meaning of certain terms in the patent and how they cooperate together (the patent attorney prosecuting a patent application is *not* a person of ordinary skill in the art to whose understanding the patent is addressed); what the inventors did or did not experiment on in connection with the application. These and similar questions propounded to Attorney Alix clearly relate to confidential client communications regarding a patent prosecution, which is privileged. Mr. Alix should not be required to answer them.

III.        **CONCLUSION**

For all of the reasons given above, Defendants' motion should be denied in all respects.

Respectfully submitted,

Dated: June 25, 2004                    Cohen, Pontani, Lieberman & Pavane

By:  _E. E. Grondahl_
                             Sidney R. Bresnick, Esq. (ct 16295)
                             Yunling Ren, Esq.
                             551 Fifth Avenue
                             New York, NY 10176
                             Tel. 212-687-2770
                             Fax 212-972-5487
                                 -and-
                             McCarter & English, LLP
                             Basam E. Nabulsi, Esq. (ct 20897)
                             Eric E. Grondahl, Esq. (ct 08988)
                             Alexandra B. Stevens, Esq. (ct 20300)
                             Four Stamford Plaza
                             107 Elm Street, 9th Floor
                             Stamford, CT 06902
                             Tel. 203-965-0601
                             Fax 203-323-6513

                             Attorneys for Plaintiff,
                             Ahlstrom Windsor Locks LLC

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing Plaintiff's Opposition To Defendants' Motion to Compel Compliance with the Subpoena of Alix, Yale & Ristas and the associated Declaration of James E. Piotrowski, Esq. (with their respective attachments) have been hand delivered, this 25th day of June, 2004 to:

> Dina S. Fisher, Esq.
> Robinson & Cole LLP
> 280 Trumbull Street
> Hartford, CT 06103-3597

> and sent by Federal Express to:

> Marc J. Farrell, Esq.
> Buchanan Ingersoll PC
> One South Market Square, 3rd Floor
> Harrisburg, PA 17101-2121
> Tel. 717-237-4820