IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| AHLSTROM WINDSOR LOCKS LLC, | : |
| Plaintiff | : CASE NO. 3:03-CV-0169-AVC |
| v. | : |
| SCHOELLER & HOESCH, NA, INC., | : |
| and | : |
| P. H. GLATFELTER COMPANY, | : |
| Defendants | : JULY 1, 2004 |

**DEFENDANTS' REPLY TO
PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR PROTECTIVE ORDER**

Defendants, P. H. Glatfelter Company and Schoeller & Hoesch, NA, Inc. (collectively "Defendants") submit this reply to the memorandum of law in opposition to Defendants' Motion for Protective Order ("Pl. Opp.") filed by the Plaintiff, Ahlstrom Windsor Locks LLC ("Plaintiff" or "Ahlstrom") on June 17, 2004. Plaintiff's brief is laden with mischaracterizations of the discovery already produced to Plaintiff and misleading assertions as to what is and is not at issue in this case. Plaintiff's arguments overlook the principle that the scope of permissible discovery is defined by the issues framed in the Complaint and Counterclaim. Fed.R.Civ.P. 26(b). Plaintiff now seeks to trespass those boundaries. This latest deposition notice and accompanying request for documentation for <u>all records of quality control [QC] testing on paper sold to Teekanne in Europe and Redco in the U.S. since 1997</u>, as well as <u>all customer specifications relating to Teekanne Europe</u>, is unduly burdensome, and seeks costly discovery into matters that have no bearing on the material issues of the case.

Three arguments made in Plaintiff's brief demonstrate this point: the claim that all QC test records are "highly relevant" (Pl. Opp. at 2-5) without any persuasive argument how such

records could bear on matters at issue, *and* without acknowledgment of the data that has already been produced; the argument that these requests aim at discovering evidence of "copying" (Pl. Opp. at 22-26) which goes to "obviousness", without any evidence showing a nexus between any copying and the nonobviousness of the claimed invention; and finally, the outrageous suggestion that S&H Germany has worked a deceit on its European customer Teekanne regarding chemical treatment of its paper (*id*. at 15-20) – without bothering to connect that to any issue in this case. Defendants submit that Plaintiff has sought to confuse the issues in order to disguise the impropriety of its discovery requests.

### I.   PLAINTIFF IS SEEKING DISCOVERY ON SUBJECTS THAT HAVE NOTHING TO DO WITH MATERIAL FACTS IN THE CASE.

Plaintiff's brief misstates what has already been produced in discovery to justify overstepping the bounds of permissible discovery. (See Pl. Opp. at page 2.) Either the Plaintiff does not apprehend what it has been given and thinks it needs more; or it does not like what it has been given, and seeks to build a new case by delving into areas that have nothing to do with issues raised in the Complaint. Plaintiff argues:

> The subject matter of the requested testimony and documents is highly relevant and essential to Plaintiff's claim for patent infringement and copying **in that it is expected to reveal the properties of Defendants' tea bag paper** and those properties that their customers ordered for their tea bag paper.

Pl. Opp. at 2 (emphasis added).

Oddly, this seems to suggest that Plaintiff has <u>not yet received</u> *any* information that would "reveal the properties of Defendants' tea bag paper and those properties that their customers ordered...." But Defendants <u>long ago</u> provided to Plaintiff extensive information revealing the properties of Defendants' tea bag paper sold in the United States as well as in Europe. To name but a few examples of the information provided to Plaintiff: the recipes for all

2

of its 212/LTA and 212/LTA-NA papers (Bates SH1733-1755; SH 1756 to 1761); production protocols for the paper machine ("laufkarten") for all runs of 212/LTA shipped anywhere (Bates SH 0433 to SH 0127); ten sheets of each of the six non-heatsealable papers shipped into the U.S. so that Plaintiff could conduct its own testing (which it evidently did do as shown by the test data set forth in its experts' reports); customer specifications for all S&H's non-heatsealable papers (Exhibit 58, Slawik Deposition); complete manufacturing data printouts for all production runs for all 212/LTA tea bag paper ever made (SH 1407 to SH 1668); and the complete lab notebook containing all notes and correspondence, in its original form, of S&H's chief inventor responsible for tea bag papers, Guenther Grauer (Exhibit 60, Grauer Deposition).

Ignoring these thousands of pages provided months ago, Plaintiff complains that it still needs information to "reveal the nature of Defendants' paper," stating "[t]here are no areas of inquiry more important than those that have been requested" in the 30(b)(6) Notice of Deposition in question. (See Pl. Opp. at page 3.) First, if that is true, it is odd that Plaintiff waited until nearly year and a half into this litigation to pursue this information, and has spent the last eighteen months obtaining information that it now claims is of only secondary importance. More to the point, conclusorily calling this information "highly relevant" does not make it so. Relevant material is that which tends to make a material fact more or less probable. Fed.R.Evid. 401. But Plaintiff seeks discovery of QC testing of paper made in Germany by Defendant Glatfelter's subsidiary, S&H Germany, and sold *outside* the U.S.; specifications for paper of Defendants' customers *outside* the U.S.; paper made *prior* to the effective date of the 1999 Agreement in this case (9/24/99); and competitive testing performed at S&H Germany on *Plaintiff's* paper(s).

The mere fact that Plaintiff would insist it is entitled to this latter category - competitive

3

testing performed by Defendants on Plaintiff's paper - is a perfect example of the double standard by which Plaintiff has conducted itself during this litigation. Plaintiff – upon whom the burden rests to establish infringement in this case, and upon whom a duty to perform an adequate pre-filing investigation prior to the initiation of this litigation is imposed – has, to this day, refused to produce the results of tests it performed on Defendants' papers in the months leading up to this suit. While refusing to produce this data, on which its claims of infringement are supposedly based, Plaintiff nonetheless insists on the right to data supposedly obtained by Defendants as a result of tests they performed on Plaintiff's papers. This is backwards. The Plaintiff's refusal to turn over the very information it now seeks from Defendants reveals the absurdity of Plaintiff's position, and most recent request. Plainly, Plaintiff's test results of Defendants' paper are relevant to a defense of this case. It is <u>entirely</u> unclear how Defendants' testing of Plaintiff's paper could possibly be relevant.

    Indeed, the claim of relevance is barely supported by argument in Plaintiff's brief. In the only argument trying to justify this request, Plaintiff states: "Tea bag paper manufactured by S&H Germany is distributed and sold by Defendants in the U.S. ... Therefore, the activities of S&H Germany, where the infringing tea bag paper was formulated, developed, tested, and manufactured, is [sic] highly relevant to the issues of infringement and obviousness in this action." (Pl. Opp. at 3.) This argument is illogical. There is no connection between the fact that <u>some</u> tea bag paper is made in Germany and sold in the U.S., and the notion that <u>all</u> activities associated with the making of <u>all</u> paper in Germany are therefore relevant.

    The law is clear on this subject: "[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any

4

patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a). There is no dispute that the allegedly infringing products are <u>made</u> outside of the United States. There is also no dispute that Defendants do not <u>use</u> the allegedly infringing products in the U.S.[1] The only appropriate focus for discovery, therefore, is <u>paper sold or offered for sale in the United States</u>.

However, that is not the focus of Plaintiff's 30(b)(6) deposition request which aims to a large extent at Teekanne, one of S&H Germany's <u>European</u> customers. The paper that is sold to Teekanne is completely irrelevant to this case. S&H Germany should not have to turn its factory upside down to find any record of any quality control testing on paper sold to Teekanne (which is a large part of Plaintiff's document request) or to find Teekanne's customer specifications for all paper it has purchased from S&H Germany since 1997. Even if, *arguendo*, S&H Germany had a paper at some point that <u>exactly duplicated</u> the paper disclosed in the '997 patent and had sold it to Teekanne Europe, that would not be relevant to a claim of infringement of the '997 Patent unless that paper was <u>sold in the U.S. or offered for sale in the U.S</u>. There is <u>no</u> justification for digging through every single quality control report, every single lab test, every single competitive test note, on paper sold <u>in Europe</u>.

The fact is, S&H produces approximately <u>12,000 metric tons of paper every year</u>. (See Affidavit of Dina Fisher ("Fisher Aff."), attached hereto at Exhibit A.) Over <u>thirty different paper grades</u> are made at the S&H plant, sold to over three hundred customers worldwide. (*Id.* at ¶ 3.) Teekanne purchases over approximately 1250 metric tons per year, approximately 1050

---

[1] The allegedly infringing products are <u>used</u> by Defendants' customers, namely, tea bag manufacturers (against whom Plaintiff has chosen not to assert the '997 Patent for the obvious reason that such manufacturers are either current customers or, theoretically, potential customers of Plaintiff).

metric tons in Europe alone. (*Id.* at ¶4.) All this paper is subjected to a variety of tests in the course of production, including infusion, wet strength, wettability and other topics named by Plaintiff. Defendants have already given all such manufacturing test results to Plaintiff for the allegedly infringing products sold or offered for sale in the U.S. since 9/24/99. There is no good reason – and Plaintiff has not articulated one – for allowing hugely burdensome discovery to be undertaken as to products manufactured and sold outside the United States and/or sold prior to September 1999 (whether within or outside the U.S.).

## II. PLAINTIFF CHARACTERIZES DEFENDANTS' DEVELOPMENT OF IMPROVED TEA BAG PAPER AS UNLAWFUL IN ORDER TO JUSTIFY INAPPROPRIATE DISCOVERY.

At page 3 of its brief, Plaintiff states: "There are no areas of inquiry more important than those ... [establishing] that Defendants have willfully and deliberately modified their tea bag paper formulations unlawfully to appropriate for themselves the advantages of the invention of the '997 patent in suit while adjusting their paper treatment formulations in an attempt to conceal their deceitful actions." (Pl. Opp. at 3.) This is an astounding charge. First, even if, *arguendo*, Defendants did what Plaintiff claims (which is not the case), there is nothing unlawful about a company's modifying a product to emulate certain benefits of a patented invention while adding improvements. "Access to, and analysis of, other products in the market is hardly rare, even in the design stages of a competing product." *Cable Electric Products, Inc. v. Honeywell, Inc.*, 770 F.2d 1015, 1028 (Fed. Cir. 1985). Furthermore, the abundant (thousands of pages) of manufacturing records, lab notebooks, customer data, sample sheets and other documents produced by Defendants, plus over 50 hours of testimony of inventors and other S&H Germany personnel, offer no basis for scurrilous accusations of "deceit" and "concealment."

6

Certainly, one fact is clear and borne out in the documents that Plaintiff has been provided: Defendants have expended a great deal of effort at creating a better tea bag paper than that disclosed by the '997 Patent. Plaintiff's paper made according to the invention of the '997 Patent is overly hydrophobic. It balloons when exposed to hot water. It sacrifices infusibility for seam strength. Defendants have come up with an improvement (which they have patented: U.S. Patent No. 6,510,949, to Grauer et al.) which combines hydrophobic and hydrophilic properties, thereby resulting in (a) a solution to the "floating" problem which plagued Plaintiff's papers made pursuant to the '997 Patent, and (b) elimination of the "no appreciable water climb" requirement called for by the claims of Plaintiff's '997 Patent. This is not the result of concealment or deceit. It is the result of ingenuity, research and development. Calling this work "deceitful" and "unlawful copying" is inappropriate, and certainly calling it so does not justify discovery into every paper S&H Germany has sold in Europe.

### III. PLAINTIFF BLURS THE ISSUES BEFORE THE COURT BY RAISING CLAIMS OF "COPYING."

The Plaintiff further attempts to justify the latest round of discovery by blanketly asserting that S&H Germany's testing activities are an appropriate focus of discovery because evidence of "copying" the '997 Patent goes to the issue of obviousness. (Pl. Opp. at 23.) Even assuming that Defendants "copied" a product that was made pursuant to the '997 Patent (which they did not), "[it] is simplistic to assert that copying *per se* should bolster the validity of a patent." *Cable Electric Products,* 770 F.2d at 1028. Certainly representatives of S&H Germany have acknowledged that S&H Germany engaged in efforts to obtain a paper having performance properties similar to Plaintiff's paper. To say this amounts to "copying" the patented invention is wrong for two reasons. First, it assumes - without any support - that a paper having the

properties of the '997 invention can only be made if the exact same ingredients are used to make it. Second, it assumes - again, without any support - that the paper which Defendants allegedly sought to "copy" (using Plaintiff's terminology) was in fact paper manufactured by Plaintiff pursuant to the teachings of the '997 Patent. If the paper of Plaintiff that Defendants supposedly "copied" possessed appreciable water climb, for example, then it would not be paper manufactured pursuant to the teachings of the '997 Patent, and any evidence of "copying" would be irrelevant to the obviousness of the '997 patented invention.

Moreover, "copying" implies that Defendants' product resulting from such "copying" is substantially identical to the patented invention. That is far from the case. Defendants' product at issue in this case is significantly dissimilar from the patented invention (a hydrophilic paper with appreciable water climb and no flotation, versus the patented hydrophobic paper with no appreciable water climb and floating problems), as testified by Gerhard Slawik on the fourth day of his deposition.

> *Q: At that time did you enter into discussions among your group as to how to avoid the Dexter patent?*
>
> *A: No, never. We never talked about how to avoid the Dexter patent.*
>
> *Q: You never --*
>
> *A: No, we were concerned on our own development, because, as you know, we have our own patent and we applied for it in '98 or so. I can't remember exactly. So it was never in our mind or we never thought about how we can avoid infringing the Dexter patent because we know we have our own technology and our own know how and there is something different to the Dexter patent.*
>
> *Q: So you never had any discussions as to how to make a paper that would avoid infringement of the Dexter patent? [objections omitted]*
>
> *A: No. All what we said to ourselves and what the dialogue was we wanted to have a better product compared to the Dexter product, according to the Dexter*

> *patent, and so we thinking about how to make a better one which is more -- let's see -- more and better properties to the -- or more advantage at the end for the customers.*
>
> *Q: And what advantages did you seek to impart to this paper.*
>
> *A: Wettability, for example.*
>
> *Q: And that's an advantage, the wettability?*
>
> *A: It is a big advantage.*
>
> *Q: What is the advantage of wettability?*
>
> *A: The wettability has a big influence of the tea infusion, the cup. So you know the Dexter patent is always related to hydrophobic material. And we say, according to our patent, we can control the wettability, and we are talking about a hydrophilic material.*

Transcript of Gerhard Slawik, 2/18/04 ("Slawik Depo., Vol. iv) at pages 79-80[2].

Plaintiff fastens onto comments about "imitating" the Dexter paper (Pl. Opp. at 24, 25), to suggest improper conduct. However, Defendants' efforts to make a paper "as good as [Dexter's]" (Pl. Opp. at 24.) do not constitute the "smoking gun" that Plaintiff thinks (or pretends) it to be. Progress can be charted by improvements on known technologies. There is nothing nefarious in this process, nor is there reason – by virtue of memoranda acknowledging an effort to beat a product once considered "best"— to dig into every test record at S&H Germany. What could such records reveal that would be relevant in this case? What if, *arguendo*, there <u>were</u> records showing comparisons between Dexter paper and S&H paper? (A few records of such comparisons have already been produced to Plaintiff.) Would this make any material fact at issue in this case more or less probable? Certainly not. Consequently, there is no

---

[2] Defendants' quotation of this portion is not intended as a waiver of its claim of confidentiality of the remaining portions of the deposition.

sound reason for requiring Defendants to incur the significant expense in locating and producing all such records.

### IV. THE PLAINTIFF'S CLAIM OF "DECEPTION" IS A RED HERRING.

Another tack taken by the Plaintiff to justify expanded discovery is to claim that S&H is somehow doing something unlawful or purposefully misleading with its 212/LTA and 212/LTA-NA paper grade designations. (Pl. Opp. at 15.) This is nonsense. Loosely throwing around claims of deception, Plaintiff actually accuses S&H of deceiving its European customer Teekanne by using the same 212/LTA designation for paper sold to it and sold to Redco, but shipping different paper (calling this "the catch"; *id*.) Defendants are outraged by this claim. It shows a brazen disregard for facts revealed in discovery, and is highly irresponsible. Plaintiff has apparently failed to understand the testimony about the 212/LTA paper grade at issue in this case, and the distinctions between the version of that paper sold in the U.S. and the version sold in Europe. Reckless claims of deception are an inappropriate and distracting conceit. In the end, the Plaintiff is confused by the "-NA" designation. This does not make it inappropriate or sinister.

### V. CONCLUSION

Plaintiff's brief confuses the issues before this Court, and fails to offer any valid reasons for forcing the Defendants to engage in very expensive, very broad, and very time-consuming discovery into utterly irrelevant areas. For these and the foregoing reasons, Defendants respectfully submit that the Plaintiff's opposition to Defendants' Motion for Protective Order fails to offer valid reasons for denying the motion, and the Motion should be granted.

Attorneys for Defendants,
Schoeller & Hoesch, NA, Inc. and
P. H. Glatfelter Company

By_____
Dina S. Fisher (ct 14896)
280 Trumbull Street
Brett J. Boskiewicz (ct 25632)
Hartford, CT  06103-3597
Tel. No.: (860) 275-8200
Fax No.: (860) 275-8299
dfisher@rc.com

Marc J. Farrell (ct 24539)
BUCHANAN INGERSOLL PC
213 Market Street
3rd Floor
Harrisburg, PA  17101-2121
Tel. No.: (717) 237-4820
Fax No.: (717) 233-0852
farrellmj@bipc.com

**CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing was served by means of facsimile and the United States mail, first class, postage prepaid, on this the 1st day of July, 2004, upon the following:

>Sidney R. Bresnick, Esquire
>Yunling Ren, Esquire
>Thomas Keating, Esquire
>Cohen, Pontani, Lieberman & Pavane
>551 Fifth Avenue
>New York, NY  10176
>
>
>Basam E. Nabulsi, Esquire
>McCarter & English LLP
>Four Stamford Plaza
>107 Elm Street, 9th Floor
>Stamford, CT  06902
>
>Eric E. Grondahl, Esquire
>Alexandra Stevens, Esquire
>McCarter & English LLP
>City Place I
>185 Asylum Street, 36th Floor
>Hartford, CT  06103-3495

_____
Dina S. Fisher

Counsel for Defendants,
Schoeller & Hoesch, NA, Inc., and
P. H. Glatfelter Company