IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| AHLSTROM WINDSOR LOCKS LLC, | : | |
| | : | |
| **Plaintiff** | : | **CASE NO. 3:03-CV-0169-AVC** |
| v. | : | |
| | : | |
| SCHOELLER & HOESCH, NA, INC., | : | |
| | : | |
| **and** | : | |
| | : | |
| P. H. GLATFELTER COMPANY | : | |
| | : | |
| **Defendants** | : | **JULY 30, 2004** |

## DEFENDANTS' MOTION TO COMPEL ALL PRE-SUIT TESTING DATA PURSUANT TO THE COURT'S APRIL 12, 2004 ORDER, AND A REQUEST FOR COSTS

In keeping with this Court's order of April 12, 2004, Defendants, Schoeller & Hoesch, NA, Inc. and P. H. Glatfelter Company (collectively, "Defendants"), respectfully seek an order compelling Plaintiff Ahlstrom Windsor Locks LLC ("Plaintiff or "Ahlstrom") to produce all Plaintiff's pre-suit testing data and related documents, including all facts relating to the so-called "Totonis Table." This information was previously requested by the Defendants, and was withheld by Plaintiff as attorney work product. The Court denied a motion to compel production of this evidence, but expressly invited the Defendants to renew their motion after the parties had performed the court-ordered exchange of all evidence supporting their claims in this case. That exchange has occurred. In light of the Plaintiff's failure to produce this evidence in that exchange and the Defendants' showing of substantial need, Defendants respectfully request that the Court re-examine its March 16, 2004 conclusion, and order disclosure of all evidence related to Plaintiff's pre-suit testing of Defendants' paper, along with the costs of this motion.

## I.    BACKGROUND

This case arises from Plaintiff's allegations that Defendants have infringed U.S. Patent No. 5,431,997 (the " '997 Patent"), which covers certain porous web materials suitable for use in

making tea bags and processes for making the porous web materials. Plaintiff also alleges that Defendants have breached an Agreement executed on September 24, 1999 ("the '99 Agreement"), in which Defendants agreed not to sell two particular grades of its tea bag papers (S&H paper grades 212/LEUT and 012/RLT). Also, Plaintiff has sought leave to amend its complaint to add new claims alleging that Defendants actively induce consumers to infringe the '997 Patent and/or knowingly contribute to consumer infringement each time a cup of tea is brewed using one of the cited tea bag papers manufactured by S&H.

By way of affirmative defense and counterclaim, Defendants claim invalidity and unenforceability of the '997 Patent. In a pending request by Defendants for permission to amend their Answer and Counterclaim, Defendants also contend that the'997 Patent is unenforceable due to inequitable conduct that occurred during its prosecution.

On May 22, 2003, Defendants served discovery requests seeking, among other things, production of <u>all</u> documents in Plaintiff's possession or control relating to:

- the infringement or non-infringement of the subject matter claimed by the patent-in-suit, including documents embodying the results of any infringement investigation, report or opinion (Request for Production No. 5);

- analyses of whether infringement was or might be occurring (Request for Production No. 9);

- each product which is alleged to infringe the patent-in-suit (Request for Production No. 15); and

- any analysis or evaluation of any product competing with the Plaintiff's products that embody or utilize the patent-in-suit (Request for Production No. 20).

In the privilege log subsequently produced with a limited production of documents, Plaintiff identified a number of documents withheld on the basis of the attorney-client privilege and/or the attorney work product doctrine, including a "table indicating the hot water test of Ahlstrom and S&H products, with comments and notes," prepared on November 24, 2002 [pre-suit] by Michele Totonis, Esq., Plaintiff's in-house counsel (the "Totonis Table"). In a supplemental privilege log, Plaintiff identified seven additional documents withheld on the basis of the

attorney work product doctrine. These were identified as follows:

| DATE | TO | FROM | DESCRIPTION | PRI. # | Comments |
|---|---|---|---|---|---|
| Undated | N/A | M. Totonis, Esq. | Table indicating the hot water test of Ahlstrom and S&H products | 92 | Attorney Work Product |
| 6/28/02 | N/A | C. J. Fay | Test results re: S&H tea bag papers performed by Ahlstrom at the request of M. Totonis, Esq. | 93 | Attorney Work Product |
| 9/20/02 | N/A | C. J. Fay | Test results re: S&H tea bag papers performed by Ahlstrom at the request of M. Totonis, Esq. | 94 | Attorney Work Product |
| 11/26/02 | N/A | C. J. Fay | Test results re: S&H tea bag papers performed by Ahlstrom at the request of M. Totonis, Esq. | 95 | Attorney Work Product |
| 8/19/02 | P. Scott cc: R. Volpe | M. Fuss | Analytical Report re: test of S&H tea bag papers prepared at the request of M. Totonis, Esq. | 96 | Attorney Work Product |
| 8/2/02 | M. Fuss cc: R. Volpe | Outside Laboratory | Test results re: S&H tea bag papers prepared at the request of M. Totonis, Esq. | 97 | Attorney Work Product |
| 7/15/02 | M. Fuss cc: R. Volpe | Outside Laboratory | Test results re: S&H tea bag papers prepared at the request of M. Totonis, Esq. | 98 | Attorney Work Product |

Seeking discovery of this and other information on which Plaintiff was purportedly relying in bringing this suit, Defendants filed a "First Motion to Compel" on September 22, 2003. By Order dated December 12, 2003, the Court granted in part and denied in part that motion,[1] ordering Plaintiff to produce responses to the aforestated requests for production Nos. 5, 9, 15, and 20.

Plaintiff did not then produce the requested documents, necessitating Defendants' filing a Motion for Order of Compliance on March 3, 2004. By Order dated March 16, 2004 ("the 3/16/04 Order"), the Court denied Defendants' Motion, concluding in part that production of the test data included in the Totonis table was attorney work product, and that Defendants did not show a substantial need or inability to obtain equivalent data. On March 30, 2004, Defendants filed a Motion for Reconsideration of the 3/16/04 Order. In the Court's April 12, 2004 Order,

---

[1] In the 12/12/03 Order, the Court also ordered the parties to simultaneously exchange their proposed claim constructions on February 27, 2004, a date that was later extended by the parties with the approval of the Court to May 27, 2004.

the Court denied the requested relief at that time but stated in pertinent part:

> **The plaintiff need not furnish the information requested at this juncture as it is protected by the work product doctrine. The court will, however, revisit this issue upon request of the defendants after the [May 27], 2004 information exchange. On this date, the plaintiff will be providing all facts forming the basis of its claims. If such facts are withheld as privileged or as protected by the work product doctrine, <u>the court will re-examine its March 16, 2004 conclusion that disclosure is not authorized because the defendants have failed to show substantial need or inability to obtain equivalent information</u>.**

Order dated April 12, 2004 [Docket #70] ("the 4/12/04 Order") (emphasis added).

At this juncture, the parties have completed their exchange of all information forming the basis of their claims in this case and in that exchange on May 27, 2004, Ahlstrom did not produce the requested information and failed to offer any explanation for its failure to do so. Ahlstrom did produce two documents: (1) "Bases for Plaintiff's Claim of Infringement of the '997 Patent," and (2) its claim construction interpretation of the '997 patent, but neither of these documents disclosed any of the requested information. Instead, Plaintiff's "Bases for Claim of Infringement" relies entirely on documents produced during discovery, i.e., <u>after</u> the filing of its Complaint. Thus, to this day Defendants have yet to see any of the information that purportedly formed the very foundation of this lawsuit.

## II.    DEFENDANTS HAVE DEMONSTRATED SUBSTANTIAL NEED AND AN INABILITY TO OBTAIN THE INFORMATION ELSEWHERE.

Defendants respectfully submit that they are entitled to obtain Plaintiff's pre-suit testing results and related information under Fed. R. Civ. P. 26(b)(3). Under that Rule, Defendants may obtain evidence that is considered attorney work product "upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Fed. R. Civ. P. 26(b)(3). The Defendants do in fact have substantial need for the evidence sought, and cannot obtain it through other means.

## A. DEFENDANTS HAVE SUBSTANTIAL NEED FOR THE RESULTS OF PLAINTIFF'S PRE-SUIT TESTING.

Defendants are entitled to evidence in Plaintiff's possession of the circumstances and relating to the Plaintiff's pre-suit tests and the results thereof, so that Defendants can mount a defense to Ahlstrom's claims. If this evidence supports Plaintiff's claims that Defendants' infusion paper infringes the '997 Patent, then Defendants are entitled to access to that evidence so that it might be counter-analyzed for impeachment or refutation by Defendants' experts.[2] If, on the other hand, the testing results do <u>not</u> support Ahlstrom's allegations of infringement, Defendants are equally entitled to such evidence to use in their defense. Either way, the documents are critical to the very issue at the heart of this case — whether Defendants' have infringed the claims of the '997 patent. *See Loctite Corp. v. Fel-Pro, Inc.*, 667 F.2d 577, 582 (7th Cir. 1999) (finding production of plaintiff's pre-Complaint testing results in patent case required as essential to the case). The Plaintiff's refusal to produce this information is especially egregious given that Plaintiff's in-house counsel Michele Totonis, Esq. testified at her deposition in November 2003 that this testing formed the basis of the lawsuit. (Deposition of Michele Totonis, Esq., November 10, 2003 ("Totonis Dep."), at 117-22, attached at Tab A.)

Allowing a plaintiff to withhold such information would suggest that all future patent-holder plaintiffs could bring suits for infringement and then withhold the information that supposedly

---

[2]     Notably, if the evidence sought supports Ahlstrom's allegations, then Ahlstrom has failed to comply with the Court's 12/12/03 Order to provide Defendants with "<u>all</u> facts and identify all information supporting its allegations of infringement". Order dated December 12, 2003 [Docket #58] (emphasis in original). The Court's 12/12/03 Order did not instruct Plaintiff to produce only those facts supporting its allegations of infringement which Plaintiff intends to rely upon to prove its case; it ordered the production of "<u>all</u> facts" and the identification of "<u>all</u> information" supporting those allegations, regardless of whether or not Plaintiff intends to rely upon it. The Totonis Table and the supporting data and related evidence were <u>not</u> produced by Plaintiff in its May 27, 2004 proffer.

formed the basis of the suit, simply by making sure that they have attorneys conduct or supervise all of the pre-filing investigations into the defendant's allegedly infringing product. The mere fact that certain evidence is unfavorable to one's case does not mean that a party can hide such evidence and pretend that it never existed. *See Astra Aktiebolag v. Andrx Pharmaceuticals, Inc.,* 208 F.R.D. 92, 106-07 (S.D.N.Y. 2002) ("A party should not be allowed to conceal critical, non-privileged discoverable information, which is uniquely in the knowledge of the party and which is not obtainable from any other source, simply by imparting the information from its attorney and then attempting to hide behind the work product doctrine . . .."). Defendants must conclude that that is exactly what is happening here.

### B. DEFENDANTS ARE UNABLE TO OBTAIN EQUIVALENT INFORMATION ELSEWHERE.

Defendants seek two categories of testing results from the Plaintiff: (1) the internal or in-house testing results (identified as PRI. # 92-96 in addition to the data underlying the Totonis Table); and (2) testing results obtained from an outside laboratory (identified as PRI. #97-98). Defendants cannot obtain information equivalent to the withheld evidence in *either* category.

First, with regard to Plaintiff's internal testing results, Defendants have no way of obtaining equivalent data elsewhere because the test results are uniquely within Plaintiff's possession and control. Only Ahlstrom knows what tests it ran, the conditions, the circumstances, and the results. While Defendants can obviously test their own products, such testing is no substitute for Ahlstrom's testing results, which it alleges formed the basis for this suit and which Defendants will be called upon to challenge and refute. Those results are uniquely held and known only to Ahlstrom.

As to testing performed by Plaintiff's outside laboratory, Defendants' attempts to obtain this data directly from the laboratory itself have been entirely thwarted by the Plaintiff's refusal even to identify the lab. First, as shown in the following excerpt from Plaintiff's privilege log, Ahlstrom did not identify the laboratory that conducted such tests.

| DATE | TO | FROM | DESCRIPTION | PRI. # | Comments |
|------|-----|------|-------------|--------|----------|
| 8/2/02 | M. Fuss<br>cc: R. Volpe | **Outside Laboratory** | Test results re: S&H tea bag papers prepared at the request of M. Totonis, Esq. | 97 | Attorney Work Product |
| 7/15/02 | M. Fuss<br>cc: R. Volpe | **Outside Laboratory** | Test results re: S&H tea bag papers prepared at the request of M. Totonis, Esq. | 98 | Attorney Work Product |

Moreover, when questioned in Attorney Totonis's deposition as to the identity of the lab,

the Plaintiff refused to answer:

> *Q. Who is the outside laboratory identified in 97 and 98?*
>
> *MR. BRESNICK:  I'm going to instruct the witness not to answer to give you the name of the outside laboratory, except that it is--there's an outside laboratory.  The other tests haven't been done at Ahlstrom.*
>
> *MR. FARRELL:  How is the name protected, just the name -- the identity?*
>
> *MR. BRESNICK:  **We're withholding that name because we believe that if we turn that name over to you, you would then by alternative means, such as a subpoena, etc., attempt to get the information from the outside laboratory**.*

Totonis Dep., pp. 93-94 (emphasis added) (see Tab A).  This refusal to identify the outside

testing laboratory has effectively foreclosed any attempt to obtain the testing data by the only

available alternative means.  The Plaintiff cannot claim that Defendants have failed to show an

inability to obtain equivalent information on the one hand, and then refuse to identify the very

name necessary to obtain the information by alternative means on the other.

**III.    CONCLUSION**

An entire year has passed since basic discovery requests were served, and Ahlstrom

continues to refuse to produce the results or associated data related to the pre-suit testing it

performed and on which it claims to have based this lawsuit.  Accordingly, in keeping with this

Court's April 12, 2004 Order, Defendants request that this Court revisit its prior ruling, and issue

an order requiring Plaintiff to produce all documents in its possession relating to its pre-suit

testing (documents identified as PRI #92-98 on its supplemental privilege log).  Additionally, in

light of the delay in Plaintiff's production of this information and Plaintiff's failure to produce

this documentation in its May 27, 2004 exchange of evidence, Defendants ask for an award of costs and expenses associated with the filing of this motion.

Defendants, Schoeller & Hoesch, NA, Inc. and
P. H. Glatfelter Company

By _____

    Dina S. Fisher (ct 14896)
    dfisher@rc.com
    Brett J. Boskiewicz (ct 25632)
    bboskiewicz@rc.com
    Robinson & Cole LLP
    280 Trumbull Street
    Hartford, CT 06103-3597
    Tel. No.: (860) 275-8200
    Fax No.: (860) 275-8299

    Marc J. Farrell (ct 24539)
    farrellmj@bipc.com
    BUCHANAN INGERSOLL PC
    213 Market Street, 3rd Floor
    Harrisburg, PA 17101-2121
    Tel. No.: (717) 237-4820
    Fax No.: (717) 233-0852

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was sent via facsimile and first class mail on this day, to the following counsel of record:

Basam E. Nabulsi, Esquire
Cummings & Lockwood
Four Stamford Plaza
Stamford, CT  06904-0120

Sidney R. Bresnick, Esquire
Cohen, Pontani, Lieberman & Pavane
551 Fifth Avenue
New York, NY  10176

_____
Dina S. Fisher

**11/10/2003 Totonis, Michele M.**

```
1                        IN THE UNITED STATES DISTRICT COURT
                          FOR THE DISTRICT OF CONNECTICUT
2

3

4

      AHLSTROM WINDSOR LOCKS LLC      :

5                                     :

      VS.                            : CIVIL ACTION NO.
6                                    : 3:03-CV-0169(AVC)

      SCHOELLER & HOESCH, NA, INC.   :
7                                    :

      AND                            :
8                                    :

      P.H. GLATFELTER COMPANY        :
9

10

11

12

13        DEPOSITION OF: Michele M. Totonis, Legal Counsel
          DATE: November 10, 2003
14        HELD AT: Robinson & Cole, LLP, 280 Trumbull Street
          Hartford, Connecticut

15

16

17

18

19

20

21

22

23    REPORTER: KATHLEEN A. MORIN, LIC./REG. NO.: 00078
                    BRANDON SMITH REPORTING SERVICE, LLC
24                         44 Capitol Avenue
                      Hartford, Connecticut 06106
25                         (860) 549-1850
```

**11/10/2003 Totonis, Michele M.**

1          MS. FISHER:  No, I'm sorry.  Keeping on the

2     record, I understood Ms. Ren's letter to say that that

3     initial testing data would be produced.

4          MS. REN:  That letter was written before I knew

5     there was work product, so I have a -- subsequently we sent

6     you another letter which is indicating -- which indicates

7     that this document is our work product.

8          MS. FISHER:  So there's no --

9          MS. REN:  We're going to identify it in our

10     supplemental privilege log, but not produce.

11          MS. FISHER:  At the beginning of this

12     deposition, there were comments made about a supplemental

13     production that would be maybe in the next 30 days, maybe

14     longer, but that's different from what Ms. Ren was talking

15     about.

16          THE WITNESS:  Yes.  Actually, it was a

17     supplemental response to the interrogatories.  At that

18     time, we weren't dealing with the production of documents.

19          MR. BRESNICK:  That's absolutely --

20          MS. FISHER:  So there's no more that you intend

21     to produce with respect to the test results?

22          MR. BRESNICK:  There is no more, as I

23     understand it, other than what's been identified to you on

24     the privilege log.

25          MS. FISHER:  Okay.

1        Q.    (By Mr. Farrell)   Referring to the supplemental

2    log which includes PRI 92 through 98, could you tell me

3    which of those entries corresponds to the initial testing

4    data or results underlying the Totonis Table.  Is it solely

5    PRI 91 or are there documents in PRI 92 through 98 that may

6    include or related to the initial testing data or

7    underlying results that led to your table?

8        A.    Table 91 -- or PRI 91 appears to me to be the

9    compilation table that I prepared, as does 92.  I think

10   it's the same table listed twice.  91 is my transmission of

11   that table to outside counsel and PRI 92 is the actual

12   table itself, so it's the same exact document, just one was

13   transmitted.  93, 94 and 95 are all information that is

14   included within the table listed as 91 and/or 92.

15       Q.    So 93, 94 and 95 all related to 91?

16       A.    And 92 -- 91 and 92 are the same thing.

17       Q.    How about 96 or 97 or 98, do any of those three

18   tie back to 91?

19       A.    All of that is also testing that was conducted.

20   It's not separately included in the document that's

21   identified as 91 or 92 because they have results in and of

22   themselves.  There was no need to compile it again.

23       Q.    Who is the outside laboratory identified in 97

24   and 98?

25            MR. BRESNICK:   I'm going to instruct the

**11/10/2003 Totonis, Michele M.**

1   witness not to answer to give you the name of the outside

2   laboratory, except that it is -- there's an outside

3   laboratory.  The other tests haven't been done at Ahlstrom.

4            MR. FARRELL:  How is the name protected, just

5   the name -- the identity?

6            MR. BRESNICK:  We're withholding that name

7   because we believe that if we turn that name over to you,

8   you would then by alternative means, such as subpoena,

9   etc., attempt to get the information from the outside

10  laboratory.

11           MS. FISHER:  And you think we shouldn't be

12  allowed to do that?

13           MR. BRESNICK:  I don't think you should be

14  allowed to get that because that's the tests that we're

15  claiming is attorney work product.

16           MS. FISHER:  Okay.

17           MR. FARRELL:  So the name of the lab itself is

18  attorney work product.

19           MR. BRESNICK:  At some point, no.  At some

20  point, I believe we can turn that name over to you, but it

21  will be with a protective order that you not subpoena the

22  tests.  If you want to agree today perhaps, if you don't

23  subpoena those test results --

24           MS. FISHER:  No.

25           MR. BRESNICK:  -- from the outside laboratory,

**11/10/2003 Totonis, Michele M.**

1    we'd be happy to give you the name.

2                    MS. FISHER:  No.  I think we're at the point --

3    and I don't mean any disrespect or offense, but this feels

4    a little cat-and-mouse-like, so if you want to withhold the

5    name, great, because once we get it, we'll plan to subpoena

6    them.

7                    MR. BRESNICK:  I figured you would.

8                    MS. FISHER:  But we do disagree with your

9    reading of that, whether or not that's an appropriate claim

10   of privilege.

11                   MR. BRESNICK:  Let's put it this way, I made

12   the offer to give you the name --

13                   MS. FISHER:  As long as we don't --

14                   MR. BRESNICK:  As long as you don't subpoena

15   those test results until we have the court order saying

16   you're entitled to them.  If you get a court order saying

17   you're entitled to those test results, then, of course,

18   we'd turn them over, but if we give you that name today,

19   absent your agreement not to seek the results by other

20   means, then we've just given up our claim of privilege.

21                   THE WITNESS:  As the motions are still pending

22   before the court, I think we need to just refrain from

23   delving into the areas that are presently pending.  Once the

24   court rules, then we can --

25                   Q.   (By Mr. Farrell)  With regard to 96, who is R.

1          MR. BRESNICK:  Answer the question.

2          THE WITNESS:  We believe so, yes.

3      Q.   (By Mr. Farrell)  What is the factual basis for

4    that belief?

5      A.   Some of the initial testing that was done.

6      Q.   Which samples are we talking about there?

7    There was the Brian Koesher one, but he only brought back

8    212C; is that correct?

9      A.   Again, you continue to use the 212C

10   designation and I'm not certain which sample had 212C on

11   it.  Again, there was a number of samples.  There was only

12   one that had any kind of marking on it, so I don't want to

13   misrepresent the record and indicate that I'm positive that

14   that particular sample came from Mr. Koesher.  I don't know

15   that that's so.

16      Q.   How many different samples are we talking about

17   that came back from your sales folks, how many sheets of

18   paper, even if it's a rough ballpark?

19      A.   I believe, it's four.

20          MS. FISHER:  Did you say "four"?

21          THE WITNESS:  I believe it's four in the

22   initial testing.

23      Q.   (By Mr. Farrell)  What do you mean by that,

24   "initial testing"?

25      A.   That was during the spring, summer, fall of

**11/10/2003  Totonis, Michele M.**

1    2002 when we were conducting the initial investigation to

2    determine whether or not we believed that there was a

3    reasonable belief that there was infringement.

4         Q.    Does that initial testing include the tea bags

5    that you bought off of the grocery shelf?

6         A.    Yes.

7         Q.    So is one or more of the four sheets an actual

8    tea bag?

9         A.    Yes.

10        Q.    How many of the four sheets were tea bags from

11   the store shelf?

12        A.    I believe, two.

13        Q.    And then, the other two were samples that came

14   back from your sales folks who had obtained them from

15   customers?

16        A.    I don't know where they obtained them.

17   They came back from the salespeople.

18        Q.    So one of the two sheets that came back was

19   marked 212C, correct?

20        A.    Yes.

21        Q.    So we have one sheet from the sales folks that

22   was unidentified as far as a grade designation?

23        A.    To the best that I can recall, yes.

24        Q.    How do we know, again, that the unidentified

25   sheet from the sales force (sic) was a paper of defendants?

11/10/2003 Totonis, Michele M.

1        A.    We had it on excellent information that it was

2    material of the defendant.

3        Q.    Can you elaborate?  Who said what to whom to

4    give you this impression that it was excellent?  What are

5    the sources?

6        A.    It was given to one of the salespeople but I

7    do not know whom.  I was not told that this is Schoeller

8    paper.

9        Q.    Did that person who then relayed the

10   information to you describe it as being an excellent

11   source --

12       A.    Yes.

13       Q.    -- of information?

14             Is the reason that you're not sure where it

15   came from, the fact that that person was told, you know,

16   not to say where he had gotten it?

17       A.    That may be true.

18       Q.    Who is this person?

19       A.    Brian Koesher.

20       Q.    And you're not sure, again, if he brought back

21   the 212C sheet or the unidentified sheet.

22       A.    Correct.

23       Q.    Was there another person that brought back a

24   sheet from the field?  Was it --

25       A.    Richard Clist.

11/10/2003 Totonis, Michele M.

1           Q.   Yes, Richard.

2                Aside from the initial testing, was there

3    another round of testing after that?

4           A.   Prior to the commencement of the suit?

5           Q.   Yes.

6           A.   Well, there was the testing that's all

7    identified in the privilege log.

8           Q.   All of which relates to the two tea bags and

9    the two sheets that came back from the field?

10          A.   Correct.

11          Q.   Was the later testing that you're alluding to,

12   that was conducted, done after the commencement of the suit?

13          A.   As I stated prior to lunch, I'm not certain

14   that testing subsequent to the commencement of suit has

15   actually happened yet.  I don't know that.

16          Q.   But there would be no other testing that you

17   would have any knowledge about other than this initial

18   testing of these four sheets.

19          A.   Correct.

20          Q.   Is it plaintiff's contention that each of the

21   tea bag sheets infringed the 997 Patent?

22          A.   It is.

23          Q.   Is it plaintiff's contention that each of the

24   tea bag sheets contained one or more percent, by weight, of

25   a hydrophobic agent?

**11/10/2003 Totonis, Michele M.**

1          A.    Not necessarily.

2          Q.    What do you mean by that?

3          A.    I don't recall the exact constituents of each

4    of the samples tested as I sit here today.

5          Q.    Well, is it possible that it would not have

6    included a hydrophobic binder?

7          A.    I don't believe so.

8          Q.    Is it plaintiff's contention that each of the

9    two tea bag samples exhibited no water climb?

10          MS. BRESNICK:   Where do you get "no water climb"?

11          Q.    (By Mr. Farrell)   I'm sorry -- exhibited no

12    appreciable water climb -- my mistake.

13          A.    Can you repeat the question.

14          MR. BRESNICK:   Let me just make a comment here.

15    You can answer first and then I'll make my comment.

16          MS. FISHER:   That would be helpful, but I think

17    she wanted to hear it again.

18          Q.    (By Mr. Farrell)   Is is plaintiff's contention

19    that each of the two tea bag sheets that were tested

20    exhibited no appreciable water climb?

21          A.    It is.

22          MR. BRESNICK:   My comment is this.   Now, what

23    you're doing is asking this witness, claim element by claim

24    element, apparently, whether your product -- your clients'

25    products infringed the patent.

1          MR. FARRELL:  Yes.

2          MS. FISHER:  Can I interject this one proviso:

3    We haven't conceded that what she tested was our clients'

4    product.

5          MR. BRESNICK:  Okay, that's fine.  This witness

6    has not made that determination and that determination of

7    all of your clients' products and whether or not they meet

8    all of the elements of the claims will wait the completion

9    of discovery in the case, obviously.  So anything that's in

10   the complaint is an allegation at this time made on

11   information and belief, and on that basis, you can ask the

12   questions, but there's no proof positive that you can ask

13   her at this point until we get the discovery that we need.

14         MS. FISHER:  Can I just --

15         MR. BRESNICK:  Sure.

16         MS. FISHER:  I would ask you or the deponent,

17   what discovery do you feel you need that you don't yet have

18   that would allow you to answer the question?

19         MR. BRESNICK:  Well, that is something that

20   we'll advise you of shortly, but we feel that we have not

21   -- I don't want to go into discovery issues, but we have

22   not gotten the discovery that we've requested and it

23   certainly hasn't been complete in many respects, and until

24   we get that, we wouldn't be able to give you a definitive

25   answer as to what our contention is with respect to each

**11/10/2003 Totonis, Michele M.**

```
1               STATE OF CONNECTICUT

2

3           I, Kathleen A. Morin, a Notary Public duly

4    commissioned and qualified in and for the State of

5    Connecticut, do hereby certify that pursuant to notice

6    there came before me on the 10th day of November, 2003, the

7    following-named person, to wit: Michele M. Totonis, Legal

8    Counsel, who was by me duly sworn to testify to the truth

9    and nothing but the truth; that she was thereupon carefully

10   examined upon her oath and her examination reduced to

11   writing under my supervision; that this deposition is a

12   true record of the testimony given by the witness.

13           I further testify that I am neither attorney

14   nor counsel for nor related to nor employed by any of the

15   parties to the action in which this deposition is taken,

16   and further that I am not a relative or employee of any

17   attorney or counsel employed by the parties hereto, or

18   financially interested in this action.

19           IN WITNESS THEREOF, I have hereunto set my hand

20   this 20th day of November, 2003.

21

22           _____

23           Kathleen A. Morin, Notary Public

24           My Notary Expires: March 31, 2008
```