IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| AHLSTROM WINDSOR LOCKS LLC, | : |
| Plaintiff | : CASE NO. 3:03-CV-0169-AVC |
| v. | : |
| SCHOELLER & HOESCH, NA, INC., | : |
| and | : October 8, 2004 |
| P. H. GLATFELTER COMPANY | : |
| Defendants | : |

**LOCAL RULE 56(a)(1) STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED,
FILED IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
ON THE BASIS OF PATENT INVALIDITY UNDER 35 U.S.C. §§ 102 AND 103**

Pursuant to Rule 56(a)(1) of the Local Civil Rules of the United States District Court for the District of Connecticut, Defendants, Schoeller & Hoesch, NA, Inc. ("S&H NA") and P. H. Glatfelter Company ("Glatfelter," and collectively with S&H NA, "Defendants"), submit this statement of material facts as to which there is no genuine issue to be tried, in connection with Defendants' Motion for Summary Judgment on the Basis of Patent Invalidity Under 35 U.S.C. § 102 and 103 ("102/103 Invalidity Summary Judgment Motion"). For the sake of brevity, Defendants herein set forth only those facts germane to the 102/103 Invalidity Summary Judgment Motion. Thus, the facts as to which there is no genuine issue to be tried are as follows.

I. **BACKGROUND.**

A. **PARTIES.**

1. Plaintiff, Ahlstrom Windsor Locks LLC ("Plaintiff" or "Ahlstrom"), is engaged in the business of manufacturing and marketing fibrous web materials for making infusion packages (such as tea bags) for brewing beverages. Plaintiff's Complaint, ("Complaint"), ¶ 1.

2.      Ahlstrom is the successor in interest of the Non-Woven Division of The Dexter Corporation ("Dexter"). Complaint, ¶ 1.

3.      Defendant Glatfelter, through its subsidiaries, is engaged in the business of manufacturing and marketing, *inter alia*, a variety of fibrous web materials for making infusion packages (including tea bags) for brewing beverages. Answer of Defendants, Schoeller & Hoesch, NA, Inc. and P. H. Glatfelter Company, to Plaintiff's Complaint ("Answer"), ¶ 3.

4.      Defendant S&H NA is a wholly owned subsidiary of Glatfelter. Deposition of Stanley L. Schreffler, December 5, 2003 ("Schreffler Dep."), at 8:17-18 (*see* Tab C[1]).

5.      Non-party Papierfabrik Schoeller & Hoesch GmbH & Co. KG ("S&H Germany") is a subsidiary owned, through a series of other subsidiaries, by Glatfelter. See Tab C, Schreffler Dep., at 9:1 through 14:19.

6.      At its facility in Gernsbach, Germany, S&H Germany manufactures the products at issue in this case. *See* Tab C, Schreffler Dep., at 9:1 through 14:19.

7.      S&H NA is the North American sales and marketing arm for products manufactured by S&H Germany. *See* Tab C, Schreffler Dep., at 16:3-6.

**B.     THE PATENT-IN-SUIT.**

8.      Plaintiff's Complaint contains two counts, one for patent infringement (Count I) and one for breach of contract (Count II). Complaint, ¶¶ 4-11.

9.      The sole patent alleged to be infringed is U.S. Patent No. 5,431,997 ("the '997 Patent" or "Patent-in-Suit", *see* Tab A). Complaint, ¶¶ 5, 7.

10.     The parties entered into an agreement in 1999, pursuant to which Defendants agreed, *inter alia*, ". . . until the ['997] patent expires or is held invalid or unenforceable by a court of competent jurisdiction, it will not make, have made, use or sell in the United States of America . . . fibrous web materials for making infusion packages for brewing beverages as covered by one or

---

[1]     As used herein, "Tab _" refers to the lettered tabs of the separate Appendix of Exhibits which Defendants have filed concurrently herewith in support of the instant motion. This notation is employed throughout this Statement.

more claims of the ['997] patent." Complaint, ¶ 15.

11. The '997 Patent, entitled "Process of Producing Porous Web Materials Used for Making Infusion Packages for Brewing Beverages and the Web Materials Thus Produced," was issued on July 11, 1995 in the names of inventors Peter C. Scott, Helen Viazmensky and Nicholas Wolcheck, Jr., and assigned on its face to Dexter. See Tab A, Patent-in-Suit.

12. The application which resulted in the '997 Patent was filed July 1, 1993 ("the '997 Application") and given U.S. Application Serial No. 08/086,673. See Tab B-1.[2]

13. Ahlstrom alleges that it is the sole owner of the Patent-in-Suit, by way of its acquisition of the assets of Dexter on June 20, 2000 and a confirmatory assignment executed on August 31, 2000. Complaint, ¶ 6.

## II. THE PROSECUTION OF THE '997 APPLICATION BEFORE THE USPTO.

14. Following the filing of the '997 Application on July 1, 1993, Dexter filed an Information Disclosure Statement with the United States Patent and Trademark Office ("USPTO") on September 28, 1993 (the "IDS", see Tab B-2).

15. In the IDS, Dexter disclosed patents of which Dexter was aware which, in Dexter's words, it believed "may be material to the examination of the ['997 Application] and in respect of which there may be a duty to disclose in accordance with 37 CFR 1.56." See Tab B-2, IDS. Those patents were U.S. Patent Nos.: 2,852,795 to Hermanson et al.; 3,174,889 to Anderson et al.; 3,183,096 to Hiscock; 3,373,043 to Rubenstein; 3,386,834 to Noiset et al. ("Noiset" or the "Noiset Patent", see Tab D); 3,468,696 to Conway; 3,616,166 to Kelley ("Kelley" or the "Kelley Patent", see Tab E); 3,881,987 to Benz; 4,289,580 to Elston et al.; 4,902,370 to Dust et al.; and 5,015,513 to Newbold et al. See Tab B-2, IDS.

16. As the prosecution history shows, other than what it cited in the IDS, Dexter brought no other prior art to the attention of the USPTO during the prosecution of the '997 Application, nor

---

[2] A complete copy of the prosecution history or "file wrapper" of the Patent-in-Suit is included at Tab B of the Appendix of Exhibits filed concurrently herewith ("File Wrapper"), and select individual items within the prosecution history are indicated with numerical tabs and identified as Tab B-1, Tab B-2, etc.

was any other prior art considered by the USPTO in its examination of the '997 Application. *See* Tab B, File Wrapper.

17.    The term "high molecular weight" appeared nowhere in the specification or claims of the '997 Application as originally filed. *See* Tab B-1, '997 Application.

18.    In an Office Action dated October 4, 1994 (the "Office Action," *see* Tab B-3), the USPTO initially rejected the '997 Application on the basis, *inter alia*, that all of the claims were obvious in light of the Kelley and Noiset Patents. *See* Tab B-3, Office Action, pp. 2-3.

19.    It was in response to the Office Action that Plaintiff first interjected the term "high molecular weight," via an Amendment it filed with the USPTO on January 11, 1994 (the "Response," *see* Tab B-4, p. 11).

20.    In its attempt to overcome the USPTO's obviousness rejection as it related to the Kelley Patent, Plaintiff argued in the Response that Kelley was distinguishable from its invention because, *inter alia*, "the Kelley patent requires the use of a polyblend having two components, the first of which must have a molecular weight between 150,000 and 300,000." *See* Tab B-4, Response, pg. 11.

21.    Neither the Plaintiff nor the USPTO discussed or otherwise addressed the molecular weight of *Component 2* of the Kelley Patent's two-part binder composition during prosecution of the '997 Application. *See* Tab B, File Wrapper.

22.    At no time during the prosecution of the '997 Application did the USPTO make mention of the following statement in the Kelley Patent:

> It is known that emulsion polymers made from acrylic esters such as ethyl acrylate by the usual polymerization procedures yield polymers of high molecular weight such as about 500,000 to several million. It has been suggested heretofore to use such a high molecular weight polymer of ethyl acrylate as a binder for nonwoven fabrics.

*See* Tab E, Kelley, 1:5-10.[3]

---

[3]   As used herein, the citation "1:5-10" refers to the portion of the Kelley Patent appearing at column 1, lines 5 through 10. This notation is employed throughout this Statement.

-4-

23. In its attempt to overcome the USPTO's obviousness rejection as to the Noiset Patent, Plaintiff argued in the Response, *inter alia*, that "the teaching of Noiset [is] . . . that the hydrophobic material should not be used as an impregnant throughout the entire extent of the porous fibrous sheets." *See* Tab B-4, Response, p. 8.

24. At no time during the prosecution of the '997 Application did Plaintiff or the USPTO address or otherwise make mention of the four sample webs referred to in Table 1 of the Noiset Patent, which sets forth porosity data for "tea bags in which the entire surface area was treated" with hydrophobic silicone dispersions of varying concentrations. *See* Tab B, File History; *see also* Tab D, Noiset, 4:27-40.

25. On February 8, 1995, the USPTO issued a Notice of Allowability along with a Notice of Allowance and Issue Fee Due (the "Notice of Allowance", *see* Tab B-5).

26. Dexter paid the issue fee on April 11, 1995, and the '997 Patent issued thereafter on July 11, 1995. *See* Tab B-6.

### III. THE EUROPEAN COUNTERPART TO THE '997 APPLICATION.

27. On May 23, 1994, while the '997 Application was still pending before the USPTO, Dexter filed a counterpart application with the European Patent Office ("EPO") claiming priority to the '997 Application, which counterpart application was given Application No. 94303680.6 and later published as EP 0 632 163 A1 (the "European Counterpart Application", *see* Tab F).

28. On September 23, 1994, five days before Dexter filed its IDS in the United States with the USPTO in connection with the '997 Application and four-and-a-half months before the USPTO issued its Notice of Allowability, a European Search Report (the "European Search Report", *see* Tab G) was issued by the EPO in connection with its examination of Dexter's European Counterpart Application.

29. The European Search Report identified two prior art documents which the EPO determined to be relevant to the patentability of Dexter's European Counterpart Application: (1) the Noiset Patent (U.S. Pat. No. 3,386,834); and (2) European Patent Application 85305042.5, filed July

15, 1985 and published February 5, 1986 under Publication No. 0 170 461 A1 in the name of Slawko Yadlowsky and assigned to General Foods Corporation ("Yadlowsky" or the "Yadlowsky Application", *see* Tab H).

30. The EPO assigned the Yadlowsky Application the letter designation "X", to indicate it as being a "particularly relevant" prior art document standing alone - the highest level of relevance available to the EPO in its categorization system, as shown on the face of the European Search Report. *See* Tab G, European Search Report.

31. Dexter never brought the Yadlowsky Application to the attention of the USPTO in connection with the prosecution of the '997 Application, nor was the Yadlowsky Application ever considered by the USPTO in its examination of the '997 Application. *See* Tab B, File Wrapper.

32. After several rejections based on the Yadlowsky Application, the EPO eventually granted Dexter's European Counterpart Application, which issued as European Patent No. 0 632 163 B1 on August 29, 2001 (the "European Counterpart Patent", *see* Tab I).

33. Dexter's European Counterpart Patent issued with 21 claims, including one independent product claim (Claim 1) and 11 claims dependent thereon (Claims 2-11 and 20), along with one independent process claim (Claim 12) and eight claims dependent thereon (Claims 13-19 and 21)[4]. *See* Tab I, European Counterpart Patent.

34. The claims of the European Counterpart Patent at the time of its issuance are set forth in the left-hand column of the table found at Tab T of the Appendix of Exhibits; the claims of the Patent-in-Suit are set forth in the right-hand column of that table.

35. In the table below, the portion of Claim 1 of the Patent-in-Suit relating to the claimed web's properties is set forth in the left-hand column; the corresponding portion from Claim 1 of the European Counterpart Patent at the time of its issuance is set forth in the right-hand column:

---

[4] Patent claims are either independent or dependent. An independent claim stands alone. A dependent claim always refers back to, and incorporates the limitations of, an independent claim.

| "Properties" Portion of<br>Claim 1 - Patent-in-Suit<br>(*see* Tab A) | Corresponding Claim Limitations<br>Claim 1 - European Counterpart<br>(*see* Tab I) |
|---|---|
| the impregnated sheet material exhibiting no appreciable water climb when measured using water at a temperature of about 100° C and | the impregnated web exhibiting a water climb of not more than 0.5 inch (13 mm) over a period of 400 seconds when measured using water at a temperature of about 100° C and |
| no substantial loss of infusion characteristics | no substantial loss of infusion characteristics as measured by first-colour infusion time |
| while providing less than 10 percent failure in the mechanical seam upon exposure to boiling water. | while providing less than 10 percent failure in the mechanical seam of tea bags constructed from the said web material upon exposure to boiling water. |

## IV. CROMPTON'S OPPOSITION TO THE EUROPEAN COUNTERPART.

36. Following its issuance, an opposition proceeding was instituted against the European Counterpart Patent by J.R. Crompton Limited ("Crompton") on May 29, 2002, in which Crompton sought to have the claims of Ahlstrom's European Counterpart Patent declared invalid (the "Crompton Opposition", *see* Tab J).

37. Crompton is one of the three largest manufacturers of tea bag paper worldwide -- Ahlstrom and Defendants being the others. Deposition of Michele M. Totonis, November 10, 2003 ("Totonis Dep.", *see* Tab W), at 149:12-13.

38. On June 1, 2004, the Opposition Division of the EPO issued its decision in the Crompton Opposition (the "EPO Opposition Decision", *see* Tab K), in which it declared all 21 of the claims that were originally granted in the European Counterpart Patent unpatentable due to a lack of novelty vis-à-vis the Kelley Patent. *See* Tab K, EPO Opposition Decision, pp. 6, 18-20 and 32-33 (of 39).

39. The EPO's Opposition Division also deemed two auxiliary sets of claims submitted by Ahlstrom during the course of the Crompton Opposition as being unpatentable in view of the Kelley Patent, each set directed generally to a "porous fibrous web material of the non-heat seal type suited for making infusion packages," before the EPO ultimately allowed a third set of auxiliary claims directed to a "mechanically sealed infusion package" (not to a "porous fibrous web material"). *See* Tab K, EPO Opposition Decision, pp. 6, 7, 20-22 and 34-37 (of 39).

40. The EPO Opposition Decision thereby allowed Ahstrom's European Counterpart Patent to stand, but with revised claims (directed essentially to tea *bags*) replacing the originally-issued claims (which had been directed essentially to teabag *paper*). *See* Tab K, EPO Opposition Decision, pp. 3, 7, 12-13, 22-24 and 38-39 (of 39).

41. During the course of the hearing in the Crompton Opposition conducted before the EPO's Opposition Division on May 6, 2004, Plaintiff stated that the subject matter of Claim 1 of its European Counterpart Patent differed from the subject matter disclosed in the Kelley Patent only in that the web claimed in the European Counterpart Patent was suitable for making mechanically-sealed tea bags whereas according to Plaintiff the web disclosed in the Kelley Patent was not. *See* Tab K, EPO Opposition Decision, p. 5 (of 39). The EPO rejected this argument. *Id.* at 19 (of 39).

42. Unlike the revised, post-Crompton-Opposition version of Plaintiff's European Counterpart Patent, the Patent-in-Suit does not contain any claims directed to a "mechanically sealed infusion package" or processes for producing same. *See* Tab A, Patent-in-Suit.

43. Instead, the Patent-in-Suit is limited exclusively to claims directed to a "*fibrous web* suited for making infusion packages for brewing beverages" and a "process for producing *porous web materials* for making infusion packages." *See* Tab A, Patent-in-Suit, 7:23 to 8:60 (emphasis added); *see also* Tab T.

## V. THE CLAIMS OF THE '997 PATENT AT ISSUE.

44. Plaintiff alleges that various products manufactured in Gernsbach, Germany by S&H Germany and offered for sale and/or sold by S&H NA in the United States infringe claims 1-4, 6-8,

-8-

10-13 and 15-16 of the '997 Patent. <u>Plaintiff's Second Supplemental Answer to Interrogatory No. 1</u>, May 19, 2004 (*see* Tab M).

45.  Defendants have counterclaimed for a declaratory judgment of invalidity as to *all* claims of the Patent-in-Suit. <u>Answer</u>, ¶ 9 of Counterclaim.

46.  Claim 1 of the '997 Patent, the lone independent product claim, reads as follows (*see* Tab A, <u>Patent-in-Suit</u>, paragraphing added):

> **1. A fibrous web suited for making infusion packages for brewing beverages and exhibiting improved resistance to the failure of a mechanical seam therein, said web comprising** [hereinafter "<u>Preamble</u>"]
>
> **a porous fibrous sheet material** [hereinafter "<u>First Element</u>"]
>
> **impregnated throughout its extent with about one percent or more by weight** [hereinafter "<u>Second Element</u>"]
>
> **of a hydrophobic treating system comprising a cured hydrophobic agent selected from the group consisting of high molecular weight cross-linked acrylic polymers, silicones, fluorohydrocarbons, paraffins, alkyl ketene dimers and stearylated materials,** [hereinafter "<u>Third Element</u>"]
>
> **the impregnated sheet material exhibiting no appreciable water climb when measured using water at a temperature of about 100° C and no substantial loss of infusion characteristics while providing less than 10 percent failure in the mechanical seam upon exposure to boiling water** [hereinafter "<u>Properties</u>"].

47.  Claim 2 of the '997 Patent reads as follows (*see* Tab A, <u>Patent-in-Suit</u>):

> **2. The infusion web of claim 1 wherein the hydrophobic agent that completely impregnates the entire web material comprises at least 3-4 percent by weight of the web material.**

48.  Claim 3 of the '997 Patent reads as follows (*see* Tab A, <u>Patent-in-Suit</u>):

> **3. The infusion web of claim 1 wherein the hydrophobic agent is a high molecular weight alkyl acrylate strength imparting hydrophobic binder.**

49. Claim 4 of the '997 Patent reads as follows (*see* Tab A, Patent-in-Suit):

> **4. The infusion web of claim 3 wherein the hydrophobic binder is selected from the group consisting of ethyl acrylate and butyl acrylate polymers and copolymers.**

50. Claim 5 of the '997 Patent reads as follows (*see* Tab A, Patent-in-Suit):

> **5. The infusion web of claim 1 wherein the hydrophobic agent comprises up to about 8-12 percent by weight of the web material and the mechanical seam failure of the web is less than one percent.**

51. Claim 6 of the '997 Patent reads as follows (*see* Tab A, Patent-in-Suit):

> **6. The infusion web of claim 1 wherein the hydrophobic agent is a strength imparting hydrophobic binder comprising a high molecular weight cross-linked butyl acrylate copolymer.**

52. Claim 7 of the '997 Patent reads as follows (*see* Tab A, Patent-in-Suit):

> **7. The infusion web of claim 1 wherein the hydrophobic agent is a hydrophobic strength imparting binder completely impregnating the entire web material and imparting sufficient resistance to wetting to eliminate the water climb of the fibrous sheet material, the hydrophobic binder exhibiting an affinity for being readily absorbed into the fibers of the web, the binder being a high molecular weight cross-linked alkyl acrylate polymeric material.**

53. Claim 8 of the '997 Patent reads as follows (*see* Tab A, Patent-in-Suit):

> **8. The infusion web of claim 1 wherein the fibrous sheet material contains a strength imparting binder other than the hydrophobic agent.**

54. Claim 9 of the '997 Patent reads as follows (*see* Tab A, Patent-in-Suit):

> **9. The infusion web of claim 8 wherein the hydrophobic agent comprises from 0.3 to 30 percent by weight.**

55.     Claim 10 of the '997 Patent, the lone independent process claim, reads as follows (*see* Tab A, <u>Patent-in-Suit</u>, paragraphing added):

> 10. A process for producing porous web materials for making infusion packages having enhanced mechanical seam integrity comprising the steps of
>
> providing a porous absorbent web material suited for use as an infusion package,
>
> treating the entire web material with an aqueous emulsion of a hydrophobic agent selected from the group consisting of
>
> high molecular weight cross-linked acrylic polymers, silicones, fluorohydrocarbons, paraffins, alkyl ketene dimmers and stearylated materials
>
> to provide a treated web that exhibits no appreciable water climb when measured using water at a temperature of about 100° C and
>
> less than 10 percent failure in the mechanical seam therein when exposed to boiling water.

56.     Claim 11 of the '997 Patent reads as follows (*see* Tab A, <u>Patent-in-Suit</u>):

> 11. The process of claim 10 wherein the aqueous emulsion of the hydrophobic agent exhibits an affinity for being readily absorbed into the fibers of the web and the process includes the step of subsequently insolubilizing the agent on the web.

57.     Claim 12 of the '997 Patent reads as follows (*see* Tab A, <u>Patent-in-Suit</u>):

> 12. The process of claim 10 wherein the hydrophobic agent is a cross-linked high molecular weight acrylic polymer which also acts as a strength imparting hydrophobic binder, the hydrophobic agent imparting resistance to aqueous absorption as measured by water climb and exhibiting an affinity for being readily absorbed into the fibers of the web, the treating step comprising a saturating treatment and the process includes the step of subsequently drying the treated web material.

58. Claim 13 of the '997 Patent reads as follows (*see* Tab A, Patent-in-Suit):

> **13. The process of claim 12 wherein the binder is a latex dispersion of an alkyl acrylate, the latex binder being present in an amount sufficient to provide a binder pick up by the web of at least 3-4 percent by weight.**

59. Claim 14 of the '997 Patent reads as follows (*see* Tab A, Patent-in-Suit):

> **14. The process of claim 10 wherein the fibrous sheet material is soft, tissue weight material, the process including the step of treating the web with a binder in addition to the hydrophobic treating agent, said agent exhibiting an affinity for being readily absorbed into the fibers of the web, said hydrophobic agent being applied as a latex dispersion in an amount sufficient to impart a hydrophobic agent pick up of about 0.3 to 30 percent by weight.**

60. Claim 15 of the '997 Patent reads as follows (*see* Tab A, Patent-in-Suit):

> **15. The process of claim 10 wherein the fibrous sheet material is a prebonded, light weight, highly wettable material and the hydrophobic agent imparts complete resistance to wetting as measured by water climb, the hydrophobic agent exhibiting an affinity for being readily absorbed into the fibers of the web and being applied by a size press.**

61. Claim 16 of the '997 Patent reads as follows (*see* Tab A, Patent-in-Suit):

> **16. The process of claim 10 wherein the hydrophobic treating agent completely impregnates the web material as the web material is being treated with a strength imparting binder.**

## VI. INTERPRETING THE CLAIMS OF THE '997 PATENT.

62. With regard to the "Preamble" and "First Element" portions of Claim 1 of the Patent-in-Suit, the specification of the Patent-in-Suit states in part: "[t]he present invention in its application to tea bags permits the use of commercially available, self-supporting infuser webs" which are "generally soft, tissue-thin fibrous materials characterized by light weight". *See* Tab A,

Patent-in-Suit, 3:21-24; *see also* Plaintiff's proposed claim construction, submitted herewith at Tab V ("Plaintiff's Claim Construction"), pp. 2-3.

      63.    With regard to the claim terms "mechanical seam" and "infusion packages" in the "Preamble" portion of Claim 1, the specification of the Patent-in-Suit states in part that its "webs are of the nonheat-seal variety and require mechanical fastening, i.e., folding and crimping, for the formation of the tea bag." *See* Tab A, Patent-in-Suit, 3:27-29; *see also* Tab V, Plaintiff's Claim Construction, pp. 2-3.

      64.    With regard to the "Second Element" of Claim 1, the Patent-in-Suit states in pertinent part:

> The hydrophobic agent may be applied to the preformed infuser web material by well-known techniques used to add binders while assuring complete coverage of the web material. For example, the web may be treated by brush, roll, spray or immersion bath to effectuate the desired application to the web material. Since complete impregnation of the web is desired, a saturation treatment is preferred. The alkyl acrylate binder emulsions generally penetrate quickly through the rather thin and absorbent infuser web and may be applied during a suitable stage in the manufacture of the continuous fibrous web.

*See* Tab A, Patent-in-Suit, 4:29-40; *see also* Tab V, Plaintiff's Claim Construction, pp. 3-5.

      65.    The Third Element of Claim 1 -- "a hydrophobic treating system comprising a cured hydrophobic agent selected from the group consisting of high molecular weight cross-linked acrylic polymers, silicones, fluorohydrocarbons, paraffins, alkyl ketene dimers and stearylated materials" -- constitutes what is known as a "*Markush* group."

      66.    With regard to the claim term "acrylic polymers" in the *Markush* portion of the "Third Element" of Claim 1, the specification of the Patent-in-Suit states in part that "[t]hose found to be particularly effective as hydrophobic binders are the materials generally categorized as acrylic polymers and, more particularly, as latex dispersions or emulsions of alkyl acrylate polymers and copolymers." *See* Tab A, Patent-in-Suit, 4:4-8; *see also* Tab V, Plaintiff's Claim Construction, pp. 5-6.

67. With regard to the claim term "high molecular weight" in the in the *Markush* portion of the "Third Element" of Claim 1, Plaintiff's Claim Construction does not suggest any specific numeric value or range of molecular weights that it would construe to be "high" (*see* Tab V, Plaintiff's Claim Construction); nor is that term defined anywhere in the Patent-in-Suit itself. *See* Tab A, Patent-in-Suit.

68. The claim term "hydrophobic" in the *Markush* portion of the "Third Element" of Claim 1 is expressly defined in the specification of the Patent-in-Suit itself: "[a]s used herein the term 'hydrophobic' refers to the characteristic of the treating agent that imparts to the web material a resistance to, or the ability to avoid, wetting with water." *See* Tab A, Patent-in-Suit, 3:3-6.

69. The Patent-in-Suit discloses that in addition to high molecular weight, cross-linked acrylic polymers, "the hydrophobic treating agent may be any of a number of fluid-repellent materials, such as silicones, [and] fluorohydrocarbons, ...." *See* Tab A, Patent-in-Suit, 6:36-38.

70. With regard to the claim term "fluorohydrocarbons" in the *Markush* portion of the "Third Element" of Claim 1, the Patent-in-Suit discloses that:

> Where a fluorochemical treating agent is employed, it should, of course, meet the standards for use with foods and beverages and preferably should be in the form of an aqueous emulsion for ease of application. A typical aqueous emulsion formulation ... may employ materials such as the Scotchban treating agent sold by Minnesota Mining and Manufacturing under the designation "FC-809" or "FX-845".

*See* Tab A, Patent-in-Suit, 6:43-52.

71. With regard to the claim term "silicones" in the *Markush* portion of the "Third Element" of Claim 1, the Patent-in-Suit states that when silicones are chosen as the hydrophobic treating agent, they "may be any of those materials mentioned in U.S. Pat. No. 3,386,834 [the Noiset Patent], the disclosure of which is incorporated herein by reference." *See* Tab A, Patent-in-Suit, 6:39-42.

72. With regard to the "Properties" portion of Claim 1 of the Patent-in-Suit that calls for "no appreciable water climb when measured using water at a temperature of about 100° C," a specific test for measuring water climb is set forth in the Patent-in-Suit:

> The web material treated with a hydrophobic binder of the type described, while retaining its porosity, exhibits substantially no absorption characteristics. As mentioned, these are measured by a "water climb" test procedure that determines the rate of saturation of a web material by capillary action. In accordance with this procedure, a strip of treated material is cut to a specimen size of one inch by five inches. The strip is mounted on a support bar above a container, such as a 500 ml. beaker, so that the strip will be suspended within the beaker. The specimen is marked at ½ inch and at 1½ inches from the bottom of the specimen. The beaker is partially filled with distilled water to a level such that the bottom ½ inch of the specimen will be immersed in the water. The time then is recorded for the water front to advance up the specimen to the 1½" mark, a distance of one inch. The test is stopped at 400 seconds if the water front has not advanced sufficiently to complete the one inch climb on the specimen. The time is reported for the one inch travel of the water front. If the water front does not move above the level of the water in the beaker, a report of "no absorption" is recorded.

See Tab A, Patent-in-Suit, 5:9-32.

73.  With regard to the "Properties" portion of Claim 1 of the Patent-in-Suit that calls for "less than 10 percent failure in the mechanical seam upon exposure to boiling water," a specific test for measuring seam failure is set forth in the Patent-in-Suit:

> The water climb absorbency rate test has been correlated to the number of seam failures in a standard teabag of the flow through type. The purpose of the seam failure test is to assess the ability of a tea bag seam to maintain its integrity during forces exerted on it in a harsh brewing condition. In accordance with this test procedure, a teabag of the flow through type is inverted so that the "W" fold is extending in an upward direction and the head fold in a downward direction, with the tea located adjacent the head fold. The teabag so oriented is placed in the bottom of a beaker with the head fold facing down. Tap water is heated to a constant boiling condition and approximately 400 ml. of boiling water is poured directly onto the teabag with the stream of water being maintained on the bag throughout the pour to provide a maximum degree of water flow turbulence upon the bag. The time for pouring the boiling water onto the teabag should take about 3 seconds. The container then is examined for tea leaves discharged by the teabag. Thereafter, the bag is removed and examined at both the center fold and the head fold for any openings therein. If any of the following conditions are present, the seam is considered to be a failure:
> 1. Tea leaves in the beaker;
> 2. Opening of the center fold area;
> 3. Opening of the head fold area.
>
> Based on the foregoing, the determination is made as to either failure or non-failure of the seam.

See Tab A, Patent-in-Suit, 5:33-63; see also Tab V, Plaintiff's Claim Construction, p. 6.