patent.[8]  35 U.S.C. §§ 253, 282, 288.

While an issued patent is presumed valid, the mere fact that the USPTO has issued a patent clearly does not preclude a district court from conducting an examination into that patent, nor does the fact that the USPTO deemed the patent valid in light of the prior art mandate a finding of validity by the court. *Xerox*, 71 USPQ2d at 1464. Furthermore, although attention must be paid to the statutory presumption of validity,

> it is weakened where the relevant prior art was not considered by the Patent Office. As pointed out in *Monroe Auto Equipment Co. v. Superior Industries, Inc.*, 332 F.2d 473, 481 (9th Cir.), *cert. denied*, 379 U.S. 901, 85 S.Ct. 190, 13 L.Ed.2d 175 (1964), ' * * * one pertinent example of unconsidered prior art is not only sufficient basis to dissipate the presumption of validity, but may render the patent invalid.'

*Monaplastics, Inc. v. Caldor, Inc.*, 264 F.Supp. 57, 62 (D. Conn. 1966), *aff'd*, 378 F.2d 20 (2d Cir. 1967) (footnote omitted).

### 2. Anticipation by Inherency.

While normally a prior art reference must disclose each and every limitation of a claim in order to invalidate the claim by anticipation, a reference that does not expressly disclose one or more claim elements may still anticipate when such elements are nonetheless inherent in the reference. *Atlas Powder*, 190 F.3d at 1347. Under the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claimed limitations, it anticipates. *See In re King*, 801 F.2d 1324, 1326 (Fed. Cir. 1986).

### 3. Summary Judgment Is Appropriate to Establish Invalidity Via Anticipation.

Although anticipation is a question of fact, it may be decided on summary judgment if there is no genuine issue of material fact on the record. *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1327 (Fed. Cir. 2001); *see Monaplastics, Inc.*, 264 F.Supp. at 64; *see also Key*

---

[8] This general rule does not apply in situations where an invalid claim involved deceptive intention, in which case the entire patent would be found unenforceable under 35 U.S.C. §§ 253 and 288 and under the doctrine of inequitable conduct. The issues of deceptive intention and inequitable conduct are not the subject of the present motion, but will be addressed, as applicable, at a later point in this litigation, if it continues.

*Pharmaceuticals*, 161 F.3d at 714 (claims of anticipation amenable to summary judgment where there are no material issues of fact in dispute). "Once a *prima facie* case of invalidity has been established, the proponent of validity must come forward with evidence to counter this challenge." *Honeywell Int'l, Inc. v. Universal Avionics Systems Corp.*, 288 F.Supp.2d 638, 645 (D. Del. 2003); *see also In re Schreiber*, 128 F.3d at 1478.

### C. STANDARDS APPLICABLE TO THE NON-OBVIOUSNESS REQUIREMENT - 35 U.S.C. § 103.

#### 1. General Standard.

In accordance with the patentability requirements set forth in 35 U.S.C. § 103, a patent claim that is novel may nonetheless still be determined invalid if it is <u>obvious</u> in light of the prior art. "A claim is 'obvious' if the patented invention would have been obvious to a person skilled in the art at the time the invention was disclosed." *Xerox*, 71 USPQ2d at 1464, *citing Eisele v. St. Amour*, 423 F.2d 135 (6th Cir. 1970); *Glaxo Group Ltd. v. Apotex, Inc.*, 268 F.Supp.2d 1013, 1031 (N.D. Ill. 2003) ("patent claim is invalid for obviousness where the differences between the subject matter patented and the prior art are such that the subject matter as a whole would have been obvious to a person having ordinary skill in the art at the time the invention was made").

#### 2. Summary Judgment Is Appropriate to Establish Invalidity Via Obviousness

"Whether or not a claim is obvious in light of prior art is a legal conclusion, but one which is premised on factual findings." *Xerox*, 71 USPQ2d at 1464, *citing Beckson Marine v. NFM Inc.*, 292 F.3d 718 (Fed. Cir. 2002); *Miles Laboratories, Inc. v. Shandon Inc.*, 997 F.2d 870 (Fed. Cir. 1993). Although the determination of whether or not a claim is obvious requires factual determinations, those issues may nevertheless be resolved on motions for summary judgment where there are no material facts in dispute. *Xerox*, 71 USPQ2d at 1464, *citing SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1359 (Fed. Cir. 2000) (granting summary judgment on issues of obviousness).

## IV.  ARGUMENT

All of the claims of the Patent-in-Suit are invalid due to a lack of novelty -- as can be seen by comparing each claim of the Patent-in-Suit with the prior art. Moreover, as will be shown below, several of the claims of the Patent-in-Suit are disclosed not just in one individual prior art reference. Rather, there are *three* individual prior art references (the Kelley Patent, the Yadlowsky Application, and the Noiset Patent), each of which - standing alone - anticipates one or more of the claims. To summarize:

- <u>There is no genuine issue of material fact that each element of Claim 1 of the Patent-in-Suit is found in a single prior art reference, namely, the Kelley Patent.</u> For that reason and that reason alone, Claim 1 of the Patent-in-Suit is invalid under 35 U.S.C. § 102 due to its lack of novelty vis-à-vis the Kelley Patent. The same can be said for the elements of Claim 2, the elements of Claim 3, and so forth for the elements of the remaining Claims 3-16 of the Patent-in-Suit, each of which is disclosed either expressly or inherently in, and thus anticipated by, Kelley.

- <u>Separate and apart from Kelley, there is no genuine issue of material fact that each element of Claim 1 of the Patent-in-Suit is also found in a second individual prior art reference, namely, the Yadlowsky Application.</u> The same holds true for the elements of several other claims of the Patent-in-Suit, including Claims 2, 5, 8-11 and 14-16. Therefore, each of those claims is invalid under 35 U.S.C. § 102 due to a lack of novelty in light of the Yadlowsky Application.

- <u>Similarly, there no genuine issue of material fact that each element of Claims 1, 2, 5, 8-11 and 14-16 is further found in a third individual prior art reference, namely, the Noiset Patent.</u> Therefore, each of those claims is invalid under 35 U.S.C. § 102 due to a lack of novelty over Noiset.

Moreover, to the extent any of the claims of the Patent-in-Suit are determined not to have all of its elements disclosed in at least one of Kelley, Yadlowsky and/or Noiset, such elements would

have been obvious in view of those references, and therefore a claim which includes such elements would be invalid for failure to satisfy the non-obviousness requirement of 35 U.S.C. §103.

The Patent-in-Suit's lack of novelty is most clearly seen by examining each of its relevant claims and comparing them separately to each of the noted prior art references. While the specific claims of the '997 Patent which Plaintiff alleges are infringed are claims 1-4, 6-8, 10-13 and 15-16, Plaintiff's Second Supplemental Answer to Interrogatory No. 1, May 19, 2004 (*see* Tab M), the instant motion is not so limited, in light of Defendants' counterclaim for a declaratory judgment of invalidity as to <u>all</u> claims of the Patent-in-Suit. Answer, ¶ 9 of Counterclaim. *See, e.g., Shelcore, Inc. v. Durham Industries, Inc.*, 745 F.2d 621, 624 (Fed. Cir. 1984) ("[the patent owner] could not unilaterally remove the validity issue [as to a certain claim] because [the accused infringer's] counterclaim put validity of all of the claims in issue").

Additionally, where, as here, the claim language in the patent is straightforward, a detailed claim construction is unnecessary. *Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc.*, No. 03-1472, -1473, 2004 WL 1543286 (Fed. Cir. July 12, 2004) (a copy of which is submitted herewith at Tab L) (affirming district court's decision invalidating patent claims directed to "a process for browning precooked, whole muscle meat products"). Moreover, the parties have already exchanged their proposed claim constructions for the asserted claims in this case. Defendants' proposed construction is submitted herewith at Tab U ("Defendants' Claim Construction"). Plaintiff's proposed construction is submitted herewith at Tab V ("Plaintiff's Claim Construction"). In most instances, unless otherwise noted herein, Defendants do not dispute -- *for purposes of this motion only* -- Plaintiff's proposed interpretation of the meaning of the various claim elements discussed below.

The following demonstrates how the claims of the Patent-in-Suit are anticipated by the aforementioned prior art references.

### A. ALL OF THE CLAIMS OF THE PATENT-IN-SUIT ARE ANTICIPATED BY THE KELLEY PATENT.

On October 26, 1971, over twenty years prior to the filing of the '997 Application, the USPTO issued the Kelley Patent for "Adhesive Composition and Bonded Nonwoven Fabrics." *See* Tab E, Kelley Patent. The Kelley Patent expired more than 15 years ago (35 U.S.C. § 154), and thus the public at-large should be free to practice Kelley's subject matter without fear of infringement. "It is self-evident that on the expiration of a patent the monopoly created by it ceases to exist, and the right to make the thing formerly covered by the patent becomes public property." *Singer Mfg. Co. v. June Mfg. Co.*, 163 U.S. 169, 185 (1896) ("It follows, as a matter of course, that on the termination of the patent there passes to the public the right to make the machine in the form in which it was constructed during the patent.").

Yet as shown in the table below, Kelley discloses a web whose construction would "read on" (and thus, infringe) at least Claim 1 of the Patent-in-Suit -- an anomalous result, which merely emphasizes why the Patent-in-Suit cannot be novel under 35 U.S.C. § 102 and should not have been granted in the first place. "Anticipation analysis is similar to infringement analysis in that art which would infringe on a patent claim if it appeared after a patent was issued will anticipate a claim if the art predates the patent." *Xerox*, 71 USPQ2d at 1464-65, *citing Aerotec Industries of Cal. v. Pacific Scientific Co.*, 381 F.2d 795 (9th Cir. 1967) ("[T]hat which infringes, if later, will anticipate, if earlier."). Such is the case with respect to the Kelley Patent, which clearly discloses a web that could not be constructed today without infringing the Patent-in-Suit if it is allowed to stand:

| **WEB DISCLOSED IN PRIOR ART KELLEY PATENT**<br><br>*(Kelley issued on October 26, 1971)* | **INVENTION CLAIMED IN '997 PATENT-IN-SUIT**<br><br>*(Patent-in-Suit was filed in 1993, and issued in 1995)* |
|---|---|
| (unless otherwise noted, all column and line references to Tab E, Kelley, emphasis added throughout) | (emphasis added throughout) |
| Kelley Patent (1971):<br><br>Kelley's two-component composition is "particularly valuable as a **binder** for nonwoven **webs** or fleeces or fibers or filaments" (4:43-44), capable of being "formed into all sorts of **packaging** or wrapping materials which may be of **various porosity in respect to liquids** and/or gases including air" (5:55-58), including "**tea bags**" (5:66). | Claim 1 of Patent-in-Suit (1993):<br><br>1. A **fibrous web** suited for making **infusion packages for brewing beverages** |
| Kelley Patent (1971):<br><br>"various surfaces and materials to be bonded with the polyblend adhesive can be lightly sealed, **tacked**, or adhered **without resorting to heated platens** by simply pressing the adhesive-covered surfaces together" (4:58-61)<br><br>Tubes or sleeves formed by **overlapping edges** of a binder-treated web or sheet according to Kelley "**have no tendency to pull apart**" (5:69 to 6:1) | Claim 1 of Patent-in-Suit (1993) - continued:<br><br>and exhibiting **improved resistance to the failure of a mechanical seam** therein |
| Kelley Patent (1971):<br><br>"The binder may be applied to the nonwoven fabric in any suitable way such as by **immersing** the fabric within the aqueous dispersion of the polyblend which may be accomplished by passing continuously a fleece or **web** of indefinite length about a roll **submerged** in the polyblend dispersion. Alternatively, the dispersion may be applied by **spraying it over the surface** of the fleece or **web** which may be continuously passed beneath the spray head. When **the polyblend is applied over the entire area**, the amount of polymer that is applied may be **from 20 to 100 percent by weight** based on the weight of the dried fibers." (5:11-22) | Claim 1 of Patent-in-Suit (1993) - continued:<br><br>said web comprising, a porous fibrous sheet material **impregnated throughout its extent with about one percent or more by weight** |

| Kelley Patent (1971): | Claim 1 of Patent-in-Suit (1993) - continued: |
|---|---|
| the web is treated with "a **binder** of adhesive composition" (1:37) consisting of two components: the first component being "**an aqueous dispersion of a polymer of ethyl acrylate** having a low molecular weight" (1:39-41) which is "**reasonably water-resistant**" (2:71) and the second being an aqueous dispersion of a polymer made by emulsion polymerization, such as **copolymers of "methyl acrylate, ethyl acrylate or methacrylate, [and] butyl acrylate or methacrylate"** (1:62 to 2:8) which have a "normally **high molecular weight** (e.g. about 500,000 or higher viscosity average)" (7:61-65) | of a **hydrophobic** treating system comprising a cured **hydrophobic** agent selected from the group consisting of **high molecular weight cross-linked acrylic polymers**, silicones, fluorohydrocarbons, paraffins, alkyl ketene dimers and stearylated materials, |
| Plaintiff admitted during the Crompton Opposition proceeding that the web disclosed in the Kelley Patent was the same as Plaintiff's claimed web, except for the alleged difference between Kelley's use in connection with heat-sealable webs and Plaintiff's use in connection with non-heatsealable webs. Therefore, the claimed properties are **inherently disclosed** in the Kelley Patent.<br><br>Kelley Patent (1971):<br><br>Moreover, the Kelley Patent itself does contain various teachings consistent with Plaintiff's admission that of each of these properties is inherent, including:<br><br>no appreciable water climb (Kelley's binder is "reasonably water-resistant" (2:71));<br><br>no substantial loss of infusion characteristics (Kelley's binder-treated web "is still highly porous to liquids and also somewhat porous to gases" even when the binder is "distributed over the entire area of the web" (5:58-61)); and<br><br>less than 10 percent failure in the mechanical seam (tubes or sleeves formed by overlapping edges of Kelley's binder-treated web or sheet "have no tendency to pull apart" (5:69 to 6:1)). | Claim 1 of Patent-in-Suit (1993) - continued:<br><br>the impregnated sheet material exhibiting no appreciable water climb when measured using water at a temperature of about 100 degrees C. and no substantial loss of infusion characteristics while providing less than 10 percent failure in the mechanical seam upon exposure to boiling water. |

1. **The Kelley Patent Anticipates Claim 1 of the Patent-in-Suit.**

Claim 1 of the Patent-in-Suit, the lone product claim, reads as follows (*see* Tab A, Patent-in-Suit, paragraphing added):

> 1. A fibrous web suited for making infusion packages for brewing beverages and exhibiting improved resistance to the failure of a mechanical seam therein, said web comprising (hereinafter "Preamble")
>
> a porous fibrous sheet material ("First Element")
>
> impregnated throughout its extent with about one percent or more by weight ("Second Element")
>
> of a hydrophobic treating system comprising a cured hydrophobic agent selected from the group consisting of high molecular weight cross-linked acrylic polymers, silicones, fluorohydrocarbons, paraffins, alkyl ketene dimers and stearylated materials, ("Third Element")
>
> the impregnated sheet material exhibiting no appreciable water climb when measured using water at a temperature of about 100° C and no substantial loss of infusion characteristics while providing less than 10 percent failure in the mechanical seam upon exposure to boiling water ("Properties").

As shown in the preceding table, and explained in more detail below, each of the components of Claim 1 of the Patent-in-Suit is expressly or inherently disclosed in the Kelley Patent.

a. **The Kelley Patent Expressly Discloses the *Preamble* and the *First Element* of Claim 1 of the Patent-in-Suit.**

As a first step, each element of the claims must be interpreted. To the extent the ordinary meaning of the Preamble and First Element of Claim 1 is not self-evident from the plain language of the claim itself, and in accordance with Plaintiff's own proposed interpretation, resort may be had to the specification of the '997 Patent, wherein it states, for example, that "[t]he present invention in its application to tea bags permits the use of commercially available, self-supporting infuser webs" which are "generally soft, tissue-thin fibrous materials characterized by light weight". *See* Tab A, Patent-in-Suit, 3:21-24; *see also* Tab V, Plaintiff's Claim Construction, pp. 2-3. With reference to the terms "mechanical seam" and "infusion packages," the Patent-in-Suit discloses that the "webs are

of the nonheat-seal variety and require mechanical fastening, i.e., folding and crimping, for the formation of the tea bag." *See* Tab A, Patent-in-Suit, 3:27-29; *see also* Tab V, Plaintiff's Claim Construction, pp. 2-3.

*The Kelley Patent unquestionably discloses this same subject matter.* For example, Kelley states that application of its two-component composition is "particularly valuable as a binder for nonwoven webs or fleeces or fibers or filaments". *See* Tab E, Kelley, 4:44-46. Kelley further discloses that materials bonded with its composition can be sealed by mechanical means ("surfaces ... can be ... lightly sealed, tacked"), i.e., without the application of heat ("or adhered without resorting to heated platens by simply pressing the adhesive-covered surfaces together"). *Id.* at 4:59-62. Kelley goes on to state that once the webs or fabrics have been treated with the two-component binder, they "can be formed into all sorts of packaging or wrapping materials which may be of various porosity in respect to liquids and/or gases including air". *Id.* at 5:55-58. The Kelley Patent specifically discloses application of its polyblend binder to "tea bags". *Id.* at 5:66.

Therefore, there is no genuine issue of material fact that the components of the claimed web recited in the Preamble and First Element of Claim 1 of the Patent-in-Suit -- i.e., "a fibrous web suited for making infusion packages for brewing beverages and exhibiting improved resistance to the failure of a mechanical seam therein, said web comprising a porous fibrous sheet material" -- are expressly disclosed in the Kelley Patent.

      **b.**    **The Kelley Patent Expressly Discloses the *Second Element* of Claim 1 of the Patent-in-Suit.**

To the extent resort to the specification of the Patent-in-Suit is deemed necessary to interpret this portion of Claim 1, the following passage provides insight:

> The hydrophobic agent may be applied to the preformed infuser web material by well-known techniques used to add **binders** while **assuring complete coverage of the web material**. For example, the web may be treated by brush, **roll, spray** or **immersion bath** to effectuate the desired application to the web material. Since **complete impregnation of the web is desired**, a saturation treatment is preferred. The alkyl acrylate binder emulsions generally penetrate quickly through the rather thin and absorbent infuser web and may be applied during a suitable stage in the

-17-

manufacture of the **continuous fibrous web.**

See Tab A, Patent-in-Suit, 4:29-40 (emphasis added); *see also* Tab V, Plaintiff's Claim Construction, pp. 3-5.

The Kelley Patent similarly discloses complete impregnation of the web:

> The **binder** may be applied to the nonwoven fabric in any suitable way such as by **immersing** the fabric within the aqueous dispersion of the polyblend which may be accomplished by **passing continuously** a fleece or **web** of indefinite length about a **roll submerged** in the polyblend dispersion. Alternatively, the dispersion may be applied by **spraying** it over the surface of the fleece or **web** which may be **continuously passed beneath the spray head. When the polyblend is applied over the entire area**, the amount of polymer that is applied may be from 20 to 100 percent by weight based on the weight of the dried fibers.

See Tab E, Kelley, 5:11-22 (emphasis added).

Therefore, there is no genuine issue of material fact that the features of the claimed web recited in the Second Element of Claim 1 of the Patent-in-Suit -- i.e., "impregnated throughout its extent with about one percent or more by weight" -- are expressly disclosed in the Kelley Patent.

### c. The Kelley Patent Expressly Discloses the *Third Element* of Claim 1 of the Patent-in-Suit.

The Third Element of Claim 1 -- "a hydrophobic treating system comprising a cured hydrophobic agent selected from the group consisting of high molecular weight cross-linked acrylic polymers, silicones, fluorohydrocarbons, paraffins, alkyl ketene dimers and stearylated materials" -- constitutes what is known as a "*Markush* group."[9] The novelty of a claim with a *Markush* group is determined much as in the case of other generic claims. If an applicant claims an invention having four elements, A+B+C+D, with element C defined as a *Markush* group of C1, C2 and C3, and the prior art discloses the same invention wherein only one of the *Markush* group is disclosed (e.g., A+B+C2+D), then the entire claim is invalid. It "reads on" the prior art and is therefore anticipated. *See Ecolochem, Inc. v. Southern California Edison Co.*, 863 F.Supp. 1165, 1179 (C.D. Cal. 1994), *aff'd in part, rev'd in part*, 91 F.3d 169 (Fed. Cir. 1996) (unpublished), *aff'd in part, rev'd in part*

---

[9] The decision in *Ex parte Markush*, 1925 C.D. 126, 340 O.G. 839 (Comm'r Pat. 1924) allowed the use of an artificial group in the form of "material selected from the group consisting of A, B, C, and D" in situations where there was no true generic word that embraced that group and that group only.

*after remand*, 227 F.3d 1361 (Fed. Cir. 2000), *cert. denied*, 121 S.Ct. 1607 (2001) ("The novelty of a claim with a *Markush* group is determined as if the claim were generic.").

The element of the foregoing *Markush* group that is disclosed in, and thus anticipated by, the Kelley Patent is "high molecular weight cross-linked acrylic polymers." As described in the '997 Patent, "[t]hose found to be particularly effective as hydrophobic binders are the materials generally categorized as acrylic polymers and, more particularly, as latex dispersions or emulsions of alkyl acrylate polymers and copolymers." *See* Tab A, Patent-in-Suit, 4:4-8; *see also* Tab V, Plaintiff's Claim Construction, pp. 5-6.

With regard to the meaning of the term "high molecular weight" in the Third Element of Claim 1, Plaintiff's Claim Construction does not suggest any specific numeric value or range of molecular weights that it would construe to be "high." Nor is that term defined in the Patent-in-Suit itself. In fact, that term appeared *nowhere* in the specification or claims of the '997 Application as originally filed.[10] *See* Tab B-1, '997 Application. It was only as a result of a first Office Action dated October 4, 1994 (the "Office Action", *see* Tab B-3), wherein the USPTO rejected all of the '997 Application's claims as being obvious in view of the Kelley Patent in combination with the Noiset Patent, that Plaintiff first interjected the term "high molecular weight." In its attempt to overcome the USPTO's rejection, Plaintiff argued that the Kelley Patent was distinguishable from its invention because "the Kelley patent requires the use of a polyblend having two components, the first of which must have a molecular weight between 150,000 and 300,000." *See* Tab B-4, Response, pg. 11. Thus, one might surmise that Plaintiff would construe any molecular weight greater than 300,000 to be "high."

A specific definition for "high molecular weight" need not be fixed upon in order to decide the present motion however, for it is clear that under any definition the Kelley Patent itself discloses at its very outset that the use of high molecular weight polymers (including specifically, an "ethyl

---

[10] Plaintiff's failure to satisfy the various requirements of 35 U.S.C. § 112 is not the subject of the present motion, but will be addressed, as applicable, at a later point in this litigation, if it continues.

-19-

acrylate" polymer) as a binder for nonwoven fabrics was known -- a fact which the USPTO failed to address during prosecution of the '997 Application:

> It is known that emulsion polymers made from acrylic esters such as ethyl acrylate by the usual polymerization procedures yield polymers of high molecular weight such as about 500,000 to several million. **It has been suggested heretofore to use such a high molecular weight polymer of ethyl acrylate as a binder for nonwoven fabrics.**

See Tab E, Kelley, 1:5-10 (emphasis added).

While Plaintiff (and apparently the USPTO as well) focused on the purportedly low molecular weight of Component 1 of the Kelley Patent's two-part polyblend during prosecution of the '997 Application, it is notable that both the USPTO and Plaintiff failed to address the molecular weight of *Component 2* of Kelley's binder. The Kelley Patent states that Component 2 is an aqueous dispersion of a polymer made by emulsion polymerization, including, *inter alia*, copolymers of "methyl acrylate, ethyl acrylate or methacrylate, [and] butyl acrylate or methacrylate". See Tab E, Kelley, 1:62 to 2:8 (emphasis added). These copolymers are the very same acrylic polymers disclosed in the Patent-in-Suit, which states that "[t]he preferred materials are alkyl acrylates such as ethyl acrylate and butyl acrylate polymers, copolymers and interpolymers". See Tab A, Patent-in-Suit, 4:15-17 (emphasis added). Kelley further discloses that "**polymers of normally high molecular weight** (e.g. about **500,000 or higher** viscosity average)" **may serve as Component 2 in the polyblend.** See Tab E, Kelley, 7:61-65 (emphasis added). Therefore, the Kelley Patent expressly teaches the use of a binder which includes a component that is an aqueous dispersion of a high molecular weight acrylic copolymer.

Lastly, with regard to the meaning of the word "hydrophobic" in the Third Element of Claim 1, the '997 Patent expressly defines that term and thus resort for its meaning need not extend beyond the body of the patent itself: "[a]s used herein the term 'hydrophobic' refers to the characteristic of the treating agent that imparts to the web material a resistance to, or the ability to avoid, wetting with water." See Tab A, Patent-in-Suit, 3:3-6. The prior art Kelley Patent teaches this feature, in that Kelley describes his polyblend binder composition as being "reasonably water-resistant." See Tab E,

Kelley, 2:71.

Therefore, there is no genuine issue of material fact that the components of the claimed web recited in the Third Element of Claim 1 of the Patent-in-Suit -- i.e., "a hydrophobic treating system comprising a cured hydrophobic agent selected from the group consisting of high molecular weight cross-linked acrylic polymers ..." -- are expressly disclosed in the Kelley Patent.

                d.       The Kelley Patent Inherently Discloses the *Properties* of Claim 1 of the Patent-in-Suit.

The remainder of Claim 1 does not recite any further components or add any additional structure to the claimed web, but rather, sets forth various *properties* purportedly possessed by the claimed web, namely, "the impregnated sheet material exhibiting no appreciable water climb when measured using water at a temperature of about 100° C and no substantial loss of infusion characteristics while providing less than 10 percent failure in the mechanical seam [presumably, of tea bags made from the claimed web] upon exposure to boiling water."

In determining the meaning of the "no appreciable water climb" limitation, it must be noted that a specific test for measuring water climb is set forth in the '997 Patent:

> The web material treated with a hydrophobic binder of the type described, while retaining its porosity, exhibits substantially no absorption characteristics. As mentioned, these are measured by a "water climb" test procedure that determines the rate of saturation of a web material by capillary action. In accordance with this procedure, a strip of treated material is cut to a specimen size of one inch by five inches. The strip is mounted on a support bar above a container, such as a 500 ml. beaker, so that the strip will be suspended within the beaker. The specimen is marked at ½ inch and at 1½ inches from the bottom of the specimen. The beaker is partially filled with distilled water to a level such that the bottom ½ inch of the specimen will be immersed in the water. The time then is recorded for the water front to advance up the specimen to the 1½" mark, a distance of one inch. The test is stopped at 400 seconds if the water front has not advanced sufficiently to complete the one inch climb on the specimen. The time is reported for the one inch travel of the water front. If the water front does not move above the level of the water in the beaker, a report of "no absorption" is recorded.

*See* Tab A, Patent-in-Suit, 5:9-32.

Similarly, with regard to determining whether or not tea bags constructed from a particular teabag paper exhibit "less than 10 percent failure in the mechanical seam upon exposure to boiling

water," a specific test is set forth in the '997 Patent:

> The water climb absorbency rate test has been correlated to the number of seam failures in a standard teabag of the flow through type. The purpose of the seam failure test is to assess the ability of a tea bag seam to maintain its integrity during forces exerted on it in a harsh brewing condition. In accordance with this test procedure, a teabag of the flow through type is inverted so that the "W" fold is extending in an upward direction and the head fold in a downward direction, with the tea located adjacent the head fold. The teabag so oriented is placed in the bottom of a beaker with the head fold facing down. Tap water is heated to a constant boiling condition and approximately 400 ml. of boiling water is poured directly onto the teabag with the stream of water being maintained on the bag throughout the pour to provide a maximum degree of water flow turbulence upon the bag. The time for pouring the boiling water onto the teabag should take about 3 seconds. The container then is examined for tea leaves discharged by the teabag. Thereafter, the bag is removed and examined at both the center fold and the head fold for any openings therein. If any of the following conditions are present, the seam is considered to be a failure:
>  1. Tea leaves in the beaker;
>  2. Opening of the center fold area;
>  3. Opening of the head fold area.
> Based on the foregoing, the determination is made as to either failure or non-failure of the seam.

Id. at 5:33-63; see also Tab V, Plaintiff's Claim Construction, p. 6.

No specific test is given in the '997 Patent for determining whether a particular untreated infusion paper satisfies the final Property, i.e., a web material treated with Plaintiff's claimed hydrophobic agents must display "no substantial loss of infusion characteristics" as compared to the equivalent web material having no such hydrophobic treatment. The only quantifiable test referenced in the '997 Patent to measure infusion characteristics is a "first color" test. See Tab A, Patent-in-Suit, 6:26-31. The first color test is the time it takes (measured in seconds) for color to be observed in a cup of hot water from the moment a tea bag is placed in it. Id.

The Kelley Patent does not contain data relating to the water climb value of the webs disclosed therein. Kelley likewise does not report on first color infusion time, or on the number of seam failures exhibited in tea bags constructed from his webs -- let alone contain such data as measured pursuant to the specific test parameters called for in the Patent-in-Suit. Therefore, these various Properties cannot be said to be *expressly* disclosed in Kelley. Nevertheless, as explained below, even Plaintiff itself has admitted that those properties are *inherently* disclosed in Kelley.

-22-

During the course of the Crompton Opposition proceeding, Plaintiff admitted that the web recited in claim 1 of its European Counterpart Patent as originally granted was the same in all material respects as the web disclosed in the Kelley Patent.[11] *See* Tab K, EPO Opposition Decision, p. 5 (of 39). As shown in the table below, the "Properties" portion of Claim 1 of the Patent-in-Suit is virtually identical to the corresponding portion of claim 1 of Plaintiff's European Counterpart Patent:

| "Properties" Portion of<br>Claim 1 - Patent-in-Suit<br>(*see* Tab A) | Corresponding Claim Limitations<br>Claim 1 - European Counterpart<br>(*see* Tab I) |
|---|---|
| the impregnated sheet material exhibiting no appreciable water climb when measured using water at a temperature of about 100° C and | the impregnated web exhibiting a water climb of not more than 0.5 inch (13 mm) over a period of 400 seconds when measured using water at a temperature of about 100° C and |
| no substantial loss of infusion characteristics | no substantial loss of infusion characteristics as measured by first-colour infusion time |
| while providing less than 10 percent failure in the mechanical seam upon exposure to boiling water. | while providing less than 10 percent failure in the mechanical seam of tea bags constructed from the said web material upon exposure to boiling water. |

Thus, given Plaintiff's admission that the various physical properties as recited in claim 1 of its European Counterpart were inherently disclosed in the Kelley Patent, and given the virtual identity between claim 1 of the European Counterpart and Claim 1 of the Patent-in-Suit in this regard, the Properties recited in Claim 1 of the Patent-in-Suit must necessarily be likewise inherently disclosed in Kelley.

Even absent Plaintiff's admission, the Properties set forth in Claim 1 of the Patent-in-Suit -- while not expressly disclosed -- are in fact nonetheless at least alluded to in the Kelley Patent. For

---

[11] Plaintiff alleged in the Crompton Opposition, to no avail, that the lone difference between its claimed invention and the Kelley Patent was that Kelley did not disclose a web suitable for making mechanically-sealed infusion packages - an argument which the EPO rejected (*see* Tab K, EPO Opposition Decision, p. 19 (of 39)) -- and which in any event does not affect Kelley's inherent disclosure of the claimed Properties.