example, the "no appreciable water climb" limitation of Claim 1 is suggested by Kelley's reference to its binder being "reasonably water-resistant" (*see* Tab E, Kelley, 2:71). The limitation requiring "no substantial loss of infusion characteristics" is inherently taught in the Kelley Patent, wherein it discloses that despite the fact that Kelley's binder composition is "reasonably water-resistant", a web treated with the binder disclosed in Kelley "is still highly porous to liquids and also somewhat porous to gases" even when the binder is "distributed over the entire area of the web" (*Id.* at 5:58-61). Lastly, the limitation of Claim 1 of the Patent-in-Suit which calls for "less than 10 percent seam failure" is also alluded to in the Kelley Patent, which has as one of its goals avoiding the pulling apart of bonds formed between overlapping surfaces of webs treated with its binder (*Id.* at 1:25-27).

Therefore, there is no genuine issue of material fact that the components of the claimed web recited in the Properties portion of Claim 1 of the Patent-in-Suit -- i.e., "no appreciable water climb," "no substantial loss of infusion characteristics," and "less than 10 percent failure in the mechanical seam" -- are inherently disclosed in the Kelley Patent.

For all of the foregoing reasons, Claim 1 of the Patent-in-Suit is not novel in view of Kelley, and must be declared invalid pursuant to 35 U.S.C. § 102.

### 2. The Kelley Patent Anticipates Claims 2-9 of the Patent-in-Suit.

The remaining product claims (2-9) which depend from Claim 1 of the '997 Patent each add relatively minor additional limitations to those set forth in Claim 1. For example: Claim 2 includes all of the elements of Claim 1 and further specifies that the hydrophobic agent which completely impregnates the web material must comprise "at least 3-4 percent by weight of the web material"; Claim 3 includes all of the elements of Claim 1, and further specifies that the hydrophobic agent must be a "high molecular weight alkyl acrylate strength imparting hydrophobic binder"; and so forth. It would needlessly lengthen this memorandum to present a comparison between each of claims 2-9 and the prior art Kelley Patent similar to the one conducted for Claim 1, *supra*. Such comparisons are included in the accompanying Local Rule 56(a)(1) Statement of Material Facts ("Statement of Facts"), ¶¶118-125. As those comparisons demonstrate, Claims 2-9 of the Patent-in-

Suit are not novel in view of Kelley, and must be declared invalid pursuant to 35 U.S.C. § 102.

### 3. The Kelley Patent Anticipates Claims 10-16 of the Patent-in-Suit.

As shown in the table below, Claim 10 of the Patent-in-Suit, the lone independent process claim, is very similar to Claim 1 discussed in detail above -- with Claim 10 simply being worded in the form of a sequence of method steps, as opposed to elements of a product:

| Similarity Between Independent Product Claim 1 and . . . | . . . Independent Process Claim 10 of the Patent-in-Suit. |
|---|---|
| 1. A fibrous web suited for making infusion packages for brewing beverages and exhibiting improved resistance to the failure of a mechanical seam therein, said web comprising a porous fibrous sheet material | 10. A process for producing porous web materials for making infusion packages having enhanced mechanical seam integrity comprising the steps of providing a porous absorbent web material suited for use as an infusion package, |
| impregnated throughout its extent with about one percent or more by weight of a hydrophobic treating system comprising a cured hydrophobic agent selected from the group consisting of high molecular weight cross-linked acrylic polymers, silicones, fluorohydrocarbons, paraffins, alkyl ketene dimers and stearylated materials, | treating the entire web material with an aqueous emulsion of a hydrophobic agent selected from the group consisting of high molecular weight cross-linked acrylic polymers, silicones, fluorohydrocarbons, paraffins, alkyl ketene dimers and stearylated materials |
| the impregnated sheet material exhibiting no appreciable water climb when measured using water at a temperature of about 100.degree. C. and no substantial loss of infusion characteristics while providing less than 10 percent failure in the mechanical seam upon exposure to boiling water. | to provide a treated web that exhibits no appreciable water climb when measured using water at a temperature of about 100.degree. C. and less than 10 percent failure in a mechanical seam therein when exposed to boiling water. |

Likewise, the claims which depend from Claim 10 (nos. 11-16) are similar to Claims 2-9, in that they incorporate all of the elements of the claim(s) from which they depend and include one or more additional limitations, all of a fairly minor nature. Given this similarity between Claims 1 and 10 (and between Claims 2-9 and 11-16), it would needlessly lengthen this memorandum to present a

comparison between the Kelley Patent and each of Claims 10-16 here. Such comparisons are included in the accompanying Statement of Facts, ¶¶ 126-132. As those comparisons demonstrate, Claims 10-16 of the Patent-in-Suit are not novel in view of Kelley, and must be declared invalid pursuant to 35 U.S.C. § 102.

### B. CLAIMS 1, 2, 5, 8-11 AND 14-16 OF THE PATENT-IN-SUIT ARE ANTICIPATED BY THE YADLOWSKY APPLICATION.

Separate and apart from the Kelley Patent, all of the elements for several of the Patent-in-Suit's claims are disclosed in a second prior art reference: the Yadlowsky Application. Yadlowsky was published on February 5, 1986, in connection with "Infusion Bag Material Treatment with Fluoro-Chemical Sizing Agent" -- over seven years prior to the filing of Plaintiff's '997 Application. *See* Tab H, Yadlowsky Application. Like the Kelley Patent, the subject matter disclosed in Yadlowsky is in the public domain, and thus anyone who wishes to put the subject matter disclosed in Yadlowsky to use ought to be entitled to do so without fear of patent infringement.

Yet that would not be the case if the Patent-in-Suit is allowed to stand. As shown in the table below, Yadlowsky discloses a web, the construction of which would "read on" (and thus, infringe) at least Claim 1 of the Patent-in-Suit -- a result which mandates a finding of invalidity. "[I]f granting patent protection on the disputed claim would allow the patentee to exclude the public from practicing the prior art, then that claim is anticipated, regardless of whether it also covers subject matter not in the prior art." *Titanium Metals*, 778 F.2d at 781. Yadlowsky does not merely disclose treating a teabag paper's fibers with fluorochemicals and silicones. Rather, as discussed below, Yadlowsky specifically discloses coating *100%* of the fibers of *a grade of tea bag paper manufactured by the Plaintiff* with a *fluorochemical that is substantially similar* -- and with *silicones that are literally identical* -- to those claimed in the Patent-in-Suit.

| **WEB DISCLOSED IN PRIOR ART YADLOWSKY APPLICATION** *(Yadlowsky was published on February 5, 1986)* | **INVENTION CLAIMED IN '997 PATENT-IN-SUIT** *(Patent-in-Suit was filed in 1993, and issued in 1995)* |
|---|---|
| (unless otherwise noted, all column and line references to Tab H, Yadlowsky, emphasis added throughout) | (emphasis added throughout) |
| Yadlowsky Application (1986):<br><br>"This invention relates to the preparation of an improved aqueous food extract such as a coffee, **tea** or vegetable extract, in a filter device suitable for percolation, steeping, or other **brewing** technique. More particularly, this invention pertains to treating the filter device such as an **infusion bag** ...." (1:7-13)<br><br>"Particularly suitable applications include treatment of **infusion bags** used for coffee or **tea brew preparations**" (4:4-6)<br><br>"EXAMPLE: **A paper, Dexter 3968 grade (a product of Dexter Co., Windsor Locks, Ct.)**, having a porosity of 395 CFM/Ft2 was treated with a fluoro-chemical sizing agent, Scotchban (a product of 3M, St. Paul, Minn.), .... Said papers were treated ... by immersion in a 33% aqueous solution by weight of FC-807 Scotchban. Treatment was for a period of 1 minute, at which time the treated paper was passed through a sizing press and then cured in a photo sheet drier to an end temperature of 325°F. Said paper was found to be 100% treated with the sizing agent, i.e., 100% of the paper fibers were coated. A sample of treated paper and a sample of control (without Scotchban) paper were **formed into infusion bags** and filled with 6 grams of roast and ground coffee. An expert evaluation of the roast and ground coffee **brews** ...." (8:25 to 9:3) | Claim 1 of Patent-in-Suit (1993):<br><br>1. A **fibrous web** suited for making **infusion packages for brewing beverages** |

| Yadlowsky Application (1986): | Claim 1 of Patent-in-Suit (1993) - continued: |
|---|---|
| "Enclosure of the food product may be accomplished by … **stitch**[ing], or any other method as is known in the art." (4:13-17).<br><br>"The infusion bag material should have sufficient porosity to allow substantial extraction of the food material but **insufficient to allow migration of the food material from inside the infusion bag, especially during extraction when swelling of the food material is common upon contact with the hot extracting water.**" (5:10-17) | and exhibiting **improved resistance to the failure of a mechanical seam** therein |
| Yadlowsky Application (1986):<br><br>"Any natural material having sufficient **porosity** for extraction can be used in conjunction with the fluoro-chemical sizing agent, particularly a natural **fiber** material such as cotton gauze." (5:7-10)<br><br>"Said treatment may be accomplished by addition of the fluoro-chemical sizing agent as a liquid suspension or emulsion during the infusion bag stock preparation, by application to the infusion bag surface, or by addition to a coating which is subsequently applied to the infusion bag, or any other method which would be evident to one skilled in the art." (5:29 to 6:3)<br><br>"Addition of a fluoro-chemical sizing agent internally during stock preparation is viewed as advantageous because a more uniform **distribution of the sizing agent throughout the infusion bag material** is produced" (6:4-8)<br><br>"Typically, said application is achieved by **immersing** an infusion bag material in an aqueous solution of the sizing agent" (7:11-13)<br><br>"EXAMPLE: **A paper,** Dexter 3968 grade (a product of Dexter Co., Windsor Locks, Ct.), **having a porosity** of 395 CFM/Ft2 was treated with a fluoro-chemical sizing agent, Scotchban (a product of 3M, St. Paul, Minn.), ….  Said papers were treated … by immersion in a 33% aqueous solution by weight of FC-807 Scotchban. Treatment was for a period of 1 minute, at which time the treated paper was passed through a sizing press and then cured in a photo sheet drier to an end temperature of 325°F. **Said paper was found to be 100% treated with the sizing agent, i.e., 100% of the paper fibers were coated.**" (8:25 to 9:3) | Claim 1 of Patent-in-Suit (1993) - continued:<br><br>said web comprising, a **porous fibrous** sheet material **impregnated throughout its extent with about one percent or more by weight** |

| | |
|---|---|
| Yadlowsky Application (1986): <br><br> "The treated paper is then pressed and **cured**" (7:14-15) <br><br> "If **water repellency** is desired, **silicone compounds** such as are disclosed in U.S. Pat. No. 3,386,834 [the Noiset Patent] **may be employed** in conjunction **with the fluoro-chemical** sizing agent to **achieve an increased water repellency**." (8:5-9) <br><br> "EXAMPLE: A paper, Dexter 3968 grade (a product of Dexter Co., Windsor Locks, Ct.), having a porosity of 395 CFM/Ft$^2$ was treated with a **fluoro-chemical** sizing agent, **Scotchban** (a product of 3M, St. Paul, Minn.), .... Said papers were treated ... by immersion in a 33% aqueous solution by weight of **FC-807 Scotchban**. Treatment was for a period of 1 minute, at which time the treated paper was passed through a sizing press and then **cured** in a photo sheet drier to an end temperature of 325°F." (8:25 to 9:1) | Claim 1 of Patent-in-Suit (1993) - continued: <br><br> of a **hydrophobic** treating system comprising a **cured hydrophobic** agent selected from the group consisting of high molecular weight cross-linked acrylic polymers, **silicones, fluorohydrocarbons**, paraffins, alkyl ketene dimers and stearylated materials, |
| A web identical to the claimed web made according to the teachings of Yadlowsky would necessarily exhibit the same physical properties as the claimed web of the '997 Patent. Such properties are therefore **inherently disclosed** in the Yadlowsky Application. <br><br> Moreover, the Yadlowsky Application itself does contain various teachings to substantiate this inherency, including: <br><br> no appreciable water climb ("If water repellency is desired, silicone compounds such as are disclosed in U.S. Pat. No. 3,386,834 [the Noiset Patent] may be employed in conjunction with the fluoro-chemical sizing agent to achieve an increased water repellency" (8:5-9)); <br><br> no substantial loss of infusion characteristics (the treated infusion bag material prevents the fibers that make up the bag from absorbing flavor oils emitted by the tea leaves during the brew process, and in turn "the porosity of the infusion bag material is not diminished" and "the flow of extracted food solids" is not impeded (3:30-34)); <br><br> less than 10 percent failure in the mechanical seam ("The infusion bag material should have sufficient porosity to allow substantial extraction of the food material but insufficient to allow migration of the food material from inside the infusion bag, especially during extraction when swelling of the food material is common upon contact with the hot extracting water" (5:10-17)). | Claim 1 of Patent-in-Suit (1993) - continued: <br><br> the impregnated sheet material exhibiting no appreciable water climb when measured using water at a temperature of about 100 degrees C. and no substantial loss of infusion characteristics while providing less than 10 percent failure in the mechanical seam upon exposure to boiling water. |

### 1. The Yadlowsky Application Anticipates Claim 1 of the Patent-in-Suit.

As shown in the preceding table, and as explained in more detail below, each of the components of Claim 1 of the Patent-in-Suit[12] is expressly or inherently disclosed in the Yadlowsky Application -- a prior art reference which notably was never brought to the attention of, or otherwise considered by, the USPTO during its examination of the '997 Application, despite Plaintiff having become aware of Yadlowsky mid-way through prosecution of the '997 Application. *See* Tab B, File Wrapper.

        a.      **The Yadlowsky Application Expressly Discloses the *Preamble* and the *First Element* of Claim 1 of the Patent-in-Suit.**

The Yadlowsky Application discloses treatment of an infusion bag material with a fluoro-chemical sizing agent, including "treatment of infusion bags used for coffee or tea brew preparations." *See* Tab H, Yadlowsky, 3:20-21; 4:4-6. The Yadlowsky Application further discloses that sealing of its infusion bags is not limited solely to heat-sealable means but includes mechanical means as well: "Enclosure of the food product may be accomplished by heat sealing the infusion bag material as by the use of heat sealable binders and/or heat sealable fibers, or films, or stitched, or any other method as is known in the art." *Id.* at 4:13-17.

Therefore, there is no genuine issue of material fact that the components of the claimed web recited in the Preamble and the First Element of Claim 1 of the Patent-in-Suit -- i.e., "a fibrous web suited for making infusion packages for brewing beverages and exhibiting improved resistance to the failure of a mechanical seam therein, said web comprising a porous fibrous sheet material" -- are expressly disclosed in the Yadlowsky Application.

        b.      **The Yadlowsky Application Expressly Discloses the *Second Element* of Claim 1 of the Patent-in-Suit.**

The Second Element of Claim 1 is also disclosed in the Yadlowsky Application, inasmuch as

---

[12] Defendants will not re-state the meaning of each of the components of Claim 1 here, inasmuch as such interpretations have already been recited in Section IV(A)(1), *supra*.

Yadlowsky clearly teaches complete impregnation of the web:

> [T]reatment may be accomplished by addition of the fluoro-chemical sizing agent as a liquid suspension or emulsion during the infusion bag stock preparation, by application to the infusion bag surface, or by addition to a coating which is subsequently applied to the infusion bag, or any other method which would be evident to one skilled in the art. Addition of a fluoro-chemical sizing agent internally during infusion bag stock preparation is viewed as advantageous because a more uniform **distribution of the sizing agent throughout the infusion bag material** is produced, which results in a material which is able to withstand physical abuse with less degradation than would result in a case of surface treatment.

See Tab H, Yadlowsky, 5:29 to 6:11 (emphasis added).

Yadlowsky's lone example actually discloses the treatment of a paper grade described as being *one of the Plaintiff's products* ("Dexter 3968 grade (a product of Dexter Co., Windsor Locks, CT)"), by immersing the paper in an aqueous solution of a fluorochemical product, namely, Scotchban FC-807. After curing, the "paper was found to be 100% treated", i.e., "100% of the paper fibers were coated." *Id.* at 8:26 to 9:3.

Therefore, there is no genuine issue of material fact that the features of the claimed web recited in the Second Element of Claim 1 of the Patent-in-Suit -- i.e., "impregnated throughout its extent with about one percent or more by weight" -- are expressly disclosed in the Yadlowsky Application.

        c.     **The Yadlowsky Application Expressly Discloses the *Third Element* of Claim 1 of the Patent-in-Suit.**

The element of the *Markush* group that is disclosed and thus anticipated by the Yadlowsky Application is "fluorohydrocarbons," or in the alternative "silicones".[13] The '997 Patent discloses that in addition to high molecular weight, cross-linked acrylic polymers, "the hydrophobic treating agent may be any of a number of fluid-repellent materials, such as silicones, [and] fluorohydrocarbons, ...." See Tab A, Patent-in-Suit, 6:36-38. With regard to the use of

---

[13] It is for this reason that the Yadlowsky Application is not analyzed herein with regard to dependent claims 3, 4, 6, 7, 12 and 13 of the Patent-in-Suit, which each call specifically for the hydrophobic agent selected from the *Markush* Group in Claim 1 to be a high molecular weight cross-linked acrylic polymer. Yadlowsky discloses two different agents from the *Markush* Group: fluorohydrocarbons and silicones.

-31-

fluorohydrcarbons, the '997 Patent further discloses that:

> Where a fluorochemical treating agent is employed, it should, of course, meet the standards for use with foods and beverages and preferably should be in the form of an aqueous emulsion for ease of application. A typical aqueous emulsion formulation . . . may employ materials such as the **Scotchban treating agent** sold by Minnesota Mining and Manufacturing under the designation **"FC-809"** or **"FX-845"**.

*Id.* at 6:43-52 (emphasis added).

Like the Patent-in-Suit, the Yadlowsky Application seven years earlier disclosed the treatment of infusion packages, such as tea bags, with fluorohydrocarbons, including specifically Scotchban. Although Yadlowsky disclosed a grade of Scotchban bearing a slightly different designation (FC-807) than the two grades of Scotchban disclosed in the '997 Patent (FC-809 and FX-845), the chemical similarity of those products was known in the art well prior to the filing of the '997 Application.

For example, U.S. Patent No. 4,564,552, issued January 14, 1986, references the interchangeability of <u>FC-807</u> (disclosed by Yadlowsky in 1986 as being suitable for coating 100% of the fibers of one of Plaintiff's teabag paper grades) and <u>FC-809</u> (claimed by Plaintiff, seven years after Yadlowsky, as being suitable for completely impregnating Plaintiff's teabag papers):

> The treating agent used to render the intermediate layer of this invention oleophobic and **hydrophobic** as well as preferably to provide detergent and solvent resistance can be any treating agent which imparts the requisite properties as determined by the tests set out above. The preferred **fluorochemicals** can have varied chemical structures. See for example, U.S. Pat. No. 3,489,148 and the patents cited therein at column 4. **Particularly, preferred compositions contain perfluorinated fluorochemicals. These type materials are available from Minnesota Mining and Manufacturing Company under the designations <u>FC-807</u>, <u>FC-809</u> and FC-824.** The actives in **<u>FC-807</u>** and **<u>FC-809</u>** are described in detail in the Federal Register, Volume 37, Number 96, at pages 9762-9763. Specifically, **they are liquid based compositions containing as the active solids a minimum of about 40 percent of ammonium bis(N-ethyl-2-perfluoroalkylsulfonamidoethyl) phosphates, wherein the alkyl group is more than 95 percent $C_8$ and the fluorine content is from 50.1 to 52.8 percent by weight.**

See Tab N, <u>U.S. Pat. No. 4,564,552</u>, 6:53 to 7:4 (emphasis added).

Likewise, the chemical similarity of <u>FC-807</u> (Yadlowsky) and <u>FX-845</u> (the Patent-in-Suit) was also known in the art prior to the filing of Plaintiff's '997 Application, as shown, for example,

by U.S. Patent No. 5,281,507, filed November 2, 1992:

> Representative examples of hold-out coating materials which give the desired effect include materials sold by The 3M Company under the trademarks SCOTCH-GARD and **SCOTCH BAN** with the designations FC-100, FC-431, **FC-807, and FX-845**. These materials are fully fluorinated, cationic or amphoteric surfactants. FC-100, FC-431 and FC-807 are methanol soluble and can be applied by any suitable technique such as roll coating, spraying, or other suitable application means, and air dried. FX-845 is water soluble and must be heat set to achieve carrier hold-out. This material can also be applied by roll coating, spraying or other suitable application means.

See Tab O, U.S. Pat. No. 5,281,507, 5:60 to 6:4 (emphasis added).

Therefore, there is no genuine issue of material fact that the Yadlowsky Application discloses the use of "fluorohydrocarbons" as that term is used in Claim 1 of the Patent-in-Suit. The fact that Plaintiff simply chose to set forth in the Patent-in-Suit two grades of Scotchban that differ slightly from the specific Scotchban grade disclosed in Yadlowsky does not alter that conclusion, since it was known in the art as evidenced by the above-mentioned patents that these Scotchban grades were interchangeable.

Nor is that conclusion altered by the fact that Yadlowsky characterizes its fluorochemical as a "sizing agent", whereas the language of Claim 1 of the '997 Patent calls for a "hydrophobic agent," given that it was generally known in the art that fluorochemical sizing agents could serve as hydrophobic agents. It is and was well known in the art to add sizing materials during the papermaking process in order to "increase . . . such properties as water resistance". THE DICTIONARY OF PAPER (3d ed. 1965) (see Tab P). For example, U.S. Patent No. 4,429,162 discloses various perfluoroalkyl phenol compounds which may be used "as an internal fluorochemical sizing agent for paper pulp to render the same oil and water repellent." See Tab Q, U.S. Pat. No. 4,429,162, 10:30-31. In fact, the prior art even recognizes FC-807 itself (the Scotchban grade disclosed in Yadlowsky) as a "fluorochemical sizing agent" capable of providing hydrophobicity. See, e.g., U.S. Patent No. 4,740,495, issued April 26, 1988:

> The **fluorochemical sizing agent** is mixed into the top coat or layer 14 consisting of the binder, the wax, the wetting agent and the anti-foam material, and the coating or layer is applied on top of the thermally reactive layer 12. The **top coat or layer 14**

-33-

> **containing the fluorocarbon sizing agent causes beading**, illustrated as 16 in FIG. 1, **of any damaging or adverse material or elements, such as oil, water,** alcohol, etc., and prevents penetration of such material or elements into the thermally reactive layer . . . .
>
> \*     \*     \*
>
> [A suitable] **sizing agent is FC-807 fluorochemical from 3M Company,** . . . .

*See* Tab R, U.S. Pat. No. 4,740,495, 3:64 to 4:5; 6:12-13 (emphasis added).

Although Yadlowsky may not have contemplated using Scotchban to provide water repellent qualities, Yadlowsky certainly did recognize the general desirability of providing such water repellency to a teabag paper. The Yadlowsky Application teaches that "silicone compounds such as are disclosed in U.S. Pat. No. 3,386,834 [the Noiset Patent] may be employed in conjunction with the fluoro-chemical sizing agent to achieve an increased water repellency." *See* Tab H, Yadlowsky, 8:1-9. In identical fashion, the Patent-in-Suit discloses *those very same silicone compounds* from the Noiset Patent as being suitable "hydrophobic agents" for use in Plaintiff's invention:

> In accordance with this embodiment of the invention, the hydrophobic treating agent may be any of a number of fluid-repellent materials, such as **silicones,** fluorohydrocarbons, parafins, alkyl ketene dimmers, stearylated materials and the like. **The silicones may be any of those materials mentioned in U.S. Pat. No. 3,386,834,** the disclosure of which is incorporated herein by reference.

*See* Tab A, Patent-in-Suit, 6:35-42 (emphasis added).

In summary, the hydrophobic silicones which Plaintiff has claimed in the Patent-in-Suit are literally identical to those disclosed in the prior art Yadlowsky Application. The fluorohydrocarbons disclosed by Plaintiff are grades of Scotchban recognized by the prior art as being chemically similar or closely related to the lone grade of Scotchban disclosed in Yadlowsky. Therefore, there is no genuine issue of material fact that the components of the claimed web recited in the Third Element of Claim 1 of the Patent-in-Suit, namely, the use of "fluorohydrocarbons" and/or "silicones" which act as "hydrophobic agents", are expressly disclosed in the Yadlowsky Application.

### d.   The Yadlowsky Application Inherently Discloses the *Properties* of Claim 1 of the Patent-in-Suit.

Like the Kelley Patent (see Section IV(A)(1)(d), *supra*), the Yadlowsky Application does not provide data for "water climb" or "infusion characteristics," or for the number of seam failures

observed in tea bags made from the Yadlowsky webs. However, for the same reasons that necessitated Plaintiff to admit that such properties where inherently disclosed in the Kelley Patent, logic dictates that such properties must also be inherent in the webs disclosed in the Yadlowsky Application. That is, a web is disclosed in Yadlowsky which has a construction identical to one embodiment of the web claimed in the Patent-in-Suit, and given that such a web -- if the teachings of the Patent-in-Suit are to be believed -- possesses no appreciable water climb, no substantial loss of infusion characteristics, and less than 10 percent failure in the mechanical seam of tea bags constructed therefrom, then an identical web made according to the disclosure of the Yadlowsky Application must necessarily possess the same water climb, infusion, and seam failure properties.

The fact that Yadlowsky either did not measure those properties or did not appreciate that they existed in his web does not negate this inherency. As the Federal Circuit held in *Atlas Powder*:

> Inherency is not necessarily coterminous with the knowledge of those of ordinary skill in the art. Artisans of ordinary skill may not recognize the inherent characteristics or functioning of the prior art. However, **the discovery of a previously unappreciated property of a prior art composition**, or of a scientific explanation for the prior art's functioning, **does not render the old composition patentably new to the discoverer**.

*Atlas Powder*, 190 F.3d at 1347 (emphasis added), *citing Titanium Metals*, 778 F.2d at 780, 782. These principles are further illustrated in the Federal Circuit's decision in *Titanium Metals*, wherein claims directed to a titanium alloy containing various ranges of nickel, molybdenum, iron and titanium "characterized by good corrosion resistance in hot brine environments" were deemed unpatentable in light of a prior art reference which disclosed a titanium alloy falling within the claimed ranges but which did not disclose any corrosion-resistant properties. In affirming the USPTO's conclusion that the claimed alloy was not novel, the Federal Circuit noted that "it is immaterial, on the issue of their novelty, what inherent properties the alloys have or whether these applicants discovered certain inherent properties." *Titanium Metals*, 778 F.2d at 782. "The public remains free to make, use, or sell prior art compositions or processes, regardless of whether or not they understand their complete makeup or the underlying scientific principles which allow them to

-35-

operate." *Atlas Powder*, 190 F.3d at 1348. "The doctrine of anticipation by inherency, among other doctrines, enforces that basic principle." *Id*.

Moreover, the Yadlowsky Application -- while not expressly disclosing the Properties as measured by the specific "water climb," "infusion" and "seam burst" tests called for in the '997 Patent -- contains various statements demonstrating that the characteristics which manifest themselves in those properties were in fact appreciated by Yadlowsky as early as 1986. For example, the Patent-in-Suit claims that a web having "no appreciable water climb" can be achieved by completely impregnating a web with the silicone compounds disclosed in the Noiset Patent. *See* Tab A, Patent-in-Suit, 6:39-41. *Yadlowsky discloses the exact same thing*, i.e., distributing the Noiset silicones throughout the entirety of an infusion bag material (*see* Tab H, Yadlowsky, 6:4-8; 8:5-9). Therefore, the Yadlowsky web must necessarily likewise exhibit no appreciable water climb. The fact that Yadlowsky does not comment, one way or the other, on "water climb" is irrelevant to the inherency analysis.

Furthermore, the claimed limitation relating to "infusion characteristics" in the Patent-in-Suit refers to the ability of the web to allow water to pass through (into and out of) the web, as in the case of using hot water to extract flavors from tea leaves contained within a teabag. The Patent-in-Suit's requirement for "no substantial loss of infusion characteristics" refers to the fact that a web treated with Plaintiff's claimed hydrophobic treating agents purportedly will not suffer a substantial decrease in its ability to allow the passage of water into and out of the web, as compared to an equivalent web to which no hydrophobic agent has been applied. This precise characteristic is recognized, and thus inherently disclosed, in the Yadlowsky Application, wherein it teaches that the treated infusion bag material prevents the fibers that make up the bag from absorbing flavor oils emitted by the tea leaves during the brew process, and in turn "the porosity of the infusion bag material is not diminished" and "the flow of extracted food solids" is not impeded. *See* Tab H, Yadlowsky, 3:30-34.

The limitation of Claim 1 which calls for "less than 10 percent seam failure" is also alluded to in the Yadlowsky Application, which teaches that the infusion bag material must have "sufficient

porosity to allow substantial extraction of the food material but insufficient to allow migration of the food material from inside the infusion bag, especially during extraction when swelling of the food material is common upon contact with the hot extracting water." *Id.* at 5:10-17.

Plaintiff's assertions in the '997 Patent that the claimed porous fibrous web material exhibits no appreciable water climb and no substantial loss of infusion characteristics, and that mechanically-sealed infusion packages made from the claimed web material exhibit less than 10 percent seam failure, amount to no more than claims to the discovery of inherent properties which an equivalent web would possess; they do not amount to the addition of novel elements sufficient to patentably distinguish Claim 1 of the '997 Patent over the Yadlowsky Application, which discloses such an equivalent web. "Insufficient prior understanding of the inherent properties of a known composition does not defeat a finding of anticipation." *Atlas Powder*, 190 F.3d at 1349, *citing Titanium Metals*, 778 F.2d at 782.

In summary, it was publicly known as far back as 1986 when the Yadlowsky Application was published to (a) treat an infusion bag material, including specifically a grade of teabag paper manufactured and sold by the Plaintiff, with (b) a fluorochemical such as Scotchban FC-807, in order to (c) coat 100% of the teabag paper's fibers. Yadlowsky further disclosed that if increased water repellency was desired, silicone compounds identical to those claimed in the Patent-in-Suit could be used. Seven years later, Plaintiff applied for and subsequently obtained the Patent-in-Suit for the ***exact same thing***: a porous fibrous web material (such as teabag paper) impregnated throughout its extent, in one embodiment, with a fluorochemical (such as Scotchban FC-809 or FX-845, two products which earlier patents referenced as being chemically similar and/or closely related to Yadlowsky's Scotchban FC-807), or, in another embodiment also in accordance with Claim 1 of the Patent-in-Suit, with the silicone compounds disclosed in the Noiset Patent. Therefore, Claim 1 of the Patent-in-Suit is not novel as required by 35 U.S.C. § 102 (a) and (b) in view of Yadlowsky, and as such should never have issued.

### 2. The Yadlowsky Application Anticipates Claims 2, 5, 8-11 and 14-16 of the Patent-in-Suit.

As with the analysis of Kelley's anticipatory effect on the claims of the Patent-in-Suit other than Claim 1, it would needlessly lengthen this memorandum to present a comparison here of the prior art Yadlowsky Application and each of the remaining claims which Yadlowsky invalidates (2, 5, 8-11 and 14-16). Such comparisons are included in the accompanying Statement of Facts (¶¶ 133-141), which clearly show that those claims are not novel in view of Yadlowsky, and thus are invalid pursuant to 35 U.S.C. § 102.

### C. CLAIMS 1, 2, 5, 8-11 AND 14-16 OF THE PATENT-IN-SUIT ARE ANTICIPATED BY THE NOISET PATENT.

Even before the Kelley Patent and the Yadlowsky Application ever came into existence, a prior art reference had already publicly disclosed the subject matter which Plaintiff, 25 years later, claimed when it applied for and subsequently obtained the Patent-in-Suit. On June 4, 1968, the Noiset Patent was issued for "Infuser Web Material, Method of Preparing Same and Infusion Package." *See* Tab D, Noiset Patent. Notably, the Noiset Patent was issued to The Dexter Corporation, Plaintiff's predecessor. Of further note is the fact that large sections of the specification of the Noiset Patent appear verbatim (or nearly verbatim) in the disclosure of the Patent-in-Suit, a point which simply underscores the remarkable overlap between the two patents.

When it obtained the Noiset Patent in 1968, Plaintiff's predecessor, Dexter, publicly described (a) an infusion bag material, such as a teabag paper, (b) the entire surface area of which had been treated with (c) water-repellent silicone compounds. While Noiset clearly did not recognize, and in fact taught away from, complete coverage of the entire web, it nevertheless *disclosed* precisely that. Then, nearly a quarter of a century later, Plaintiff managed to obtain patent protection for a web having this *exact same construction*, i.e., a porous fibrous web material (such as teabag paper) impregnated throughout its extent with, in one embodiment, the identical water-repellent silicone compounds disclosed in the Noiset Patent:

-38-