adhesives can be lightly sealed, tacked, or adhered without resorting to heated platens by simply pressing the *adhesive-covered* surfaces together." (Kelley, col. 4, lines 58-62) (emphasis added). Clearly this is not the type of improved strength claimed in the '997 patent, which includes the use of a hydrophobic material in a tea bag paper that is sealed by folding and crimping. The Defendants cite to another part of Kelley in respct of this same limitation (Kelley, col. 5, line 69 to col. 6, line 1). But this section of Kelley states that "two of the nonwoven webs are placed one above and one below the parcel of powder and then is *heat-sealed* around the periphery of the superimposed webs." The '997 patent is directed to folded and crimped seams, not heat sealed seams. Thus the tactic emploed by Defendants -- divide and conquer -- becomes apparent. But it falls apart upon close scrutiny.

Defendants have done exactly the same thing in their analysis of Noiset and Yadlowsky.

There is a big difference between a fibrous web for brewing beverages, and a fibrous web for brewing beverages that has *improved resistance to failure of a mechanical seam*. It is this *structural* difference that distinguishes the tea bag paper manufactured by Plaintiff from that which preceded the invention of the '997 patent. And it is this difference that has made the product commercially successful. None of the prior art references disclose such a paper to be used with such a seam. It is a limitation of the claim.

The Federal Circuit dealt with the issue of whether a *preamble* is in fact a claim limitation in *Poly-America, L.P. v. GSE Lining Technology, Inc.*, 383 F.3d 1303, 1310 (Fed. Cir. 2004), in which it held:

> "We agree with Poly-America that the phrase "blown-film" is a limitation of the claims of the '047 patent. The specification is replete with references to the invention as a "blown-film" liner, . . . The phrase is used repeatedly to describe the preferred embodiments, and the entire preamble "blown-film textured liner" is restated in each of the patent's seven claims. *Our analysis shows that the inventor*

18

*considered that the "blown-film" preamble language represented an important characteristic of the claimed invention.* We therefore agree with the district court's conclusion that a "[r]eview of the entirety of the '047 patent reveals that the preamble language relating to 'blown-film' does not state a purpose or an intended use of the invention, but rather *discloses a fundamental characteristic of the claimed invention that is properly construed as a limitation of the claim itself.*" (emphasis added)

In accordance with the *Poly-America* case, *supra*, a review of the '997 patent specification shows that the fibrous web of the invention must exhibit "improved resistance to the failure of a mechanical seam therein." Not any fibrous web material will satisfy this limitation. Indeed, prior to the '997 patent no fibrous web was known to possess this limitation. The web *must* exhibit enhanced integrity of a folded and crimped seam of an infusion package, i.e., a tea bag. The '997 patent (col. 1, lines 30-34) define the manner in which the mechanical seam is made: "In the mechanically sealed tea bags, the edges of the web material are brought together, folded a number of times, and the multiple fold is crimped to provide a mechanical seam securing the two edges of the web material."

The '997 patent further discusses the "mechanical seam integrity" of the invention at col. 2, line 7; "resistance to mechanical seam failure" at col. 2, line 28; "improved resistance to the failure of a mechanically-crimped seam" at col. 2, lines 34-5; "less than 10 percent failure in the mechanical seam" at col. 2, lines 45-6; "mechanical fastening, i.e., folding and crimping" at col. 3, lines 27-28; "improved seam integrity" at col. 4, line 68; and "improved mechanical seam integrity" at col. 7, lines 12-13. The phrase "improved resistance to the failure of a mechanical seam," or "enhanced mechanical seam integrity" is found in each and every one of the claims of the '997 patent. This follows exactly the basis for the holding in *Poly-America*, *supra*, in which the Court held that a reference to "blown-film" in the preamble to the claim was an essential feature of the claim and properly construed as a limitation of the claim itself.

It is clear from a review of the '997 patent that the inventors thereof considered the language "improved seam integrity" and "enhanced mechanical seam integrity" and "mechanically-crimped seam" to be important characteristics of their invention. Therefore, in accordance with the holding in *Poly-America*, the first element of claim 1 and claim 10, must be considered as a unitary concept in which the web is mechanically sealed by folding and crimping and exhibits enhanced or improved seam integrity. This cannot be ignored; it is a fundamental characteristic of the '997 invention. A careful review of Defendants' anticipation analysis shows that the webs of the prior art references they have cited do not have these characteristics.

**b)      Each of the so-called "properties" is a separate claim limitation that must be found in each of the references**

Defendants have lumped together all of the essential characteristics of the webs claimed in the '997 patent, i.e., water climb, seam failure, and infusion, and denominated them as "properties." Defendants have chosen to deal with these claim limitations collectively and to *declare* all three of the group "inherent" in the prior art. If Defendants are to be believed, each of the prior art references discloses a web having the properties of "no appreciable water climb," "less than 10 percent failure in the mechanical seam," and "no substantial loss of infusion characteristics." Defendants, however, have not provided a shred of evidence to support these contentions. They rely instead entirely upon lawyers' arguments. Lawyers' arguments are *not* evidence.

Each of the limitations of the '997 patent claims, including water climb, seam failure and infusion characteristics must be shown to be "necessarily present" in each piece of the prior art for it to be inherent. There is no exception to this rule of anticipation. One cannot just deal with them as a group and declare them inherent, as Defendants have done. Each is a separate limitation of the claims and each must be dealt with separately.

The Federal Circuit considered a similar issue in *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 347 F.3d 1367, 1372 (Fed. Cir. 2003). The Court was considering whether a particular prior art patent (to Blum) anticipated the patent in suit. Teva argued that the Blum patent anticipated because it "mentioned" that the chemical compounds disclosed therein were "suitable for the production of cosmetic and pharmaceutical preparations." The Federal Circuit held that that was not enough for anticipation. The Court held, at 1372:

> Teva argues that because Blum mentioned "pharmaceutical preparations," one of ordinary skill in the art would know that the compounds are useful for therapeutic treatments such as in claim 1 of the '077 patent. However, *there is no suggestion of the claimed therapeutic uses in Blum; and Blum does not identify the particular compound of the claim as having superior bone reabsorption properties.* An "anticipating" reference must describe all of the elements and limitations of the claim in a single reference, and enable one of skill in the field of the invention to make and use the claimed invention. *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1378-79 (Fed.Cir. 2001); *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226 (Fed.Cir. 1989). Such description is absent in Blum. (emphasis added)

See also, the case of *Union Oil Company of California v. Atlantic Richfield Company*, 208 F.3d 989, 996 (Fed. Cir. 2000), where the Court was faced with a situation in which the patent claims were directed to ordinary fuels for use in standard passenger cars, while the prior art was directed to aviation and racing fuels. The patent in suit was held not to be anticipated because the alleged prior art did not include the limitation of being a standard automotive fuel composition. The Federal Circuit held that such factors as the patentees' testing procedures and results in the specification were directed to fuels for ordinary passenger automobiles. ("Specifically, the patentees used ordinary passenger automobiles in their tests"). The Court concluded that the patent in suit was not anticipated because:

> [m]oreover, the record does not show that the aviation and racing fuels otherwise have the claimed characteristics of the particular standard automotive fuels recited in the '393 patent. While the record shows that some properties of the aviation and

racing fuels coincide with the properties of the '393 patent's claims, the record does not show the presence of each and every limitation.    An expert for the refiner appellants stated that the allegedly anticipatory Phillips B-35 racing fuel "is very different from typical [automotive fuel]." Tr. at 4782.   When asked, "Is Unocal unleaded racing gasoline very different from typical          motor gasoline?", the          expert again answered "Yes." Id. at 5047.    This expert similarly answered "yes" when questioned about whether the asserted aviation fuels were "very different" from typical motor gasoline.   See id. at 5060.

The record on which Defendants base their motion for summary judgment of anticipation does not show that the particular materials disclosed in the prior art have the claimed characteristics of the webs of the '997 patent. They are directed to different problems and do not attempt to solve the problem of mechanical seam failure that is the hallmark of the '997 patent. They are, in short, similar to the situation in Union Oil, supra, in which a patent for racing or aviation fuel compositions was held not to anticipate a patent for a standard fuel composition. For this reason alone one cannot simply predict whether those prior art materials when treated in the manner disclosed therein would result in a web having the required water climb, seam failure rates, or infusion characteristics. In fact, none of the prior art references cited by Defendants mention water climb or the means by which it is measured in the '997 patent; none of the prior art references mentions the seam failure rates claimed in the '997 patent or the means by which seam failure is determined (nor could they as none of the references contemplates a folded and crimped seam); and none of the references mentions the loss of infusion characteristics in the context of a hydrophobically treated infusion web as in the '997 patent.

> **c)**    **None of the prior art references are directed to *folded and crimped* materials and none refers to the water climb, seam failure or infusion characteristics of the '997 patent**

It is abundantly clear from the declaration of Dr. Malcolm, Plaintiff's expert, that each of the prior art references cited by Defendants is directed primarily to heat sealable materials. None of the

materials are sealed by folding and crimping (Malcolm Decl., Par. 22). The differences between these types of materials, as discussed by Dr. Malcolm, is significant, particularly when taken in the context of the '997 patent. Dr. Malcolm states that heat sealable webs are different in kind from mechanically sealed webs, and the two are *not* interchangeable. Heat sealable webs, which must contain a sufficient amount of thermoplastic agent to form a bond when pressed under heat, are *not* suited for making tea bags sealed by folding and crimping. Thermoplastic material reduces the surface friction of the web, likely weakening the strength of a folded and crimped seam. Moreover, heat sealable tea bag paper has a higher basis weight than non-heat sealable paper, which results in a loss of infusion characteristics. (Malcolm Decl., Par. 23).

Moreover, none of the cited prior art references mentions in any way the *properties* of a folded and crimped tea bag made from a fibrous web, let alone how to achieve those properties (Malcolm Decl., Par. 24). In contrast, all of the claims of the '997 patent specifically recite the properties of the fibrous web of the invention. None of the references mentions a fibrous web having improved folded and crimped seams (Malcolm Decl., Par. 24).

## 2. The Kelley patent

### a) The Kelley patent is directed to adhesives for heat sealable, *not* folded and crimped sealed materials

The Kelley patent relates to an adhesive composition for use in various types of non-woven fabrics. It does not refer to or suggest in any manner a folded and crimped seal. The Kelley patent is primarily directed to *heat sealed bonding* of the fabrics, as is apparent from the following excerpts from the patent:

- ". . . the bonded fabrics are sealed together by *heating*. . . " (col. 1, lines 14-15);
- ". . . pulls the bond apart immediately after removal of the pressure by the *heated* jaws or rollers. . . " (col. 1, lines 26-27);

- "It is an object of the present invention to provide a binder which is adapted to be *heat sealed. . .* " (col. 1, lines 29-30);

- ". . . the extent of fusion depends on the temperature and time of maintenance during the *heat-sealing* operation." (col. 3, lines 27-29);

- "They are thermoplastic and *heat-sealable* and can serve quite efficiently in *heat sealing* areas . . ." (col. 4, lines 46-47);

- ". . . *heat sealed* around the periphery . . . " (col. 5, line 68);

"The overlapped edges proceed under a *hot sealing* roll in contact therewith to *heat-seal* the laps together . . . " (col. 9, lines 1-3).

The Kelley patent does state that because of "the pressure-sensitive character of the adhesive, various surfaces and materials to be bonded with the polyblend adhesives can be *lightly sealed*, tacked or adhered without resort to heated platens by simply pressing the adhesive-covered surfaces together." (emphasis added). Pressing two adhesive covered surfaces together to obtain a "lightly sealed" bond is something that is entirely different from the folded and crimped seal of the '997 patent, which is intended to withstand the effect of boiling water. Defendants offer no proof whatsoever to support their theory that such a bond would work as intended in the '997 patent. There is no disclosure of a folded and crimped seam in Kelley, as there is in the '997 patent. And heat-sealable materials are not suitable for use in folded and crimped sealed tea bags.

Defendants have *admitted* that heat sealable and non-heat sealable tea bag papers are *not* interchangeable. In an e-mail, dated August 8, 2003 from Defendants' counsel, Marc Farrell to Yunling Ren, Esq. of Plaintiff's Counsel (**Tab F**) Mr. Farrell made clear that Defendants would object to the production of any of their documents that involved the use of *heat sealable materials* for making mechanically sealed tea bags. Mr. Farrell stated in that e-mail:

As to your last point, I have determined that *there are no heatsealable materials that are used for making mechanically sealed tea bags*. In fact, the two (heatsealable versus non-heatsealable) are distinct products and used only for individual purposes. Our clients, like yours I'm sure, work closely with packaging machine manufacturers to supply filter paper to fit their requirements. If a tea company is looking for a certain tea bag, they will purchase the correct equipment to make that bag. It is impossible to have a packaging machine that can use either paper - the machines are not interchangeable and cannot be modified. So in other words, *heatsealable papers could never be used on the tea bag machines that use non-heatsealable papers.* (emphasis added).

We agree with Mr. Farrell as to the point that heat sealable and non-heat sealable tea bag papers are *not* compatible and that a heat sealable web would not be considered for use in a mechanically sealed (crimp and fold) tea bag operation by one of ordinary skill in the art. Confirmation is found in the fact that the Kelley patent contains not a single word relating to a mechanically sealed tea bag, let alone one that has increased seam strength.

> **b)    The Kelley patent discloses a "polyblend" of both low and high molecular weight components, whereas the '997 patent requires high molecular weight materials only**

The Defendants have argued that the Kelley patent discloses the "high molecular weight" binder materials used in the '997 patent. But in fact, the Kelley patent requires an adhesive binder comprised of two components: a low molecular weight component (150,000-300,000) and a high molecular weight component (500,000 and higher), to form a "polyblend" (Kelley patent, col. 1, lines 5-11 and 36-47; col. 2, lines 60-62; col. 7, lines ). Dr. Malcolm has stated that a binder system comprised only of high molecular weight materials (such as that in the '997 patent) would not be useful in the binder system of the Kelley patent (Malcolm Decl., Par. 29). The purpose of the two-component "polyblend" binder system of the Kelley patent is to be used with *heat sealable* materials, which is not a problem that the folded and crimped sealed system of the '997 patent (Malcolm Decl., Par. 30).

The Kelley patent, moreover, does not disclose or refer to the level of hydrophobicity of the binder treated paper as measured by the water climb test of the '997 patent (Malcolm Decl., Par. 32). Dr. Malcolm states that a person of ordinary skill in the art "would understand the concept of 'reasonably water resistant' in the Kelley patent to refer to the wet strength of the paper and not to water absorbency of the paper." (Malcolm Decl., Par. 32). Wet strength and water absorbency are two entirely different properties. Since the Kelley patent provides no indication of water repellency, there is no teaching or suggestion that the treatment of a paper with a polyblend of the type disclosed in Kelley would result in a paper having "no appreciable water climb," because a person of ordinary skill would understand that the "water resistance" of Kelley does not necessarily lead to water repellency as in the '997 patent (Malcolm Decl., Par. 32). Furthermore, the Kelley patent is concerned with adhesive properties, which is not suitable for the purpose of the '997 patent (Malcolm Decl., Par. 33). Thus, Dr. Malcolm concludes that a person of ordinary skill would not be able to use the teachings of the Kelley patent to make a tea bag having no appreciable water climb and no substantial loss of infusion characteristics while providing less than 10% failure in the folded and crimped seam in boiling water without undue experimentation (Malcolm Decl., Par. 34).

c)     There is nothing in the prosecution of Plaintiff's
European counterpart patent that adversely affects the
validity of the '997 patent

Defendants' refer to the prosecution of the Plaintiff's European counterpart patent as supporting the anticipatory nature of the Kelley patent. In particular, they cite a statement in the minutes of the oral proceedings in an opposition proceeding between Plaintiff and J. R. Crompton Company, which states:

"The proprietor [Ahlstrom] admits that subject-matter of claim 1 differs from the disclosure of D3 [the Kelley patent] *only* in that the web is suitable for making mechanical seals whereas the web according to D3 is not. (emphasis added)."

In the first place, the statement in the minutes is inadmissible hearsay. As stated in the Declaration of Michael Donnan, Plaintiff's registered patent agent in connection with the European opposition, the taking of minutes is governed by Rule 76 EPC, which does not require the minutes to be an exact transcript of the proceedings. (Donnan Decl., Par. 5). Mr. Donnan was not aware of any sound recording of the hearing or of any official stenographer being present and he has no contemporaneous notes recording the statements he made at the hearing. To the best of his recollection, the minutes were compiled in the usual manner from notes taken down by a member of the panel hearing the argument. (Donnan Decl., Pars. 10-11).

Furthermore, Mr. Donnan does not recall stating during the hearing that the subject matter of claim 1 of the European patent differs from the disclosure of the Kelley patent only in that the web according to the European patent (Plaintiff's European patent) is suitable for making mechanical seals whereas the web according to D3 (Kelley) is not suitable for making mechanical seals. Corroboration of Mr. Donnan's account is found in the written "Reasons for the Decision", the official decision of the Opposition Division. The word "only" is not found in the official decision of the proceeding, in which the corresponding sentence reads:

> Thus the subject-matter of claim 1 would differ from the porous web of D3 in that it is suited for making infusion packages with mechanical seams. (Donnan Decl., Par. 7)

### d)   U.S. Courts do not give much weight to foreign decisions on patent validity

Moreover, the word "only" does not appear in the written submissions made by Ahlstrom either prior to the hearing or in the appeal that followed the decision of the Opposition Division. (Donnan Decl., Par. 8). Thus, there is no evidence whatsoever to support Defendants' argument with respect to the alleged "admission" with respect to the Kelley patent.

27

Because of the differences in United States and foreign patent prosecution, the courts have not readily accepted the decisions of foreign tribunals when considering issues of patent validity here. In *Heidelberger Druckmaschinen AG v. Hantscho Commercial Products, Inc.*, 21 F.3d 1068, 1072 (Fed. Cir. 1994), the Federal Circuit noted that the district court held that Heidelberger's withdrawal of its corresponding European patent application after the European examiner rejected the application on a specific prior art reference established Heidelberger's recognition of its unpatentability over that reference. The Federal Circuit held with respect to the district court's reliance upon the European prosecution was misplaced because of the differences between U. S. and foreign patent laws:

> The weight that the district court appeared to place on the European examiner's rejection was not appropriate.   We take notice of the fact that the theories and laws of patentability vary from country to country, as do examination practices. Caution is required when applying the action of a foreign patent examiner to deciding whether the requirements of 35 U.S.C. § 103 are met under United States law, for international uniformity in theory and practice has not been achieved.

This has been the position taken by the Federal Circuit and its predecessor court, the U. S. Court of Customs and Patent Appeals, for many years. In *In re Dulberg*, 472 F.2d 1394, the CCPA held:

> We need not even consider the actions taken in foreign countries with regard to the patentability of this application under our law. The granting      of a patent on an "invention" in a foreign country has no relevance to the determination of whether the same "invention" would be obvious within the ambit of § 103 since *it is notoriously well known that the standards of patentability vary from country to country*. In re Larsen, 292 F.2d 531, 49 CCPA 711 (1961). (emphasis added).

In *Medtronic, Inc. v. Daig Corporation*, 789 F.2d 903, 907 (Fed. Cir. 1986), the Federal Circuit held that an attempt to adopt the conclusion of a foreign tribunal with respect to obviousness was *specious*:

As a final effort to prove obviousness of the '501 invention, Daig urges this court to adopt the conclusion of a German tribunal holding the '501 German counterpart patent obvious. This argument is specious. The patent laws of the United States are the laws governing a determination of obviousness/ nonobviousness of a United States patent in a federal court. (citing *In re Dulberg*, *supra*). See also, *Merck & Company v. Teva Pharmaceuticals USA, Inc.*, 288 F. Supp. 2d 601, 612 (D. Del. 2003); *Allen v. Howmedica Leibinger, Inc.*, 197 F. Supp 2d 101, 110 (D. Del. 2002).

Therefore, there is no legal authority upon which Defendants may assert invalidity of the '997 patent based upon a foreign tribunal's rejection of or cancellation of claims in a foreign patent application. Furthermore, even if that were the case, Plaintiff's European counterpart application was allowed to issue as a European patent and that European patent was allowed to stand (albeit with modified claims) following the opposition referred to by Defendants. Accordingly, there is no basis upon which Defendants can rely upon the prosecution of Plaintiff's European counterpart patent in connection with the instant motion for summary judgment.

### 3.    The Noiset patent

The Noiset patent is directed to the problem of seam failure principally in *heat sealed* tea bags. The seam failure results from pressure buildup inside the tea bag when the bag is exposed to boiling water and a film of water covers the surface of the bag preventing the escape of gases. (Malcolm Decl., Par. 35). The solution to the problem discussed in Noiset is to apply silicone to discrete portions of the paper surface so that the gases can escape through those discrete treated areas. The total amount of surface area coated with silicone is stated to be *no greater than 40%*. (Malcolm Decl., Par. 36). The Noiset patent explicitly teaches that greater than 40% coverage with silicone is undesirable as this causes loss of infusion characteristics (Noiset patent, col. 4, line 71 to col. 5, line 4). In contrast, the '997 patent requires that the entire surface of the web  material be

impregnated with the hydrophobic material ('997 patent, col. 2, lines 5-13 and 35-39). The '997 patent is directed to seam failure folded and crimped sealed tea bag with 100% coverage of hydrophobic material, while maintaining infusion characteristics. The Noiset patent teaches away from this concept by teaching that the web material not be completely treated with silicone because over 40% results in loss of infusion characteristics. The differences between the Noiset patent and that which is disclosed and claimed in the '997 patent were thoroughly discussed during its prosecution in the PTO. The Noiset patent was also incorporated by reference into the '997 patent. [4]

Defendants rely heavily on Table 1 in Noiset where Noiset describes a porosity test to determine an appropriate amount of silicone to be applied to the areas to be treated. This test is performed because excessive application of silicone can result in significant reduction of porosity (Malcolm Decl., Par. 38). Dr. Malcolm states that a person of ordinary skill would not understand this porosity test as a teaching of impregnating the entire surface area of a tea bag paper with silicone as such an understanding is inconsistent with the teaching in Noiset that the paper be treated in specific areas only, not throughout its entire area as required by the claims of the '997 patent. The paper used to run the test in Table 1 is in the context of a *heat sealable* paper. There is no teaching or suggestion in Noiset of treating the entire web of a non-heat sealable tea bag paper or of a *non-heat sealable* folded and crimped sealed tea bag paper as in the '997 patent (Malcolm Decl., Par. 38).

The percentages of silicone given relate to concentration of silicone in the emulsion that is applied to the web and not the amount of silicone in the tea bag material itself. Therefore, there is no disclosure of a tea bag paper in which the entire surface area has been treated in an amount of 1% or

---

[4] Noiset also states that his invention can be used with "non-heat sealable paper" which would require "mechanical fastening for the formation of the tea bag". There is no description of the nature of the "mechanical fastening". Clearly, there is no suggestion that it be a folded and crimped seam.

more, as claimed in the '997 patent (Malcolm Decl., Par. 39). There is also no mention in the Noiset patent of no appreciable water climb and no substantial loss of infusion characteristics while providing less than 10% seam failure as set forth in the '997 patent (Malcolm Decl., Par. 40).

Dr. Malcolm states (Malcolm Decl., Par. 42) that in his opinion the attempt by Defendants to correlate porosity changes in the air vents (silicone coated pores) shown in Table 1 with the change of infusion characteristics in the '997 patent is unrealistic, because they are two different physical characteristics and there is no direct relationship between the two. Air porosity deals with air movement through an opening while infusion deals with the movement of dissolved materials in water through water saturated pores. The fact that the Noiset patent rejects the idea of covering the entire web with silicone, regardless of at what concentration silicone will be applied, also suggests that this porosity test has nothing to do with infusion characteristics. It is relevant only to the gas release addressed in the Noiset patent.

Dr. Malcolm also states that a person of ordinary skill in the art following the teachings of Noiset would not be able to make a tea bag paper as specified by the claims of the '997 patent (Malcolm Decl., Par. 43). In this respect, the PTO examiner agreed as he allowed the patent to issue over the Noiset patent.

Defendants' reliance on the testimony of Peter Scott to establish anticipation by Noiset is misplaced. The tesimony of a fact witness who is presented at the spur of the moment with prior art at a deposition and grilled on what is essentially a hypothetical question is hardly substantive. Moreover, the question itself was ambiguous and meaningless. Mr. Scott was asked whether or not a tea bag paper made according to Table 1 in Noiset would have any water climb. There is no tea bag paper in Table 1. Table 1 refers to a porosity test in which test papers -- not tea bag papers -- were coated over their entire surface with silicone. That is the only way a porosity test

could have been made in this case. It is also unclear which sample in Table 1 the question was directed to. Whether or not such a hypothetical paper would have no water climb is also irrelevant as speculation, at best. (Tab G, Scott Depo., pages 210, 213)

### 4. The Yadlowsky application

The Yadlowsky application teaches a method of preventing the absorption of flavor oils into the fibers of an infusion bag by coating the fibers with a water-soluble fluoro-chemical sizing agent. This application primarily refers to infusion packages made of *heat sealable* paper. A person of ordinary skill reading the Yadlowsky application would not consider it to be applicable to a folded and crimped sealed tea bag. The Yadlowsky application specifically refers to the use of heat sealable binders and/or heat sealable fibers or films ("Enclosure of the food product may be accomplished by heat sealing the infusion bag material as by the use of *heat sealable* binders and/or *heat sealable* fibers or films, or stitched, or any other method as is known in the art.") (Yadlowsky app., page 4, lines 13-17) (emphasis added). Stitching is the only method other than heat sealing *specifically* referred to in Yadlowsky.

The only example in Yadlowsky, which is found on page 8, lines 25 et seq., refers to a test using Dexter paper grade #3968. Dexter grade #3968 is a *heat sealable* paper See Declaration of Peter Scott, Par. 4 (submitted herewith) . Therefore, one of ordinary skill would not be expected to consider the use of other sealing means, such as folding and crimping, in the context of this disclosure (Malcolm Decl., Par. 44).

The Yadlowsky application also teaches that the content of the fluoro-chemical for coating the heat sealable web is no more than 0.6% by weight and typically from about 0.1 to 0.3% of FC sizing agent to dry furnish by weight (Yadlowsky app., page 6, lines 19-24). The claims of the '997 patent, in contrast, require that the hydrophobic agent impregnated throughout the paper *must be at*

*least 1% by weight.* There is no teaching or suggestion in the Yadlowsky application that the use of an FC sizing agent in the amount contemplated by Yadlowsky would prevent seam failure of the folded and crimped seams while maintaining infusion characteristics of folded and crimped sealed tea bags (Malcolm Decl., Par. 45). Thus, the Yadlowsky application fails to meet at least the claim requirements for the non-heat sealable web and the minimum amount of the hydrophobic treating agent when using the fluoro-chemical alone as a coating agent.

Even if a silicone is "employed in conjunction with" the fluoro-chemical to treat the web as suggested by Yadlowsky in view of the Noiset patent (page 8, lines 5-9), the Yadlowsky application still fails to teach each and every requirement of the claims of the '997 patent, because neither the Yadlowsky application nor the Noiset patent describes how and in what amount the silicone is to be applied to a teabag paper to make folded and crimped sealed tea bags having enhanced seams (Malcolm Decl., Par. 48). As in the Kelley and Noiset patents, there is no mention in Yadlowsky of water climb, infusion characteristics and the seam failure properties of a non-heat sealable tea bag paper for making the mechanically sealed tea bags set forth in the claims of the '997 patent.

Since both the Yadlowsky application and the Noiset patent address mainly *heat sealable* web materials, any properties resulting from the application of a hydrophobic agent to such heat sealable web materials are not necessarily the properties of the treated non-heat sealable web material as specified in the '997 patent. Therefore, a person of ordinary skill in this art would not be able to make a tea bag paper that meets the requirements of the claims of the '997 patent (Malcolm Decl., Pars. 49, 50).

5.    **Dr. Malcolm's Comparison of the claims of the '997 patent with the cited references**

The following chart summarizes Dr. Malcolm's findings with respect to whether a person of ordinary skill would find each of the elements of claim 1 of the '997 patent in any one of the three cited patent references (Malcolm Decl., Par. 52):

| Claim 1 of the '997 patent | Yadlowsky | Kelley | Noiset |
|---|---|---|---|
| A fibrous web suited for making infusion packages for brewing beverages and exhibiting improved resistance to the failure of a mechanical seam therein, | No teaching or suggestion | No teaching or suggestion | No teaching or suggestion |
| said web comprising a porous fibrous sheet material | Infusion bag material for heat seal. | Nonwoven webs for heat seal. | Porous web material for heat seal. |
| impregnated throughout its extent with about one percent or more by weight of | "A fluoro-chemical sizing agent is subsequently added to the furnish at a level from about 0.05 to 06% fluoro-chemical sizing agent to dry furnish, …" p6:19-24. | "When the polyblend is applied over the entire area, the amount of polymer that is applied may be from 20 to 100 percent by weight based on the weight of the dried fibers. See c5:18-21. | No teaching or suggestion |
| a hydrophobic treating system comprising a cured hydrophobic agent selected from the group consisting of high molecular weight cross-linked acrylic polymers, silicones, fluorohydrocarbons, paraffins, alkyl ketene dimers and | Fluoro-chemicals | "… a binder of adhesive composition is provided which comprises two essential components. The first … is an aqueous dispersion of a polymer of ethyl acrylate having a low molecular weight. | silicones |

| stearylated materials, | | The second component … is an aqueous dispersion of an emulsion polymer having an MFT of about 50 °C or higher."(col. 1:37-44). | |
|---|---|---|---|
| the impregnated sheet material exhibiting no appreciable water climb when measured using water at a temperature of about 100 $^0$C. | No teaching or suggestion | No teaching or suggestion | No teaching or suggestion |
| and no substantial loss of infusion characteristics | No teaching or suggestion | No teaching or suggestion | No teaching or suggestion |
| while providing less than 10 percent failure in the mechanical seam upon exposure to boiling water. | No teaching or suggestion | No teaching or suggestion | No teaching or suggestion |

The following chart summarizes Dr. Malcolm's findings with respect to whether a person of ordinary skill would find each of the elements of claim 10 of the '997 patent in any of the three cited patent references (Malcolm Decl., Par. 53):

| Claim 10 of the '997 patent | Yadlowsky | Kelley | Noiset |
|---|---|---|---|
| A process for producing porous web materials for making infusion packages having enhanced mechanical seam integrity | No teaching or suggestion | No teaching or suggestion | No teaching or suggestion |
| comprising the steps of providing a | Infusion bag material for heat | Nonwoven webs for heat seal. | Porous web material for heat seal. |

| porous absorbent web material suited for use as an infusion package, | seal. | | |
|---|---|---|---|
| treating the entire web material | "Said treatment may be accomplished by addition of the fluoro-chemical sizing agent as a liquid suspension or emulsion during the infusion bag stock, …" p5: 24-33. | "When the polyblend is applied over the entire area, the amount of polymer that is applied may be from 20 to 100 percent by weight based on the weight of the dried fibers. See c5:18-21. | The porosity test at column 4, Table 1. |
| with an aqueous emulsion of a hydrophobic agent selected from the group consisting of high molecular weight cross-linked acrylic polymers, silicones, fluorohydrocarbons, paraffins, alkyl ketene dimers and stearylated materials | Fluoro-chemicals | "… a binder of adhesive composition is provided which comprises two essential components. The first … is an aqueous dispersion of a polymer of ethyl acrylate having a low molecular weight. The second component … is an aqueous dispersion of an emulsion polymer having an MFT of about 50 °C or higher."(col. 1:37-44). | Silicones |
| to provide a treated web that exhibits no appreciable water climb when measured using water at a temperature of about 100 $^0$C. | No teaching or suggestion | No teaching or suggestion | No teaching or suggestion |
| and less than 10 percent failure in a mechanical seam | No teaching or suggestion | No teaching or suggestion | No teaching or suggestion |

| therein when exposed to boiling water. | | | |
| --- | --- | --- | --- |

### C.   NO CASE FOR SUMMARY JUDGMENT BASED ON OBVIOUSNESS UNDER 35 U.S.C. § 103 HAS EITHER BEEN ATTEMPTED OR PROVED

As stated at the outset, the Defendants have not even attempted to make a serious argument in support of invalidity for obviousness under 35 U.S.C. § 103. Their memorandum contains a very brief summary statement of about 1/2 page concluding that the '997 patent is invalid for obviousness. The Defendants pose the issue of obviousness as being a ground for invalidity over each of the three prior art references standing alone. "To the extent any differences are found between any of the claims of the '997 patent and either of Kelley, Yadlowsky and/or Noiset, such differences would be so small or insignificant as to render them obvious as a matter of law." (Defendants' Mem., page 49). That is the extent of Defendants' analysis and argument.

Obviousness is a question of law based on underlying questions of fact, such as (1) the scope and content of the prior art; (2) the differences between the prior art and the claimed invention; (3) the level of ordinary skill in the art at the time the invention was made; and (4) any objective considerations that may be present. *Graham v. John Deere Co.*, 383 U.S. 1, 17 (86 S.Ct. 684, 693-94 (1966). *Continental Can Co. v. Monsanto*, 948 F.2d 1264, 1270 (Fed. Cir. 1991). A determination of obviousness also requires that the court must ascertain what would have been objectively obvious to one of ordinary skill in the art at the time of the invention. *Ryko Manufacturing Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991). No such objective analysis has been made by Defendants. Dr. Malcolm, on the other hand, found that the three prior art references are different in kind and in scope from that of the '997 patent. The problems to be solved

by the prior art are not those which the invention of the '997 patent solved (seam failure in mechanically sealed tea bags).

Defendants do not address the level of skill in the art and whether the differences between the invention of the '997 patent and the prior art would have been obvious to such a person. Without such an analysis it is impossible to determine obviousness. Moreover, there is no discussion of the objective considerations that are present here. The invention of the '997 patent is the result of the practical problem of leaking tea bags, which was brought to the attention of Dexter by the Lipton Company. Dexter immediately jumped on the problem and solved it. No other company did. (Tab G, Scott, pages)

There is no basis for a summary judgment of obviousness under 35 U.S.C. § 103 to be found in Defendants' motion papers.

## V.   CONCLUSION

For all of the reasons stated herein, Defendants' motion for a summary judgment of invalidity of the '997 patent on the grounds of anticipation under 35 U.S.C. § 102 and for obviousness under 35 U.S.C. § 103 should be denied.

Respectfully submitted,

December 2, 2004                    Cohen, Pontani, Lieberman & Pavane

By _____
Myron Cohen, Esq.
Sidney R. Bresnick, Esq. (ct 16295)
Yunling Ren, Esq.
551 Fifth Avenue
New York, NY 10176
Tel. 212-687-2770
Fax 212-972-5487
                    -and-

38

McCarter & English, LLP
Basam E. Nabulsi, Esq. (ct 20897)
Four Stamford Plaza
107 Elm Street, 9th Floor
Stamford, CT 06902
Tel. 203-965-0601
Fax 203-323-6513

Attorneys for Plaintiff,
Ahlstrom Windsor Locks LLC

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing Opposition To Defendants' Motion For Summary Judgment On The Basis Of Patent Invalidity Under 35 U.S.C. §§ 102 and 103 has been sent by **Federal Express**, this 2nd day of December, 2004 to:

      Dina S. Fisher, Esq.
      Robinson & Cole LLP
      280 Trumbull Street
      Hartford, CT 06103-3597

and sent by first class mail to:

      Marc J. Farrell, Esq.
      Buchanan Ingersoll PC
      One South Market Square, 3rd Floor
      Harrisburg, PA 17101-2121
      Tel. 717-237-4820

*Sidney N. Bresnick*