UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

AHLSTROM WINDSOR LOCKS LLC,          )
                                     )
                    Plaintiff,       )
                                     )
        v.                           )    CIVIL ACTION NO. 3:03-CV-0169 (AVC)
                                     )
SCHOELLER & HOESCH, N.A., INC. and   )
P. H. GLATFELTER COMPANY,            )
                                     )
                    Defendants.      )

## DECLARATION OF EARL W. MALCOLM

I, Earl W. Malcolm, declare as follows:

## I.  Professional Background and Qualifications

1.      I reside at 54 Coburn Drive West, Bluffton, South Carolina 29909. I have

been retained by the law firm of Cohen Pontani Lieberman & Pavane, 551

Fifth Avenue, New York, New York 10176, on behalf of plaintiff, Ahlstrom

Windsor Locks, LLC ("Ahlstrom"). I make this declaration in opposition to

the Defendants' motion for summary judgment of invalidity of U. S. patent

No. 5,431,997 ("the '997 patent") (**Exh. A**), which I have read and am familiar

with. I have also read and am familiar with three patent references cited by

Defendants: (i) Yadlowsky European published patent application No. 0 170

461 ("the Yadlowsky application" or "Yadlowsky") (**Exh. B**), (ii) Noiset U. S.

patent No. 3,386,834 ("the Noiset patent" or "Noiset") (**Exh. C**) and (iii)

Kelley U. S. patent No. 3,616,166 ("the Kelley patent" or "Kelley") (**Exh. D**).

I received the B.S. degree in Chemistry and Paper Technology from Western

Michigan University in Kalamazoo, Michigan in 1961, and M.S. and Ph.D.

degrees in Paper Chemistry from the Institute of Paper Chemistry at Lawrence

University in Appleton, Wisconsin in 1961 and 1964, respectively. The

Institute of Paper Chemistry is now known as the Institute of Paper Science

and Technology at the Georgia Institute of Technology in Atlanta, Georgia.

2.    I was employed as a research chemist in the areas of wet-laid, non-woven

materials by the Dow Chemical Company in Williamsburg, Virginia from

1963-1965. From 1966-1976 I was Research Manager - Process and Product

Development for the C.H. Dexter Division of the Dexter Corporation in

Windsor Locks, Connecticut where my duties included the following areas:

pulping of manila hemp; tea bag development including processes for heat

seal manufacture and fibrous casing substrate; glass fiber super insulation;

hospital disposables; chromatographic paper and vacuum bags. C.H Dexter

Division of the Dexter Corporation was the predecessor to plaintiff Ahlstrom.

From 1976-2000, I was Group Leader, Division Director, Vice President of

Research, and Professor of Chemistry at the Institute of Paper Chemistry in

Atlanta, Georgia. I retired from full time employment in 2000. I then

continued my professional work on a part time basis as a consultant. I am an

active member of the Technical Association of Pulp and Paper Industry

("TAPPI") in Atlanta, Georgia. I was named a TAPPI Fellow in 1992. This

honor is only available to persons who have made contributions to paper

technology over a long period of years. I have been a co-inventor on a number

of U. S. patents including U.S. patent 6,436,486 entitled "Method For

Distributing Chemicals Through A Fibrous Material Using Low-Headspace Dielectric Heating."

3.   The opinions I have formed to date and would offer on the foregoing subjects are based on my 40 years of experience in the field of paper making industry as a scientific researcher and a professor and upon information I have considered in connection with this case. Such information includes my review of the '997 patent and its file history, and the additional information and documents attached to this report.

4.   I may rely upon visual aids or demonstrative exhibits that demonstrate, or may assist me in explaining, my opinions or the bases for them. Such visual aids and demonstrative exhibits may include, for example, excerpts from patent specifications, file histories, deposition testimony or deposition exhibits, charts, diagrams, or other relevant presentation.

5.   I may supplement or amend my opinion in response to any expert reports served by Defendants, or in light of any additional evidence, testimony, discovery, or other information that may be provided to me after the date of this declaration.

## II. Summary of The Opinion

6.   My opinion on the foregoing subjects is summarized below:

- Each of the three cited patent references, the Kelley patent, the Noiset patent and the Yadlowsky application, is directed to a *heat sealable* type of paper and *not* the non-heat sealable type of paper for making *folded and crimped sealed* tea bags that is the subject of the '997 patent. Therefore,

none of these three references is concerned with preventing a folded and crimped seal on a tea bag from opening during the brewing of tea.

- None of the three cited patent references discloses the concept of water climb in boiling water as disclosed and claimed in the '997 patent as a determinant of the required degree of hydrophobicity or a means by which this test parameter is to be determined.

- None of the three cited patent references discloses the requisite test parameter of less than 10% seam failure in boiling water as disclosed and claimed in the '997 patent or the means by which this parameter is to be determined. Indeed, as already stated, none of the references is concerned with failure of a folded and crimped seam in boiling water.

- None of the three cited patent references discloses the requisite infusion characteristics of folded and crimped sealed tea bags in boiling water disclosed and claimed in the '997 patent.

- The '997 patent claim limitations that the inventive sheet material exhibits "no appreciable water climb when measured using water at a temperature of about 100 °C. and no substantial loss of infusion characteristics while providing less than 10 percent failure in the folded and crimped seam upon exposure to boiling water" does not necessarily result from merely impregnating the tea bag paper with a hydrophobic agent. Therefore, these claim limitations are not inherent properties of any web materials made according to the teachings in the Kelley patent, the Noiset patent or the Yadlowsky application.

- Therefore, it is my opinion that a person of ordinary skill in the art would not be able to make the tea bag paper as recited in the claims of the '997 patent, following the teachings in the Kelley patent, the Noiset patent and the Yadlowsky patent, individually or in combination.

### III. The Person of Ordinary Skill in the Art and the Anticipation and Obviousness Analysis

7.   Plaintiff's counsel, Cohen Pontani Lieberman & Pavane, has explained to me the meaning of the term "person of ordinary skill in the art". As I understand their explanation, a person of ordinary skill is neither a genius nor does he have a substandard intellect. He/she is a person of ordinary or average intellect working in the field of the invention. Based upon my study of the '997 patent and its file history, it is my opinion that the field of this invention is broadly in the field of specialty papers, especially lightweight specialty papers and most particularly lightweight specialty papers that have had treatments applied that provide specific end-use properties, namely, the end-use properties of a tea bag paper in a tea bag formed by a folded and crimped seam. The person of ordinary skill is a person of average education relating to the field of the invention, average experience and an average ability to deal with the problems that persons encounter in their work in the field of the invention. During my many years in the field I have met, discussed with, dealt with and worked with countless persons in the field including students, present and past, coworkers and members of professional societies. In my opinion the person of ordinary skill in the art to which this invention relates would have a Bachelors Degree in chemistry, chemical engineering, paper

technology or similar technical areas and at least five years of industrial or laboratory experience in the field. Such a person would have sufficient skill to substitute one type of fiber for another in a paper or to recommend other routine alterations in paper or treatments, such as the use of so called binder system as is customarily done in this industry.

8. Plaintiff's counsel, Cohen Pontani Lieberman & Pavane, has also explained to me that the law of anticipation requires that each and every limitation recited in a challenged claim must be taught in a single prior art reference, either expressly or inherently. I also understand that the prior art reference, as well as the patent, must be interpreted from the standpoint of knowledge of a person of ordinary skill in the art. Moreover, an anticipating reference must provide sufficient information to enable a person of ordinary skill to practice the invention without undue experimentation. I may offer an opinion on whether each of the prior art references teaches each and every limitation recited in the challenged claims and whether the reference enables a person of ordinary skill in the art to practice the invention in the '997 patent.

9. Plaintiff's counsel, Cohen Pontani Lieberman & Pavane, has also explained to me that the law of obviousness does not require all limitations of a claim to be found in a single reference and may be established by a combination of references. However, to establish the obviousness of a claim over a combination of references, all limitations in the claim must be found in one or more of the references to be combined. There also must be some suggestion or motivation in at least one of these references to suggest to a person of ordinary

6

skill in the art to combine them in a way that would produce the claimed invention. I may offer an opinion on whether all limitations in the challenged claims can be found in one or more of the references and whether there is some suggestion or motivation in at least one of these references to suggest to a person of ordinary skill in the art to combine them in a way that would produce the claimed invention.

## IV. The Use of Binders in Fibrous Web Materials

10.    A binder is sometimes used in the manufacture of fibrous web materials to increase the physical strength between individual fibers in a web.  This additional binding between fibers translates into an increase in physical strength of the fibrous web.  A person of ordinary skill usually understands that when a binder is added it is for strength purposes.

11.    In addition to enhancement of strength, a binder may also provide other desirable properties, such as hydrophobicity, stiffness, or adhesiveness to a web. In this latter case, these compounds do not necessarily impart strength and are generally considered a separate category from strength imparting additives.   Examples of these non-strength imparting compounds include compounds such as fluorocarbons and silicones, which are *not* normally used as binders. These latter compounds are added to modify the surface characteristics of paper and non-woven fibrous structures for particular purposes, such as water repellency, hydrophobicity and surface feel.

12.    Both strength-imparting binders and non-strength imparting additives are commonly applied to the web in the form of a latex dispersion, emulsion or

solution of an appropriate solvent, such as water, benzene or ethanol, by such methods as saturation, printing or spraying.

13.    A selection of a particular binder, additive or a combination thereof, coupled with the method of applying such material to the web will result in a final product exhibiting various properties. While it is well known that a binder or additive may be added to a web to modify its properties, it is difficult to predict exactly what the effect on the final product will be and how this will relate to a specific set of desirable end-use properties.  It normally requires extensive experimentation with a variety of additives and process conditions to achieve a web with the desired set of physical properties.  For example, if the desired web requires a particular set of dry strength, wet strength, porosity and feel characteristics, it will take considerable experimentation with a large number of different compounds to achieve the final product.

**V.    The '997 Patent**

15.    The '997 patent is directed to an improved fibrous web material for making infusion packages for brewing beverages, including papers for making tea bags.  The improvements include producing a tea bag paper that will yield a folded and crimped tea bag seal that will not fail under normal home-brewing conditions and still provide other features required in a tea bag, such as infusion properties that give the desirable brew of tea and wet strength in boiling water.

16.     Tea bag papers generally fall into two categories: heat sealable and non-heat sealable.  Heat-sealable papers require heat and pressure form a

strong seal around the edges of a tea bag. Non-heat sealable papers require some form of fastening to prevent the tea leaves from coming out of the bag during brewing. The most common form of seal employs a multiple fold and/or crimp to keep the bag together during brewing. Other types of seals include stitching or stapling. Whatever the method used, the seam must have adequate strength to withstand the forces encountered when boiling water is poured over the bag during the initial part of the brewing process. The '997 patent is directed specifically to paper for tea bags having folded and crimped seams.

17.     Fibers in dry paper contain hydrogen bonds. These bonds hold individual fibers together to provide strength to the dry paper. In addition, internal hydrogen bonds provide stiffness to the individual fibers and hence to the ultimate paper. Both of these properties are important in obtaining a seam that is strong enough to maintain the physical integrity of a folded and crimped seam tea bag. This natural hydrogen bonding is very water sensitive. If water is present in the seam, the hydrogen bonds break and paper strength and stiffness are lost. This leads to a loss of integrity of the folded and crimped seam in a tea bag. Under such circumstances the folded and crimped seam may fail during brewing and the tea leaves pour out of the tea bag into the cup.

18.     The invention in the '997 patent resolved this seam failure problem in folded and crimped seams by treatment of a complete tea bag paper with hydrophobic material to inhibit water from penetrating into the paper and

9

into the paper fibers of the folded and crimped seam. The hydrophobic material imparts to the paper the property of repelling water to inhibit wetting of the paper, including the paper forming the seam. This prevents the loss of hydrogen bonds and the resultant loss of strength and stiffness of the paper, and inhibits seam failures. Such a hydrophobic material may also provide additional strength and stiffness to the paper. The hydrophobic material does not clog or cover the pores of the paper. As a result, seam failures are substantially reduced while infusion characteristics of the paper are substantially maintained. Most importantly, the amount and nature of the hydrophobic material used in the treatment system must be controlled within the limits set forth in the patent claims; otherwise, the desired properties of the paper as measured by the parameters of water climb, seam failure and infusion characteristics will not be achieved.

19.    Accordingly, the essence of the invention disclosed and claimed in the '997 patent is not merely applying a hydrophobic agent to a tea bag paper, as Defendants argue, but to apply an appropriate amount and type of a hydrophobic agent on a tea bag paper to prevent the seam failure of folded and crimped sealed tea bags in boiling water while maintaining the requisite infusion characteristics.

20.    As understood by a person of ordinary skill in the art, all claims of the '997 patent are directed to a fibrous web material adapted to make tea bags having folded and crimped seams. Certain properties of the claimed web

10

material, such as infusion characteristics and seam failure in boiling water, can only be exhibited when the web material becomes part of a tea bag. Thus, the claims of the '997 patent must include the web material that composes the tea bags held together by folded and crimped seams.

21.     A person of ordinary skill in the art would also understand that the claim term "a hydrophobic treating system comprising a cured hydrophobic agent selected from the group consisting of high molecular weight cross-linked acrylic polymers, silicones, fluorohydrocarbons, paraffins, alkyl ketene dimmers and stearylated materials" means that the hydrophobic agent used in the treating system must be chosen from the members of the group specified in this claim term.

## VI.     Prior Art References Cited by Defendants

22.     At the outset, I note that none of the prior art references at issue teaches a fibrous web suited for making *folded and crimped* (non-heat sealable) sealed tea bags exhibiting improved seam strength in boiling water, whereas all product claims of the '997 patent are directed to a fibrous web suited for making folded and crimped sealed tea bags exhibiting improved seam strength in boiling water. The references all focus on *heat sealable* webs, which differ in kind from non-heat sealable webs. These two types of materials are not interchangeable and, to my knowledge, are not used interchangeably.

23.     A heat sealable web must contain a sufficient amount of a thermoplastic agent to be able to form a bond when pressed under heat. Heat sealable tea

bag paper has a higher basis weight than non-heat sealable tea bag paper, which results in a loss of infusion characteristics. Also, heat sealable material is *not* suited for making folded and crimped sealed tea bags because thermoplastic material likely reduces the surface friction of the web, likely weakening the strength of the folded and crimped seam. As known to a person of ordinary skill in the art, the properties of a heat sealable web material and a non-heat sealable web material are distinctly different and one cannot directly substitute one for the other.

24.     I also note that none of the prior art references mentions in any way the properties of the fibrous web for making folded and crimped sealed tea bags having improved folded and crimped seams, let alone any teaching on how to achieve those properties, whereas all claims of the '997 patent specifically recite the properties of the invented web material. In particular, the claims of the '997 patent refer to the properties of the tea bag in boiling water and require that the hydrophobic agent treated tea bag paper exhibits no appreciable water climb, no substantial loss of infusion characteristics and less than 10% seam failure.

25.     Defendants stated that the missing teachings in the prior art references of the '997 patent claim requirements, i.e., water climb, infusion characteristics and seam failure rate, can be established by "inherency". However, they provided no factual basis to support their "inherency theory".

26.     I was advised by Plaintiff's counsel that the inherent properties of a

product defined by a claim requires that those inherent properties must be *necessarily present* in the product. A property is not inherent if it *may* or *could* follow the formation of the product.

27.    In my opinion, the water climb, infusion characteristics and seam failure properties specifically recited in the claims are not inherent from mere application of a hydrophobic agent to a tea bag paper. There will be no product that meets the requirements of the claim absent the teaching of these specific properties. In fact, these properties provide a quantity measurement for a particular type of hydrophobic agent based on the balance between the infusion characteristics and the seam failure rate. For example, the tea bag paper would result in a substantial loss of infusion characteristics if too much hydrophobic agent is applied or would result in a higher seam failure if there were not enough hydrophobic agents on the paper.

28.    In addition to the lack of teachings common in all three prior references discussed above, I will address each individual reference in connection with the '997 patent below.

**A.    The Kelley Patent**

29.    The object of the Kelley patent is to provide an adhesive binder system "which is adapted to be heat sealed". (Exh. D at col.1, lines 29-35). This binder system requires *two* components: a low molecular weight component polymer (MW 150,000 - 300,000) (Exh. D at col. 2, lines 57-62), and a high molecular weight component polymers (MW 500,000 or

more) including acrylic polymer (Exh. D at col.1, lines 5-11), to form a
polyblend. A binder system containing only a high molecular weight
component is unsatisfactory for the use described in the Kelley patent
because such high molecular weight component causes the web to have
"such resilience and springiness that the tension exerted along the line of
bonding by the resilience of the bond apart immediately after removal of
the pressure by the heated jaws or rollers of the bonding mechanism."
(Exh. D at col. 1, lines 21-28). The Kelley patent does not teach any other
use of such binder.  Therefore,  based on Kelley, a person of ordinary skill
would not expect a high molecular polymer to adequately perform in a
folded and crimped seal of tea bags and in fact would expect such a seal to
spring open and release the tea leaves.

30.    Kelley teaches that as a result of the two component polyblend binder
system, the treated web becomes heat sealable and possesses the
properties associated with heat sealable materials. Non-heat sealable web
materials for making folded and crimped seamed tea bags and the
properties associated therewith are not the concern of the Kelley patent
and are thus not addressed at all.

31.    A basic distinction between the Kelley patent and the invention of the '997
patent is that the claims of the '997 patent require a binder system that
contains *only* a high molecular weight polymer for improving the folded
and crimped seams of tea bags, whereas the Kelley patent teaches a *two*
polymer binder system containing a low and high molecular weight

14

polymers to improve an adhesive bond.

32.   The Kelley patent also does not disclose or refer to the level of hydrophobicity of the binder treated paper as measured by the water climb test described in the '997 patent. In my opinion, a person of ordinary skill would understand the concept of "reasonably water resistant" in the Kelley patent to refer to the wet strength of the paper and *not* to water absorbency of the paper. (Exh. D at col. 2, line 70).  A person of ordinary skill in the art would understand that wet strength and water absorbency are two distinct properties and one does not necessarily follow the other. For example, a common paper towel has wet strength and, as such, is quite water resistant. At the same time, however, the paper towel exhibits a great degree of water absorbency and would have an appreciable water climb under the water climb test. Since the Kelley patent provides no indication as to water repellency, there is no teaching or suggestion in the Kelley patent that the treatment of the paper with the two polymer polyblend binder results in a paper having water repellency, i.e. "no appreciable water climb in boiling water". A person of ordinary skill would not infer that the "water resistance" referred in the Kelley patent necessarily leads to water repellency as referred in the '997 patent.

33.   In addition, the claims of the '997 patent specifically provide the measurements of the amount of the high molecular weight acrylic polymers by reciting the properties of the resulting tea bag paper in boiling water: no appreciable water climb and no substantial loss of infusion

characteristics while providing less than 10 percent failure in the seam ('997 patent, claims 1 and 10). Adhesiveness is not a criterion for the purpose of the invention of the '997 patent. However, the Kelley patent requires that there must be enough of the *two* component binder to give the paper an adhesive property, which in my opinion is not suitable for the purpose of the '997 patent. (Exh. D at col.5, lines 18-21).

34.    Thus, the conditions, such as the type of the materials used as a binder and the amount of such materials, under which the objectives of the Kelley invention are achieved are not necessarily the conditions suitable for the objectives of the '997 patent. A person of ordinary skill in the art would not be able to use the teachings of the Kelley patent, to make a tea bag paper exhibiting no appreciable water climb and no substantial loss of infusion characteristics while providing less than 10 percent failure in the folded and crimped seam in boiling water.

**B.    The Noiset Patent**

35.    The Noiset patent is directed to the problem of seam failure in *heat sealed* tea bags. This seam failure problem results from the pressure buildup or the formation of gases inside the bag when the bag is exposed to boiling water.   A film of water covers the pores in the tea bag paper and prevents the entrapped gases within the bag from escaping. (Exh. C. at  col.1, lines 34-35).

36.    Thus, the object of the invention in the Noiset  patent is to provide  a means by which the entrapped gases within the heat sealed tea bag can

escape without a reduction in the infusion rate of the tea bag. This is
accomplished by applying silicone to discrete areas of the bag paper so
that the silicone coated area will not form a water film which traps the
gases and will remain open to provide a pathway for escape of entrapped
gases. At the same time, the non-silicone coated area will allow water to
pass through the paper so that the infusion rate will not be adversely
affected. The total surface area of the tea bag paper covered by the
silicone is no greater than 40%. Silicone is the only substance disclosed in
the Noiset patent for this purpose. The Noiset patent explicitly teaches that
100% coverage of silicone is undesirable as such coverage causes loss of
infusion characteristics. (Exh. C. at  col. 4, lines 71 to col. 5, line 4).  The
Noiset  patent says nothing about the seam failure  problem associated
with folded and crimped seams.

37.    In contrast, the invention disclosed and claimed in the '997 patent is
directed specifically to the seam failure problem in boiling water of tea
bags having folded and crimped seams. The problem arises during the
brewing step when the wetting of the crimped seam due to water
absorption at the seam area occurs. This wetting weakens the strength of
the seam. All claims of the '997 patent require that any applicable
hydrophobic agent for inhibiting water absorption thereby preventing
seam failure must be applied to the entire tea bag paper, i.e., 100% of the
paper area. Thus, the Noiset patent teaches away from the invention of the
'997 patent by directing the application of the silicone to only a partial

17

surface area of the web since 100% coverage reduces infusion rate.

38.  The sole reference to the application of silicone to the entire web in the Noiset patent is found in Table 1, where Noiset, having determined that only a partial surface area of the tea bag paper should be treated with silicone, describes a porosity test to ascertain an appropriate amount of silicone to be applied to the *treated* surface area. This test is performed because excessive application of silicone can result in significant reduction in porosity and limit the ability of the treated areas to act as a gas vent. A person of ordinary skill would not consider this porosity test as a teaching of treating the entire surface area of a tea bag paper with silicone for making tea bags, as it is inconsistent with the entire teaching of the Noiset patent which requires the web material to be treated at only a partial and discrete area. It should also be noted that the paper used to run this test is in the context of a heat-seal variety. (Exh. C. at col. 4, lines 7-12 and col. 5, lines 10-44). The results of this test are therefore are not necessarily applicable to a non-heat sealable tea bag paper. There is *no* teaching or suggestion whatsoever of treating the entire web of a non-heat sealable tea bag paper, particularly, no teaching or suggestion of treating the entire web of a folded and crimped sealable tea bag paper.

39.  In addition, it should be noted that the percentages of silicone given relate to concentration of silicone in the emulsion that is applied to the web and not the amount of silicone in the tea bag material itself.  There is no explicit disclosure of the pick-up of silicone based on the final paper

weight and thus there is no explicit disclosure of a tea bag paper in which the entire surface area has been treated in an amount of 1% or more in the paper. Not enough information is given to determine the actual percent pick-up in the examples of Table 1.

40.     Nowhere in the Noiset patent did the patentee mention no appreciable water climb or no substantial loss of infusion characteristics while providing less than 10 percent seam failure in boiling water. In the '997 patent, these characteristics are associated only with a non-heat sealable tea bag paper suited for making tea bags having folded and crimped seams, as set forth in the claims of the '997 patent.

41.     Nevertheless, Defendants argue that those properties associated with the non-heat sealable tea bag paper of the '997 patent would be inherent from the teaching of Table 1 of the Noiset patent. Defendants provided neither factual support nor an explanation for their assertion. Based on my 40 years experience in the paper making industry, I believe that the teachings in the Noiset patent will not necessarily lead to the invention of the '997 patent.

42.     The attempt by Defendants to correlate porosity changes in the air vents (silicone coated pores) shown in Table 1 with the change of infusion characteristics in the '997 patent is unrealistic, because they are two different physical characteristics and there is no direct relationship between the two. Air porosity deals with air movement through an opening while infusion deals with the movement of dissolved materials in

water through water saturated pores. The fact that the Noiset patent rejects the idea of covering the entire web with silicone, regardless of at what concentration silicone will applied, also suggests that this porosity test has nothing to do with infusion characteristics. It is relevant only to the gas release addressed in the Noiset patent.

43.   I am of the opinion, therefore, that a person of ordinary skill in the art, following the teaching of the Noiset patent, would not be able to make a tea bag paper as specified by the claims of the '997 patent.

## C.    The Yadlowsky application

44.   The Yadlowsky application teaches a method of preventing the absorption of flavor oils into the fibers of an infusion bag by coating the fibers with a water-soluble fluoro-chemical sizing agent. This application primarily refers to infusion packages made of heat sealable paper. (Exh. B at page 4, lines 13-15). A person of ordinary skill reading the Yadlowsky application would not consider it to be applicable to a folded and crimped sealed tea bag. The Yadlowsky application specifically refers to 'heat sealing the infusion bag material by the use of heat sealable binders and/or heat sealable fibers or films.' Stitching is the only other method specifically mentioned. Yadlowsky refers primarily to packages produced with heat sealable paper. The only example, which is found on page 8, refers to Dexter paper grade #3968, which, I have been informed, is a heat sealable paper. Therefore, one of ordinary skill would not be expected to consider the use of other sealing means, such as a folded and crimped

seam in the context of this disclosure.

45.    The Yadlowsky application also teaches that the content of the fluoro-chemical for coating the heat sealable web is no more than 0.6% by weight, typically 0.1 – 0.3%. (Exh. B at page 4, lines 19-24). In addition, it is directly stated that the fluorocarbon-sizing agent does not provide increased water-repellency to the infusion bag substrate. (Exh. B at page 8, lines 1-5). There is no teaching or suggestion in the Yadlowsky application that the use of such a fluoro-chemical would prevent seam failure of a folded and crimped seams while maintaining infusion characteristics of crimped sealed tea bags.

46.    As discussed above, the claims of the '997 patent are directed solely to tea bag paper suited for making folded and crimped seals rather than heat seals. The claims require that any hydrophobic agent impregnated throughout the paper must be at least 1% by weight or more than twice the amount suggested in Yadlowsky. The '997 patent also requires a degree of hydrophobicity defined by the water climb test.

47.    Thus, the Yadlowsky application fails to meet at least the claim requirements for the non-heat sealable web and the minimum amount of the hydrophobic treating agent when using the fluoro-chemical alone as a coating agent.

48.    Even if a silicone is "employed in conjunction with" the fluoro-chemical to treat the web as suggested by Yadlowsky in reference to the Noiset patent (Exh. B at page 8, lines 5-9), the Yadlowsky application still fails

to teach each and every requirement of the claims of the '997 patent. Neither the Yadlowsky application nor the Noiset patent describes how and in what amount of the silicone is to be applied to a tea bag paper to make a folded and crimped sealed tea bag having enhanced folded and crimped seams. Like the Kelley and Noiset patent, nowhere in the Yadlowsky application did the patentee mention the water climb, infusion characteristics and seam failure properties of the non-heat sealable tea bag paper for making the crimped sealed tea bags as given in the claims of the '997 patent.

49.    Since both the Yadlowsky application and the Noiset patent address mainly heat sealable web materials, any properties resulting from the application of a hydrophobic agent to such heat sealable web materials are not necessarily the properties of the non-heat sealable web material as specified in the '997 patent.

50.    In my opinion, a person of ordinary skill in the art, following the teaching of the Yadlowsky application will not be able to make a tea bag paper that meets the requirements of the claims in the '997 patent.

## VII.    Comparison of the Claims of the '997 Patent with the Cited References

51.    Plaintiff's counsel, Cohen Pontani Lieberman & Pavane, has also explained to me that claims 1 and 10 of the '997 patent are the only independent claims in the patent and that claims 2 through 9, as dependent from claim 1, must under the patent law contain all of the limitations of

22

claim 1. Similarly, claims 11 through 16, as dependent from claim 10, must contain all of the limitations of claim 10. Therefore, I have summarized claims 1 and 10 in the chart below with the understanding that if a cited reference does not include an element of claim 1 it also will not contain that the same element implicitly in claims 2 through 9. Similarly, if a cited reference does not have all of the elements of claim 10 it also will not contain that same element implicitly in claims 11 through 16.

52.    The following chart summarizes my findings with respect to whether a person of ordinary skill would find each of the elements of claim 1 of the '997 patent in any of the three cited patent references:

| Claim 1 of the '997 patent | Yadlowsky | Kelley | Noiset |
|---|---|---|---|
| A fibrous web suited for making infusion packages for brewing beverages and exhibiting improved resistance to the failure of a mechanical seam therein, | No teaching or suggestion | No teaching or suggestion | No teaching or suggestion |
| said web comprising a porous fibrous sheet material | Infusion bag material for heat seal. | Nonwoven webs for heat seal. | Porous web material for heat seal. |

| impregnated throughout its extent with about one percent or more by weight of | "A fluoro-chemical sizing agent is subsequently added to the furnish at a level from about 0.05 to 0.6% fluoro-chemical sizing agent to dry furnish, ..." Exh. B at 6:19-24. | "When the polyblend is applied over the entire area, the amount of polymer that is applied may be from 20 to 100 percent by weight based on the weight of the dried fibers. Exh. D at 5:18-21. | No teaching or suggestion |
|---|---|---|---|
| a hydrophobic treating system comprising a cured hydrophobic agent selected from the group consisting of high molecular weight cross-linked acrylic polymers, silicones, fluorohydrocarbons, paraffins, alkyl ketene dimers and stearylated materials, | Fluoro-chemicals | "... a binder of adhesive composition is provided which comprises two essential components. The first ... is an aqueous dispersion of a polymer of ethyl acrylate having a low molecular weight. The second component ... is an aqueous dispersion of an emulsion polymer having an MFT of about 50 °C or higher." Id. at 1:37-44. | silicones |
| the impregnated sheet material exhibiting no appreciable water climb when measured using water at a temperature of about 100 $^0$C. | No teaching or suggestion | No teaching or suggestion | No teaching or suggestion |
| and no substantial loss of infusion characteristics | No teaching or suggestion | No teaching or suggestion | No teaching or suggestion of infusion characteristics of folded and crimped |

| | | | tea bags |
|---|---|---|---|
| while providing less than 10 percent failure in the mechanical seam upon exposure to boiling water. | No teaching or suggestion | No teaching or suggestion | No teaching or suggestion |

53.    The following chart summarizes my findings with respect to whether a person of ordinary skill would find each of the elements of claim 10 of the '997 patent in any of the three cited patent references:

| Claim 10 of the '997 patent | Yadlowsky | Kelley | Noiset |
|---|---|---|---|
| A process for producing porous web materials for making infusion packages having enhanced mechanical seam integrity | No teaching or suggestion | No teaching or suggestion | No teaching or suggestion |
| comprising the steps of providing a porous absorbent web material suited for use as an infusion package, | Infusion bag material for heat seal. | Nonwoven webs for heat seal. | Porous web material for heat seal. |
| treating the entire web material | "Said treatment may be accomplished by addition of the fluoro-chemical sizing agent as a liquid suspension or emulsion during the infusioin bag stock, ..." Exh. B at 5: 24-33. | "When the polyblend is applied over the entire area, the amount of polymer that is applied may be from 20 to 100 percent by weight based on the weight of the dried fibers. Exh. D at 5:18-21. | No teaching or suggestion |

| with an aqueous emulsion of a hydrophobic agent selected from the group consisting of high molecular weight cross-linked acrylic polymers, silicones, fluorohydrocarbons, paraffins, alkyl ketene dimers and stearylated materials | Fluoro-chemicals | "… a binder of adhesive composition is provided which comprises two essential components. The first … is an aqueous dispersion of a polymer of ethyl acrylate having a low molecular weight. The second component … is an aqueous dispersion of an emulsion polymer having an MFT of about 50 °C or higher." Id. at 1:37-44. | Silicones |
| --- | --- | --- | --- |
| to provide a treated web that exhibits no appreciable water climb when measured using water at a temperature of about 100 $^0$C. | No teaching or suggestion | No teaching or suggestion | No teaching or suggestion |
| and less than 10 percent failure in a mechanical seam therein when exposed to boiling water. | No teaching or suggestion | No teaching or suggestion | No teaching or suggestion |

## VIII.  CONCLUSION

54.    I find that neither the Kelley patent, nor the Yadlowsky application, nor

the Noiset patent teaches, among other things, a fibrous web suited for

making folded and crimped sealed tea bags, which has improved folded

and crimped seams and exhibits no appreciable water climb when

measured using water at a temperature of about 100° C, and no substantial

loss of infusion characteristics, while providing less than 10 percent

failure in the folded and crimped seam upon exposure to boiling water.

55.     I am also of the opinion that the combined prior art references fail to teach

all of the limitations of the claims of the '997 patent. Moreover, there is no

motivation or suggestion in these references to suggest to a person of

ordinary skill in the art that they be combined. A person of ordinary skill

in the art, who is confronted with the same problem as described in the

'997 patent, would not be able to resolve the problem by combining two or

more of the references. None of the three references even confronts the

problem solved by the '997 patent. Moreover, there is no suggestion in any

of the references for combining it with any other of the references in the

same way as taught in the '997 patent.

I declare under penalty of perjury that the foregoing is true and correct. Executed

on December 1, 2004.

Earl W. Malcolm