F

# CARPMAELS & RANSFORD

CHARTERED PATENT ATTORNEYS  EUROPEAN PATENT ATTORNEYS  TRADE MARK ATTORNEYS

TELEPHONE    020-7242 8692
FACSIMILE    020-7405 4166
             020-7831 8501
WEBSITE      www.carpmaels.com
E-MAIL       email@carpmaels.com

43 BLOOMSBURY SQUARE
LONDON WC1A 2RA

*AND AT MUNICH*

ALAN J JONES*          PAUL N HOWARD*†
N KEITH HOWICK*†       ANNE WONG†
ADRIAN J FISHER*†      ANTHONY C W P JAMES*
CHRIS P MERCER*†       BRUCE R COCKERTON*†
HUW G HALLYBONE*†      CAMERON J MARSHALL*
RICHARD E JACKSON*†    HUGH R GOODFELLOW†

MICHAEL J DONNAN*      SUSAN E KIRSCH*
PETER M JOHNSTON*      ROBERT M C CARPMAEL*
R DUDLEY HAWKINS*      ALMUT S ELEND‡
B PATRICIA B HARRIS‡   GARY J SMALL*
SUSAN M THOMAS*        HEIDI F ASTON†
JANDAN M ALISS‡

JOHN A MURPHY (MANAGER)

CONSULTANTS

CHRISTOPHER S TUNSTALL*

DEREK G R GRUNDY       STEPHEN J COLGAN
S DAVID VOTIER OBE     JOHN W M CARPMAEL
IAN B P de M DEVAUX

* CPA and EPA          ‡ EPA          † TMA

European Patent Office
Erhardtstrasse 27
D-80298 Munich
GERMANY
**Attn: DG3 (Appeals)**

YOUR REF  94303680.6/0632163
**T0995/04-336**

OUR REF  O002977EP: CPM/MJD/KTU

**BY FACSIMILE & COURIER**                    8th October 2004

## STATEMENT OF GROUNDS OF APPEAL

Dear Sirs,

**Re:   European Patent No. 0 632 163 (Application No. 94303680.6) –
        Ahlstrom Windsor Locks LLC – Opposition by J.R. Crompton Limited
        Appeal File T0995/04-336**

The present statement is filed in support of the patent proprietor's Notice of Appeal dated 5th August 2004 and sets forth the grounds upon which the patent proprietor is appealing against the Opposition Division's decision dated 1st June 2004, in so far as that decision rejected the claims as granted.

Issues arising from the Opposition Division's decision

1.      The patent proprietor contests the reasons given by the Opposition Division for rejecting the main request (the claims as granted).

2.      Without prejudice to the generality of the foregoing submission, it is submitted that the subject matter of the independent claims 1 and 12 of the main request is indeed novel over cited document D3, namely US-A-3 616 166.

3.      Further, it is submitted that the subject matter claimed in the main request is not only novel but also possessed of an inventive step over D3.

4.      For completeness, it is hereby also submitted that, contrary to the opponent's assertions (a) the patent as granted does not incorporate subject matter extending

---

## FACSIMILE MESSAGE

To:        **EPO Munich**
Fax No.:   **00 49 89 2399 4465**

This fax consists of 22 sheets. If a sheet is missing or has been imperfectly received, please contact us immediately (Tel: 020-7242 8692; Fax: 020-7405 4166). If you are not the addressee, please contact us immediately and then

beyond the content of the application as filed; (b) the patent specification does disclose the invention in a manner sufficiently clear and complete for it to be carried out by a person skilled in the art; and (c) the subject matter claimed in the main request is novel and possessed of an inventive step over each of D1, namely US-A-3 386 834, and D2, namely EP-A-0 170 461.

The Patent Proprietor's Requests

*The Main Request*

5.      The claims as granted constitute the Patent Proprietor's Main Request.

*Auxiliary Request*

6.      The sole auxiliary request currently maintained by the patent proprietor as appellant is Auxiliary Request 3, as submitted during the opposition proceedings and as upheld by the Opposition Division's decision. This will simply be referred to as the "Auxiliary Request" hereinafter. For good order, a copy of the claims of the Auxiliary Request on appeal are enclosed herewith.

7.      In the Auxiliary Request, claim 1 has been amended, from being directed to a porous fibrous web material for making infusion packages having a mechanical seam therein, to being directed to the infusion packages made from such a web material. The independent claim 12 has simply been amended in order to direct it to a process for making infusion packages having an enhanced mechanical seam integrity, that independent claim thereby being rendered consistent with the amended claim 1. Since the claim to the web material would also have been infringed by infusion packages made from that material, the amendments do not extend the scope of the claims and therefore do not offend against Article 123(3) EPC. Furthermore, the patent and the application upon which it was granted are replete with references to infusion bags, for example tea bags, manufactured from the porous web material of the invention. Accordingly, the amendments do not introduce subject matter extending beyond the content of the application as filed and hence do not offend against Article 123(2) EPC. It may be added that the manufacture of mechanically sealed tea bags and other infusion packages from porous web materials may be carried out by techniques that are very well known in the art; accordingly, the patent specification provides sufficient teaching to enable the invention as claimed in the Auxiliary Request to be carried out by the person skilled in the art; accordingly, the amendments do not give rise to any objection under Article 83 EPC.

Contrary to the Opposition Division's decision, the subject matter claimed in the main request *is* novel over D3

8.      D3, namely US-A-3 616 166 (Kelley), discloses an adhesive binder composition that comprises (1) an aqueous dispersion of a polymer of ethyl acrylate having a low molecular weight, and (2) an aqueous dispersion of an emulsion polymer having an MFT (minimum film-forming temperature) of at least 50°C (column 1, lines 36-45). Preferably, component (1) is a linear polymer of ethyl acrylate having an MFT not above room temperature and a molecular weight of 150,000 to 300,000 (viscosity average) obtained by emulsion polymerisation using 0.2 to 5% by weight, based on the total monomer

weight of a chain-transfer agent, and component (2) is a polymer containing units of vinyl chloride, methyl methacrylate, styrene, vinyl toluene or acrylonitrile, which polymer has an MFT of at least 50°C, the polymers being present in a proportion of 60-90% by weight of component (1) and 40-10% by weight of component (2) (see claim 1 and claim 3).

9.    The binder composition is intended for use as a binder for non-woven fabrics; in particular, it is said to provide a binder that is adapted to be heat sealed, whether or not the bonded fabric is in a state of rest (e.g. when it is lying flat) or in a state of tension (e.g. resulting from the bending or flexing of the sheet into, for example, a closed sleeve or tube) (column 1, lines 29-35). D3 states that the bonded non-woven webs may be formed into "all sorts of packaging or wrapping materials which may be of various porosity in respect to liquids and/or gases including air" (column 5, lines 55-58). Amongst many other possible uses, D3 mentions the "packing of tea, coffee or similar beverage solids in unit parcels such as the well-known tea bags in which two of the nonwoven webs are placed one above and one below the parcel of powder and is then heat-sealed around the periphery of the superimposed webs" (column 5, lines 64-68).

10.    There are no grounds for stating that the procedure of D3 will inevitably lead to a material as defined in claim 1 of the opposed patent. Thus, there is no teaching or suggestion that a fibrous web material treated with the adhesive binder of D3 will satisfy the limits placed on the water climb performance and on the mechanical seam failure rate prescribed by claim 1 and claim 12 of the main request.

11.    D3, at column 5, lines 58-61, states that the treated fabric remains "highly porous to liquids and also *somewhat porous* to gases" (emphasis added). There are no grounds for asserting that a web material saturated with the binder composition according to D3 and which is only somewhat porous to gases could prevent the buildup of differential pressures on opposite sides of the web and facilitate the passage therethrough of condensible and non-condensible gases (see paragraph 0005 at page 2, lines 43-44, of the opposed patent) and substantially improve the seam integrity of mechanically sealed infusion packages.

12.    D3 goes on to state (column 5, lines 61-64) that "this porosity to both gases and liquids can be increased by applying the binder to preselected areas leaving interstitial areas provided with no binder". D3 therefore teaches that the binder should not be applied across the entire area of the web material. Thus, D3 teaches *away* from the present invention, which requires the web material to be impregnated throughout its extent with the hydrophobic treating system.

13.    It will be noted that the passage that refers to tea bags (D3, column 5, lines 64-68) follows *immediately* after the above-quoted passage that teaches that porosity to gases and liquids can be increased by applying the binder to pre-selected areas only (D3, column 5, lines 61-64). The clear and unambiguous teaching in D3, therefore, is that the polyblend disclosed in D3, when applied to materials intended for use in tea bags and similar infusion pouches should be applied only in selected areas leaving other areas to which the polyblend has not been applied. This teaching in D3 is consistent with D1 (which document will be discussed in greater detail below), which teaches that a silicone treating agent should be applied over an area of less than 50% of the total area of the sheet material being treated.

14.    The teaching in D3 is also consistent with the teaching in US-A-4 289 580 (Elston et al) – a copy of which is filed herewith as D4 - , which US patent teaches that when synthetic pulp is used as the heat seal phase, the heat seal phase should be disrupted over 10 to 75% of the total exposed surface area in order to achieve improved infusion in heat seal tea bags. In contrast, the claims of the main request are directed to porous fibrous web materials (and a process for producing same) suited for making infusion packages, wherein the web material is impregnated *throughout its extent* with a hydrophobic treating system.

15.    There is no disclosure in D3 of a mechanically sealed infusion package made from a web material impregnated throughout its extent with a hydrophobic treating system, as claimed in the Auxiliary Request on appeal.

The Objection raised by the opponent under Article 100(c) EPC (Article 123 (2) EPC)

16.    The Opposition Division held – correctly – that claims 1 and 12 do not involve the addition of subject matter extending beyond the content of the application as filed. However, since the opponent may, as respondent, wish to contest that decision, the following remarks are offered.

17.    The independent claims in the application as filed – namely claims 1 and 11 – required the impregnated sheet material to exhibit no appreciable water climb when measured using water at a temperature of about 100°C. The application, as filed, discloses a test by means of which the water climb may be ascertained; please see page 8, lines 6-28, of the original typescript, corresponding to page 4, lines 37-48, of EP-A-0 632 163. The disclosure states quite clearly that the test is stopped at 400 seconds if the water front has not advanced sufficiently to complete the one-inch (= 25.4mm) climb on the specimen. Thus, the period of 400 seconds constitutes a cut-off point for *all* embodiments.

18.    Table 1 in the application, as filed, records the results of tests on seven specimens, which differ in the nature of the binder used. The results fall into two distinct groups: a group, comprising specimens E, F and G, that is distinguished by the use of a binder stated to be preferred (please see page 6, lines 22-36, of the original typescript, corresponding to page 4, lines 3-10, of EP-A-0 632 163), by a 0% seam failure and by no appreciable water climb in the hot-water test (that is to say the water front had not advanced sufficiently to complete the 1-inch climb by the end of the 400-second period), and another group, comprising specimens A-D, which are characterised by substantial seam failure (30% or higher) and a rapid water-climb in the hot-water test.

19.    Specimen E in Table 1 exhibited a water climb of not more than 0.5 inch, in the cross direction (CD). The water climb for the same material in the machine direction (MD) was lower, as were the results for specimens F and G in both the CD and the MD. This provides ample justification for adopting the requirement of "not more than 0.5 inch (13mm) over a period of 400 seconds" as a requirement in claim 1 for the 100°C water climb test.

20.    The Opponent objects, in Item 1.2, that there "is no basis in the application as originally filed that the range quoted in [Item 1.1] is applicable across the entire scope of the invention". However, the objection is misconceived. Table 1 in the application, as filed, showed clearly that a water climb of not more than 0.5 inch over a period of 400

seconds, when measured using water at a temperature of about 100°C, is attainable by means of the present invention. The Applicant, therefore, was perfectly justified in adopting that feature as part of the definition of the fibrous web material according to the present invention.

## The Objection raised by the opponent under Article 100(b) EPC (Article 83 EPC)

21.    The Opposition Division held – correctly – that the patent *does* disclose the invention in a manner sufficiently clear and complete for it to be carried out by a person skilled in the art. However, since the opponent may, as respondent, wish to contest that decision, the following remarks are offered.

22.    With regard to the patent specification, paragraphs 11-13 disclose web materials and fibres that can be used. Paragraphs 14 and 15 disclose hydrophobic agents that can be used. Paragraphs 16-18 disclose methods of applying the hydrophobic agent to the web material and paragraph 18 further discloses suitable solution concentrations and web pick-up amounts that can be used in the practice of the invention. Paragraphs 19 and 20 disclose test procedures for determining the remaining characteristics of the web material according to the invention.

23.    In Items 2.2 and 2.3 of the Notice of Opposition, it is alleged, in particular, that the patent specification is insufficient with regard to the requirement that there be less than 10% failure in the mechanical seam upon exposure to boiling water. However, the seam failure test is disclosed in some detail in paragraph 20 of the patent. This employs a tea bag of known type (the flow through type) and the precise orientation of the bag (with the "W" fold oriented upward and the head fold oriented downward), the amount of boiling water (400ml) and the duration of pouring (3 seconds) are all described, as are the criteria with regard to failure or non-failure of the seam (see the conditions recited on page 5, lines 2-5, of the patent as published). It is worth recalling that the addressee of the patent specification is the person skilled in the art: such a person would know the size, construction (including the manner in which the seam is formed) and tea content of a standard tea bag of the known flow through type.

## The Objection of Lack of Novelty raised by the opponent under Article 100 (a) EPC (Articles 52 (1) and 54 EPC)

24.    The opponent had objected that the invention as claimed in the main request lacked novelty not only over D3 but also over D1, namely US-A-3 386 834 (Noiset *et al*) or D2, namely EP-A-0 170 461 (General Foods Corp.). With regard to the main request, the question of novelty over D1 and D2 was not considered in the Opposition Division's decision. However, since the opponent may, as respondent, wish to pursue his objections in that regard, the following remarks are submitted in support of the patent proprietor's contention that the present invention is not disclosed in either of those cited documents, the patent proprietor's comments on which are as follows:

D1: US-A-3 386 834 (Noiset et al)

25.    This discloses an infuser material for use in making packages for brewing beverages, which material comprises a continuous, prebonded fibrous web (D1, column 5, lines 51-53). The web has a plurality of discrete water-repellent gas-release zones which, upon immersion in water, will allow the free passage of gases therethrough. The

gas-release zones consist essentially of fibres impregnated with a water-repellent material, the total water-repellent area of the web constituting less than one-half the total area of the web (D1, column 5, lines 55-65), the water-repellent areas generally constituting from 0.1 to 40% of the total surface area (D1, column 4, lines 45-51 and 70-73, and column 6, line 1).

26.    The water-repellent material with which the fibres in the water-repellent, gas-release zones are impregnated is a thermosetting resin, in particular a thermosetting resin within the category of silicones (D1, column 3, lines 11-14).

27.    The upper limit on the surface area constituted by the water-repellent, gas-release zones is justified by a technical effect, whereby the porosity of the web tends to decrease when the said zones constitute more than 40% of the surface area (D1, column 4, line 71, to column 5, line 4). In contrast, the present invention, as claimed in claim 1, requires the porous fibrous sheet material to be impregnated *throughout its extent* with 1% or more by weight of a hydrophobic treating system.

28.    Furthermore, the objection of lack of novelty is not justified by the passage in D1, column 4, lines 27-40, being the passage to which attention is drawn in item 3.1.3 of the Notice of Opposition. This passage discloses tea bags in which the entire surface area was treated with a silicone in dispersion, the amount of silicone in that dispersion ranging from 1 to 15%. It should be carefully noted that the said percentages relate to the amount of silicone in the *dispersion* and not in the tea bag material itself. There is no explicit disclosure of the pick-up or rate of application of the silicone dispersion and thus there is no explicit disclosure of a tea bag in which the entire surface area has been treated such that the treating agent is present in an amount of 1% by weight or more.

29.    The discussion in items 3.1.3-3.1.5 of the Notice of Opposition fails to make good the deficiency noted in the preceding paragraph herein. Since factors other than resin concentration in an emulsion will determine the resin pick up by a non woven web material, the opponent's statements regarding the presumed pick-up of silicone resin in the samples of Table 1 of D1 must be regarded as purely speculative. Such other factors having an influence on binder pickup of a nonwoven sheet include the pressure applied to the web by the press rolls of the size press, the type of press roll in terms of covering and fill, and the line speed, which will affect the residence time of the web in the dispersion and between the rollers. The passage in D1, column 4, lines 27-40, is silent with regard to such factors. There are therefore no grounds for presuming that the samples disclosed in Table 1 of D1 must inevitably fall within the terms of claim 1 of the patent in suit.

30.    The tea bags employed in the tests described in D1 were of the heat-seal type (column 5, lines 9-11). There is in D1 no disclosure of a mechanically sealed infusion package made from a web material impregnated throughout its extent with a hydrophobic treating system, as claimed in the Auxiliary Request.

D2.  EP-A-0 470 494 (General Foods Corp.)

31.    This discloses an infusion bag, for example a tea bag or coffee bag, which has been treated with a water-soluble fluoro-chemical sizing agent to prevent sorption of flavour oils by the bag material (D2, page 3, lines 13-17, and page 8, lines 10-18). The treatment of the infusion bag material may be effected by immersing it in an aqueous

solution of the sizing agent for a sufficient period, followed by curing of the agent (D2, page 7, lines 11-19).  The infusion bag material can be any non-toxic, relatively tasteless, insoluble natural material having sufficient porosity for extraction of the food material within the bag, particularly a natural fibre material such as cotton gauze (D2, page 5, lines 4-17).

32.    The fluoro-chemical sizing agent is an anionic material and it is stated that, in order internally to bond the sizing agent to infusion bag materials, which are also anionic, the addition of cationic retention aids is necessary (D2, page 6, lines 11-15).  In order to promote the uniform distribution of the sizing agent throughout the infusion bag material, it may be desirable initially to add a low molecular weight cationic retention aid and later to add a high molecular weight retention aid (D2, page 6, lines 25-30).  Other additives that are mentioned include a wetting agent and a defoaming agent (D2, page 7, lines 27-32).

33.    The fluoro-chemical sizing agent in D2 does not constitute a hydrophobic treating system as specified in the present claim 1, for at least the following two reasons.

34.    First, the treatment levels of the fluoro-chemical sizing agent in the infusion bag material are generally from 0.05 to 0.6% by weight, typically only from 0.1 to 0.3% (D2, page 7, lines 19-22).  In contrast, the present claim 1 requires the porous fibrous sheet material to be impregnated throughout its extent with 1% or more by weight of the hydrophobic treating system.

35.    Second, it is explicitly stated in D2 that the fluoro-chemical sizing agent does not provide increased water-repellency to the infusion bag substrate (D2, page 8, lines 1-5), whereas the present claim 1 requires the hydrophobic treating system to impart sufficient water-repellency such that there is no appreciable water climb when measured using water at a temperature of about 100°C.

36.    In item 3.2.1 of the Notice of Opposition, it is asserted that, even though the fluoro-chemical sizing agent of D2 does not itself provide increased water-repellency, D2 teaches that silicone compounds, such as are disclosed in D1, may be employed in conjunction with the fluoro-chemical sizing agent to achieve an increased water repellency (D2, page 8, lines 5-9).

37.    The Opponent has argued, in effect, that the expression "in conjunction with" means that the silicone compound (i.e. the hydrophobic agent) would be applied to the web of D2 at the same time, and in the same way, as the fluoro-chemical sizing agent.  Since the fluoro-chemical sizing agent may be applied by immersing the infusion bag material in an aqueous solution of the sizing agent, the Opponent appears to argue that inclusion of the silicone hydrophobic agent in that solution would result in the web material being impregnated *throughout* with the silicone hydrophobic agent.  The Opponent then declares that the hydrophobic agent so incorporated would amount to more than 1% by weight.

38.    It is respectfully submitted, however, that the analysis presented by the Opponent - which analysis depends entirely on a tendentious construction of the expression "in conjunction with" on page 8, line 7, of D2 - does not withstand scrutiny.  The following four observations are appropriate.

39.    First, it may be noted that the wording in D2, at page 8, line 7, is not "applied in conjunction with" but "employed in conjunction with" and should therefore be construed as meaning no more than that not only the fluoro-chemical sizing agent but also a silicone compound may be present in the final product, in order to impart water repellency to that product.

40.    Second, the passage in D2, at page 8, lines 5-9, ought to be considered together with the passage in D2, at page 2, lines 22-26, which indicates that the silicones of D1 are used as a water repellent for the purpose of improving gas release from within the infusion bag.  Accordingly, the notional person skilled in the art, who according to established case law is a rather unimaginative spirit (see Decision T127/82 [1979-1985] EPOR, vol. B,587, at page 589, item 5), would apply the silicone, if at all, in accordance with the teaching in D1, that is to say by ensuring that the silicone is applied to less than 50%, and preferably less than 40%, of the web surface area.

41.    Third, and in support of the preceding submission, it may be recalled that the reason for limiting the surface area over which the silicone is applied, according to D1, is that the porosity of the web would otherwise tend to decrease.  The person skilled in the art is taught by D2, at page 3, lines 28-34, that the porosity of the infusion bag material should not be diminished, so as not to impede the flow of the extracted material.  Thus, D2 itself strengthens the technical motivation, already apparent from D1, to restrict the surface area that is treated with the silicone, so as to achieve the benefits of the silicone treatment without impairing porosity.

42.    Fourth, the notional person skilled in the art is deemed to be aware of D4, namely US-A-4,289,580 (Elston *et al*), which indicates that a uniform hydrophobic phase reduces the permeability of a web and hence will retard any infusion through it.

43.    The passage in column 4, lines 27-40, of D1 does not alter the conclusion, which may be drawn from the above discussion, that the present invention is indeed novel over D2.  The said passage in D1 relates only to an illustration of the proposition that a decrease in the porosity of the web will occur as the percentage of the silicone in the dispersion is increased.  The said passage does not illustrate the invention that is disclosed in D1, the teaching of which is consistently that the total water-repellent area of the paper should be less than one half of the total area of the paper, preferably no more than 40% of the total surface area.

44.    There is in D2 no disclosure of a mechanically sealed infusion package made from a web material impregnated throughout its extent with a hydrophobic treating system, as claimed in the Auxiliary Request.

The Objection of Lack of Inventive Step raised by the opponent under Article 100 (a) EPC (Articles 52 (1) and 56 EPC).

45.    The opponent objected that the invention as claimed in the main request lacked an inventive step over the cited art.  This objection is not discussed in the Opposition Division's decision.  However, since the opponent may, as respondent, wish to pursue the objection, the following remarks are offered in support of the patent proprietor's submission that the present invention is not at all obvious from any of D1, D2 and D3, or from any combination thereof.

*The Objection Based on D1*

46. Contrary to the statements in Item 4.1.1. (i) and (ii) of the Notice of Opposition, D1 does not deal with the same problem as the patent in suit. Although there is a passing reference in D1 to the use of webs of the non heat-seal variety that require mechanical fastening for the formation of the tea bag (column 2, lines 46-47), D1 appears to recognise a problem of the opening of the seams due to "ballooning" only in respect of heat-sealed bags (see column 1, lines 40-45; column 4, lines 7-10; column 5, lines 9-12; and column 6, lines 6-9).

47. In Item 4.1.1 (iv) of the Notice of Opposition, the Opponent offers some "reasons" which purport to show that it would have been obvious to apply the technique of D1 to the entire area of the web material. These "reasons" are quite contrived and do not outweigh the very clear teaching in D1 that the web is *not* to be treated over its entire area. Attention may be drawn to the following statements in D1:

48. Column 2, lines 8-10 – "Broadly, the present invention comprises a continuous, infuser web material provided with *small* water repellent and air permeable zones or areas ..." (emphasis added).

49. Column 3, lines 8-10 – "... Accordingly, they [i.e., the water repellent materials] are distinguished from material which form solid films over the entire treated area".

50. Column 4, lines 45-51 – " ... According to the present invention, it has been found that the water repellent zones comprising an area *as small as about 0.1% of the total surface area of each tea bag* will function effectively and at the same time give an improved infusion rate without decreasing the porosity of the material. ... " (emphasis added).

51. Column 4, lines 71-75 – "Generally, gas release zones covering from 0.5-40.0% of the total area of each tea bag have been found quite satisfactory; however, the preferred range of area covered by these zones is from about 1.0 to 15.0% of the total surface area of each tea bag". Immediately after this passage D1 teaches that above 40% the porosity of the web decreases.

52. Column 5, lines 63-65 – "... the total water repellent area of the paper constituting *substantially* less than one-half of the total area of the paper" (emphasis added).

53. Clearly, D1 does not even suggest a treated area of as much as 50%, let alone areas approaching 100%. Furthermore, as noted above, the restriction on the surface area is taught for a stated technical reason. The Opponent has failed to adduce any serious reason why the person skilled in the art would have considered the said stated technical reason to be outweighed by the "reasons" set forth in item 4.1.1 (iv) of the Notice of Opposition.

*The Objection Based on D2*

54. The objection in Item 4.2.1 of the Notice of Opposition is, in essence, a repetition of the objection of lack of novelty expressed in Item 3.2.1, which latter objection also relied upon a combination of D2 with D1. (It is assumed that the reference to D2 in line 4 of Item 4.2.1 of the Notice of Opposition was intended to be a reference to D1.) It is

submitted, however, that if the skilled person were to employ the silicone compound of D1, he or she would also take into account the teaching given in D1 regarding the manner in which the silicone compound is to be used. It follows that the person skilled in the art would not have considered using the silicone compound to impregnate the web material throughout its extent; on the contrary, following the teaching in D1 would lead the person skilled in the art to use the silicone compound over an area of less than 50% of the total surface area (see D1, column 5, lines 63-65).

55.     It is worth adding that D2 is concerned with the problem of increasing the level of flavour and aromas into a food extract obtained by percolation, steeping or other brewing technique (D2, page 1, lines 7-16). This is a quite different problem from the one addressed by the invention claimed in the opposed patent.

*The Objection Based on D3*

56.     One has to state, with the utmost respect, that the statement in Item 4.3.1 of the Notice of Opposition does not even constitute an argument, let alone a proper analysis of the question of inventive step using the problem-and-solution approach prescribed by the Boards of Appeal.

57     The problem addressed by D3, as indicated above, is the provision of a binder that can be heat sealed irrespective of whether the bonded fabric is in a state of rest or in a state of tension (D3, column 1, lines 29-35). There appears to be no recognition in D3 of the problem addressed by the opposed patent, namely the problem of seam failure due to the "ballooning" effect in *mechanically* sealed tea bags and the like.

58.     Taking the problem to be solved as the avoidance of the rupture of seams in mechanically sealed infusion packages owing to the "ballooning effect", then a person skilled in the art would look to maximise the gas porosity of the web material. If the skilled person were to apply a polyblend according to D3 to the web material, he or she would follow the clear teaching in D3 to apply the polyblend only in selected areas, leaving interstitial areas untreated (D3, column 5, lines 61-68). The person skilled in the art would also seek to maximise the porosity of the infusion web material so as to permit a quick and thorough extraction of the beverage powder, thereby decreasing the first colour times. Again, this would provide a clear technical motivation to apply the treating agent only in selected areas. As noted above, this would also be consistent with the teachings in D1 and D4. The upshot is that the cited art provides no technical motivation whatsoever to apply a hydrophobic treating system throughout the extent of the web material.

Relief Sought

59.     It is requested that the decision of the Opposition Division be set aside and that the patent be maintained on the basis of the main request, namely the claims as granted.

60.     Failing that, it is requested that the patent be upheld on the basis of the Auxiliary Request.

61.     At the time of writing, the patent proprietor has received no notification of an appeal by the opponent. It is submitted that, if the patent proprietor is indeed the sole

appellant, then the patent should be maintained *at the least* on the basis of the Auxiliary Request, which was upheld in accordance with the interlocutory decision of the Opposition Division. This submission is believed to be consistent with the finding of the Enlarged Board of Appeal in Decision G9/92 (Kuka *et al* v. BMW, OJ EPO 12/1994, 875).

<u>Oral Proceedings</u>

62.    If the Board of Appeal is minded not to uphold the patent on the basis of the Main Request or the Auxiliary Request, it is respectfully requested that Oral Proceedings be instituted in order that the Board's concerns may be directly addressed.

· · · · · · · · · · ·

A copy of this letter and of the stated enclosures is being filed herewith for transmission to the Opponent, in accordance with Rule 36(4) EPC.

A copy of this letter, of the Auxiliary Request and of D4 is being filed by facsimile.

Yours truly,

DONNAN, MICHAEL JOHN
(Carpmaels & Ransford Professional Association No. 182)
<u>Authorised Representative of the Patent Proprietor</u>

Encs.  D4
       Claims of the Auxiliary Request
       Copy of this letter and of the enclosures in accordance with Rule 36(4) EPC

*AUXILIARY REQUEST* [handwritten]

EP 0 632 163 B1

## Claims

1. A ~~porous fibrous web material, suited for making~~ *mechanically sealed* infusion package[s] which ~~are~~ *is* for *a* brewing beverage[s] and which exhibit[s] improved resistance to the failure of a mechanical seam therein, [s]said web material being impregnated throughout its extent with one percent or more by weight of a hydrophobic treating system, the impregnated web exhibiting a water climb of not more than 0.5 inch (13 mm) over a period of 400 seconds when measured using water at a temperature of about 100°C and no substantial loss of infusion characteristics as measured by first-colour infusion time while providing less than 10 percent failure in the mechanical seam of tea bags constructed from the said web material upon exposure to boiling water.

2. The ~~web material~~ *infusion package* of claim 1 wherein the hydrophobic treating system includes a latex emulsion of a hydrophobic agent that completely impregnates the entire web material and is comprised of at least 3 percent by weight of a strength imparting binder.

3. The ~~web material~~ *infusion package* of claim 1 wherein the hydrophobic treating system includes an alkyl acrylate hydrophobic binder.

4. The ~~web material~~ *infusion package* of claim 3 wherein the hydrophobic binder is selected from the group consisting of ethyl acrylate and butyl acrylate polymers and copolymers.

5. The ~~web material~~ *infusion package* of claim 1 wherein the hydrophobic treating system comprises up to 12 percent by weight of a hydrophobic agent and the mechanical seam failure of the web is less than one percent.

6. The ~~web material~~ *infusion package* of claim 1 wherein the hydrophobic treating system includes a strength imparting hydrophobic binder comprising a butyl acrylate copolymer.

7. The ~~web material~~ *infusion package* of claim 3 wherein the hydrophobic treating system includes a latex emulsion of the hydrophobic binder completely impregnating the entire web material and imparting sufficient resistance to wetting to eliminate the water climb of the fibrous web material, the latex emulsion of the hydrophobic binder exhibiting an affinity for being readily absorbed into the fibers of the web.

8. The ~~web material~~ *infusion package* of claim 1 wherein the fibrous web material contains a strength imparting binder and the hydro-phobic treating system comprises a hydrophobic agent.

9. The ~~web material~~ *infusion package* of claim 8 wherein the hydrophobic agent is selected from the group consisting of silicones, fluorohydrocarbons, paraffin, alkyl ketene dimers and stearylated materials.

10. The ~~web material~~ *infusion package* of claim 8 wherein the amount of the hydrophobic agent is from 0.3 to 30 percent by weight.

11. The ~~web material~~ *infusion package* of claim 7 wherein the hydrophobic treating system is heat cured or otherwise insolubilised.

12. A process for ~~producing porous web materials for~~ making infusion packages having enhanced mechanical seam integrity comprising the steps of providing a porous absorbent web material suited for use as an infusion package, ~~and~~ treating the entire web material with a hydrophobic treating system to provide a treated web that exhibits a water climb of not more than 0.5 inch (13 mm) over a period of 400 seconds when measured using water at a temperature of about 100°C and less than 10 percent failure in a mechanical seam of tea bags constructed from the said web material when exposed to boiling water, ‹‹—››

13. The process of claim 12 wherein the hydrophobic treating system includes a latex dispersion of a hydrophobic agent that exhibits an affinity for being readily absorbed into the fibers of the web, the dispersion completely im-pregnating the web material, and subsequently insolubilizing the agent on the web.

14. The process of claim 12 wherein the hydrophobic treating system completely impregnates the web material and is comprised of a strength imparting hydrophobic binder that imparts resistance to aqueous absorption as measured by water climb, the hydrophobic agent exhibiting an affinity for being readily absorbed into the fibers of the web, the binder being a latex dispersion applied as a saturating treatment and subsequently dried.

15. The process of claim 14 ~~...~~ ... ... ... of an alkyl acrylate, the latex binder being present in an amount sufficient to provide a binder pick up by the web of at least 3 percent by weight.

‹ *which infusion package is made from a porous fibrous web material,* › [handwritten]

6

‹‹ *and making mechanically sealed infusion packages from th-* [handwritten]

*Auxiliary Request*

EP 0 632 163 B1

16. The process of claim 12 wherein the fibrous sheet material is soft, tissue weight material, the process including the step of treating the web with a binder in addition to the hydrophobic treating system, said system being comprised of a hydrophobic agent that exhibits an affinity for being readily absorbed into the fibers of the web, said hydrophobic agent being applied as a latex dispersion in an amount sufficient to impart a hydrophobic agent pick up of 0.3 to 30 percent by weight.

17. The process of claim 12 wherein the hydrophobic treating system includes a hydrophobic agent selected from the group consisting of silicones, fluorohydrocarbons, paraffin, alkyl ketene dimers and stearylated materials.

18. The process of claim 12 wherein the fibrous sheet material is a prebonded, light weight, highly wettable material and the hydrophobic treating system includes a hydrophobic agent that imparts complete resistance to wetting as measured by water climb, the hydrophobic agent exhibiting an affinity for being readily absorbed into the fibers of the web and being applied by a size press.

19. The process of claim 12 wherein the hydrophobic treating system completely impregnates the web material as the web material is being treated with a strength imparting binder.

20. The web material of claim 1 wherein the hydrophobic treating system comprises a hydrophobic strength-imparting binder selected from acrylic polymers and copolymers.

21. The process of claim 12 wherein the hydrophobic treating system comprises a hydrophobic strength-imparting binder selected from acrylic polymers and copolymers.

**Patentansprüche**

1. Poröses Fasergewebematerial, geeignet zur Herstellung von Aufgussbeuteln, die zum Aufbrühen von Getränken bestimmt sind und einen verbesserten Widerstand gegen Schäden an deren mechanischer Naht zeigen, wobei das Gewebematerial über seine ganze Erstreckung mit 1 Gew.-% oder mehr eines hydrophoben Behandlungssystems imprägniert ist, und wobei das imprägnierte Gewebe einen Wasseranstieg von nicht mehr als 0,5 inch (13mm) über eine Zeitdauer von 400 Sekunden bei einer Messung unter Verwendung von Wasser bei einer Temperatur von ungefähr 100°C und keinen wesentlichen Verlust von Aufgusscharakteristika aufweist, wie durch die Anfangsfarbenaufgusszeit gemessen, während weniger als 10 % Versagen in der mechanischen Naht der dem kochenden Wasser ausgesetzten aus dem genannten Gewebematerial konstruierten Teebeutel vorgesehen auftritt.

2. Das Gewebematerial nach Anspruch 1, worin das hydrophobe Behandlungssystem eine Latexemulsion eines hydrophoben Agens beinhaltet, das das gesamte Gewebematerial vollständig imprägniert und aus wenigstens 3 Gew.-% eines Stärke verleihenden Binders besteht.

3. Das Gewebematerial nach Anspruch 1, worin das hydrophobe Behandlungssystem einen hydrophoben Alkylacrylatbinder beinhaltet.

4. Das Gewebematerial nach Anspruch 3, worin der hydrophobe Binder aus der Gruppe bestehend aus Acrylacrylat und Butylacrylatpolymeren und Copolymeren gewählt ist.

5. Das Gewebematerial nach Anspruch 1, worin das hydrophobe Behandlungssystem bis zu 12 Gew.-% eines hydrophoben Agens umfasst und der mechanische Nahtschaden des Gewebes geringer als 1 % ist.

6. Das Gewebematerial nach Anspruch 1, worin das hydrophobe Behandlungssystem eine Stärke verleihenden hydrophoben Binder mit einem Butylacrylatcopolymer beinhaltet.

7. Das Gewebematerial nach Anspruch 3, worin das hydrophobe Behandlungssystem eine Latexemulsion des hydrophoben Binders beinhaltet, das das gesamte Gewebematerial vollständig imprägniert und genügend Widerstand gegen Befeuchtung verleiht, um den Wasseranstieg des Fasergewebematerials abzubauen, wobei die Latexemulsion des hydrophoben Binders eine Affinität aufweist, leicht in die Fasern des Gewebes absorbiert zu

# United States Patent [19]

## Elston et al.

[11]    **4,289,580**

[45]    **Sep. 15, 1981**

[54]    **HEAT SEAL FIBROUS WEB AND METHOD OF ITS MANUFACTURE**

[75]    Inventors:    Colin Elston, Windsor, Conn.; Herbert A. Hoffman; H. Joseph Murphy, both of Longmeadow, Mass.

[73]    Assignee:    The Dexter Corporation, Windsor Locks, Conn.

[21]    Appl. No.:    **93,441**

[22]    Filed:    **Nov. 13, 1979**

[51]    Int. Cl.$^3$ ................................................ D21H 5/02
[52]    U.S. Cl. ..................................... 162/109; 162/115; 162/129; 162/146; 162/208
[58]    Field of Search ............... 162/115, 116, 146, 129, 162/208, 210, 109; 428/171, 286, 288

[56]    **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 995,602 | 9/1909 | Howes | 162/115 |
| 2,414,833 | 1/1947 | Osborne | 162/129 |
| 3,067,087 | 12/1962 | Gorski et al. | 162/157 R |
| 3,350,260 | 10/1967 | Johnson | 162/116 |

*Primary Examiner*—Peter Chin
*Attorney, Agent, or Firm*—Prutzman, Kalb, Chilton & Alix

[57]    **ABSTRACT**

Improved infusion web material for tea bags and the like is provided by using synthetic pulp in the heat seal phase and forming therein an array of a large number of small discrete craters. These craters, which exhibit an average planar area of at least about $1 \times 10^{-3}$ square centimeters, are formed prior to drying the initially formed multi-phase material by directing a low impact mist-like liquid spray onto the heat seal phase. The droplets from the spray displace the fibers to form the shallow craters and, at times, expose portions of the underlying non-heat seal fiber phase. The small craters are present throughout the heat seal phase at a concentration of at least about 40 per square centimeter and occupy about 10–75 percent of the total exposed surface area of the heat seal fiber phase of the material. The web also is treated with a surfactant.

**17 Claims, 3 Drawing Figures**



36  38  34  36
22
20
HEAT SEAL PHASE
NON HEAT SEAL BASE PHASE

U.S. Patent                 Sep. 15, 1981                 4,289,580



FIG. 1

FIG. 3

HEAT SEAL PHASE

NON HEAT SEAL BASE PHASE



FIG. 2

4,289,580

1

## HEAT SEAL FIBROUS WEB AND METHOD OF ITS MANUFACTURE

### TECHNICAL FIELD

The present invention relates generally to water laid infusion web materials and more particularly is concerned with a new and improved multi-phase heat sealable fibrous web having particular application as infusion packaging material, such as for tea bags and the like. The invention also relates to the process of manufacturing such fibrous web materials.

### BACKGROUND ART

Heretofore, heat sealable tea bag papers have comprised both single phase and multi-phase sheet material. Both materials have included non-heat seal fibers such as cellulosic fibers in combination with heat seal fibers. The particular heat seal fibers used have included thermoplastic fibers, such as the fibers of a copolymer of polyvinyl acetate, commonly referred to as "vinyon," and polyolefin fibers such as fibers of polyethylene and polypropylene. These synthetic heat seal fibers are typically smooth rod-like fibrous materials exhibiting a low specific surface area. They form a highly porous and open structural arrangement which, despite their hydrophobic character, permit adequate liquid permeability and transmission of both hot water and tea liquor through the sheet material during the normal brewing process. During manufacture the sheet material is dried by a conventional heat treatment resulting in a slight contraction of the heat seal thermoplastic fibers that maintains and enhances the desired open distribution of the heat seal particles throughout the sealing phase of the web.

In recent years, fibrillar materials formed from polyolefins and similar polymers have been introduced in the paper industry. These materials, commonly referred to as "synthetic pulps", exhibit certain processing advantages over the smooth rod-like synthetic fibers used heretofore. The synthetic pulps exhibit a fibrilliform morphology and resultant higher specific surface area. Additionally, they are more readily dispersible in water without the need for additional surface active agents and, although hydrophobic in nature, they do not dewater as rapidly as conventional synthetic fibers and therefore avoid plugging problems in lines, pumps, etc., within the paper-making machine. Further, these synthetic particles do not exhibit the tendency to "float out" in chests and holding tanks used in the typical paper-making process. For these reasons the synthetic pulps exhibit a potential for use as the heat seal component of infusion package materials, particularly since they provide substantially improved wet seal strength under end use conditions, that is, improved wet seal strength in a hot aqueous liquid environment and improved resistance to seal delamination under boiling and steaming test conditions.

Despite the apparent advantages evident in the use of synthetic pulp for heat seal infusion paper application, it has been found that such material exhibits a significant disadvantage with respect to its infusion properties and . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . usefulness in the paper-making process, that it, its fibrilliform structure and high specific surface area. When the synthetic pulp is heat treated, as in the conventional drying operation, it tends to soften and flow, typically forming a film, albeit discontinuous, particularly in the

2

heat seal phase of a multi-phase sheet material. Unlike the highly porous and open web structure formed by the larger and smoother synthetic fibers, the high surface area pulp with its lower density, smaller particle size and more numerous particles results in a closed, low permeability structure. In addition, the hydrophobic nature of the basic polymer inhibits water permeability and any surfactant added to the synthetic pulp is neutralized during the drying process. The result is that certain areas of the web surface are rendered water impermeable substantially retarding or inhibiting infusion and reducing the water permeability and wettability of the material. In use, the non-wetted or partially wetted areas of the web material are easily observed as opaque areas on the sheet while the thoroughly wetted areas exhibit a transparent appearance. The reduced wettability of the web material coupled with its mottled opaque appearance influences the aesthetic attractiveness of the product under end use conditions and, therefore, its acceptability by the consumer.

### DISCLOSURE OF INVENTION

Accordingly, the present invention provides a new and improved heat seal fibrous web material utilizing synthetic pulp as the heat seal fibrous component yet at the same time obviates the infusion and wettability deficiencies noted hereinbefore with respect to the use of such material. More specifically there is provided a heat sealable fibrous web having a disruptively modified heat seal phase having a larger total infusion area with an attendant enhancement in liquid permeability.

Additionally the present invention provides a new and improved process for the manufacture of heat seal infusion web materials having excellent infusion characteristics and improved strength characteristics through the utilization of synthetic pulp and the incorporation within the process of a technique for overcoming the infusion and wettability deficiencies observed heretofore with respect to the use of synthetic pulp material. This process involves the modification of essentially only the heat seal phase of a multiphase heat seal infusion web material to facilitate improved infusion characteristics despite the greater covering power of the high surface area hydrophobic synthetic pulp material. This is accomplished by disruptively modifying the heat seal material's heat generated film, thereby increasing the open surface area of the heat seal phase to provide a larger total infusion area and greater water permeability. This process includes the step of forming a random array of small high-infusion areas having a reduced synthetic pulp content, with some areas being essentially free of heat seal synthetic fibers so as to fully expose the underlying non-heat seal phase of the multiphase material. These small high-infusion areas can be formed in a simple and facile manner at relatively low cost with no substantial decrease in the production rate of the multi-phase heat seal material yet with improved seal strength under end use conditions by a simple low impact mist-like spray and subsequent treatment with a surfactant.

The heat seal phase of a multi-phase infusion web material is provided with a random array of a large number of small discrete craters by displacement of particles in the heat seal phase to form the craters. These craters, which expose portions of the underlying non-heat seal fiber phase, exhibit an average planar area of at least about $1 \times 10^{-3}$ square centimeters and are

4,289,580

3

formed prior to drying the initially formed multi-phase web material. The small craters are present throughout the heat seal phase at a concentration of at least about 40 per square centimeter and occupy about 10–75 percent of the total exposed surface area of the heat seal fiber phase of the material.

## BRIEF DESCRIPTION OF DRAWINGS

A better understanding of the invention will be obtained from the following detail description of the several steps of the process together with the relation of one or more of such steps with respect to each of the others and the article processing the features, properties and relation of elements exemplified in the following detailed description. In the drawing:

FIG. 1 is a schematic view of the wet end of a papermaking machine depicting one way of operating the process of the present invention for producing a multi-phase infusion web material;

FIG. 2 is an illustration of a planar view of the fibrous web material of the present invention depicting the craters formed within the heat seal phase, the view being substantially enlarged for purposes of illustration, and

FIG. 3 is a further enlarged sectional view of the web material of FIG. 2 taken along the line 3—3 of FIG. 2.

## BEST MODE FOR CARRYING OUT THE INVENTION

As mentioned hereinbefore, the present invention provides a technique for improving the infusion characteristics of a heat seal fibrous web material suited for use in tea bags or the like. This is accomplished by, in effect, enhancing the water permeable surface area of the heat seal phase of that material. In the preferred embodiment the enhancement is achieved primarily by physical disruption of the heat seal phase and secondarily through chemical treatment of the fibrous web material. It is this combination of physical and chemical treatments which provides the enhanced infusion characteristics found necessary when using larger surface area heat seal particles of low density and smaller particle size, such as the fibrous particles in commercially available synthetic pulp.

As mentioned, the invention is primarily concerned with multi-phase sheet material since it is directed toward the disruption of only one phase of the multi-phase material, namely, the heat seal phase. Additionally, the invention is primarily concerned with multi-phase water laid material produced in accordance with the conventional paper-making techniques. In this connection numerous different techniques have been employed heretofore to make the multi-phase fibrous webs. Typical of those found most useful in the production of infusion web materials is the dual headbox technique described in U.S. Pat. No. 2,414,833. In accordance with that process and as illustrated in FIG. 1, a suspension of non-heat seal fibers 10 flow through a primary headbox 12 and continuously deposit as a base phase on an inclined wire screen 14. The heat seal material 16 is introduced into the primary headbox at a location immediately after or at the point of deposition of the non-

out by means of an inclined trough 18, as shown, or by a secondary headbox in such a manner that the heat seal particles comingle slightly with the non-heat seal papermaking fibers flowing through the primary headbox 12. In this way, the non-thermoplastic fibers 10 have a

4

chance to provide a base mat or non-heat seal phase, 20, best shown in FIG. 3, prior to the deposition of the heat seal phase, 22. As is appreciated the latter is secured to the base phase by an interface formed by the intermingling of the particles within the aqueous suspensions. Typically, sheets produced in this manner have non-heat seal fibrous covering the entire surface area of the sheet material on the surface in contact with the inclined fiber collecting screen 14 while the top of the sheet material has some non-heat seal fibers and some heat seal fibers with the latter greatly predominating. In this way there is not a clear line of demarcation between the two phases of the multi-phase sheet material; yet there is a predominance of heat seal thermoplastic material on the top surface or top phase 22 of the multi-phase sheet. The center or interface boundary, of course, is composed of a mixture of the two different types of fibers.

Although the technique or process described in the aforementioned U.S. Pat. No. 2,414,833 is preferably followed, the heat seal material used in preparing the heat seal phase of the sheet material is different. It is comprised of synthetic pulp fibril-like particles. In view of the improved characteristics of such materials, including their high specific surface area, water insensitivity, low density, and smaller particle size, substantially improved seal strength characteristics under end use conditions can be achieved. These synthetic pulps are typically synthetic thermoplastic materials, such as polyolefins, having a structure more closely resembling wood pulp than synthetic fibers. That is, they contain a micro-fibrillar structure comprised of micro-fibrils exhibiting a high surface area as contrasted with the smooth, rod-like fibers of conventional synthetic man-made organic fibers. The synthetic thermoplastic pulp-like material can be dispersed to achieve excellent random distribution throughout the aqueous dispersing media in a paper-making operation and, consequently, can achieve excellent random distribution within the resultant sheet product. The pulps found particularly advantageous in the manufacture of infusion sheet materials are those made of the high density polyolefins of high molecular weight and low melt index.

The fibrils can be formed under high shear conditions in an apparatus such as a disc refiner or can be formed directly from their monomeric materials. Patents of interest with respect to the formation of fibrils are the following: U.S. Pat. Nos. 3,997,648, 4,007,247 and 4,010,229. As a result of these processes, the resultant dispersions are comprised of fiber-like particles having a typical size and shape comparable to the size and shape of natural cellulosic fibers and are commonly referred to as "synthetic pulp". The particles exhibit an irregular surface configuration, have a surface area in excess of one square meter per gram, and may have surface areas of even 100 square meters per gram. The fiber-like particles exhibit a morphology or structure that comprises fibrils which in turn are made up of micro-fibrils, all mechanically inter-entangled in random bundles generally having a width in the range of 1 to 20 microns. In general, the pulp-like fibers of polyolefins such as polyethylene, polypropylene, and mixtures thereof have a

e.g., in the range of 0.4 to 2.5 millimeters with an overall average length of about 1 to 1.5 millimeters. Typical examples of these materials are the polyolefins sold by Crown Zellerbach Corporation under the designation "FYBREL", by Solvay and Cie/Hercules under the

5

designation "LEXTAR" and by Montedison, S.P.A. and others.

Since the pure polyolefin particles are hydrophobic and have a surface tension that does not permit water wettability, the material obtained commercially is frequently treated to improve both wettability and dispersibility in aqueous suspensions. The amount of wetting agent added, however, is relatively small, and generally is less than 5 percent by weight, e.g., about 3 percent by weight and less. The chemically inert polyolefins are thermoplastic materials that become soft with increasing temperature; yet exhibit a true melting point due to their crystalinity. Thus, synthetic pulps of polyethylene exhibit a melting point in the range of 135° C. to 150° C. depending on the composition and surface treatment of the material.

Typically, the fiber composition of the heat seal phase is such that it contains cellulosic paper-making fibers in addition to the heat seal fibers. In this connection, it has been found that for optimum results it is preferred that the heat seal component constitute approximately 70 to 75 percent of the fiber composition within the heat seal fiber slurry. As will be appreciated, variations in the amount of heat seal material will depend on the specific material utilized as well as the source of that material. However a sufficient amount of heat seal particles must be employed to provide satisfactory heat seal conditions in the end product. Consequently, it is preferred that about 60 to 80 percent of the fibers in the heat seal fiber suspension be of a thermoplastic heat seal type in order to provide the necessary characteristics.

It should be noted that the preferred heat seal polymers are those which have already received approval for use in food and beverage applications. Consequently, the synthetic pulp made from polyolefins and vinyon are the preferred materials while other materials may be used for different end use applications. As will be appreciated, the remaining fibers may be of a wide variety depending upon the end use of the fibrous web material. However, for infusion packages having application in the food and beverage field, it is preferable to employ approved natural or man-made fibers and preferably cellulosic natural fibers, for example, fibers of bleached or unbleached kraft, manila hemp or jute, abaca and other wood fibers. A variety of infuser web materials may be made from these fibers and utilized in accordance with the present invention. However, for ease of understanding and clarity of description, the invention is being described in its application to porous infusion web materials for use in the manufacture of tea bags and the like.

As mentioned, the present invention involves opening or enhancing the water permeability of the heat seal phase of a multi-phase sheet material. This can be achieved by altering, disrupting or displacing the heat seal fibers within the heat seal phase prior to the conventional heat drying operation. Although this can be accomplished in numerous different ways, such as by the entrapment and melting of ice particles, or by the use of decomposable particles, air bubbles and the like, it is preferred in accordance with the present invention to achieve the disruptive relocation within the heat seal phase by the use of a light water spray or mist directed onto the heat seal phase, preferably as the initially formed fibrous web material leaves the headbox of a paper-making machine. As is known to those skilled in the paper-making art, the fibrous web material leaving the headbox consists predominantly of dispersing me-

6

dium with the fibers constituting only a minor portion, that is, less than 20 percent by weight, and typically less than 15 percent of the web material at this stage in its formation. In other words, the fiber consistency has changed from a level of about 0.01-0.05 percent by weight within the headbox to a fiber consistency of about from 1 to 2 percent by weight to 8 to 12 percent by weight on the web forming wire. At this stage, the newly formed fibrous web material is highly susceptible to fiber re-arrangement without adversely affecting the fiber to fiber bonding within the resultant fibrous product. Accordingly, by directing low impact mist-like spray droplets onto the sheet material immediately after it is formed the mist droplets act as if they are falling into a viscous liquid and do not penetrate deeply into the web, disrupting only the heat seal layer and leaving undisturbed the fibers of the base web material.

Preferably, the spray head generating the mist, such as a spray nozzle 30 is located adjacent the lip of the heat seal tray or headbox and the spray is angled slightly away from the vertical toward the wire 14 so that any large water droplets falling from the nozzle will fall harmlessly into the undeposited fiber dispersion within the headbox rather than on the partially dewatered fibrous web material. By positioning the mist spray head at this location, the mist water droplets impact on the partially dewatered fibrous web material between its final formation point upon emergence from the headbox and the suction slot 32 of the paper-making machine where the formed but partially dewatered fibrous web material is subject to a vacuum designed to significantly reduce the water content of the web and facilitate removal of the web from the web forming wire.

Since large water droplets will have the effect of not only removing the heat seal fibers but also a substantial portion of the base phase thereby causing an unsightly disruption in the web, it is preferred that the spray nozzle be selected and that the water pressure be controlled so as to produce a large array of small droplets. The spray can be synchronized with the speed of the paper-making machine so that the very small water drops of a mist consistency having a low impact will impinge on the web at a controlled rate. By suitable choice of the nozzle, the impact force of the water droplets are controlled to produce a disruptive effect on the fibrous web material which affects only the upper portion or heat seal phase of the fibrous web material, leaving the lower or support phase substantially unaffected.

In the preferred embodiment, it has been found that a low impact spray nozzle provides the desired mist-like spray conditions. The low impact type of spray helps to avoid disturbing the base web fibers of the multi-phase sheet material. Multiple spray heads are preferably used and are spaced transversely across the headbox of the paper-making machine. High performance, low output, finely atomizing spray heads operate effectively with minimum water pressure such as mill supply water at 40-45 psi, to provide the preferred spray design such that the mist-like atomized spray impinges on the newly formed web material. In a typical arrangement the nozzles are located approximately six inches apart across the width of the headbox and are spaced from the web forming wire by a distance of about eighteen inches.

A spray head that has been found particularly effective is the hollow cone type designated "MB-1" and sold by Buffalo Forge Company of New York. When operated at a low water pressure of about 40 psi, the

4,289,580

inch orifice diameter nozzle provides a spray cone angle of about 45 to 50 degrees and a throughput in the range of approximately 0.2–1.0 liter per minute of water through each spray head. Due to the low water pressure conditions and the highly atomized droplets formed by the hollow cone spray head, the resultant water droplets impinging on the heat seal layer of the newly formed heat seal phase are of a fine or minute droplet size. The actual size of the droplets are difficult to measure but based on the sizes of the craters formed by the drops it is believed they generally fall within the range of about 50–5000 microns in diameter, with the preferred droplet size being approximately 200–2000 microns.

Due to the high water content of the fibrous web material prior to reaching the suction box 32, the water droplets will tend to displace the fibers, pushing them to the outer edge of the drop and forming small shallow craters in the sheet material, as shown at 34 in FIGS. 2 and 3. The dislodged and displaced fibers within the heat seal phase are pushed to the periphery of the craters by the droplets, as shown at 36 of FIG. 3, leaving an area substantially free of heat seal fibers within the central portion 38 of each crater. Although this results in a sheet material initially having a mottled effect, the small size of the craters i.e., 0.2–2 mm, and the subsequent heat drying operation avoid any unsightly appearance in the resultant web material. In this connection, heat seal tea bag paper is conventionally given a heat treatment during its manufacture to dry and partially adhere the heat sealable fibers within the upper phase to the base web fibers in order to provide the desired integrated web structure. During this heat treatment, synthetic pulp fibers become transparent and the slightly mottled effect resulting from the mist spray becomes almost entirely unobservable. However, if the mist spray is of such a force and size so as to also disrupt the base fiber layer, then the disruption thus produced will be discernable even after the heat drying of the synthetic pulp fibers within the heat seal phase.

As will be appreciated, the craters formed by the water droplets will be present in a random array on the surface of the heat seal material. The size and concentration of the craters will vary substantially depending on the type of spray head and the impact force with which the water droplets strike the web material. Generally, it is preferred that the water droplets create a sufficiently large number of small discrete craters so that the craters occupy up to but less than about 75 percent of the total exposed surface area of the material. In this connection, it is important to assure that a sufficient distribution of heat seal fibers remains so as to provide the necessary heat sealing function. Typically, the craters are present throughout the entire planar extent of the heat seal phase at a concentration of at least about 40 per square centimeter of surface area, and occupy a minimum of about 10 percent of the total exposed surface area of the heat seal phase. An average crater density or concentration is about 60 to 80 craters per square centimeter occupying about 40–55 percent of the total exposed surface area. The craters formed by the impact of the spray drops have a shallow depth and, as indicated, a relatively random pattern that may vary depending on the particular shower head used to form the mist-like spray. Consequently, two adjacent craters may partially overlap as illustrated at 40 in FIG. 2. Additionally, the linear speed of the web forming wire will have an effect on the shape of the crater although

the primary effect of machine speed is on the concentration and number of craters per unit of area of the sheet material. In this connection a web formed at 75 fpm linear speed will be impacted by about 7–30 ml of spray per square foot of web to provide the desired crater concentration.

The craters will vary in size and in configuration although most will be circular and typical of the configuration formed as a result of the spray droplets impinging on the readily displacable fibers in the heat seal phase of the sheet material. Typically, the craters will exhibit an average planar area of at least about $1 \times 10^{-3}$ square centimeters while the individual craters will vary in surface area from about $3 \times 10^{-1}$ to $3 \times 10^{-4}$ square centimeters. Although the small size of the craters prevents accurate measurements, the craters naturally vary in size with the size of the droplets. Typically the average planar area of each crater falls within the range of 1 to $9 \times 10^{-3}$ square centimeters. The diameter of the resultant craters typically falls within the range of 0.04 to 0.2 centimeters, with the average crater diameter being about 0.07 centimeters.

Not only may the production rate alter the size, concentration, and population of the resultant craters, but also the particular shower head can permit substantial variation in the size and pattern of the water droplets used to form the craters since those nozzles can be fitted with interchangeable shower discs. As indicated, however, the primary object of the spray is not simply to create a crater-like impression in the web, but rather to displace some of the fibers in the heat seal phase to provide an area of improved receptivity to water permeability and therefore improved infusion characteristics.

As mentioned hereinbefore, the water permeability of the heat seal web can be enhanced further by the utilization of chemical treatments. In particular, it has been found that the heat seal hydrophobic layer can be treated with surface active agents or surfactant systems to improve the wettability and water permeability of the heat seal phase, even after that phase has been opened by the crater forming technique described hereinbefore. The treatment with the chemical surfactant is not such as to produce a chemical reaction but rather is more in the nature of an alteration in the surface characteristics of the fibrous web material, particularly the wetting characteristics. It is believed that the surface active agent or surfactant will affect the surface tension so as to alter the contact angle between the infusing liquids and the synthetic pulp particles. The contact angle is the angle between a surface and the tangent to a drop of water which has been applied to the surface at its point of contact with the surface. The theory of contact angles and their measurements are well known to those skilled in the art.

The surface active agents can be conveniently classified as anionic, cationic, nonionic and amphoteric. The materials are characterized structurally by an elongated non-polar portion having little affinity for water or water soluble systems and a short polar portion possessing high affinity for water and water soluble systems. The polar portion is hydrophilic and the non-polar portion is lipophilic (hydrophobic). Although different surfactants may be used for different applications, it has been found that nonionic materials having an appropriate hydrophile/lipophile balance (HLB) are preferred for food and beverage uses such as tea bag and similar infusion materials. The most consistent feature of the

4,289,580

effective surfactants is that they are nonionic, usually containing a polyoxyethylene group. The nonionic surface active agents do not dissociate in water but nevertheless are characterized by a relatively polar portion and non-polar portion and are the only class of surfactants that can be assigned an HLB number. Materials having HLB numbers from about 10 to 28 appear to work well. However, even among otherwise acceptable surfactants it is necessary that the material meet FDA approval and be free of adverse taste effects. Many surfactants give a strong mouth feel and leave a foamy, plastic or bitter aftertaste. As mentioned, the preferred surfactants are those that contain polyoxyethylene groups and among these, materials such as the polyoxyethylene (20) sorbitan monostearate (HLB-14.9) sold under the trademark "Tween-60" by ICI America have given best results particularly in the taste test. Blends of two or more agents also may be used.

Typically, the surfactant is added to the sheet material after formation and conveniently can be applied as a dilute solution (1 percent) of the agent. Such an operation will generally result in the addition of 0.1–0.6 percent of the surface active agent based on the dry fiber weight with about 0.3 percent being preferred. It may be applied at various stages in the paper-making process, even while it is still on the forming wire, or later by size press or at the wind up reels. Application at the wet end can result in very poor retention of the agent and/or lowering of the internal bonding strength or tensile properties of the finished paper so that, preferably, the material is applied to the formed and dried web. This can be achieved by spraying or size pressing the web with a large amount of the solution containing a low concentration of surface active agent followed by subsequent drying. This leads to a uniform distribution of the surface active agent through the web. Of course other well known alternative methods of applying the material prior to the take up reel using a small amount of high concentration solution or by calendar stack application may be used. The preferred method is to spray the dry sheet material with a one percent solution of the surface active agent between two drying sections of the paper-making machine using a very coarse spray to obtain high absorption efficiency. The surface active agent employed to produce the desired effect is limited not only to those which have FDA approval for the particular end use and have minimal effect on taste, but also to those that will show maximum effect at a minimum application level.

As mentioned, it has been found that the use of synthetic pulps, while providing improved seal strength characteristics, are deficient with respect to wettability and infusion properties. The expression "wettability" refers to the speed and uniformity of water abdsorption by the paper under end use conditions. Thus upon immersion of the material non-wetted or poorly wetted areas of the sheet are easily observed as opaque white areas while the thoroughly wetted areas immediately become transparent. A poorly wettable paper, therefore, produces an aesthetically displeasing appearance and can be readily noted while a paper exhibiting good wettability characteristics will rapidly absorb water and exhibit a uniform appearance. Infusion refers to the rate at which water can pass into the tea bag and tea liquor can pass out of the tea bag as well as the degree of extraction which is able to take place within a specified time. This is usually reported in terms of "first color" and "percent transmittance", respectively.

When testing for first color a tea bag made from the material to be tested is carefully placed in quiet distilled water after the water has been brought to a boil. Using a stopwatch the time is recorded at which the first amber stream appears at the bottom of the sample. A first color time of about 5–6 seconds is considered indicative of good infusion characteristics. The percent transmittance test is conducted by measuring the transmittance of the brew after a 60 second steep time using a Markson Colorimeter Model T-600 at a wavelength of 530 mμ and using a 1 cm. cell. A target value for good infusion is in the mid-sixty percentile range with transmittance decreasing as infusion improves.

The following samples are given in order that the effectiveness of the present invention may be more fully understood. These examples are set forth for the purpose of illustration only and are not intended in any way to limit the practice of the invention. All parts are given by weight.

EXAMPLE I

This example shows the improved infusion characteristics obtained by using the process of the present invention.

A base phase fiber dispersion was prepared from about 75 percent hemp fibers and 25 percent wood fibers and a separate heat seal fiber dispersion was prepared using a fiber formulation comprising 75 percent polyethylene synthetic pulp FYBREL ® E-400 and 25 percent kraft wood pulp. Using these dispersions a two phase heat seal sheet material was formed on a paper-making machine operated at a linear speed of about 75 feet per minute to provide a web material having a basis weight of about 16.5 grams per square meter. As the sheet emerged from the headbox, it was treated with a fine mist water spray directed toward the wet fibrous web at a location of about 1 inch from the stock dam. The spray nozzle was of the hollow cone type, Model MB-1 with a ⅛ inch orifice located about 18 inches from the web at a pressure of about 40 psi. The sheet material thus produced was dried on steam heated can dryers and was subject to an airless spray of a 0.16 percent solution of polyoxyethylene (20) sorbitan monostearate surfactant (Tween-60). The resultant material was designated Sample 1-A.

For comparison purposes, a second web material was produced in the identical manner as Sample 1-A from the same fiber dispersions except that the web was not subject to the mist spray and did not receive the surfactant treatment. The second material was designated 1-B.

These web materials were tested for infusion characteristics and wettability and the results were compared with the properties of a commercial grade of heat seal tea bag paper designated Sample 1-C. The results are reported in Table I. The first color and percent transmittance data is the average of four separate tests conducted in the manner set forth hereinbefore.

TABLE I

| Sample No. | First Color (sec) | Transmittance (%) | Wettability |
|---|---|---|---|
| 1-A | 6.0 | 67.3 | good |
| 1-B | 7.8 | 73.0 | poor |
| 1-C (control) | 5.8 | 65.8 | good |

4,289,580

11

## EXAMPLE II

The procedure of Example I was repeated except that a change was made in the type of synthetic pulp used in the heat seal layer. The FYBREL ® was replaced by a synthetic pulp called "Pulpex" sold by Solvay and Cie. Sample 2-A is the material treated with the mist spray and surfactant while Sample 2-B is the identical material without the mist or surfactant treatments. Once again, the average of four tests are reported in the table.

### TABLE II

| Sample No. | First Color (sec) | Transmittance (%) | Wettability |
|---|---|---|---|
| 2-A | 8.0 | 70.3 | good |
| 2-B | 9.0 | 77.8 | poor |

As can be seen the treatment according to the present invention provided substantial improvement in the infusion and wettability properties.

## EXAMPLE III

This example illustrates the effect of the mist spray treatment on the infusion characteristics of a two phase heat seal material with and without the surfactant treatment.

In this example, the procedure of Example I was repeated. Sample 3-A was treated by both the mist spray and surfactant while Sample 3-B is identical except that the surfactant treatment was omitted. Sample 3-C was prepared from the same fiber furnish but received no mist spray and no surfactant. Sample 3-D is a control sheet of a typical commercial two phase heat seal web material.

### TABLE III

| Sample No. | First Color (sec) | Transmittance (%) | Wettability |
|---|---|---|---|
| 3-A | 5.8 | 65.0 | good |
| 3-B | 5.5 | 66.7 | poor |
| 3-C | 7.5 | 69.2 | poor |
| 3-D (control) | 5.5 | 64.7 | good |

As will be apparent to persons skilled in the art, various modifications, adaptations and variations of the foregoing specific disclosure can be made without departing from the teachings of the present invention.

We claim:

1. In a wet papermaking process for preparing a light weight multiphase heatsealable fibrous web material having excellent infusion characteristics comprising the steps of forming a dilute dispersion of heatsealable fibers in an aqueous dispersing medium; providing a fibrous substrate phase of non-heatsealing character; depositing said dispersion on said substrate phase while simultaneously removing a sufficient portion of said dispersing medium to form a partially dewatered heatsealable fiber phase superimposed on said substrate phase, said partially dewatered heatsealable phase having a fiber consistency of at least about one percent by weight with the remainder being substantially dispersing medium; and subsequently drying the resultant multi-phase web material to remove the dispersing medium and firmly secure said heatsealable phase to said fibrous substrate phase, the improvement wherein the heatsealable fibers are highly fibrillated synthetic thermoplastic particles and the process includes the step of disruptively dislodging and displacing portions of the heatseal particle in the partially dewatered heatseal fiber phase while

12

superimposed on the fibrous substrate and prior to removing a major portion of the dispersing medium initially retained within said superimposed phase to provide a random array of discrete areas of reduced heatseal particle content and enhanced infusion in said multi-phase web material, the enhanced infusion areas being present throughout said heatseal phase at a concentration sufficient to occupy about 10–75 percent of the planar surface area of said heatseal fiber phase having an average diameter per area of up to 5 mm and an average planar area of at least $1 \times 10^{-3}$cm² and being substantially invisible in the dried web material, said substrate phase being substantially unaffected by the displacement of portions of the heatseal phase and being itself substantially unmodified.

2. The process of claim 1 wherein said infusion areas of reduced heatseal particle content have an average concentration of at least about 40 per sq. cm.

3. The process of claim 1 wherein the step of dislodging and displacing the heatseal phase includes treating the partially dewatered phase with a low impact mist-like liquid spray to form a random array of a large number of small high infusion areas of reduced thermoplastic particle content in the form of discrete shallow craters.

4. The process of claim 3 wherein the low impact liquid spray to dislodge and displace the heatseal particles and form the random array of a large number of small, high infusion areas of reduced heatseal particle content in the form of discrete shallow craters having an average planar area per crater of about $3 \times 10^{-4}$ to $3 \times 10^{-1}$ sq. cm. and an average diameter in the range of 0.05–5 mm., the process including the step of treating the heatseal phase with a surfactant.

5. The process of claim 4 wherein the finely atomized spray is formed using a high performance hollow cone type spray head and the craters occupy about 40–55 percent of the total surface area of the heatseal phase and have an average diameter of about 0.7 mm.

6. The process of claim 1 wherein the thermoplastic particles are a synthetic pulp comprised of high density polyolefin having a molecular weight greater than 40,000 and a melt index less than 0.1, the particles being of high specific surface area, low density and small particle size; the discrete areas being shallow craters having an average planar diameter in the range of 0.2–2 mm. and an average concentration of at least about 40 per sq. cm.

7. The process of claim 6 wherein the average concentration of craters is about 60–80 per sq. cm.

8. In a lightweight fibrous multi-phase heatsealable infusion web material comprising a non-heatseal fiber phase, a coextensive heatseal fiber phase superimposed thereon and an interface of intermixed non-heatseal and heatseal fibers secured between said phases, the improvement wherein said heatseal fiber phase and interface is provided with a large number of small, discrete physically modified high infusion areas of substantially reduced heatseal fiber content in the form of shallow craters that are substantially invisible in the dry web phase having an average diameter per area up to 5 mm and an average planar area of at least $1 \times 10^{-3}$cm², said underlying nonheatseal fiber phase being substantially free of associated areas of reduced fiber content.

4,289,580

13

14

9. The web material of claim 8 wherein the discrete shallow craters have an average planar area per crater in the range of about $3 \times 10^{-4}$ to $3 \times 10^{-1}$ sq. cm. and an average concentration of at least about 40 per sq. cm.

10. The web material of claim 8 wherein the heatseal fibers comprise synthetic pulp and the small shallow craters have an average diameter in the range of 0.05-5 mm.

11. The web material of claim 10 wherein the periphery of each crater has a higher synthetic pulp content than the non-crated planar portions of the heatseal phase, some of said craters being essentially free of heatseal fibers at their base so as to expose portions of said underlying nonheatseal phase.

12. The web material of claim 8 wherein the discrete shallow craters occupy 40-55 percent of the total surface area, the craters having an average planar area per crater in the range of about $1 \times 10^{-3}$ to $9 \times 10^{-3}$ sq. cm. at an average concentration of at least about 40 per sq.

cm., said craters having an average diameter in the range of 0.2-2 mm.

13. The web material of claim 8 wherein the heatseal fibers comprise fibrillated thermoplastic synthetic pulp of high specific surface area and low density.

14. The web material of claim 13 wherein the synthetic pulp is comprises of high density polyolefin having a molecular weight greater than 40,000 and a melt index less than 0.1.

15. The web material of claim 8 containing a sufficient amount of surfactant to provide substantially uniform wettability within the heatseal phase of the web material.

16. The web material of claim 8 containing at least about 0.1 percent by weight of a nonionic surfactant containing a polyoxyethylene group, said surfactant being FDA approved for food contact applications, having a minimal effect on taste and providing substantially uniform wettability of the dried web material.

17. The web material of claim 16 wherein the surfactant is polyoxyethylene (20) sorbitan monostearate.

* * * * *

# CARPMAELS & RANSFORD
43-45 BLOOMSBURY SQUARE, LONDON, WC1A 2RA

**TELEPHONE:**   020-7242 8692          email@carpmaels.com          **FACSIMILE:**   020-7405 4166
                                                                                    020-7831 8501

Your Ref:  94303680.6/0632163                    Our Ref: O002977EP/CPM/MJD/jmh
           **T0995/04-336**

European Patent Office
Erhardtstrasse 27
D-80298 Munich
GERMANY

*With Compliments*

Re:   **European patent No. 0 632 163 (Application No. 94303680.6) -
      Ahlstrom Windsor Locks LLC – Opposition by J.R. Crompton Limited
      Appeal File T0995/04-336**

COPY OF THE STATEMENT OF GROUNDS OF APPEAL, THE AUXILIARY
REQUEST AND D4, FOR TRANSMISSION TO THE OPPONENT
(RESPONDENT) ACCORDING TO RULE 36(4) EPC.