Page 1

1    UNITED STATES DISTRICT COURT
       DISTRICT OF CONNECTICUT
2
3                                              ORIGINAL
4
     - - - - - - - - - - - - - - - - - - )
5                                        )
     AHLSTROM WINDSOR LOCKS, LLC,         ) Civil Action No.
6                                        ) 3:03-CV-0169 (AVC)
                        Plaintiff,       )
7                                        )
        VS.                              )
8                                        )
     SCHOELLER & HOESCH, N.A., INC.       )
9    and P.H. GLATFELTER COMPANY,         )
                                         )
10                      Defendants.      )
                                         )
11   - - - - - - - - - - - - - - - - - - )
12
13
     CONFIDENTIAL VIDEOTAPED DEPOSITION OF:  GLEN A. BONETTI
14            DATE:  NOVEMBER 18, 2003
              HELD AT:  McCARTER & ENGLISH, LLP
15                     CITYPLACE I
                       185 ASYLUM STREET
16                     HARTFORD, CONNECTICUT
17
18
19
20
21
22
      Reporter: Sandra V. Semevolos, RMR, CRR, LSR #00074
23             BRANDON SMITH REPORTING SERVICE
                       44 Capitol Avenue
24                     Hartford, CT  06106
                       Tel (860) 549-1850
25

CONFIDENTIAL

11/18/2003         Ahlstrom vs Schoeller              Glen Bonetti

Page 25

1   involved with the Canadian market.  Once it's in Canada,
2   you keep it in Canada.
3        Q    And from these warehouses, the paper is
4   shipped to the ultimate customer; is that correct?
5        A    That is correct.
6        Q    Where does the customer place -- with whom
7   does the customer place an order?
8        A    Directly with the Schoeller & Hoesch office in
9   Pisgah Forest, North Carolina.
10       Q    And what happens next with that particular
11  customer?  Is the order filled through your office?
12       A    There is several ways a customer can receive
13  the order, whether it goes directly to a warehouse, and
14  then ships to the customer, or if they are large enough
15  to take a full container, the container goes directly to
16  the customer and does not have to require warehousing,
17  so there is two answers to that question.
18       Q    All right.  I think I don't quite understand
19  this.  You said that for smaller quantities or volumes
20  of product, that would come from your distributor
21  Rothline Industries; is that right?
22       A    Can you rephrase that?  Smaller quantities on
23  a daily basis, a monthly basis, a yearly basis?
24       Q    I see, it depends on the time frame as well?
25       A    That's correct, yes.

CONFIDENTIAL
11/18/2003          Ahlstrom vs Schoeller                Glen Bonetti

Page 29

1    Q    Why is that?

2    A    We do it at the plant in Germany before we

3    bring it into the United States.

4    Q    All right. So Schoeller & Hoesch in Germany

5    does the converting and ships it into the United States

6    in converted form?

7    A    Finished goods.

8    Q    Finished forms?

9    A    Finished goods, that's correct.

10   Q    Does Schoeller & Hoesch sell any tea bag paper

11   that comes from a source other than Schoeller & Hoesch

12   in Germany?

13   A    I don't think so. I'm not aware of that. I

14   have no knowledge of the manufacturing processes.

15   Q    No, I didn't ask about the manufacturing. I'm

16   just saying, do you, Schoeller & Hoesch, sell any tea

17   bag paper other than that which is produced by Schoeller

18   & Hoesch in Germany?

19   A    Yes. We have a plant in France, and we

20   produce tea filter paper also at the plant in France.

21   Q    Is that a Schoeller & Hoesch plant?

22   A    It is a subsidiary of Schoeller & Hoesch, yes.

23   Q    A subsidiary of --

24              MS. FISHER: Of Schoeller & Hoesch GmbH?

25   A    Of Schoeller & Hoesch GmbH.

CONFIDENTIAL

11/18/2003           Ahlstrom vs Schoeller           Glen Bonetti

Page 75

1  A   I have no knowledge of that. I haven't
2  asked.
3  Q   What about the second one, 212 RL-TA?
4  A   The same version, but reduced tea fall-out,
5  reduced dusting is referred to also.
6  Q   Now, the better crimp seal that you refer to
7  as being the solution for the tea leakage in the cups,
8  how is that accomplished with these -- and I assume, am
9  I correct in assuming that these two Dynacrimp series
10 were the answers to these problems; correct?
11 A   Yes, it is. It's a better product.
12 Q   All right. So how did you accomplish the
13 better crimp seal?
14 A   They tested that at the plant in Gernsbach,
15 Germany. I did not attend any of those tests, so I
16 don't know what they did. It's a better product.
17 Seeing it run on the machine, watching it in the testing
18 with the five bags in the one-quart pitcher, it just
19 performs better.
20 Q   So you don't know what it is that made it a
21 better seal, a better crimp seal?
22 A   No, I do not.
23      MS. FISHER: I just want to refer you,
24 Mr. Bresnick, to area of inquiry A4, research and
25 development with respect to infusion paper, that is one

Page 88

1    "Methodology."

2    A    Okay.

3    Q    Were you involved in any of these comparative
4    tests?

5    A    The tests were done in Germany, and I was not
6    involved.

7    Q    Had you ever been involved in tests,
8    comparative tests, comparing your product, Schoeller &
9    Hoesch product, with your competitors?

10         MS. FISHER: I'm going to interject and
11   just ask that you narrow that question to any tests
12   performed prior to litigation. Post-litigation testing
13   would be the subject of attorney-client privilege.
14   BY MR. BRESNICK:

15   Q    All right. First I'll leave it at any time.
16   A    Define my involvement. By "involvement," what
17   do you -- being present, is that how you are defining
18   "involvement?"

19   Q    Well, being present, how about that?
20   A    I've never been present at any test.
21   Q    Never been present. Directing that tests be,
22   comparative tests be performed?
23   A    I've never directed the test.
24   Q    Being advised of the results of comparative
25   tests?

CONFIDENTIAL
11/18/2003         Ahlstrom vs Schoeller          Glen Bonetti

Page 89

```
1     A    Yes.
2     Q    Why would you be advised of the results of
3     comparative tests?
4     A    To be able to use that as a sales tool.
5     Q    So you do use these comparative -- the
6     comparisons between products as a sales tool?
7     A    Yes.
8     Q    That's pretty standard in the sales business,
9     isn't it?
10    A    Yes, it is.
11    Q    How many salespeople do you have working for
12    you at Schoeller & Hoesch?
13    A    North America?
14    Q    Yeah.
15    A    In the tea industry?  One.
16    Q    That's you?
17    A    That's it.
18    Q    Now, on page D 27, which has got the number 6
19    up in the upper left-hand corner, it refers to an
20    infusion test that was done according to Schoeller &
21    Hoesch standard method, the dynamic test.  What is that?
22    A    We have our own testing systems that they use
23    in Schoeller & Hoesch Germany that I could not even
24    describe.  I just know that it's -- to me this would
25    read as not a standard test used in the industry.  It's
```

CONFIDENTIAL
11/18/2003   Ahlstrom vs Schoeller   Glen Bonetti

Page 130

1  Q    By the way, if you look at the logo on the
2  front page, the first page here, "Schoeller & Hoesch, a
3  Glatfelter company," do you see that?
4  A    Yes.
5  Q    Is that your logo from North Carolina, or is
6  that the German company logo?
7  A    That is the company logo we use in North
8  Carolina.
9  Q    Do they use a different logo in Germany?
10 A    I am not familiar with their logo.
11 Q    So you got samples, it says, from Lipton,
12 samples of Ahlstrom paper.
13 A    Yes.
14 Q    And you did an infusion test; is that right?
15 A    They performed that test in Germany.
16 Q    According to an S&H standard method, the
17 dynamic test.  What is that test?
18 A    Whatever equipment they used, they use as
19 comparative value, not a standard value, which would
20 mean something to some other company.  It's a
21 comparative test.
22 Q    Are you familiar with the test?
23 A    No, I'm not.
24 Q    Are you familiar with the water climb test?
25 A    In principle, yes.

1  BY MR. BRESNICK:

2      Q    This is a letter, right, from Joe Szorc?

3      A    Yes, it is.

4      Q    Who is Joe Szorc?

5      A    Joe was a sales manager before I took over in
6  the summer of 2000.

7      Q    So he was a Schoeller & Hoesch sales manager
8  before you got the job?

9      A    That's correct.

10     Q    Did you replace Joe Szorc?

11     A    He sold our overlay products, so for a time we
12 were in the same office together.

13     Q    There is a copy to you.

14     A    I was the CSR at the time.

15     Q    Near the bottom of the page, it says "It is my
16 understanding the proposal made to Teecanna,
17 T-e-e-c-a-n-n-a, is based on our supplying an equivalent
18 paper to that of the Dexter Latex paper."

19          What did you understand the Dexter Latex paper
20 to be?

21     A    At the time or now?

22     Q    At the time that you wrote this?

23     A    At the time I was a CSR, I had no idea.  I had
24 been working with these products for six months, and I
25 didn't know where Joe was shooting from.