IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| AHLSTROM WINDSOR LOCKS LLC, : | |
| Plaintiff : | CASE NO. 3:03-CV-0169-AVC |
| v. : | |
| SCHOELLER & HOESCH, NA, INC., : | |
| and : | December 23, 2004 |
| P. H. GLATFELTER COMPANY : | |
| Defendants . : | |

**DEFENDANTS' BRIEF IN REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF PATENT INVALIDITY**

Despite Plaintiff's heavy reliance on expert testimony and its numerous assertions as to what the prior art references relied upon by Defendants to establish invalidity do or do not *teach*, nothing that Plaintiff submitted in connection with its Opposition to Defendants' Motion for Summary Judgment places into dispute the basic proposition that the Kelley Patent, the Noiset Patent, and the Yadlowsky Application each *disclose* an embodiment of a web which if constructed using the proper amount of hydrophobic agent would exhibit the inherent properties necessary for the webs to "read on" to the claims of the '997 Patent. As such, Kelley, Noiset and Yadlowsky each must be found to invalidate the '997, pursuant to the patent law principle that "that which would literally infringe if later in time anticipates if earlier." *Schering Corp. v. Geneva Pharmaceuticals, Inc.*, 339 F.3d 1373, 1379 (Fed. Cir. 2003), *quoting Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1378 (Fed. Cir. 2001).

I. **PLAINTIFF'S RULE 56(a)(2) STATEMENT FAILS TO COMPLY WITH THE REQUIREMENTS OF LOCAL RULE 56(a).**

Local Rule 56(a)(3) states in part:

> Each statement of material fact by a movant in a Local Rule 56(a)1 Statement or by an opponent in a Local Rule 56(a)2 Statement, and each denial in an opponent's Local Rule 56(a)2 Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial. The affidavits, deposition testimony, responses to discovery requests, or other documents containing such evidence shall be filed and served with the Local Rule 56(a)1 and 2 Statements in conformity with Fed. R. Civ. P. 56(e).

As pointed out in much greater detail in "Defendants' Objections to Plaintiff's Local Rule 56(a)(2) Statement and Motion for Sanctions" filed concurrently herewith, Plaintiff's Rule 56(a)(2) Statement comes nowhere close to being in compliance with the specific requirements set forth therein. Plaintiff's Local Rule 56(a)(2) Statement is rife with bald conclusions bearing no citation whatsoever to affidavits, responses to discovery requests, deposition testimony or other documents (let alone citations to specific pages or paragraphs within those sorts of supporting materials). Moreover, many of the "facts" do not actually amount to facts, but rather, unsupported expert opinion testimony insufficient to create a material factual dispute.

The manner in which it went about putting together its Rule 56(a)(2) Statement is such that Plaintiff ends up effectively defeating the whole purpose of the Rule itself, which is to assist the Court in understanding the scope of the summary judgment motion by highlighting those facts which the parties contend are in dispute. In the absence of the required statements, "the Court is forced to scour the record on its own in a search for evidence which may support that party's contention that a certain fact is not in dispute." *Archie Comic Publications, Inc. v. Decarlo*, 258 F.Supp.2d 315, 317 (S.D.N.Y. 2003). In construing a similar local rule, the court in the Southern District of New York noted that while the non-movant is permitted to submit a separate statement of contested facts, such a separate statement is not a substitute for the paragraph-by-paragraph response. *See Rodriguez v. Schneider*, 1999 WL 459813, at *1 n. 3 (S.D.N.Y. June 29, 1999). In construing that same local rule, the Second Circuit stated that the Rule is designed "to streamline the consideration of summary

judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2nd Cir. 2001).

Unfortunately, that is precisely the task this Court now faces with regard to the instant summary judgment motion, absent a determination -- as requested in "Defendants' Objections to Plaintiff's Local Rule 56(a)(2) Statement and Motion for Sanctions" filed concurrently herewith -- that each of Defendants' Statements of Fact for which Plaintiff has not provided a response fully complying with Local Rule 56(a) shall be deemed admitted in its entirety. "Courts in this Circuit have not hesitated to deem admitted the facts in a movant's Local Civil Rule 56.1 statement that have not been controverted by a Local Civil Rule 56.1 statement from the nonmoving party." *Minuteman Press Int'l, Inc. v. Matthews*, 232 F. Supp.2d 11, 12 (E.D.N.Y. 2002).

Aside from Plaintiff's failure to comply with Local Rule 56, Plaintiff further does its best to raise issues and create areas of dispute at every possible turn no matter how big or small. However, it must be remembered that the mere existence of disputed facts does not preclude entry of summary judgment. "Rather, '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment." *Liberty Leather Products Co. v. VT Int'l, Ltd.*, 894 F.Supp. 136, 139 (S.D.N.Y. 1995), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II. THE DECLARATION OF EARL MALCOLM MUST BE STRICKEN.

Plaintiff places heavily reliance for on statements contained in the Declaration of Earl Malcolm in its efforts to provide support on a number of important issues. However, the Malcolm Declaration itself largely consists of wholly unsupported, conclusory-type assertions and as such, is defective and must be stricken.

As pointed out in much greater detail in "Defendants' Motion to Strike the Declaration of Earl W. Malcolm" and supporting Brief filed concurrently herewith, Plaintiff's Rule 56(a)(2) Statement comes nowhere close to being in compliance with the specific requirements set forth

therein. Plaintiff's Local Rule 56(a)(2) Statement is rife with bald conclusions bearing no citation whatsoever to affidavits, responses to discovery requests, deposition testimony or other documents (let alone citations to specific pages or paragraphs within those sorts of supporting materials). Moreover, many of the "facts" do not actually amount to facts, but rather, unsupported expert opinion testimony insufficient to create a material factual dispute.

Dr. Malcolm also improperly defines the field to which the invention of the '997 Patent relates, the reason being that he does not possess the requisite level expertise as the true field of the invention, namely, tea bag paper and tea bags made therefrom.

Separate and apart from the questions related to the qualifications of Dr. Malcolm as an expert, his declaration still must stricken due to its failure to satisfy the obligations imposed by Fed. R. Civ. P. 56(e), which requires that the party opposing summary judgment set forth "specific facts showing that there is a genuine issue for trial." Dr. Malcolm's declaration largely consists of mere conclusory opinions, for which absolutely no basis – factual or otherwise – is provided in support thereof. Moreover, much of what Dr. Malcolm states is based on nothing more than what he read in the '997 Patent or the prior art patents, or what he was told by Plaintiff's counsel. In several instances where he relies solely on what he read in a particular patent, he provides testimony in a manner which is highly misleading in the way it is phrased or otherwise presented. As just one example, Dr. Malcolm's asserts that the Noiset Patent "contains no teaching or suggestion" of "a fibrous web suited for making infusion packages for brewing beverages and exhibiting improved resistance to the failure of a mechanical seam therein". Malcolm Decl., ¶ 52. This directly contradicts the plain and unequivocal language of the Noiset Patent, wherein Noiset states that one of the objectives of his invention is to "improve the rate of infusion of the liquid through the paper **while minimizing the possible delamination of the seals provided therein,**" and explicitly states that the webs to which his invention relates include "**the non-heatseal variety that require mechanical fastening for the formation of the tea bag.**" Noiset Patent, col. 1, lines 63-65; col. 2, lines 46-47 (emphasis added).

-4-

Dr. Malcolm's testimony also addresses a key issue in a manner which is inappropriately addressed by expert testimony. Specifically, Plaintiff relies heavily on statements made by Dr. Malcolm to refute Defendants' assertions regarding inherency. With regard to whether or the claim limitation calling for "no appreciable water climb" is inherently disclosed in the Kelley Patent, for example, Dr. Malcolm states that

> A person of ordinary skill would not infer that the "water resistance" referred in the Kelley patent necessarily leads to water repellency as referred to in the '997 patent.

Malcolm Decl., ¶ 32. However, the Court of Appeals for the Federal Circuit has held that "inherent anticipation does not require that a person of ordinary skill in the art at the time would have recognized the inherent disclosure." *Schering Corp. v. Geneva Pharmaceuticals*, 339 F.3d 1373, 1377 (Fed. Cir. 2003) (citations omitted). Thus Plaintiff's reliance on the expert testimony of Dr. Malcolm in this regard to refute Defendants' assertions of inherency is misplaced, and for that reason Dr. Malcolm's testimony regarding inherency must be stricken.

### III. EXPERT TESTIMONY IS NOT NECESSARY IN ORDER TO DETERMINE THAT THE '997 PATENT IS INVALID DUE TO ANTICIPATION.

Anticipation depends primarily on the meaning of the claims in the asserted patent and the disclosures made in the prior art publication. Thus, the inquiry is by its nature relatively objective.[1]

Plaintiff makes much of the fact that its position is supported by expert testimony while the Defendants' position is not. Leaving aside questions about the qualifications of Plaintiff's expert, Plaintiff misunderstands the amount of weight that a court is required to give to such testimony in a case of this nature. The Federal Circuit has explained that "[c]laim interpretation involves a review of the specification, the prosecution history, the claims . . . and, *if necessary*, other extrinsic evidence, such as expert testimony." *Texas Instruments v. United States Int'l Trade Comm'n*, 988 F.2d 1165. 1171 (Fed. Cir. 1993) (emphasis added). *Cf. Union Carbide Corp. v. American Can Co.*,

---

[1] This is to be contrasted with obviousness, which generally requires consideration of how one of ordinary skill in the art would have been motivated to combine the teachings of more than one piece of prior art - a much more subjective inquiry, and therefore one more likely to involve disputed facts than anticipation.

724 F.2d 1567, 1573 (Fed. Cir. 1984) (noting that in that case "the references and appellant's invention [were] easily understandable without the need for expert explanatory testimony").

In *Scovill, Inc. v. Dynamics Corporation of America*, Judge Burns, in granting summary judgment of patent invalidity in favor of the alleged infringer, stated "[t]he court has examined the prior art and has determined that the relevant subject matter presented is easily discernible and understood, without the aid of expert testimony." *Scovill, Inc. v. Dynamics Corp. of America*, No. CIV. B-81-149, 1985 WL 6028, *3 (D.Conn. Mar 18, 1985), *aff'd without opinion*, 790 F.2d 90 (Fed. Cir. 1986). "Contrary to the plaintiff's assertion, the court finds that the subject matter of the patent in question is easily understood without the aid of expert testimony." *Id.* at *2, *citing Union Carbide*, 724 F.2d at 1573.

While the technology at issue in *Scovill* related to electric switches, specifically in the context of their use in connection with electric drink mixers, neither does the technology in the instant case amount to rocket science. At its core, this case is about a relatively simple product, namely tea bags. On a fundamental level, tea bags consist of than tea bag paper which is shaped and formed into a pouch-like device into which is placed tea leaves, following which the pouch is closed (sealed) in such a manner so as to prevent the contents from spilling out under most conditions. It is a product which it is safe to say can be described (even in the absence of expert testimony) as one which a vast majority of people will have actually made use of themselves, if not at a minimum at least observed or handled a tea bag at one time or another.

With regard to the manufacture of the tea bag paper itself, a fairly straightforward procedure is performed involving the application of fibers onto a wire to form the appropriate web, which is subsequently dried. Various chemicals are often added along the way for one reason or another, such as for example, to obtain a paper that possesses certain properties or can be employed in specific end uses.

In the context of the '997 Patent, a chemical treatment is applied involving the application of a hydrophobic (water repelling) agent to a tea bag paper in a manner wherein various resultant

properties are observed. One resultant property is the fact that the hydrophobic agent prevents water from penetrating into the fibers that make up the tea bag paper, thereby reducing the chances of the seam that is used to close the pouch once the tea leaves have been placed therein will not become degraded due to water exposure and thereby break open. The tests to determine whether the paper possesses the requisite seam failure properties and other properties (such as water climb and infusion) are so simple that almost anyone, skilled in the art or otherwise, could actually perform the tests themselves. See '997 Patent, columns 5 and 6.[2]

Defendants submit that none of the foregoing concepts are particularly difficult for even a layperson to understand. As such, Defendants believe the issues related to understanding the '997 Patent (and in similar fashion, understanding prior art patents in the same field) do not require expert testimony.

IV. **THE MANNER IN WHICH PLAINTIFF ASSERTS THE ISSUE OF HEATSEALABLE PAPERS BEING "DIFFERENT" FROM NON-HEATSEALABLE PAPERS IS A RED HERRING.**

    A. **PLAINTIFF SEVERELY DISTORTS DEFENDANTS' PREVIOUS POSITION REGARDING THE DIFFERENCES BETWEEN HEATSEALABLE AND NON-HEATSEALABLE PAPERS.**

Plaintiff places an enormous amount of emphasis that the '997 Patent relates solely to non-heatsealable papers whereas the three prior art references relied on by Defendants all relate to heatsealable (a point which Defendants vigorously contest, and which the plain text of the prior art references themselves each belie).

Plaintiff asserts that "[h]eat sealable webs differ *in kind* from non-heat sealable webs." *See* Plaintiff's Local Rule 56(a)2 Statement Of Material Facts As To Which There Is A Genuine Issue To Be Tried, No. 2 (emphasis added). While it is unclear what is meant by "in kind," Defendants do at

---

[2] Very briefly stated, seam failure is measured by placing a tea bag in a particular manner at the bottom of a beaker, pouring 400 ml of boiling water onto the tea bag, and observing the beaker to see if any of the tea leaves were discharged from the bag. Water climb is measured by placing one end of a strip of the paper in water (can be room temperature or near boiling) and observing the amount of "climb" achieved by the water moving through capillary action up the length of the strip over a set period of time and a set distance. Measuring infusion involves nothing more than taking a tea bag, placing it in a cup of hot water, and measuring the time it takes (via stopwatch, for example) for the first color to appear in the water.

least agree that heatsealable webs differ from non-heatsealable webs.

Plaintiff relies in part by an e-mail sent by counsel for Defendants, Marc Farrell, on August 8, 2003 to counsel for Plaintiff, Yunling Ren, in support of Plaintiff's statement that "[t]hese two types of materials are not interchangeable and have never been used interchangeably." *See* Plaintiff's Local Rule 56(a)2 Statement Of Material Facts As To Which There Is A Genuine Issue To Be Tried, No. 2. Plaintiff has twisted the words of the Farrell E-mail in a way which goes beyond deceptive – it is downright bad faith. The plain language of the Farrell E-mail makes it clear that the word "interchangeable" was never used to describe the relationship *between the two types of papers* as Plaintiff's Statement No. 2 unabashedly attempts to convey:

> As to your last point, I have determined that there are no heatsealable materials that are used for making mechanically sealed bags. In fact, the two (heatsealable versus non-heatsealable) are distinct products and used only for individual purposes. Our clients, like yours I'm sure, work closely with **packaging machine manufacturers** to supply filter paper to fit their requirements. If a tea company is looking for a certain tea bag, **they will purchase the correct equipment** to make that bag. It is impossible to have a packaging machine that can use either paper – **the machines are not interchangeable** and cannot be modified. So in other words, heatsealable papers could never be used **on the tea bag machines** that use non-heatsealable papers.

See Farrell E-mail, submitted at Tab F of Plaintiff's exhibits in support of its Opposition to Defendants' Summary Judgment Motion (emphasis added). It is highly improper for Plaintiff to suggest to the Court that the Farrell E-mail supports Plaintiff's statement that "These two types of materials are not interchangeable and have never been used interchangeably." To the extent Plaintiff's Statement No. 2 is meant to suggest that heatsealable and non-heatsealable are "interchangeable" in contexts other than their ability to be used on the different packaging equipment used to manufacture tea bags from each type of paper, Defendants agree that that portion of Plaintiff's Statement No. 2 is in dispute.

B.  **PLAINTIFF PROVIDES NO SUPPORT FOR ITS ASSERTIONS THAT WHY THE DIFFERENCES BETWEEN HEATSEALABLE AND NON-HEATSEALABLE MAKE KELLEY, YADLOWSKY AND NOISET PATENTS IRRELEVANT ON THAT BASIS ALONE TO THE ISSUE OF ANTICIPATION VIS-À-VIS THE '997 PATENT.**

Defendants submit that it is inappropriate to conclude merely on the basis that heatsealable and non-heatsealable "differ" that prior art patents having to do with heatsealable papers are automatically irrelevant to purported inventions having to do with non-heatsealable papers (or vice versa), as implied by repeated assertions of Plaintiff and Dr. Malcolm which do nothing more than point to the fact that heatsealable papers and non-heatsealable papers are "different" in order to disqualify Defendants' reliance on prior art patents which, in Plaintiff's view, relate only to heatsealable papers.

Similarly, Defendants disagree that merely stating that the machines used to make heatseal tea bags cannot be "interchanged" with the machines used to make non-heatseal tea bags, amounts to any sort of admission that both types of papers are incapable of being subjected to the same types of chemical treatment in order to impart to the webs desired physical properties that are identical.

For example, the invention disclosed and claimed in the '997 Patent relates to treating a non-heatsealable web material ('997 Patent, col. 3, lines 27-29) with a hydrophobic binder material so that the treated web material "resists the passage of liquid water into the structural components of the paper through capillary action" ('997 Patent, column 3, lines 7-9) and thereby causes the web to exhibit "substantially no absorption characteristics" as measured by a "'water climb' test" ('997 Patent, col. 5, lines 9-12), the water climb absorbency rate test being "correlated to the number of seam failures in a standard tea bag of the flow through type" ('997 Patent, col. 5, lines 33-35).

**Plaintiff's very own patent literature demonstrates that this same treatment may be applied to a *heat-sealable* web material, to achieve the same intended results.** *See* U.S. Patent Publication No. 2004/0048534, a copy of which is attached hereto as Exhibit A ("the '534

Publication"), wherein the importance of avoiding seam failure in a *heatsealable* web material is disclosed:

> Movement of the heated surfaces toward each other provides the required pressure and heat to the now touching web material faces to flow and fuse the touching fusible fibers therein and create a *heat seal seam* joining the two layers of web material, sealing the precursor material within. *Importantly, the seam retaining the beverage precursor materials within the infusion package must maintain integrity during use to prevent opening of the infusion package and the subsequent undesirable discharge of beverage precursor materials into the brew.*"

'534 Publication, ¶ 0005 (emphasis added). The '534 Publication further discloses impregnating a *heatsealable* web material "throughout its extent with a hydrophobic agent" ('534 Publication, ¶ 0043), so that the treated web material exhibits "an aversion to or lack [of] affinity for water and resists the passage of liquid water into the structural components of the web material through capillary action" ('534 Publication, ¶ 0043) as measured by a water "wicking test" ('534 Publication, ¶ 0044).

Therefore, Defendants' submit is plainly erroneous for Plaintiff to suggest that because heatsealable papers cannot be used interchangeably on non-heatsealable packaging equipment, one can extrapolate and conclude that both types of web materials are incapable of receiving the same treatment (such as complete impregnation of the webs with a hydrophobic agent) to achieve the same physical property (preventing water from passing into the fibers themselves that make up the webs). With that theory disposed of, Plaintiff's various assertions as to the inapplicability of Kelley, Noiset and Yadlowsky on the basis of the heatsealable vs. non-heatsealable "difference" quickly fall apart.

## V.  **CONCLUSION**

The various submissions provided by Plaintiff in opposition to Defendants' Motion for Summary Judgment in no way make granting of the motion any less appropriate. Accordingly, this Court should grant Defendants' Motion for Summary Judgment.

Defendants, Schoeller & Hoesch, NA, Inc.
and P. H. Glatfelter Company

By _____
Dina S. Fisher (ct 14896)
dfisher@rc.com
Brett J. Boskiewicz
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 06103-3597
Tel. No.: (860) 275-8200
Fax No.: (860) 275-8299

Marc J. Farrell (ct 24539)
farrellmj@bipc.com
BUCHANAN INGERSOLL, P.C.
One South Market Square
213 Market Street, 3rd Floor
Harrisburg, PA 17101-2121

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was served by means of facsimile and first class mail, on this the 23rd day of December, 2004, upon the following:

Sidney R. Bresnick, Esq.
Yunling Ren, Esq.
Cohen, Pontani, Lieberman & Pavane
551 Fifth Avenue
New York, NY 10176

Basam E. Nabulsi, Esq.
Alexandra Stevens, Esq.
McCarter & English LLP
Four Stamford Plaza
107 Elm Street, 9th Floor
Stamford, CT 06902

Eric E. Grondahl, Esq.
Alexandra Stevens, Esq.
McCarter & English LLP
City Place I
185 Asylum Street, 36th Floor
Hartford, CT 06103-3495

_____
Brett J. Boskiewicz