IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| AHLSTROM WINDSOR LOCKS LLC, | : |
| Plaintiff, | : CASE NO. 3:03-CV-0169-AVC |
| v. | : |
| SCHOELLER & HOESCH, NA, INC., and P. H. GLATFELTER COMPANY, | : |
| Defendants. | : DECEMBER 23, 2004 |

**DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO STRIKE
DECLARATION OF EARL W. MALCOLM**

I.  **INTRODUCTION.**

Defendants, Schoeller & Hoesch, NA, Inc. and P. H. Glatfelter Company ("Defendants"), submit this brief in support of Defendants' Motion to Strike the Declaration of Earl W. Malcolm, submitted by Plaintiff in support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment on the Basis of Patent Invalidity Under 35 U.S.C. §§ 102/103. As explained more fully below, Dr. Malcolm's declaration ("Malcolm Decl.") is fundamentally flawed in a number of respects. His declaration offers nothing more than conclusory opinions wholly unsupported by the necessary factual basis, in contravention of the well-established guidelines for the admissibility of expert testimony.

In addition, Dr. Malcolm is not qualified to opine on matters related to the area of technology at issue in this case -- porous fibrous web materials for making infusion packages for brewing beverages. Consequently, any testimony he might offer on such matters must be stricken.

Finally, Dr. Malcolm offers opinions on several matters for which expert testimony, from Dr. Malcolm or anyone else, is simply not appropriate. Such opinions should not be given consideration in ruling on Defendants' Motion for Summary Judgment.

II. **ARGUMENT**

   A. **DR. MALCOLM IS NOT QUALIFIED TO OPINE IN THE HIGHLY SPECIALIZED FIELD OF THE INVENTION – NOTWITHSTANDING HIS INCORRECT ASSESSMENT WHICH IS PLAINLY AIMED AT ENCOMPASSING HIS DIFFERENT, AND UTTERLY IRRELEVANT, EXPERTISE.**

Dr. Malcolm self-servingly defines the "field of the invention" and the "person of ordinary skill in the art" in such broad terms that they conveniently happen to encompass his own areas of expertise. With regard to the field of the invention in particular, which Dr. Malcolm indicates he deduced solely from his "study of the '997 patent and its file history," he states:

> [I]t is my opinion that the field of this invention is broadly in the field of specialty papers, especially lightweight specialty papers and most particularly lightweight specialty papers that have had treatments applied that provide specific end-use properties, namely, the end-use properties of a tea bag paper in a tea bag formed by a folded and crimped seam.

Malcolm Decl., ¶ 7.

This definition is overbroad, and completely incorrect. Dr. Malcolm's definition is so broad as to capture products as diverse as cover stock for making Formica and sausage casing substrates. *See* Deposition Transcript of Earl W. Malcolm, December 8, 2004 ("Malcolm Depo.", relevant pages of which are attached hereto as Exhibit A), 188:14-15. When asked to identify any lightweight specialty papers having been treated to provide specific end-use properties disclosed in the '997 Patent other than infusion paper, Dr. Malcolm was unable to do so. Malcolm Depo., 186:24 to 188:11. Plainly, infusion papers – of which Dr. Malcolm has no expertise – are the subject matter of the field of the invention. His declaration should be stricken to the extent it puts forth a definition for "field of the invention" which is unduly broad in its scope, inaccurately encompassing his own qualifications *and* obscuring the issues presented in Defendants' Motion for Summary Judgment.

*See*, for example, the Federal Circuit's observations on a similar, incorrect framing of the field of invention, in *Ryko Manufacturing Co. v. Nu-Star, Inc.*, 950 F.2d 714, 716 (Fed. Cir. 1991). In *Ryko*, in holding that the field of invention was more specialized than the lower court allowed, the Federal Circuit observed that the "district court accepted the concession by both parties that the pertinent art encompassed automatic car washing systems,...we felt that such a definition of the pertinent art is too broad. The art of automatic car washing systems involves technologies ranging from hydraulics and fluid mechanics to electronic microcircuitry. Questioning whether the invention would have been obvious to one having ordinary skill in the art of automatic car washing systems is too imprecise to illuminate the obviousness inquiry." *Id.*

Notably, the *Ryko* court held that "[t]he relevant art 'is defined by the nature of the problem confronting the would-be inventor.'" *Id.* Here, the problem confronting a would-be inventor involved preventing seam failure in tea bags made from non-heatsealable tea bag papers. *See* '997 Patent, Cols. 1 and 2. Accordingly, the inventors sought to discover a treatment that could be applied to non-heatsealable tea bag papers which, when used to manufacture non-heatsealable tea bags, would exhibit increased seam strength. Therefore, the relevant art did not encompass the general category of "lightweight specialty papers that have had treatments applied that provide specific end-use properties," but rather entailed treatment of non-heatsealable tea bag papers to increase seam strength in tea bags made therefrom. This is the field of invention.

**B.   DR. MALCOLM IS NOT AN EXPERT WITH REGARD TO THE FIELD OF INVENTION -- TEA BAGS <u>OR</u> THE PAPER USED TO MAKE TEA BAGS.**

Dr. Malcolm, by his own admission, has very little experience in the actual field of invention at issue in this case. In his "40 years of experience in the field of paper making industry," Dr. Malcolm's only experience specific to tea bag papers was during his employment as a "research

chemist engineer in the research and development area responsible for developing new products" while employed by Dexter (the predecessor in interest to Plaintiff Ahlstrom) from 1966 to 1976, during which he devoted only about 20% of his time to matters involving tea bag papers (of which about 10% was devoted to heatsealable papers, and the other 10% to non-heatsealable papers). Malcolm Depo., 38:10; 48:12-16. Dr. Malcolm further testified that in the last 28 years, since leaving Dexter in 1976, he has had "very little exposure" to tea bag paper technology, such exposure being limited to "passing conversations at meetings." Malcolm Depo., 48:20-25.

Dr. Malcolm also testified that as recently as within the last six months, he consulted Peter Scott (one of the named inventors on the '997 Patent), in order to "get clear in" his "mind what the differences were" between heatsealable and non-heatsealable tea bag papers. Malcolm Depo., 40:20 to 41:23. Dr. Malcolm stated that it was from that recent consultation with inventor Scott that he learned that heatsealable papers and non-heatsealable papers were not interchangeable.[1] Malcolm Depo., 41:24 to 42:4. Dr. Malcolm admitted that within the general field of paper technology, there are enough nuances to tea bag paper that he was concerned enough to want to get confirmation from inventor Scott as to whether or not various "things had changed" since 1976. Malcolm Depo., 52:10-14. Dr. Malcolm further admitted that with regard to commercial tea bag paper products, he had not kept up on those "things". Malcolm Depo., 52:15-22. Prior to his being engaged as an expert by Plaintiff, he had never even heard of the "water climb test." Malcolm Depo., 168:24 to 169:1.

---

[1] Notably, it would appear that one of the "expert" conclusions set forth at ¶ 22 of the Malcolm Declaration, namely, that "[t]hese two types of materials [heatsealable and non-heatsealable] are not interchangeable and, to my knowledge, are not used interchangeably", amounts to nothing more than a mere parroting of what Dr. Malcolm learned from inventor Scott within the last six months.

- 4 -

That Dr. Malcolm does not possess a level of expertise sufficient to qualify him as an expert to opine on matters involving tea bag paper and tea bags made therefrom is further demonstrated by the following sequence of testimony:

> Q: Okay. If I were to ask you if you can tell from a visual inspection of a tea bag paper who the manufacturer of that paper was by looking at it, would you be able to do that?
>
> A: No.
>
> Q: Do you know of anybody who would be able to do that?
>
> A: Probably the manufacturer themselves.
>
> Q: But you are not sure?
>
> A: Usually a manufacturer can identify their paper by its visual appearance because they see it every day.

<u>Malcolm Depo.</u>, 192:13-24.

Dr. Malcolm's answer to this very basic, straightforward question is completely erroneous, as evidenced by the testimony of inventors Peter Scott and Helen Viazmensky (another of the named inventors), both of whom answered unequivocally that no one, including themselves, could identify the manufacturer of a particular tea bag paper based on a visual inspection of the paper.

See, for example, the following testimony from Helen Viazmensky on this issue:

> *Q  I had asked you if you can tell by looking at a tea bag visually who the manufacturer is, and you had said you cannot.*
> *A  I cannot.*
> *Q  Can anyone at Ahlstrom do that?*
> *A  I don't believe so.*
> *Q  Is it physically possible to tell by looking visually at a tea bag to know who made it?*
> *A  I don't believe so.*
> *Q  Are you skilled in the art of tea bag paper manufacture?*

>    *A   Yes.*

Deposition of Helen Viazmensky (Viaz. Depo.), 12:3 to 12:14 (attached hereto at Exhibit B.).

Peter Scott, the other named inventor of the Patent in Suit, offered the same insight:

>    *Q   Mr. Scott, we are back on the record.*
>    *Can you tell by looking at a tea bag whether Ahlstrom made the paper?*
>    *MR. BRESNICK: I'm sorry, I didn't hear that question.*
>    *(Record was read by the Court Reporter.)*
>    *A   Just by looking at it, no.*
>    *BY MS. FISHER:*
>    *Q   Can anybody at your company do that just by looking at it?*
>    *A   No.*
>    *Q   What do you have to do to decide – to determine who made the tea bag paper?*
>    *A   You'd have to do a fiber analysis and a chemical analysis.*

Deposition of Peter Scott, 1/29/04, 114:9 to 114:24 (attached hereto at Exhibit C).

Surely if someone were truly skilled in the art of designing tea bag paper (such as inventors Scott and Viazmensky) or tea bag manufacturing (such as Mr. Farrell), he or she would know the answer to a very simple question such as the one posed to Dr. Malcolm. That he did provided an unequivocally incorrect answer speaks volumes.

The Plaintiff should only be allowed to rely on the expert testimony of one who has specialized knowledge in the particular field of the invention at issue. *See Oxford Gene Technology Ltd. v. Mergen Ltd.*, 2004 WL 2632933, *2 (D. Del. Nov. 16, 2004) (holding that "[a] party can only elicit expert testimony from someone who has specialized knowledge or training sufficient to qualify him or her to opine on an issue within their field of expertise, and the expert's opinion must be confined to that area."). For the foregoing reasons, all statements made by Dr. Malcolm in his declaration related to tea bags and tea bag paper must be stricken as being outside his field of expertise.

### C. DR. MALCOLM'S CONCLUSORY TESTIMONY DOES NOT RAISE A GENUINE ISSUE OF MATERIAL FACT.

Separate and apart from issues related to Dr. Malcolm's lack of qualifications to opine as an expert in this case, his declaration also warrants being stricken for its failure to satisfy the provisions of Fed. R. Civ. P. 56(e). In the context of a patent infringement determination, "it is well settled that an expert's unsupported conclusion on the ultimate issue of infringement is insufficient to raise a genuine issue of material fact." *Arthur A. Collins, Inc. v. Northern Telecom Ltd.*, 216 F.3d 1042, 1046 (Fed. Cir. 2000), citing *Zelinski v. Brunswick Corp.*, 185 F.3d 1311, 1317 (Fed. Cir. 1999) (conclusory expert declarations devoid of facts upon which the conclusions were reached do not raise a genuine issue of material fact). Instead, "the affidavit of an expert submitted in opposition to a motion for summary judgment must ... set forth specific facts showing that there is a genuine issue for trial." *Id.* at 1047 (quotations omitted). In order to satisfy this requirement, "the expert must set forth the factual foundation for his opinion." *Id.* These standards apply equally in the context of a patent invalidity determination.

In direct contravention of these settled rules, Dr. Malcolm's declaration is replete with conclusory statements unsupported by facts. For example, he opines: "However, the Kelley patent requires that there must be enough of the *two* component binder to give the paper an adhesive property, which in my opinion is not suitable for the purpose of the '997 patent." (Exh. D at col. 5, lines 18-21 (emphasis added). Dr. Malcolm fails to explain precisely what it is about applying the Kelley binder to a paper in an amount sufficient to give it an adhesive property that makes it not suitable for the purpose of the '997 patent. Moreover, Dr. Malcolm provides no factual basis for the opinion he espouses.

This pattern of conclusory statements without factual support is repeated throughout Dr. Malcolm declaration. For example:

> In my opinion, the water climb, infusion characteristics and seam failure properties specifically recited in the claims are not inherent from mere application of a hydrophobic agent to a tea bag paper. There will be no product that meets the requirements of the claim absent the teaching of these specific properties. In fact, these properties provide a quantity measurement for a particular type of hydrophobic agent based on the balance between the infusion characteristics and the seam failure. For example, the tea bag paper would result in a substantial loss of infusion characteristics if too much hydrophobic agent is applied or would result in a higher seam failure if there were not enough hydrophobic agents on the paper.

Malcolm Decl., ¶ 27. Dr. Malcolm fails to provide *any* explanation as to how he was able to arrive at these broad, sweeping conclusions, nor does he provide a scintilla of factual evidence to support any of these statements.

Another illustrative example: "Based on my 40 years experience in the paper making industry, I believe that the teachings in the Noiset patent will not necessarily lead to the invention of the '997 patent." Malcolm Decl., ¶ 41. This assertion is far from an admissible expert opinion, and fails to satisfy the strictures of Rule 56(e).

In a similar context in *Oxford Gene Technology, Ltd.*, the Court struck portions of an expert report prepared in support of an alleged infringer's attempt to establish invalidity of the patent-in-suit based on obviousness, stating:

> First, Dr. Purdue relies on what he considers to be common knowledge in the art regarding the use of glass supports for hybridization. Dr. Purdue's opinion, however, is devoid of factual support in the record.
> \*   \*   \*
> In his report, Dr. Purdue did not provide any basis for his conclusion that it would be obvious to one of ordinary skill in the art to use an impermeable support such as glass. Assuming that [the alleged infringer's] counsel's element-by-element chart were accepted to

- 8 -

> supplement Dr. Purdue's validity analysis, Dr. Purdue's opinion of what a person of ordinary skill in the art would know or find obvious still lacks sufficient support to make it reliable under Daubert or admissible under Rule 26(a)(2)(B).

*Oxford Gene Technology, Ltd.*, at *6.

The same conclusion is warranted here. All portions of Dr. Malcolm's declaration which are "devoid of factual support in the record" should be stricken. Likewise, all opinions set forth by Dr. Malcolm relating to what a person in the ordinary skill in the art would know (or not know), or what a person of ordinary skill in the art would have found to be taught (or not taught) in the '997 Patent or the three prior art references relied upon by Defendants, which do not have sufficient support must be stricken.

### D. MANY OPINIONS EXPRESSED BY DR. MALCOLM WERE BASED SOLELY ON WHAT HE READ IN THE '997 PATENT AND/OR WHAT HE WAS TOLD BY COUNSEL.

Even where Dr. Malcolm is able to cobble together something that resembles a reference to factual support in the record for his various opinions, upon closer examination it is clear that his opinion in fact rests solely on what he read in the '997 Patent, or what he was told by counsel. Clearly neither of these bases amount to the sort of factual foundation that is required by FRCP 56(e).

For example, Dr. Malcolm asserts in his declaration that "[t]he invention in the '997 patent resolved this seam failure problem in folded and crimped seams by treatment of a complete tea bag paper with hydrophobic material to inhibit water from penetrating into the paper and into the paper fibers of the folded and crimped seams." Malcolm Decl., ¶ 18. When pressed about this statement at his deposition, Dr. Malcolm clearly revealed that he had no prior independent knowledge to support

this statement, and instead had based it in large part on what is stated in the '997 Patent and what was told to him by Plaintiff's counsel:

> Q. Sticking with your original expert report, which we've marked as Exhibit 3 here today, Dr. Malcolm, if you look at paragraph 6 on page 3, at the bottom, the first sentence, you stated that the invention '997 patent resolved this crimped seam failure problem by treatment of a complete tea bag paper with hydrophobic material to inhibit water from penetrating into the paper and into the paper fibers. My question is: Does that mean that before the invention in the '997 patent, all commercially available nonheatsealable tea bags had problems with seam failure?
>
> A. I can't answer that question. I don't know.
>
> Q. What is the result -- you say "resolved this crimped seam failure problem," what is that problem that you are referencing there?
>
> A. The problem is -- discussed in the Scott patent was the opening of the seam when hot water was poured on a bag during the brewing of the cup of tea so that tea leaves came out and into the water, into the cup.
>
> Q. Was that something that prior to the '997 patent was observed in the then existing nonheatsealable tea bags that were available commercially?
>
> A. That is my understanding.
>
> Q. Where did you obtain that understanding?
>
> A. From counsel.
>
> Q. And what specifically -- was there data you were shown to substantiate the nature and extent of any seam failure problems prior to the '997 patent?
>
> A. Other than that, what was in the '997 patent, no. It was a statement that this was a problem in the commercial product, which had to be resolved.

Malcom Depo., pp. 67:6-68:14.

Similarly, Dr. Malcolm states in his declaration that infusion paper treated with a hydrophobic material in accordance with the '997 Patent "does not clog or cover over the pores" and that "[a]s a result, seam failures are substantially reduced while infusion characteristics of the paper are substantially maintained." Malcolm Decl., ¶ 18. When asked what formed the basis for those statements, Dr. Malcolm stated:

> Q. I wanted to go back to your original expert report, and I had some sort of specific paragraph-by-paragraph type questions for you. Paragraph 6 of your original expert report at the bottom of page 3, actually top of page 4, carryover portion of that paragraph 6, you have the sentence here that states "The hydrophobic material does not clog or cover over the pores of the paper. As a result seam failures are substantially reduced while infusion characteristics of the paper are substantially maintained." Do you see that?
>
> A. Yes.
>
> Q. Am I correct in stating that that's in reference to the invention in the '997 patent?
>
> A. Yes. Yes.
>
> Q. What is the basis for your statements that the hydrophobic material in the '997 patent does not clog or cover over the pores of the paper?
>
> A. Somewhere in the Scott patent it says the infusion properties are not made worse. That would imply that the pores are open.
>
> Q. But other than what's disclosed in the Scott patent, did you do anything independently to verify that what was stated there was accurate?
>
> A. No.

Malcom Depo., pp. 179:15-180:14.

> Q. How about that last sentence of your paragraph 6 from your original expert report "As a result seam failures are substantially

> reduced while infusion characteristics of the paper are substantially maintained," what was the basis for that statement?
>
> A. The statement that the presence of -- when you add a hydrophobic binder, while still having infusion, you had less seam failures.
>
> Q. And where did you see data to that effect? In the Scott patent?
>
> A. Yeah, Table 1, which gave several examples of the addition of the hydrophobic material which reduced the seam failure.
>
> Q. Did you yourself, though, perform any tests in that regard to verify that seam failures were in fact substantially reduced while maintaining, substantially maintaining the infusion characteristics?
>
> A. No, I did not.

Malcom Depo., 181:17-182:9.

Therefore, many of the so-called expert conclusions of Dr. Malcolm are nothing more than a restatement of language from the '997 Patent or instructions by counsel. By doing so, Plaintiff improperly attempts to transform what is disclosed in the '997 Patent or the positions of Plaintiff's counsel regarding various issues into expert testimony, and thereby give it an added sense of authority or importance. "Expert testimony may not be used merely to repeat or summarize what the jury independently has the ability to understand." *S.E.C. v. Lipson*, 46 F.Supp.2d 758, 763 (N.D. Ill. 1998).

Dr. Malcolm's deposition demonstrates this very point. Dr. Malcolm's declaration (executed on December 1, 2004) relies heavily and repeatedly on the proposition "the '997 patent is directed specifically to paper for tea bags having folded and crimped seams." Malcolm Decl., ¶ 16. When asked exactly one week later at his deposition on December 8 if he would agree that the '997 Patent does not relate to or cover heatsealable tea bag papers, Dr. Malcolm's initial response was: "I really