UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| AHLSTROM WINDSOR LOCKS LLC )<br>)<br>Plaintiff, )<br>vs. )<br>)<br>SCHOELLER & HOESCH, NA, INC. and )<br>P.H. GLATFELTER COMPANY, )<br>)<br>Defendants. )<br>_____) | CIVIL ACTION NO.: 3:03-CV-0169 (AVC) |

**SUPPLEMENTAL EXPERT REPORT OF DR. EARL W. MALCOLM
CONCERNING CONSTRUCTION OF U.S. PATENT NO. 5,431,997**

I. **Education and Employment Background**

1.  I received the B.S. degree in Chemistry and Paper Technology from Western Michigan University in Kalamazoo, Michigan in 1961, and M.S. and Ph.D. degrees in Paper Chemistry from the Institute of Paper Chemistry at Lawrence University in Appleton, Wisconsin in 1961 and 1964, respectively. The Institute of Paper Chemistry is now known as the Institute of Paper Science and Technology at the Georgia Institute of Technology in Atlanta, Georgia. A complete copy of my curriculum vitae, including papers that I have authored or presented, is attached as Exhibit 1. I have been retained by the law firm of Cohen Pontani Lieberman & Pavane, 551 Fifth Avenue, New York, New York 10176, on behalf of plaintiff, Ahlstrom Windsor Locks, LLC.

2.  I was employed as a research chemist in the areas of wet-laid, non-woven materials by the Dow Chemical Company in Williamsburg, Virginia from 1963-1965. From 1966-1976 I was Research Manager - Process and Product Development for the

C.H. Dexter Division of the Dexter Corporation in Windsor Locks, Connecticut where my duties included the following areas: pulping of manila hemp; tea bag development including processes for heat seal manufacture and fibrous casing substrate; glass fiber super insulation; hospital disposables; chromatographic paper and vacuum bags. C.H Dexter Division of the Dexter Corporation was the predecessor to plaintiff Ahlstrom. From 1976-2000, I was Group Leader, Division Director, Vice President of Research, and Professor of Chemistry at the Institute of Paper Chemistry in Atlanta, Georgia. I retired from full time employment in 2000. I then continued my professional work on a part time basis as a consultant. I am an active member of the Technical Association of Pulp and Paper Industry ("TAPPI") in Atlanta, Georgia. I was named a TAPPI Fellow in 1992. This honor is only available to persons who have made contributions to paper technology over a long period of years. I have been a co-inventor on a number of U.S. patents including U.S. patent 6,436,486 entitled "Method For Distributing Chemicals Through A Fibrous Material Using Low-Headspace Dielectric Heating."

## II.   Invention of the '997 Patent

3.      I have read the '997 patent and its file history. It is directed to an improved fibrous web material for making infusion packages for brewing beverages, including papers for making tea bags. Tea bag papers generally fall into two categories: heatsealable and non-heatsealable. Among non-heatsealable papers are materials used for making tea bags having mechanically fastened seams such as folded and crimped tea bag seams. The '997 patent is directed to paper for tea bags having such folded and crimped seams.

4.      Fibers in dry paper contain hydrogen bonds. These bonds hold individual

fibers together to provide strength to the dry paper. In addition, internal hydrogen bonds provide stiffness to the individual fibers and hence to the ultimate paper. Both of these properties are important in obtaining a mechanical seam that is strong enough to maintain the physical integrity of a crimped seam tea bag. This natural hydrogen bonding is very water sensitive. If water is present in the seam, the hydrogen bonds break and paper strength and stiffness are lost. This leads to a loss of integrity of the crimped seam in a tea bag. Under such circumstances, the crimped seam may fail during brewing and the tea leaves pour out of the tea bag into the cup.

5. The invention in the '997 patent resolved this crimped seam failure problem by treatment of a complete tea bag paper with hydrophobic material to inhibit water from penetrating into the paper and into the paper fibers. The hydrophobic material imparts to the paper the property of repelling water to inhibit wetting of the paper, thereby preventing the loss of hydrogen bonds and the resultant loss of strength and stiffness. Such a hydrophobic material may also provide additional strength and stiffness to the paper relatively unaffected by the presence of water. The hydrophobic material does not clog or cover over the pores of the paper. As a result, seam failures are substantially reduced while infusion characteristics of the paper are substantially maintained.

### III. Construction of the '997 Patent Claims

6. Plaintiff's counsel, Cohen Pontani Lieberman & Pavane, has explained to me the meaning of the term person of ordinary skill in the art. As I understand their explanation, a person of ordinary skill is neither a genius nor does he have a substandard intellect. He/she is a person of ordinary or average intellect working in the field of the

invention. Based upon my study of the '997 patent and its file history, it is my opinion that the field of this invention is broadly in the field of specialty papers, especially lightweight specialty papers and most particularly lightweight specialty papers that have had treatments applied that provide specific end-use properties. The person of ordinary skill is a person of average education relating to the field of the invention, average experience and an average ability to deal with the problems that persons encounter in their work in the field of the invention. During my many years in the field I have met, discussed with, dealt with and worked with countless persons in the field including students, present and past, coworkers and members of professional societies. In my opinion the person of ordinary skill in the art to which this invention relates would have a Bachelors Degree in chemistry, chemical engineering, paper technology or similar technical areas and at least five years of industrial or laboratory experience in the field. Such a person would have sufficient skill to substitute one type of fiber for another in a paper or to recommend other routine alterations in paper or treatments as is customarily done in this industry.

7.   I rendered an initial expert report in this case on May 13, 2004. I have since had an opportunity to review the claim construction chart to which a copy of this supplemental report has been attached as Exhibit A. After reviewing the attached claim construction chart, I reaffirm the opinions and conclusions expressed in my initial report and incorporate the same by reference herein. The additional opinions and conclusions expressed by me herein are based on the information that I have gathered through my years of experience plus information provided to me in the course of preparation for my work in this case. I reserve the right to revise or supplement this opinion if additional

information becomes known to me.

8. I have read and am familiar with the specification, claims and file history of the '997 patent. It is my opinion that a person of ordinary skill in the field of this invention, i.e., broadly, in the field of specialty papers, especially lightweight specialty papers and most particularly lightweight specialty papers that have had treatments applied that provide specific end-use properties, would understand the following terms in the claims of the '997 patent to mean the following:

a. "mechanical seam" - a seam on a teabag held together by forming simple folds with two ends of the teabag and pressing and/or crimping them together. No chemical or thermoplastic bonding is involved.

b. 'impregnated throughout" (as with a hydrophobic material) – The treatment has penetrated the entire structure of the fibrous web, as opposed to only a surface exposure.

c. "hydrophobic treating system" – a mixture of components that will make the sheet material water-repellent or water- resistant in nature.

d. "cured" – The polymer has undergone a chemical reaction that forms chemical bonds between polymer chains forming a relatively insoluble three dimensional cross-linked structure. This cross-linking reaction generally requires the application of heat such as would be encountered during the drying of the teabag paper in the dryer section of a paper machine.

e. "hydrophobic agent" – a material that when applied to tea bag paper will make it water resistance or water repellent.

  f. "high molecular weight cross-linked acrylic polymers" – An acrylic acid or acrylate-based polymer with chemical bonds crossing between the polymer chains forming a three dimensional structure and an average molecular weight of over 500,000.

  g. "no appreciable water climb" – A water climb of 1/2 –inch or less in 400 seconds using the water climb test described in the '997 patent

  h. "no substantial loss of infusion characteristics" – properties of the brewed tea including appearance of first color are not significantly altered by the treatments.

  i. "failure of a mechanical seam" – The seam opens up and permits the loose tea leaves to come out into the tea cup.

  j. "insolubilizing" –Treating a material so that it will not dissolve in hot water.

  k. "prebonded" – A web that has had the natural binding between paper fibers enhanced by the addition of material that will form bonds between adjacent fibers in the web and give it additional physical integrity and strength both wet and dry.

  l. "acrylic polymers" – A common term for polymers based on acrylic acid monomers. This includes acrylates which are a family of polymers made from acrylate monomers. Acrylate monomers are esters of acrylic acid.

  m. "fluorohydrocarbons" – A polymer with a hydrocarbon backbone that has fluorine atoms attached to the backbone.

  n. "strength imparting hydrophobic binder" – A material that increases the tensile strength of the paper in addition to making it water-repellent.

  o. "cross-linked butyl acrylate copolymer" – A polymer with butyl acrylate components that has chemical bonds between polymer chains.

  p. "aqueous emulsion" – a suspension of latex polymer particles in water.

p.   "aqueous emulsion" – a suspension of latex polymer particles in water.

q.   "affinity for being readily absorbed into the fibers of the web" – The aqueous mixture easily penetrates and wets the entire fibrous structure of the web.

## IV. Compensation

8.   I am being compensated for my service as an expert in this case at the rate of $200 per hour.

## V. Prior Testimony

9.   I have not testified as an expert at trial or by deposition in any other case within the four years preceding this report.

Dated:   May 27, 2004            _____
                                 Earl W. Malcolm

7