UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

AHLSTROM WINDSOR LOCKS LLC,    )
                                      )
                  Plaintiff,   )
                                        )
        v.                          )   CIVIL ACTION NO. 3:03-CV-0169 (AVC)
                                        )
SCHOELLER & HOESCH, N.A., INC. and   )
P. H. GLATFELTER COMPANY,         )
                                        )
                Defendants.  )

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE THE DECLARATION OF EARL W. MALCOLM

**I.**        **PRELIMINARY STATEMENT**

Plaintiff, Ahlstrom Windsor Locks LLC ("Ahlstrom" or "Plaintiff"),

hereby opposes defendants', Schoeller & Hoesch, N.A., Inc. ("S&H") and P. H. Glatfelter

Company ("Glatfelter") (collectively, "Defendants"), Motion to Strike the Declaration of

Earl W. Malcolm, dated December 1, 2004, in opposition to Defendants' Motion for

Summary Judgment with respect to U. S. patent No. 5,431,997 ("the '997 Patent"). The

Malcolm summary judgment declaration is attached to the Declaration of Earl W.

Malcolm, submitted herewith.[1]

Defendants' motion to strike Dr. Malcolm's summary judgment declaration

is primarily based on his recent deposition (taken on December 8, 2004), including such

grounds as his purported lack of expertise in the subject of tea bags and tea bag paper,

and the alleged lack of factual basis for the opinions and conclusions stated in his

declaration. None of the alleged grounds stated in support of the motion to strike

---

[1]  The Malcolm summary judgment declaration is referred to herein as (the "Malcolm S/J Decl., par. ___").

withstands scrutiny, all are baseless and, accordingly, the motion should be denied.

## II.        **ARGUMENT**

### A.    **The Malcolm Declaration Defendants Move To Strike Was Not Made an Exhibit at his Deposition Nor was He Examined on It**

Defendants have no basis for moving to strike Dr. Malcolm's summary judgment declaration as a result of his deposition on December 8, 2004, as they neither introduced the declaration at his deposition as an exhibit, nor did they examine him on its contents. Moreover, Plaintiff never had an opportunity to examine Dr. Malcolm during his deposition, because it was suspended by Defendants at the conclusion of the day subject to resumption at a later date. Plaintiff's counsel never even had an opportunity to examine Dr. Malcolm at his deposition because Defendants suspended his deposition at the end of the day subject to resumption at a later unspecified date. It is extraordinary in these circumstances that Defendants should now seek to have Dr. Malcolm's declaration stricken on the basis of a select few snippets of deposition testimony taken out of context.

At the outset of the deposition, counsel for Defendants indicated that he did not intend to examine Dr. Malcolm with respect to his declaration on summary judgment (Malcolm Depo., pages 24-25)[2]:

> MR. FARRELL: Well, the other thing I was about to say before we took the last break was in regards to plaintiff's opposition brief, attached to which was a supporting declaration from Dr. Malcolm and it's *very lengthy, very technical in its nature* and addresses issues separate and apart from his expert reports that we need to talk to him about and aren't prepared to do today either because we just got that document, and it was filed with the court Friday, December 3rd.

Mr. Farrell was exactly right when he said that Dr. Malcolm's declaration was *very lengthy and very technical* in nature. That in itself indicates that the declaration

---

[2] Excerpts from the deposition of Dr. Earl W. Malcolm are attached as Exhibit A.

is based on a thorough analysis of the underlying facts on which his conclusions and opinions are based. Furthermore, if Plaintiff's counsel had had an opportunity to examine Dr. Malcolm at his deposition, he would have had an opportunity to clarify or explain some of the issues that Defendants have raised in their motion to strike. Dr. Malcolm has submitted a declaration herewith to respond to certain of the issues raised by Defendants, foremost among which is the issue of his expertise in the field of paper technology.

### B.    Dr. Malcolm Is An Established Expert In The Relevant Field Of Paper Technology

Defendants have moved to strike Dr. Malcolm's summary judgment declaration on the ground that he does not qualify as an expert in the relevant field of paper technology. Dr. Malcolm's declaration in opposition to the motion to strike[3], submitted herewith, provides a detailed description of his education and experience.

### A.    Education

2.    I received the B.S. degree (*magna cum laude*) in Chemistry and Paper Technology from Western Michigan University in Kalamazoo, Michigan in 1959, and M.S. and Ph.D. degrees in Paper Chemistry from the Institute of Paper Chemistry at Lawrence University in Appleton, Wisconsin in 1961 and 1964, respectively. The Institute of Paper Chemistry is now known as the Institute of Paper Science and Technology and is a part of the Georgia Institute of Technology ("Georgia Tech") in Atlanta, Georgia.

3.    Among the courses I took as an undergraduate are organic chemistry, physical chemistry, physics, paper technology (including manufacture of paper and converting operations in the paper industry), and mathematics through differential equations. Among the courses I took as a graduate student are graduate courses in the mechanics of deformable media, including fibrous structures, organic chemistry, biotechnology, paper physics, surface chemistry, including paper surfaces, chemical engineering and pulp manufacture.

### B.    Employment History

---

[3] Referred to as the "Malcolm Decl., par. ___".

### a.    Dow Chemical Company (1963-1965)

4.      From 1963-1965 I was employed as a research chemist in the areas of wet-laid, non-woven materials by the Dow Chemical Company in Williamsburg, Virginia. My work at Dow involved products made on a paper machine with synthetic fibers, such as cover stock, filter material, and disposable clothing. Specific activity included projects on the bonding of fibrous webs with synthetic binders, such as acrylic latices and their effect on web properties.

### b.    The Dexter Corporation (1966-1976)

5.      From 1966-1976, I was employed at the C.H. Dexter Division of the Dexter Corporation in Windsor Locks, Connecticut ("Dexter"). Dexter is the predecessor to plaintiff, Ahlstrom. During this time, I moved from a starting position of research chemist to the position of Research Manager - Process and Product Development. During my employment at Dexter, my duties included research and development in the following areas: pulping of manila hemp; tea bag development; fibrous casing substrates; glass fiber super insulation; hospital disposables; chromatographic paper and vacuum bags. This activity covered all aspects of product development from initial laboratory investigations through and including production of products on commercial paper machines.

6.      During my tenure at Dexter I was in charge of *all* research and development for *all* product lines, including heat sealable and non-heat sealable tea bag paper. I directed a staff of approximately 60 scientists and engineers, and personally worked on such major projects as development of a new heat sealable material for use in heat sealable tea bag paper, development of alternative natural fibers for use in tea bag paper, "through drying" of paper, in which both heat sealable and non-heat sealable tea bag paper is run over a porous cylinder through which hot air is blown, as well as other projects covering tea bag paper and other products. In addition, I was involved in R&D projects involving disposable hospital items (gowns, sheets, surgical drapes), all of which require some degree of water repellency.

### c.    The Institute of Paper Science and Technology (1976-2000)

7.      From 1976-2000, I was Group Leader, Division Director, Assistant Vice President of Research, and Professor of Chemistry at the Institute of Paper Chemistry, now known as the Institute of Paper Science and Technology (the "Institute") at Georgia Tech. The Institute is a world renowned institution for fundamental research in the paper industry. The Institute also undertakes specific product development under contracts with individual companies in the paper industry, involving all aspects of paper manufacturing, including paper physics, structural mechanics, chemical engineering and organic chemistry. Supporting members of the Institute include such major players in the pulp and paper industry

as Weyerhauser, Georgia Pacific, International Paper, defendant Glatfelter, and Dexter/Ahlstrom. During my tenure at the Institute, I entered as a Division Director of Chemical Sciences and retired as the Assistant Vice President with responsibility over all divisions. As Division Director, I had oversight responsibility for 15 professional scientists at the Ph.D. level in various projects in the paper field, covering pulp manufacture, chemical recovery, environmental aspects, and process simulation projects (computer and mathematical). As an Assistant Vice President, from 1997 to 2000, I had responsibility for all research divisions as well as oversight responsibility for 35 professional scientists at the Ph.D. level, whose activities encompassed all of the items listed with respect to the chemical sciences, but also mechanical engineering, physics, paper converting, and surface chemistry.

8.      As a Full Professor in the Graduate School at the Institute, I directed and advised graduate students in Ph.D. research on paper surface chemistry, structural physics of paper, properties of fibrous webs, such as wood fibers, and various Ph.D. research activities in organic chemistry and physical chemistry. I also taught courses in pulp and paper manufacture, chemical engineering, and related subjects. While at the Institute, I also taught continuing education courses to people at all skill levels in the paper industry. These people came from both the manufacturing side in the paper mills and from the R&D laboratories.

### d.      TAPPI

9.      I am an active member of the Technical Association of Pulp and Paper Industry ("TAPPI") in Atlanta, Georgia. TAPPI is the premier technical association of the paper industry in the United States and has world wide membership. I was named a TAPPI Fellow in 1992. TAPPI Fellows are nominated by peers in the paper industry to recognize continuous significant contributions to the pulp and paper industry over a long period of years. Current TAPPI Fellows include most recognized leaders in science and technology, not only from the United States, but from the world at large.

Dr. Malcolm's declaration establishes that he has extensive experience in the paper technology field. He was in charge of research and development for *all* of Dexter's product lines, including heat sealable and non-heat sealable tea bag paper, where he directed a staff of approximately 60 scientists and engineers and personally worked on major development projects on tea bag paper (Malcolm Decl., pars. 5- 6). As Division Director at the Institute of Paper Science and Technology (the "Institute"), he had

responsibility over all divisions and oversight responsibility for 15 professional scientists at the Ph.D. level in various projects in the paper field; as an Assistant Vice President, from 1997 to 2000, he had responsibility for four Division Directors as well as oversight responsibility for 35 professional scientists at the Ph.D. level, whose activities encompassed the chemical sciences, mechanical engineering, physics, paper converting, and surface chemistry. (Malcolm Decl., par. 7); as a Full Professor in the Graduate School at the Institute, Dr. Malcolm directed and advised graduate students in Ph.D. research on paper surface chemistry, structural physics of paper, properties of fibrous webs, such as wood fibers, and various Ph.D. research activities in organic chemistry and physical chemistry; he taught courses in pulp and paper manufacture, chemical engineering, and related subjects; and he also taught continuing education courses to people at all skill levels in the paper industry. (Malcolm Decl., par. 8). Dr. Malcolm is also an active member of the Technical Association of Pulp and Paper Industry ("TAPPI") in Atlanta, Georgia, the premier technical association of the paper industry in the United States, and was named a TAPPI Fellow in 1992, in recognition of his continuous significant contributions to the pulp and paper industry over a long period of years. (Malcolm Decl., par. 9).

It is inconceivable how Defendants, in good faith, could assert so totally unfounded and absurd a proposition as Dr. Malcolm's being unqualified to provide an expert opinion in the field of paper technology. Plaintiff can think of no one who would be better qualified. The manner in which Defendants have taken Dr. Malcolm's testimony out of context or misleadingly presented it to support their argument, is consistent with the manner in which they have taken snippets of the prior art out of

context to support their motion for summary judgment.

Defendants also attempt to discredit Dr. Malcolm's declaration on the spurious ground that his expertise is "different" from and "irrelevant" to tea bag paper. This despite the fact that Dr. Malcolm testified that he spent roughly 20% of his ten year tenure at Dexter working on tea bags (both heat sealable and non-heat sealable). In addition, Dr. Malcolm has stated in his declaration that while there were times when he may not have been working directly on tea bag paper, as Research Manager - Process and Product Development, he had knowledge of and overall responsibility for everything that was going on at Dexter, including the tea bag paper manufacturing operation; he was always included in all company R&D projects on tea bag paper or any other products, and had discussions with and was consulted by members of the professional and scientific staff on a variety of matters, including tea bag paper. (Malcolm Decl., par. 13).

Dr. Malcolm states in his declaration, that "[g]enerally speaking, tea bag paper is structurally similar to other kinds of paper. It is a fibrous web composed mainly of natural fibers that form natural hydrogen bonds. As is common with many papers (e.g., paper towels, printing papers, medical disposables, and tissue) various chemical agents may be added that can enhance properties such as wet or dry strength of the fibrous structure. The factors that determine the properties of porous infusion papers are not unique to tea bag paper and are the same factors that define the characteristics found in other types of paper." (Malcolm Decl., par. 12). Therefore, Dr. Malcolm's vast experience with all types of paper over a period of 40 plus years has relevance to tea bag paper as well. Dr. Malcolm is clearly an expert in the paper field, including that of tea bag paper, and Defendants' motion to strike his declaration on the ground of lack of

expertise in the field should be denied.

### C.    The Opinions and Conclusions Reached by Dr. Malcolm are Sound, Based on Fact, and Supported by the Record

Dr. Malcolm was requested by Plaintiff to provide his expert analysis and opinion in connection with Defendants' motion for summary judgment of invalidity of the '997 patent in suit on the basis of anticipation and obviousness. He studied the '997 patent and the '997 patent file history, as well as each of three prior art references relied upon by Defendants in their motion: (1) Yadlowsky European published patent application No. 0 170 461 (the "Yadlowsky application" or "Yadlowsky"); (2) Noiset U. S. patent No. 3,386,834 ("the Noiset patent" or "Noiset"); and (3) Kelley U. S. patent No. 3,616,166 ("the Kelley patent" or "Kelley"), all of which are of record herein. The opinions and conclusions reached by Dr. Malcolm in his summary judgment declaration are based on his review of this record evidence and on his over 40 years of experience in the paper field. Dr. Malcolm's opinions are also based on his personal knowledge of the field of the invention and on his experience as an associate of and teacher to persons of ordinary skill in this art. He did not make any independent investigations with respect to his declaration, nor did he conduct experimentation of any sort. Nor was such required.

The test of anticipation requires that a *single* prior art reference *discloses* each and every element of the claims. *Electro Med. Sys. S.A. v. Cooper Life Sciences,* 34 F.3d 1048, 1052 (Fed. Cir. 1994). Whether such prior art is anticipating is a question of fact. *Scripps Clinic & Research Found. v. Genentech, Inc.,* 927 F.2d 1565, 1576 (Fed. Cir. 1991). A single prior art reference may anticipate *without disclosing* a feature of the claimed invention if that missing feature is *necessarily present,* or inherent, each and every time in the single anticipating reference. *Schering Corp. v. Geneva*

8

*Pharmaceuticals*, 339 F.3d 1373, 1377 (Fed. Cir. 2003) (citing *Continental Can Co. v.*

*Monsanto Co.,* 948 F.2d 1264, 1268 (Fed.Cir.1991)). Inherent anticipation, however,

does not does not require recognition in the prior art. Nor does it require that a person of

ordinary skill in the art at the time would have recognized the inherent disclosure. *Id. See*

*also*, *Toro Company v. Deere & Co.,* 69 U.S.P.Q.2d 1584, 1589 (Fed. Cir. 2004). When a

reference is silent about an asserted inherent characteristic, an argument Defendants make

here, such gap in the reference may be filled with recourse to extrinsic evidence. Such

evidence must make clear that the missing descriptive matter is necessarily present in the

thing described in the reference. As the Federal Circuit stated in *Schering, supra,* at 1377-

78:

> A court may resolve factual questions about the subject matter in the prior
> art by examining the reference through the eyes of a person of ordinary
> skill in the art, among other sources of evidence about the meaning of the
> prior art. Thus, in *Continental Can*, this court did not require past
> recognition of the inherent feature, but only *allowed recourse to opinions*
> *of skilled artisans* to determine the scope of the prior art reference.
> (emphasis added))

Dr. Malcolm's declaration on summary judgment provided just such an

analysis of the prior art with respect to inherency as that suggested by the Federal Circuit.

Dr. Malcolm's declaration did not provide an analysis based on past recognition, *but of*

*the disclosures in the references at the present time.*  A determination of obviousness, on

the other hand, requires that the court must ascertain what would have been objectively

obvious to one of ordinary skill in the art *at the time of the invention. Ryko*

*Manufacturing Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991).  When making a

determination of obviousness, it is not proper to look to the knowledge of one skilled in

the art apart from and unconnected to the disclosure of the patent. *Medical*

9

*Instrumentation and Diagnostics Corporation v. Elekta AB*, 344 F.3d 1205, 1212 (Fed. Cir. 2003). Dr. Malcolm has made such determinations based on the disclosure of the '997 Patent and the relevant prior art. There is nothing in this record to refute Dr. Malcolm's opinions other than attorneys' arguments, which are not evidence.

Dr. Malcolm's investigation and subsequent conclusions and opinions as expressed in his summary judgment declaration on the issues relating to summary judgment, are based in fact, carefully considered, and sound, and follow the law on the issues of anticipation and obviousness. The first thing Dr. Malcolm did, as required by law, was to determine the field of the invention and the skill level of *persons of ordinary skill in the art*.

### 1.    The field of the invention

After studying the '997 patent and its file history, Dr. Malcolm defined the field of the invention of the '997 patent as follows:

> [t]he field of this invention is broadly in the field of specialty papers, especially lightweight specialty papers and most particularly lightweight specialty papers that have had treatments applied that provide specific end-use properties, namely, the end-use properties of a tea bag paper in a tea bag formed by a folded and crimped seam.
> (Malcolm S/J Decl., par. 7)

Defendants disagree with Dr. Malcolm's definition of the field of the invention, asserting that it is "overbroad and completely incorrect," but present no evidence to refute it, or even present an alternative definition of the field. That is insufficient to support a motion to strike Dr. Malcolm's declaration. Dr. Malcolm states in response to this assertion (Malcolm Decl., par. 14) that

> it is important to note that my definition includes the end-use properties of the paper, which narrows it sufficiently to encompass

10

non-heat sealable tea bag paper that is to be folded and crimped to make a tea bag. Defendants assert that cover stock for Formica or sausage casing substrates would fall under my definition. That is not correct. While these materials are light weight, they do not have the same end-use properties as the paper I have described and, therefore, do not fall under my definition.

### 2.    The person of ordinary skill

Having defined the field of the invention, Dr. Malcolm made a determination of the skill level of a person of ordinary skill in the art based on his personal experience with people actually working in the field. As stated in his declaration (Malcolm S/J Decl., par. 7), Dr. Malcolm, as a scientist and professor, has taught and managed research in the field of paper technology for many years. He also has experience with people in the field from his membership in TAPPI. While at the Institute, he also taught continuing education courses to people at all skill levels in the paper industry. These people came from both the manufacturing side in the paper mills and from the R&D laboratories. This gave him a unique opportunity to evaluate persons at all levels of education and experience from raw beginners to Ph.D. scientists. Dr. Malcolm has concluded that a person of ordinary skill in the art to which the invention pertains would be someone with a Bachelor's Degree in chemistry, chemical engineering, paper technology or similar technical areas and at least five years of industrial or laboratory experience in this field. (Malcolm Decl., Par. 7).

Again, Defendants disagree with Dr. Malcolm's definition of a person of ordinary skill in the art, but present no evidence to the contrary.

### 3.    Dr. Malcolm's analysis is based on fact

Dr. Malcolm has made a thorough analysis of the prior art. His conclusions are based on fact, are well founded, and meet the test for admissibility in this

11

circuit. *See, Stanford Square, L.L.C. v. Nomura Asset Capital Corporation*, 228

F.Supp.2d 293, 299 (S.D.N.Y. 2002), which held that "[a]n expert's affidavit may raise a

material question of fact so long as the expert, in his affidavit, sets forth more than mere

conclusory opinions." (citing *Iacobelli Constr., Inc. v. County of Monroe*, 32 F.3d 19, 25-

26 (2d Cir. 1994). The *Stanford Square* court held, at 303, that in the *Iacobelli* case,

> [t]he Second Circuit held that an affidavit satisfies <u>Fed.R.Civ.P. 56</u> if it
> states the facts upon which the expert's opinion is based. The Second
> Circuit Court found that, in the case before it, the experts identified the
> documents and facts on which they based their conclusions and described
> industry practices and approaches. Hence, while their opinions "may not
> have been as in-depth as the district court would have liked", they were
> not bare allegations. *Id.* The Court then reversed the district court's award
> of summary judgment on that issue because the expert affidavits raised
> factual issues. *See id.,* at 26.

> *See also, B. F. Goodrich v. Betkowski*, 99 F.3d 505, 5525-26 (2nd Cir.

1996), in which the Court reversed a decision of the district court, which had held that the

expert's affidavit lacked probative merit because it did not rely on direct evidence. More

specifically, the district court found that the expert's references to facts, without

specification, in various documents relied on, were insufficient to make his opinions

relevant. The Second Circuit found that the district court assessed the weight of

conflicting proof, in effect substituting its judgment for that of the jury. The Court noted

that:

> [t]here there was only one expert opinion before the court, and *the court
> was obliged not to ignore it. . . .* [a]n expert's testimony, in order to be
> admissible under Rule 705 [Fed.R.Evid.], *need not detail all the facts and
> data underlying his opinion in order to present that opinion. . .*
> "[m]oreover, if the appellees honestly believe this scientific evidence is
> weak, they should cross-examine him at trial and present contrary
> evidence to refute his findings and conclusions. . . . This is the traditional
> and appropriate means of attacking admissible evidence with which one
> disagrees.

Dr. Malcolm's opinion is the *only* expert opinion before the Court on the

present motion for summary judgment. Attorney's arguments will not suffice to rebut it.

As the Second Circuit stated in *Iacobelli, supra*, at 25-26:

> "[a]n affidavit stating the facts upon which the expert's opinion is based
> satisfies rule 56(e) even if the data supporting the facts is not attached. . . .
> their [the experts] affidavits consisted of more than bare allegations that
> the encountered conditions differed materially from the contract
> indications. (citations omitted) The affidavits described industry practices
> and customs, defined terms of art used in the industry, explained the
> approach by which reasonably prudent contractors would interpret the
> contract documents, and enumerated the conclusions such reasonably
> prudent contractors would reach.
>
>                                 \* \* \*
>
> Not only do the [experts'] affidavits appear to rely on relevant data and
> employ conventional methods of analysis, they also raise factual issues
> that, if true, tend to support Iacobelli's claim.
>
>                                 \* \* \*
>
> Because Iacobelli has submitted affidavits that "generate[ ] uncertainty as
> to the true state of a[ ] material fact, the procedural weapon of summary
> judgment is inappropriate." *Quinn v. Syracuse Model Neighborhood
> Corp.,* 613 F.2d 438, 445 (2d Cir. 1980).

Dr. Malcolm's summary judgment declaration, a copy of which is attached

as exhibit A to his current declaration, meets all of the requirements for an expert

affidavit set forth in the above-cited cases. In his summary judgment declaration

(Malcolm S/J Decl., pars. 10-50), attached as Exhibit A to his declaration, submitted

herewith, Dr. Malcolm discusses the prior art in detail and provides the reasons for his

conclusions and opinions that they do not disclose or make obvious to a person of

ordinary skill in the art the invention of the '997 patent. These opinions and conclusions

are well referenced to the prior art, the reasoning for them is set forth in detail, and they

are based on what a person of ordinary skill in the art would understand from a reading of

the references at the time of the '997 invention.

13

Dr. Malcolm has summarized his opinions with respect to the Kelley

patent in his declaration as follows (Malcolm Decl., pars. 24-25):

> 24.    It is clear from the these descriptions that the object of the
> Kelley patent "is to provide an *adhesive* binder system 'which is adapted to
> be heat sealed'" (Malcolm S/J Decl., par. 29); that "as a result of the two
> component polyblend binder system, the treated web becomes heat
> sealable and possesses the properties associated with heat sealable
> materials" (Malcolm S/J Decl., par. 30); that "the Kelley patent teaches a
> two binder system containing a low and high molecular weight polymers
> to improve an *adhesive* bond" (Malcolm S/J Decl., par. 31); that "there is
> no teaching or suggestion in the Kelley patent that the treatment of the
> paper with the two polymer polyblend binder results in a paper having
> water repellency" (Malcolm S/J Decl., par. 32); and that "the Kelley patent
> requires that there must be enough of the two component binder to give
> the paper an *adhesive* property" (Malcolm S/J Decl., par. 33).

> 25.    A person of ordinary skill in this field would understand
> that the adhesive properties referred to in Kelley would not be suited for
> use in tea bags because the tacky nature of the paper, due to the adhesive,
> which may be applied in an amount from 20 to 100% by weight based on
> the weight of the dried fibers (Kelley patent, col. 5, lines 18-21),  would
> make it difficult to process the paper in the manufacture of tea bags. The
> Kelley patent specifically states that "[b]ecause of the pressure-sensitive
> nature of the adhesive, various surfaces and materials to be bonded with
> the polyblend adhesives can be lightly sealed, tacked, or adhered without
> resorting to heated platens by *simply pressing the adhesive-covered
> surfaces together*." (emphasis added). When referring to the use of this
> material in tea bags, Kelley describes their manufacture by placing the
> webs, one above the other, and then heat sealing around the periphery of
> the superimposed webs (Kelley patent, col. 5, lines 64-69). This is not the
> type of tea bag manufacturing process (i.e., folding and crimping)
> disclosed in the '997 patent.

Dr. Malcolm also discussed in great detail in his declaration (Malcolm

Decl., par. 27) the basis for his opinions with respect to the Noiset patent. The following

discussion appears in Dr. Malcolm's summary judgment declaration (Malcolm S/J Decl.,

pars. 35-42):

### B.    The Noiset Patent

> 35.    The Noiset patent is directed to the problem of seam failure

14

in *heat sealed* tea bags. This seam failure problem results from the pressure buildup or the formation of gases inside the bag when the bag is exposed to boiling water. A film of water covers the pores in the tea bag paper and prevents the entrapped gases within the bag from escaping. (Exh. C. at Col. 1, lines 34-35).

36.    Thus, the object of the invention in the Noiset patent is to provide a means by which the entrapped gases within the heat sealed tea bag can escape without a reduction in the infusion rate of the tea bag. This is accomplished by applying silicone to discrete areas of the bag paper so that the silicone coated area will not form a water film which traps the gases and will remain open to provide a pathway for escape of entrapped gases. At the same time, the non-silicone coated area will allow water to pass through the paper so that the infusion rate will not be adversely affected. The total surface area of the tea bag paper covered by the silicone is no greater than 40%. Silicone is the only substance disclosed in the Noiset patent for this purpose. The Noiset patent explicitly teaches that 100% coverage of silicone is undesirable as such coverage causes loss of infusion characteristics. (Exh. C. at col. 4, lines 71 to col. 5, line 4). The Noiset patent says nothing about the seam failure problem associated with folded and crimped seams.

37.    In contrast, the invention disclosed and claimed in the '997 patent is directed specifically to the seam failure problem in boiling water of tea bags having folded and crimped seams. The problem arises during the brewing step when the wetting of the crimped seam due to water absorption at the seam area occurs. This wetting weakens the strength of the seam. All claims of the '997 patent require that any applicable hydrophobic agent for inhibiting water absorption thereby preventing seam failure must be applied to the entire tea bag paper, i.e., 100% of the paper area. Thus, the Noiset patent teaches away from the invention of the '997 patent by directing the application of the silicone to only a partial surface area of the web since 100% coverage reduces infusion rate.

38.    The sole reference to the application of silicone to the entire web in the Noiset patent is found in Table 1, where Noiset, having determined that only a partial surface area of the tea bag paper should be treated with silicone, describes a porosity test to ascertain an appropriate amount of silicone to be applied to the *treated* surface area. This test is performed because excessive application of silicone can result in significant reduction in porosity and limit the ability of the treated areas to act as a gas vent. A person of ordinary skill would not consider this porosity test as a teaching of treating the entire surface area of a tea bag paper with silicone for making tea bags, as it is inconsistent with the entire teaching of the Noiset patent which requires the web material to be treated at only a partial and discrete area. It should also be noted that the paper

used to run this test is in the context of a heat-seal variety. (Exh. C. at  col. 4, lines 7-12 and col. 5, lines 10-44). The results of this test are therefore are not necessarily applicable to a non-heat sealable tea bag paper. There is *no* teaching or suggestion whatsoever of treating the entire web of a non-heat sealable tea bag paper, particularly, no teaching or suggestion of treating the entire web of a folded and crimped sealable tea bag paper.

39.    In addition, it should be noted that the percentages of silicone given relate to concentration of silicone in the emulsion that is applied to the web and not the amount of silicone in the tea bag material itself.  There is no explicit disclosure of the pick-up of silicone based on the final paper weight and thus there is no explicit disclosure of a tea bag paper in which the entire surface area has been treated in an amount of 1% or more in the paper.  Not enough information is given to determine the actual percent pick-up in the examples of Table 1.

40.    Nowhere in the Noiset patent did the patentee mention no appreciable water climb or no substantial loss of infusion characteristics while providing less than 10 percent seam failure in boiling water.  In the '997 patent, these characteristics are associated only with a non-heat sealable tea bag paper suited for making tea bags having folded and crimped seams, as set forth in the claims of the '997 patent.

41.    Nevertheless, Defendants argue that those properties associated with the non-heat sealable tea bag paper of the '997  patent would be inherent from the teaching of Table 1 of the Noiset patent. Defendants provided neither factual support nor an explanation for their assertion. Based on my 40 plus years experience in the paper making industry, I believe that the teachings in the Noiset patent will not necessarily lead to the invention of the '997 patent.

42.    The attempt by Defendants to correlate porosity changes in the air vents (silicone coated pores) shown in Table 1 with the change of infusion characteristics in the '997 patent is unrealistic, because they are two different physical characteristics and there is no direct relationship between the two. Air porosity deals with air movement through an opening while infusion deals with the movement of dissolved materials in water through water saturated pores. The fact that the Noiset patent rejects the idea of covering the entire web with silicone, regardless of at what concentration silicone will applied, also suggests that this porosity test has nothing to do with infusion characteristics. It is relevant only to the gas release addressed in the Noiset patent.

The foregoing discussion in Dr. Malcolm's declaration amply complies

with the requirements of an expert affidavit, as set forth in the *Stanford Square;*

*Iacobelli Construction;* and *B. F. Goodrich* cases *supra.* Dr. Malcolm also discusses

in his declaration those portions of his deposition testimony, on which Defendants

rely in moving to strike his declaration (Malcolm Decl., pars. 15, 16, 17, 18 and 21)

and explains why they do not support Defendants' motion to strike.

Dr. Malcolm also discusses Defendants' statement they are "troubled" by

the assertion in [his] declaration (Malcolm S/J Decl., par. 52) that the Noiset patent

contains no teaching or suggestion of "a fibrous web suited for making infusion

packages for brewing beverages and *exhibiting improved resistance to the failure of a*

*mechanical seam therein.*" (Def. Mem., at 14, emphasis added). Defendants assert

that "it cannot be disputed that at a minimum Yadlowsky does expressly teach 'a

fibrous web suited for making infusion packages for brewing beverages.'" Dr.

Malcolm maintains that the analysis summarized in his charts (Malcolm S/J Decl.,

pars. 52, 53) is correct. Dr. Malcolm responds to Defendants' assertion in his

declaration (Malcolm Decl., par. 22) as follows:

> 22.     Defendants state that they are "troubled" by the
> assertion in my declaration (Malcolm S/J Decl., par. 52) that the Noiset
> patent contains no teaching or suggestion of "a fibrous web suited for
> making infusion packages for brewing beverages and *exhibiting improved*
> *resistance to the failure of a mechanical seam therein.*" (Def. Mem., at 14,
> emphasis added). The Noiset patent describes a method of applying
> *discrete water repellent spots* of silicone to a tea bag paper, which produce
> areas or zones that act as release vents for gases *entrapped in the tea bag.*
> This *reduces the pressure inside the tea bag* and prevents delamination of
> the seals [fn]. While, the Noiset patent also suggests (no examples are
> given) the use of *discrete spots* of silicone to allow for the escape of
> entrapped gases in non-heat sealable tea bag paper, and, thus, reduces the
> internal force on the mechanical seams, the method of the Noiset patent
> does not indicate any improvement in the strength of the seam itself. On
> the other hand, the '997 patent is concerned with strengthening the
> mechanical seam itself so that it does not fail under the pressures that
> develop inside the tea bag in boiling water. Thus, the Noiset patent
> presents an entirely different  method of dealing with the problem of seam

failure (reducing internal pressure) than that given in the '997 patent (increasing seam strength). In addition, the Noiset patent specifies that coating an area as small as about 0.1% of the total surface area of each tea bag "will function effectively" in the release of gas (Noiset patent, col. 4, lines 46-49). This degree of coverage would be entirely ineffective in the method of the '997 patent, which requires 100% coverage. Therefore, I believe that the statement in my declaration is correct.

_____

[fn] The reference in Noiset to "delamination of the seals" (Noiset patent, col. 1, lines 64-65), refers to the delamination of *heat seals,* not a mechanically fastened seal.) (Noiset patent, col. 5, lines 9-12).

The point of Dr. Malcolm's statement is that the claim cannot be separated as Defendants would like it to be. The tea bag paper of the '997 patent claim is a "fibrous web suited for making infusion packages for brewing beverages and *exhibiting improved resistance to the failure of a mechanical seam therein.*" None of the prior art references discloses a fibrous web *exhibiting improved resistance to the failure of a mechanical seam therein.* Thus, in Dr. Malcolm's opinion, he was correct in stating so in the charts in his declaration (Malcolm S/J Decl., pars. 42, 53).

## III.    CONCLUSION

For all of the reasons given above, Defendants' motion to strike the declaration of Earl W. Malcolm on the issue of summary judgment should be denied in all respects.

Respectfully submitted,

January 12, 2005                    Cohen, Pontani, Lieberman & Pavane

By _Sidney R. Bresnick_

Sidney R. Bresnick, Esq. (ct 16295)
Yunling Ren, Esq.
551 Fifth Avenue
New York, NY 10176

Tel. 212-687-2770
Fax 212-972-5487
          -and-
McCarter & English, LLP
Basam E. Nabulsi, Esq. (ct 20897)
Four Stamford Plaza
107 Elm Street, 9th Floor
Stamford, CT 06902
Tel. 203-965-0601
Fax 203-323-6513

Attorneys for Plaintiff,
Ahlstrom Windsor Locks LLC

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing Opposition To Defendants'
Motion to Strike the Declaration of Earl W. Malcolm has been sent by
**Federal Express**, this 12th day of January, 2005 to:

> Dina S. Fisher, Esq.
> Robinson & Cole LLP
> 280 Trumbull Street
> Hartford, CT 06103-3597
>      and
> Marc J. Farrell, Esq.
> Buchanan Ingersoll PC
> One South Market Square, 3rd Floor
> Harrisburg, PA 17101-2121
> Tel. 717-237-4820

Sidney R. Bresnick