UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| AHLSTROM WINDSOR LOCKS LLC, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>SCHOELLER & HOESCH, N.A., INC. and )<br>P. H. GLATFELTER COMPANY, )<br>)<br>Defendants. ) | CIVIL ACTION NO. 3:03-CV-0169 (AVC) |

**DECLARATION OF EARL W. MALCOLM**

I, Earl W. Malcolm, declare as follows:

**I.**   **Professional Background and Qualifications**

1.   I reside at 54 Coburn Drive West, Bluffton, South Carolina 29909. I have been retained by the law firm of Cohen Pontani Lieberman & Pavane, 551 Fifth Avenue, New York, New York 10176, on behalf of plaintiff, Ahlstrom Windsor Locks, LLC ("Ahlstrom") in connection with this litigation. I make this declaration in support of Ahlstrom's opposition to Defendants' motion to strike my declaration, dated December 1, 2004, in opposition to the Defendants' motion for summary judgment (the "Malcolm S/J Decl."), a copy of which is attached as Exhibit A.

**A.**   **Education**

2.   I received the B.S. degree (*magna cum laude*) in Chemistry and Paper Technology from Western Michigan University in Kalamazoo, Michigan in 1959, and M.S. and Ph.D. degrees in Paper Chemistry from the Institute of Paper Chemistry at Lawrence University in Appleton, Wisconsin in 1961 and 1964,

respectively. The Institute of Paper Chemistry is now known as the Institute of Paper Science and Technology and is a part of the Georgia Institute of Technology ("Georgia Tech") in Atlanta, Georgia.

   3. Among the courses I took as an undergraduate are organic chemistry, physical chemistry, physics, paper technology (including manufacture of paper and converting operations in the paper industry), and mathematics through differential equations. Among the courses I took as a graduate student are graduate courses in the mechanics of deformable media, including fibrous structures, organic chemistry, biotechnology, paper physics, surface chemistry, including paper surfaces, chemical engineering and pulp manufacture.

  **B.** **Employment History**

   a. **Dow Chemical Company (1963-1965)**

   4. From 1963-1965 I was employed as a research chemist in the areas of wet-laid, non-woven materials by the Dow Chemical Company in Williamsburg, Virginia. My work at Dow involved products made on a paper machine with synthetic fibers, such as cover stock, filter material, and disposable clothing. Specific activity included projects on the bonding of fibrous webs with synthetic binders, such as acrylic latices and their effect on web properties.

   b. **The Dexter Corporation (1966-1976)**

   5. From 1966-1976, I was employed at the C.H. Dexter Division of the Dexter Corporation in Windsor Locks, Connecticut ("Dexter"). Dexter is the predecessor to plaintiff, Ahlstrom. During this time, I moved from a starting position of research chemist to the position of Research Manager - Process and Product

Development. During my employment at Dexter, my duties included research and development in the following areas: pulping of manila hemp; tea bag development; fibrous casing substrates; glass fiber super insulation; hospital disposables; chromatographic paper and vacuum bags. This activity covered all aspects of product development from initial laboratory investigations through and including production of products on commercial paper machines.

6. During my tenure at Dexter I was in charge of *all* research and development for *all* product lines, including heat sealable and non-heat sealable tea bag paper. I directed a staff of approximately 60 scientists and engineers, and personally worked on such major projects as development of a new heat sealable material for use in heat sealable tea bag paper, development of alternative natural fibers for use in tea bag paper, "through drying" of paper, in which both heat sealable and non-heat sealable tea bag paper is run over a porous cylinder through which hot air is blown, as well as other projects covering tea bag paper and other products. In addition, I was involved in R&D projects involving disposable hospital items (gowns, sheets, surgical drapes), all of which require some degree of water repellency.

    c.    **The Institute of Paper Science and Technology (1976-2000)**

7. From 1976-2000, I was Group Leader, Division Director, Assistant Vice President of Research, and Professor of Chemistry at the Institute of Paper Chemistry, now known as the Institute of Paper Science and Technology (the "Institute") at Georgia Tech. The Institute is a world renowned institution for fundamental research in the paper industry. The Institute also undertakes specific product development under contracts with individual companies in the paper industry,

involving all aspects of paper manufacturing, including paper physics, structural mechanics, chemical engineering and organic chemistry. Supporting members of the Institute include such major players in the pulp and paper industry as Weyerhauser, Georgia Pacific, International Paper, defendant Glatfelter, and Dexter/Ahlstrom. During my tenure at the Institute, I entered as a Division Director of Chemical Sciences and retired as the Assistant Vice President with responsibility over all divisions. As Division Director, I had oversight responsibility for 15 professional scientists at the Ph.D. level in various projects in the paper field, covering pulp manufacture, chemical recovery, environmental aspects, and process simulation projects (computer and mathematical). As an Assistant Vice President, from 1997 to 2000, I had responsibility for all research divisions as well as oversight responsibility for 35 professional scientists at the Ph.D. level, whose activities encompassed all of the items listed with respect to the chemical sciences, but also mechanical engineering, physics, paper converting, and surface chemistry.

     8.    As a Full Professor in the Graduate School at the Institute, I directed and advised graduate students in Ph.D. research on paper surface chemistry, structural physics of paper, properties of fibrous webs, such as wood fibers, and various Ph.D. research activities in organic chemistry and physical chemistry. I also taught courses in pulp and paper manufacture, chemical engineering, and related subjects. While at the Institute, I also taught continuing education courses to people at all skill levels in the paper industry. These people came from both the manufacturing side in the paper mills and from the R&D laboratories.

### d. TAPPI

9. I am an active member of the Technical Association of Pulp and Paper Industry ("TAPPI") in Atlanta, Georgia. TAPPI is the premier technical association of the paper industry in the United States and has world wide membership. I was named a TAPPI Fellow in 1992. TAPPI Fellows are nominated by peers in the paper industry to recognize continuous significant contributions to the pulp and paper industry over a long period of years. Current TAPPI Fellows include most recognized leaders in science and technology, not only from the United States, but from the world at large.

### II. My Declaration of December 1, 2004

10. I have reread my summary judgment declaration, dated December 1, 2004. I have also read a transcript of my deposition taken by Defendants on December 8, 2004. I stand by my declaration and continue to believe that the opinions stated therein are true and correct. I do not wish to change or correct it in any way.

### III. Defendants' Motion To Strike My Declaration of December 1, 2004

11. Plaintiff's counsel has provided me with a copy of Defendants' motion to strike my declaration of December 1, 2004. I have read those portions of the motion that relate to my deposition testimony and/or my alleged lack of expertise on the subject of tea bag paper. I would like to respond to each of those instances in the motion in which the subject of my alleged lack of expertise or credibility is raised.

12. Defendants' assertion that my expertise is "different" from and

"irrelevant" to tea bag paper (Def. Mem., at 2)[1] is untrue and, I suspect, is based on a lack of depth of knowledge about paper, how it is made, how it is treated, and why. I have studied and worked in the field of paper and paper manufacturing for over 40 years. This work and study included many types of paper, including tea bag or infusion papers. Generally speaking, tea bag paper is structurally similar to other kinds of paper. It is a fibrous web composed mainly of natural fibers that form natural hydrogen bonds. As is common with many papers (e.g., paper towels, printing papers, medical disposables, and tissue) various chemical agents may be added that can enhance properties such as wet or dry strength of the fibrous structure. The factors that determine the properties of porous infusion papers are not unique to tea bag paper and are the same factors that define the characteristics found in other types of paper. Therefore, my experience with all types of paper has relevance to tea bag paper as well.

        13. As stated above, I worked at Dexter for 10 years, from 1966 to 1976. Defendants' counsel asked me to give a "real rough" estimate of the percentage of my time at Dexter that was devoted specifically to tea bag paper. I answered that about 20% of my 10 year tenure at Dexter was devoted to tea bag paper, divided about equally between heat sealable and non-heat sealable paper. That would mean that I had devoted at least 2 full years at Dexter specifically to tea bag paper, whether or not it was of the heat sealable or non-heat sealable type. But the fact is that while there were times when I may not have been working directly on infusion paper (tea bag paper) during my 10 year tenure at Dexter, especially during the time (1972-1976) I was Research Manager - Process and Product Development, I had knowledge

---

[1] Reference to Defendants' Motion to Strike Declaration of Earl W. Malcolm.

of and overall responsibility for everything that was going on at Dexter R&D, including R&D related to tea bag. I was always included in all company R&D projects on tea bag paper or any other products, and had discussions with and was consulted by members of the professional and scientific staff on a variety of matters, including tea bag paper, throughout my entire time at Dexter.

14. While Defendants may assert that my definition of the field of the invention of U. S. patent No. 5,431,997 (the " '997 patent") is "overbroad and completely incorrect," (Def. Mem., at 2), it happens to be absolutely correct. The field of the invention (Malcolm S/J Decl., par.7) is as follows:

> [T]he field of this invention is broadly in the field of specialty papers, especially lightweight specialty papers and most particularly lightweight specialty papers that have had treatments applied that provide specific end-use properties, namely, the end-use properties of a tea bag paper in a tea bag formed by a folded and crimped seam.

It is important to note that my definition includes the end-use properties of the paper, which narrows it sufficiently to encompass non-heat sealable tea bag paper that is to be folded and crimped to make a tea bag. Defendants assert that cover stock for Formica or sausage casing substrates would fall under my definition That is not correct. While these materials are light weight, they do not have the same end-use properties as the paper I have described and, therefore, do not fall under my definition.

15. Defendants point to my testimony regarding a discussion I had had with Peter Scott, one of the co-inventors of the '997 patent, in which I said that I called him to discuss the properties of tea bag paper (Def. Mem., at 4). I had said that I wanted to get clear in my mind what the differences were between heat sealable and

7

non-heat sealable paper. I testified that I had learned from that conversation that they "were not interchangeable." Based on that testimony, Defendants assert that I did not know or appreciate the difference between heat sealable and non-heat sealable tea bag paper at that time. Defendants, however, failed to quote from my later testimony on the same subject in which I testified that in my discussion with Mr. Scott I was concerned about such things as basis weight properties, filtration properties, and composition. I agreed in my testimony that I hadn't kept up on the commercial side of things, but also testified that I had kept up with such things as the effect of fiber structure on web properties, the effect of how you would change fiber porosity, web porosity changes, and general aspects of paper technology, of which tea bag paper is one (Malcolm Depo., at 51-53)[2]. I also testified later (Malcolm Depo., at 63) in response to Mr. Farrell's questions as follows:

> Q. Does that refresh your recollection at all as to whether or not the '997 patent covers heatsealable or nonheatsealable or both?
> A. I misunderstood your question then. The '997 patent does not speak of heatseal.
> Q. So then you'd agree it does not cover heatsealable tea bag papers?
> * * *
> A. The '997 patent doesn't describe heatseal papers.

To suggest, as Defendants have done, that I did not understand the difference between heat sealable and non-heat sealable tea bag papers, is misleading and ignores my own testimony on the subject.

16. In addition, if asked, I would testify that at the time I made the call to Peter Scott I knew very well what the differences in the properties of heat sealable and non-heat sealable tea bag paper were. The reason for my inquiry of Peter Scott

---

[2] Reference to portions of the Malcolm deposition, taken on December 8, 2004, copies of which are attached as Exhibit B.

8

was to see if the current requirements of the tea bag manufacturing equipment had changed in a manner that would allow the interchangeability of heat sealable and non-heat sealable tea bag paper in the tea bag manufacturing process. I wished to assure myself that current product requirements i.e., properties such as basis weight, porosity and strength, had not changed sufficiently to now permit the interchangeability of heat sealable and non-heat sealable tea bag paper in that equipment. Indeed, they have not changed and heat sealable and non-heat sealable tea bag papers are still not interchangeable in the manufacturing process. However, I wish to be very clear that at no time was I in doubt as to the differences in the physical, chemical and structural properties of each, as Defendants suggest in their memorandum.

17.     Defendants have also used my testimony that I had never heard of "the water climb" test (referring to the test in the '997 patent) prior to being engaged as an expert in this case, as proof of my lack of expertise (Def. Mem., at 8). It is true that I was not familiar with the specific water climb test described in the '997 patent before reading that patent. But to use that testimony as an example of my lack of expertise is highly misleading. I also testified on that same subject that there was no industry standard for this type of test. It is not a standard TAPPI or ASTM test. I testified that similar tests are conducted by a wide variety of people, "all to their own little set of specifications." I also testified that while it was not an industry standard, "the concept of sticking a piece of paper in water and seeing the water absorb is used in many end uses." (Malcolm Depo., at 168-169). Therefore, to conclude from my testimony that I had never heard of any type of water climb or absorption test before being engaged in this case is totally incorrect.

9

18. Defendants also point to my testimony that a manufacturer could identify its own paper by a visual inspection as being contradicted by the testimony of Helen Viazmensky, and, thus, proof of my lack of expertise in this subject (Def. Mem., at 5-6). I stated that a manufacturer can identify its paper because they see it every day. I continue to believe that a manufacturer can still make a reasonable determination that a particular paper is theirs, but not that of others. I believe this is true because they would likely be very familiar with the specific floculation patterns, surface texture and general appearance of a paper of their own manufacture. During the time I was employed at Dexter, it was readily apparent to me which samples of tea bag paper were manufactured by Dexter when compared to the competitor's products. This is especially true in the tea bag paper field where there are only a very limited number of manufacturers of this product.

19. The Defendants also argue that my definition of a person of ordinary skill in the art has been cast so self servingly broad as to encompass my own qualifications as an expert (Def. Mem., at 2). That is completely untrue. In the first place, I am not a person of ordinary skill in the art. I am an expert in this field. My definition of a person of ordinary skill is based on my experience working for over 40 years with people in paper mills and laboratories directed to studies on paper. My work as a professor in continuing education courses and my TAPPI activities have enabled me to have contact with the very people whose skill in this art is at issue. I determined, based on my experience in the field, that a person of ordinary skill in this art would be someone with a Bachelor's Degree in chemistry, chemical engineering, paper technology or similar technical areas and at least five years of industrial or

laboratory experience in this field (Malcolm S/J Decl., par. 7). I continue to believe that my definition of a "person of ordinary skill" in this art is correct and has remained substantially the same over the years and I do not wish to change it. It should be noted that my definition of a person of ordinary skill does not include me as I have much higher academic degrees and many times the years of experience required of a person of ordinary skill.

20.     Defendants also argue in their memorandum that many of the opinions I rendered in my declaration were based on what I read in the '997 patent or was told by counsel (Def. Mem., at 9). It is correct that I conducted no independent investigations or experimental research with respect to any of the issues discussed in my declaration. I have no reason to believe that information provided by counsel and information in the '997 patent that I relied on is incorrect. I was instructed by counsel for Ahlstrom to study the '997 patent and the other prior art references that I discussed in my declaration to determine what a person of ordinary skill in the art would understand from reading them at the time of the invention of the '997 patent. I was instructed to present as complete a discussion of the technology disclosed in the references as possible and to compare them with the '997 patent. Having reread my declaration, and the references discussed therein, I am satisfied that I presented as complete a picture as necessary for an understanding of the references and their applicability, if any, to the '997 patent.

21.     Defendants refer to my testimony about whether the '997 patent relates to or covers heat sealable tea bag papers (Def. Mem., at 12-13). My response to the question was that I did not know because it was a legal question. I later

testified, in response to a question on the same subject, that I had misunderstood the earlier question and that the '997 patent did not describe heat sealable papers (Malcolm Depo., at 62-63). My confusion regarding this question arose from my misunderstanding of the question. My understanding was that the question asked, whether the '997 patent "covered" heat sealable tea bag papers, was in the sense that they would be legally "covered" by the claims of the patent. I was never in any doubt as to the fact that the '997 patent describes non-heat sealable tea bag paper.

22.     Defendants state that they are "troubled" by the assertion in my declaration (Malcolm S/J Decl., par. 52) that the Noiset patent contains no teaching or suggestion of "a fibrous web suited for making infusion packages for brewing beverages and *exhibiting improved resistance to the failure of a mechanical seam therein*." (Def. Mem., at 14, emphasis added). The Noiset patent decribes a method of applying *discrete water repellent spots* of silicone to a tea bag paper, which produce areas or zones that act as release vents for gases *entrapped in the tea bag*. This *reduces the pressure inside the tea bag* and prevents delamination of the seals[3]. While, the Noiset patent also suggests (no examples are given) the use of *discrete spots* of silicone to allow for the escape of entrapped gases in non-heat sealable tea bag paper, and, thus, reduces the internal force on the mechanical seams, the method of the Noiset patent does not indicate any improvement in the strength of the seam itself. On the other hand, the '997 patent is concerned with strengthening the mechanical seam itself so that it does not fail under the pressures that develop inside the tea bag in boiling water. Thus, the Noiset patent presents an entirely different

---

[3] The reference in Noiset to "delamination of the seals" (Noiset patent, col. 1, lines 64-65), refers to the delamination of *heat seals,* not a mechanically fastened seal.) (Noiset patent, col.5, lines 9-12).

method of dealing with the problem of seam failure (reducing internal pressure) than that given in the '997 patent (increasing seam strength). In addition, the Noiset patent specifies that coating an area as small as about 0.1% of the total surface area of each tea bag "will function effectively" in the release of gas (Noiset patent, col. 4, lines 46-49). This degree of coverage would be entirely ineffective in the method of the '997 patent, which requires 100% coverage. Therefore, I believe that the statement in my declaration is correct.

23. Defendants have also asserted that I have provided no factual basis for my statements regarding the Kelley patent (Def. Mem., at 7), particularly with respect to its *adhesive* properties being unsuited for use in a non-heat sealable tea bag paper. In fact, I make very clear in my declaration (Malcolm S/J Decl., pars. 29-34) the factual basis and reasoning for my opinions and conclusions regarding the Kelley patent, as follows:

### A. The Kelley Patent

29. The object of the Kelley patent is to provide an adhesive binder system "which is adapted to be heat sealed". (Exh. D at col.1, lines 29-35). This binder system requires *two* components: a low molecular weight component polymer (MW 150,000 - 300,000) (Exh. D at col. 2, lines 57-62), and a high molecular weight component polymers (MW 500,000 or more) including acrylic polymer (Exh. D at col.1, lines 5-11), to form a polyblend. A binder system containing only a high molecular weight component is unsatisfactory for the use described in the Kelley patent because such high molecular weight component causes the web to have "such resilience and springiness that the tension exerted along the line of bonding by the resilience of the bond apart immediately after removal of the pressure by the heated jaws or rollers of the bonding mechanism." (Exh. D at col. 1, lines 21-28). The Kelley patent does not teach any other use of such binder. Therefore, based on Kelley, a person of ordinary skill would not expect a high molecular polymer to adequately perform in a folded and crimped seal of tea bags and in fact would expect such a seal to spring open and release the tea leaves.

30. Kelley teaches that as a result of the two component polyblend binder system, the treated web becomes heat sealable and possesses the properties associated with heat sealable materials. Non-heat sealable web materials for making folded and crimped seamed tea bags and the properties associated therewith are not the concern of the Kelley patent and are thus not addressed at all.

31. A basic distinction between the Kelley patent and the invention of the '997 patent is that the claims of the '997 patent require a binder system that contains *only* a high molecular weight polymer for improving the folded and crimped seams of tea bags, whereas the Kelley patent teaches a *two* polymer binder system containing a low and high molecular weight polymers to improve an adhesive bond.

32. The Kelley patent also does not disclose or refer to the level of hydrophobicity of the binder treated paper as measured by the water climb test described in the '997 patent. In my opinion, a person of ordinary skill would understand the concept of "reasonably water resistant" in the Kelley patent to refer to the wet strength of the paper and *not* to water absorbency of the paper. (Exh. D at col. 2, line 70). A person of ordinary skill in the art would understand that wet strength and water absorbency are two distinct properties and one does not necessarily follow the other. For example, a common paper towel has wet strength and, as such, is quite water resistant. At the same time, however, the paper towel exhibits a great degree of water absorbency and would have an appreciable water climb under the water climb test. Since the Kelley patent provides no indication as to water repellency, there is no teaching or suggestion in the Kelley patent that the treatment of the paper with the two polymer polyblend binder results in a paper having water repellency, i.e. "no appreciable water climb in boiling water". A person of ordinary skill would not infer that the "water resistance" referred in the Kelley patent necessarily leads to water repellency as referred in the '997 patent.

33. In addition, the claims of the '997 patent specifically provide the measurements of the amount of the high molecular weight acrylic polymers by reciting the properties of the resulting tea bag paper in boiling water: no appreciable water climb and no substantial loss of infusion characteristics while providing less than 10 percent failure in the seam ('997 patent, claims 1 and 10). Adhesiveness is not a criterion for the purpose of the invention of the '997 patent. However, the Kelley patent requires that there must be enough of the *two* component binder to give the paper an adhesive property, which in my opinion is not suitable for the purpose of the '997 patent. (Exh. D at col.5, lines 18-21).

34. Thus, the conditions, such as the type of the materials used as a binder and the amount of such materials, under which the objectives

of the Kelley invention are achieved are not necessarily the conditions suitable for the objectives of the '997 patent. A person of ordinary skill in the art would not be able to use the teachings of the Kelley patent, to make a tea bag paper exhibiting no appreciable water climb and no substantial loss of infusion characteristics while providing less than 10 percent failure in the folded and crimped seam in boiling water.

24. It is clear from the these descriptions that the object of the Kelley patent "is to provide an *adhesive* binder system 'which is adapted to be heat sealed'" (Malcolm S/J Decl., par. 29); that "as a result of the two component polyblend binder system, the treated web becomes heat sealable and possesses the properties associated with heat sealable materials" (Malcolm S/J Decl., par. 30); that "the Kelley patent teaches a two binder system containing a low and high molecular weight polymers to improve an *adhesive* bond" (Malcolm S/J Decl., par. 31); that "there is no teaching or suggestion in the Kelley patent that the treatment of the paper with the two polymer polyblend binder results in a paper having water repellency" (Malcolm S/J Decl., par. 32); and that "the Kelley patent requires that there must be enough of the two component binder to give the paper an *adhesive* property" (Malcolm S/J Decl., par. 33).

25. A person of ordinary skill in this field would understand that the adhesive properties referred to in Kelley would not be suited for use in tea bags because the tacky nature of the paper, due to the adhesive, which may be applied in an amount from 20 to 100% by weight based on the weight of the dried fibers (Kelley patent, col. 5, lines 18-21), would make it difficult to process the paper in the manufacture of tea bags. The Kelley patent specifically states that "[b]ecause of the pressure-sensitive nature of the adhesive, various surfaces and materials to be bonded with the polyblend adhesives can be lightly sealed, tacked, or adhered without

15

resorting to heated platens by *simply pressing the adhesive-covered surfaces together*." (emphasis added). When referring to the use of this material in tea bags, Kelley describes their manufacture by placing the webs, one above the other, and then heat sealing around the periphery of the superimposed webs (Kelley patent, col 5, lines 64-69). This is not the type of tea bag manufacturing process (i.e., folding and crimping) disclosed in the '997 patent.

26. Defendants also refer to my statement regarding the water climb, infusion characteristics and seam failure properties recited in the claims of the '997 patent not being inherent from mere application of a hydrophobic agent to a tea bag paper (Def. Mem., at 14). As I stated in my declaration, "these properties provide a quantity measurement for a particular type of hydrophobic agent based on the balance between the infusion characteristics and the seam failure rate. For example, the tea bag paper would result in a substantial loss of infusion characteristics if too much hydrophobic agent is applied or would result in a higher seam failure if there were not enough hydrophobic agents on the paper." (Malcolm S/J Decl., par. 27). The logic in this statement is based on the disclosures in the '997 patent itself, which describes these particular parameters as providing the limits of hydrophobic agent to be applied to the paper. I see no disclosure in any of the prior art references that would suggest, to the contrary, that these properties are inherent in the prior art.

27. Defendants also state that my conclusions regarding the Noiset patent are not factually based (Def. Mem., at 8). They quote my conclusion that "the teachings of the Noiset patent will not necessarily lead to the invention of the '997 patent." But they do not quote my reasoning for such conclusion. My declaration

(Malcolm S/J Decl., pars. 35-43) provides the factual basis and reasoning for my conclusions regarding Noiset. These paragraphs from my declaration are quoted below:

### B. The Noiset Patent

35.  The Noiset patent is directed to the problem of seam failure in *heat sealed* tea bags. This seam failure problem results from the pressure buildup or the formation of gases inside the bag when the bag is exposed to boiling water. A film of water covers the pores in the tea bag paper and prevents the entrapped gases within the bag from escaping. (Exh. C. at Col. 1, lines 34-35).

36.  Thus, the object of the invention in the Noiset patent is to provide a means by which the entrapped gases within the heat sealed tea bag can escape without a reduction in the infusion rate of the tea bag. This is accomplished by applying silicone to discrete areas of the bag paper so that the silicone coated area will not form a water film which traps the gases and will remain open to provide a pathway for escape of entrapped gases. At the same time, the non-silicone coated area will allow water to pass through the paper so that the infusion rate will not be adversely affected. The total surface area of the tea bag paper covered by the silicone is no greater than 40%. Silicone is the only substance disclosed in the Noiset patent for this purpose. The Noiset patent explicitly teaches that 100% coverage of silicone is undesirable as such coverage causes loss of infusion characteristics. (Exh. C. at col. 4, lines 71 to col. 5, line 4). The Noiset patent says nothing about the seam failure problem associated with folded and crimped seams.

37.  In contrast, the invention disclosed and claimed in the '997 patent is directed specifically to the seam failure problem in boiling water of tea bags having folded and crimped seams. The problem arises during the brewing step when the wetting of the crimped seam due to water absorption at the seam area occurs. This wetting weakens the strength of the seam. All claims of the '997 patent require that any applicable hydrophobic agent for inhibiting water absorption thereby preventing seam failure must be applied to the entire tea bag paper, i.e., 100% of the paper area. Thus, the Noiset patent teaches away from the invention of the '997 patent by directing the application of the silicone to only a partial surface area of the web since 100% coverage reduces infusion rate.

38.  The sole reference to the application of silicone to the entire web in the Noiset patent is found in Table 1, where Noiset, having determined that only a partial surface area of the tea bag paper should be treated with silicone, describes a porosity test to ascertain an appropriate amount of silicone to be applied to the *treated* surface area. This test is performed because excessive application of silicone can result in significant reduction in porosity and limit the ability of the treated areas to act as a gas vent. A person of ordinary skill

would not consider this porosity test as a teaching of treating the entire surface area of a tea bag paper with silicone for making tea bags, as it is inconsistent with the entire teaching of the Noiset patent which requires the web material to be treated at only a partial and discrete area. It should also be noted that the paper used to run this test is in the context of a heat-seal variety. (Exh. C. at col. 4, lines 7-12 and col. 5, lines 10-44). The results of this test are therefore are not necessarily applicable to a non-heat sealable tea bag paper. There is *no* teaching or suggestion whatsoever of treating the entire web of a non-heat sealable tea bag paper, particularly, no teaching or suggestion of treating the entire web of a folded and crimped sealable tea bag paper.

39. In addition, it should be noted that the percentages of silicone given relate to concentration of silicone in the emulsion that is applied to the web and not the amount of silicone in the tea bag material itself. There is no explicit disclosure of the pick-up of silicone based on the final paper weight and thus there is no explicit disclosure of a tea bag paper in which the entire surface area has been treated in an amount of 1% or more in the paper. Not enough information is given to determine the actual percent pick-up in the examples of Table 1.

40. Nowhere in the Noiset patent did the patentee mention no appreciable water climb or no substantial loss of infusion characteristics while providing less than 10 percent seam failure in boiling water. In the '997 patent, these characteristics are associated only with a non-heat sealable tea bag paper suited for making tea bags having folded and crimped seams, as set forth in the claims of the '997 patent.

41. Nevertheless, Defendants argue that those properties associated with the non-heat sealable tea bag paper of the '997 patent would be inherent from the teaching of Table 1 of the Noiset patent. Defendants provided neither factual support nor an explanation for their assertion. Based on my 40 years experience in the paper making industry, I believe that the teachings in the Noiset patent will not necessarily lead to the invention of the '997 patent.

42. The attempt by Defendants to correlate porosity changes in the air vents (silicone coated pores) shown in Table 1 with the change of infusion characteristics in the '997 patent is unrealistic, because they are two different physical characteristics and there is no direct relationship between the two. Air porosity deals with air movement through an opening while infusion deals with the movement of dissolved materials in water through water saturated pores. The fact that the Noiset patent rejects the idea of covering the entire web with silicone, regardless of at what concentration silicone will applied, also suggests that this porosity test has nothing to do with infusion characteristics. It is relevant only to the gas release addressed in the Noiset patent.

43. I am of the opinion, therefore, that a person of ordinary

18

skill in the art, following the teaching of the Noiset patent, would not be able to make a tea bag paper as specified by the claims of the '997 patent.

28. Defendants also state that I had no prior independent knowledge to support the statement in the '997 patent that "the invention in the '997 patent resolved this seam failure problem in folded and crimped seams by treatment of a complete tea bag paper with hydrophobic material to inhibit water from penetrating into the paper and into the paper fibers of the folded and crimped seams." (Def. Mem., at 9-10). That is correct. I had no independent knowledge of this. Nor did I make any representation that I had such independent knowledge. My reference to that statement was taken from the disclosure of the '997 patent, and I have no reason to doubt the statement.

29. Finally, Defendants have asserted that the results of my studies of the '997 patent and the prior art references as they appear in the charts shown in paragraphs 52 and 53 of my declaration "places into question any sense of objectivity as to [my] entire declaration." (Def. Mem., at 13). In the charts, I made every effort to keep together those portions of the claims of the '997 patent as appeared to me to be naturally connected. Thus, where I stated in the chart in paragraph 52 that there was no teaching or suggestion of "[a] fibrous web suited for making infusion packages for brewing beverages and *exhibiting improved resistance to the failure of a mechanical seam therein*" (emphasis added), I understood the patent to be limited to a certain type of infusion package: i.e., one that "exhibits improved resistance to the failure of a mechanical seam." That is still my understanding of the invention of the '997 patent. The prior art references do not disclose such an infusion package. I also understand from counsel for Ahlstrom, that in an anticipation analysis, such as this, a prior art reference

19

must disclose each and every limitation of the claims. Therefore, the prior art reference, as I understand it, must disclose a fibrous web infusion package "that exhibits improved resistance to the failure of a mechanical seam." A fibrous web infusion package not exhibiting such a characteristic, as I understand it, would not constitute an anticipation.

      I declare under penalty of perjury that the foregoing is true and correct. Executed on January 10, 2005.

*EW Malcolm*

Earl W. Malcolm